# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

ENVIRONMENTAL DEFENSE      )
FUND                       )
                           )
            *Petitioners*, )
                           )
    v.                     )         No. 20-<u>1016</u>
                           )
FEDERAL ENERGY             )
REGULATORY COMMISSION,     )
                           )
            *Respondent*.  )
_____

## PETITION FOR REVIEW

Pursuant to Section 19(b) of the Natural Gas Act, 15 U.S.C. § 717r(b),

Federal Rule of Appellate Procedure 15, and D.C. Circuit Rule 15, Environmental

Defense Fund hereby petitions for review of the final actions of the Federal Energy

Regulatory Commission entitled Order on Rehearing, 169 FERC ¶ 61,134, issued

November 21, 2019 (attached as Exhibit A hereto), and Order Issuing Certificates,

164 FERC ¶ 61,085, issued August 3, 2018 (attached as Exhibit B hereto).

1

Respectfully submitted,

*/s/ Jason Gray*
Jason T. Gray
Duncan & Allen
1730 Rhode Island Avenue, NW
Suite 700
Washington, DC 20036
*Counsel for Environmental Defense Fund*

Erin Murphy
Natalie Karas
N. Jonathan Peress
Environmental Defense Fund
1875 Connecticut Ave. NW, Suite 600
Washington, DC 20009

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| _____ | | |
| ENVIRONMENTAL DEFENSE FUND | ) | |
| | ) | |
| | ) | |
| *Petitioners*, | ) | |
| | ) | |
| v. | ) | No. 20-<u>1016</u> |
| | ) | |
| FEDERAL ENERGY REGULATORY COMMISSION, | ) | |
| | ) | |
| *Respondent*. | ) | |

## RULE 26.1 STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, petitioners state as follows:

Environmental Defense Fund is a nonprofit organization that has not issued shares or debt securities to the public. EDF does not have any parent companies. No publicly held company has any ownership interest in EDF. EDF is dedicated to protecting public health and the environment and to conserving natural resources, guided by science and economics.

1

Respectfully submitted,

*/s/ Jason Gray*
Jason T. Gray
Duncan & Allen
1730 Rhode Island Avenue, NW
Suite 700
Washington, DC 20036
*Counsel for Environmental Defense Fund*

Erin Murphy
Natalie Karas
N. Jonathan Peress
Environmental Defense Fund
1875 Connecticut Ave. NW, Suite 600
Washington, DC 20009

20-1016

**EXHIBIT A**

169 FERC ¶ 61,134
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION


Before Commissioners:  Neil Chatterjee, Chairman;
                       Richard Glick and Bernard L. McNamee.


Spire STL Pipeline LLC                          Docket No.  CP17-40-002

ORDER ON REHEARING

(Issued November 21, 2019)

1.      On August 3, 2018, the Commission issued Spire STL Pipeline LLC (Spire STL) a certificate of public convenience and necessity under section 7(c) of the Natural Gas Act (NGA)[1] and Part 157 of the Commission's regulations[2] to construct and operate the Spire STL Pipeline Project (Spire Project) extending from an interconnection with Rockies Express Pipeline LLC (REX) in Scott County, Illinois, to interconnections with both Spire Missouri, Inc. (Spire Missouri) and Enable Mississippi River Transmission, LLC (MRT), in St. Louis County, Missouri.[3]  The Missouri Public Service Commission (Missouri PSC), MRT, the Environmental Defense Fund, and Juli Viel filed timely requests for rehearing.  This order dismisses, rejects, or denies the requests for rehearing.

I.      **Background**

2.      The Spire Project is a new pipeline system designed to provide 400,000 dekatherms per day (Dth/day) of new pipeline transmission service to markets in the St. Louis metropolitan area, eastern Missouri, and southwest Illinois.  The project includes a new 24-inch-diameter, 65-mile pipeline that will be constructed in two segments:  a 59-mile segment originating at a new interconnection with REX in Scott County, Illinois, and terminating at a new interconnection with Spire Missouri's Lange Delivery Station; and a 6-mile segment, known as the North County Extension, originating at Spire Missouri's Lange interconnection and terminating at a new bidirectional interconnection with both MRT and Spire Missouri at the Chain of Rocks

---

[1] 15 U.S.C. § 717f(c) (2018).

[2] 18 C.F.R. pt. 157 (2019).

[3] *Spire STL Pipeline LLC*, 164 FERC ¶ 61,085 (2018) (Certificate Order).

Station interconnect.  The project also includes three new aboveground meter and regulating stations, interconnection facilities, and other appurtenant facilities.

3.      Spire STL proposes to reconfigure MRT's existing Chain of Rocks Station interconnect with Spire Missouri to accommodate bidirectional interconnection flows between the Spire Project and MRT.  MRT will continue to make physical deliveries at Chain of Rocks; however, those deliveries will be received into Spire STL's facilities for redelivery to Spire Missouri, rather than directly into Spire Missouri's facilities.  In addition, the new bi-directional Chain of Rocks Station interconnect will enable Spire STL to make physical or displacement deliveries into MRT's system at Chain of Rocks, to the extent permitted by MRT.  All changes associated with the MRT Chain of Rocks Station interconnect will be performed at the sole cost of Spire STL.

4.      In the Certificate Order, the Commission agreed with the conclusions presented in the Environmental Assessment (EA) and adopted the EA's environmental conditions as modified in the order.  The Certificate Order determined that the Spire Project, if constructed and operated as described in the EA, would not significantly affect the environment and is required by the public convenience and necessity.

5.      Missouri PSC, MRT, the Environmental Defense Fund, and Ms. Viel filed timely requests for rehearing of the Certificate Order.

## II.    **Procedural Matters**

### A.      **Withdrawal of Rehearing Request**

6.      On September 9, 2019, MRT filed a notice of withdrawal of its request for rehearing.

7.      Pursuant to Rule 216 of the Commission's Rules of Practice and Procedure,[4] the withdrawal of any pleading is effective at the end of 15 days from the date of the filing, if no motion in opposition to the notice of withdrawal is filed within that period and if the Commission takes no action disallowing withdrawal.  The Commission did not receive any motions in opposition to the notice of withdrawal and we are not taking action to disallow MRT's withdrawal.  Accordingly, MRT's August 31, 2018 request for rehearing is withdrawn.

### B.      **Motion for Stay**

8.      On November 16, 2018, Ms. Viel filed a motion requesting that the Commission stay the Certificate Order and revoke the notice to proceed pending issuance of an order

---

[4] 18 C.F.R. § 385.216 (2019).

on rehearing.[5]  On November 30, 2018, Spire STL filed an answer to Ms. Viel's request for stay.  Our rules permit answers to motions; accordingly, we accept Spire STL's answer to Ms. Viel's stay motion.[6]  However, this order addresses and dismisses, rejects, or denies the requests for rehearing; as a result, we dismiss the request for stay as moot.

### C.     The Commission Appropriately Denied an Evidentiary Hearing

9.      The Environmental Defense Fund argues that the Commission must hold an evidentiary hearing to resolve substantial disputed issues.[7]  Specifically, the Environmental Defense Fund states that a hearing would resolve whether:  (1) precedent agreements with an affiliated shipper demonstrate sufficient need for the project;[8] (2) potential increased costs will harm captive customers;[9] (3) the project will cause adverse operational impacts to MRT's system;[10] and (4) the project will increase system reliability.[11]  The Environmental Defense Fund contends that where, as here, genuine issues of material fact exist and cannot be resolved on the written record, the Commission's "obligation to hold an evidentiary hearing is mandatory, not discretionary."[12]  Additionally, the Environmental Defense Fund states that the Commission may not resolve matters on a written record when there are issues over: (1) motive, intent, or credibility or (2) a disputed past event.[13]  Here, the Environmental Defense Fund claims both are present, including examples of affiliate abuse between Spire STL and Spire Missouri[14] and a dispute over Spire Missouri's decision to obtain

---

[5] Ms. Viel November 16, 2018 Request for Stay.

[6] 18 C.F.R. § 385.213(d) (2019).

[7] Environmental Defense Fund Request for Rehearing at 4-10.

[8] *Id*. at 4-5.

[9] *Id*. at 8.

[10] *Id*. at 8-9.

[11] *Id*. at 9-10.

[12] *Id*. at 4.

[13] *Id*. at 6 (citing *Union Pac. Fuel, Inc. v. FERC*, 129 F.3d 157, 164 (D.C. Cir. 1997)).

[14] *Id*. at 6-7.

service from Spire STL, but not other similar unaffiliated projects.[15]  The Environmental Defense Fund argues that the Commission's failure to hold an evidentiary hearing to address these issues is inconsistent with the requirements of due process.[16]

10.    We disagree that our denial of the Environmental Defense Fund's request for an evidentiary hearing in the Certificate Order was a denial of due process.  The purpose of the NGA section 7(c) hearing requirement is to "permit … all interested parties to be heard and therefore facilitate full presentation of the facts necessary" to the Commission's decision regarding a certificate application.[17]  An evidentiary, trial-type hearing is necessary only where there are material issues of fact in dispute that cannot be resolved on the basis of the written record.[18]  No party has raised a material issue of fact that the Commission cannot resolve on the basis of the written record.  Even when disputed facts are at issue, the Commission need not hold a trial-type hearing if the issues may be adequately resolved on the basis of the written record.[19]  As demonstrated by the discussion below, the existing written record provides a sufficient basis to resolve the issues relevant to this proceeding.  The Commission has done all that is required by giving interested parties an opportunity to participate through evidentiary submission in written form.[20]  Therefore, we will deny the request for a trial-type evidentiary hearing.

---

[15] *Id*. at 7.

[16] *Id*. at 5.

[17] *Cascade Natural Gas Corp. v. FERC*, 955 F.2d 1412, 1425 (10th Cir. 1992) (quoting *United Gas Pipe Line Co. v. McCombs*, 442 U.S. 529, 538 (1979)).

[18] *See, e.g.*, *S. Union Gas Co. v. FERC*, 840 F.2d 964, 970 (D.C. Cir. 1988); *Dominion Transmission, Inc*., 141 FERC ¶ 61,183, at P 15 (2012).

[19] *See CNG Transmission Corp. v. FERC*, 40 F.3d 1289, 1293 (D.C. Cir. 1994); *Public Util. Comm'n of Cal. v. FERC*, 24 F.3d 275, 282 (D.C. Cir. 1994); *Moreau v. FERC*, 982 F.2d 556, 568 (D.C. Cir. 1993) (*Moreau*); *Ala. Power Co. v. FERC*, 993 F.2d 1557, 1565-66 (D.C. Cir. 1993); *Citizens for Allegan Cnty, Inc. v. FPC*, 414 F.2d 1125, 1129 (D.C. Cir. 1969).

[20] *Moreau*, 982 F.2d 556 at 568.

20191121-3092 FERC PDF (Unofficial) 11/21/2019

### III.  Discussion

#### A.  The Certificate Order Complied with the Requirements of the NGA

##### 1.  The Certificate Order Complied With The Certificate Policy Statement

11.     The Environmental Defense Fund argues that the Commission violated the NGA by failing to establish that the Spire Project is required by present or future public convenience and necessity.[21]  Specifically, the Environmental Defense Fund asserts that the Commission:  (1) inappropriately relied on precedent agreements between Spire STL and its affiliate, Spire Missouri, to establish need;[22] (2) failed to find sufficient need for the project in order to prevent overbuilding;[23] (3) failed to explain how approval of the project will not impact Missouri PSC's review of utility costs;[24] (4) did not balance the impacts of the project on existing pipelines and their customers;[25] and (5) did not balance the impacts of the project on landowners and the environment.[26]

###### a.  Precedent Agreements with Affiliated Shippers Are Appropriate Indicators of Project Need

12.     The Environmental Defense Fund asserts that the Certificate Order violated the Certificate Policy Statement when it relied on a single precedent agreement between Spire STL and its affiliate to demonstrate need for the project.[27]  The Environmental Defense Fund argues that the Commission skirted its NGA section 7 duty to protect consumers by relying exclusively on an affiliate precedent agreement and failing to look

---

[21] Environmental Defense Fund Request for Rehearing at 10-15.

[22] *Id*. at 10-16.

[23] *Id*. at 19.

[24] *Id*. at 15-17.

[25] *Id*. at 17-18.

[26] *Id*. at 19-22.

[27] *Id*. at 10.

behind that sole piece of evidence based on the guise that the Commission will not second guess the business decisions of local distribution companies.[28]

13.    The Environmental Defense Fund argues that the Commission must rigorously evaluate the agreements that a pipeline makes with its affiliate.[29]  The Environmental Defense Fund states that "[t]he hallmark characteristic of arm's length bargaining is that it is negotiated rigorously, selfishly and with an adequate concern for price.  If the negotiating parties have common economic interest in the outcome of negotiations, their bargaining is not at arm's length."[30]  The Environmental Defense Fund claims that the Certificate Order directly contradicted this finding and ignored the fact that transactions between affiliates create special concerns because they can never be arms-length.[31]

14.    We disagree and affirm the Certificate Order's finding that the Commission is not required to look behind precedent agreements to evaluate project need, regardless of the affiliate status of the project shipper.[32]  The Certificate Policy Statement established a

---

[28] Environmental Defense Fund Request for Rehearing at 11 (citing *Atl. Refining Co. v. P.S.C. of N.Y.*, 360 U.S. 378, 388 (1959); *Mo. Pub. Serv. Comm'n v. FERC*, 601 F.3d 581, 583 (D.C. Cir. 2010); *Ca. Gas Producers Ass'n v. FPC*, 421 F.2d 422, 428-29 (9th Cir. 1970)).

[29] *Id*. at 11, 16.

[30] *Id*. at 13 (citing *Seaway Crude Pipeline Co., LLC*, 154 FERC ¶ 61,070, at P 93 (2010)).

[31] *Id*. at 14.

[32] Certificate Order, 164 FERC ¶ 61,085 at P 75 (citing *Millennium Pipeline Co. L.P.*, 100 FERC ¶ 61,277, at P 57 (2002) (*Millennium*) ("as long as the precedent agreements are long-term and binding, we do not distinguish between pipelines' precedent agreements with affiliates or independent marketers in establishing the market need for a proposed project").  *See Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227, at 61,748 (1999) (Certificate Policy Statement), *clarified*, 90 FERC ¶ 61,128, *further clarified*, 92 FERC ¶ 61,094 (2000) (Order Clarifying Policy Statement) (explaining that the Commission's policy is less focused on whether the contracts are with affiliated or unaffiliated shippers and more focused on whether existing ratepayers would subsidize the project); Certificate Policy Statement, 88 FERC ¶ 61,227 at 61,744 (the Commission does not look behind precedent agreements to question the individual shippers' business decisions to enter into contracts) (citing *Transcontinental Gas Pipe Line Corp*., 82 FERC ¶ 61,084, at 61,316 (1998) (*Transcontinental*)).  *See also Fla. Se. Connection, LLC*, 163 FERC ¶ 61,158, at P 23 (2018) ("The mere fact that

new policy under which the Commission would allow an applicant to rely on a variety of relevant factors to demonstrate need, rather than continuing to require that a percentage of the proposed capacity be subscribed under long-term precedent or service agreements.[33]  These factors might include, but are not limited to, precedent agreements, demand projections, potential cost savings to customers, or a comparison of projected demand with the amount of capacity currently serving the market.[34]  The Commission stated that it would consider all such evidence submitted by the applicant regarding project need.  Nonetheless, the policy statement made clear that, although companies are no longer required to submit precedent agreements for Commission review, these agreements are still significant evidence of project need or demand.[35]  As the court held in *Minisink Residents for Environmental Preservation and Safety v. FERC*,[36] the Commission may reasonably accept the market need reflected by the applicant's existing contracts with shippers.[37]  The dissent notes that *Minisink Residents* did not involve precedent agreements with affiliates; however, we find this is a distinction without a difference.  The D.C. Circuit has subsequently upheld the Commission's reliance on precedent agreements to support a finding of market need in a case that did involve affiliates, stating that "the fact that the agreements are with corporate affiliates does not render [the Commission's] decision to rely on these agreements arbitrary and

---

Florida Power & Light is an affiliate of Florida Southeast does not call into question the need for the project or otherwise diminish the showing of market support.").

[33] Certificate Policy Statement, 88 FERC ¶ 61,227 at 61,747.  As we explained in the Certificate Order, prior to the Certificate Policy Statement, the Commission required a new pipeline project to have contractual commitments for at least 25 percent of the proposed project's capacity.  The Spire Project, at 87.5 percent subscribed, would have satisfied this prior, more stringent, requirement.  Certificate Order, 164 FERC ¶ 61,085 at n.131.

[34] Certificate Policy Statement, 88 FERC ¶ 61,227 at 61,747.

[35] *Id*. at 61,747.

[36] 762 F.3d 97 (D.C. Cir. 2014) (*Minisink Residents*).

[37] *Minisink Residents*, 762 F.3d at 110 n.10; *see also Fla. Se. Connection, LLC*, 154 FERC ¶ 61,080, at P 67 n.39 (2016), *order on reh'g*, 156 FERC ¶ 61,160 (2016), *vacated sub nom. Sierra Club v. FERC*, 867 F.3d 1359 (D.C. Cir. 2017) (*Sabal Trail*) (finding that pipeline project proponent satisfied Commission's "market need" where 93 percent of the pipeline project's capacity has already been contracted).

capricious."[38]  Moreover, it is current Commission policy not to look behind precedent or service agreements to make judgments about the needs of individual shippers.[39] Likewise, *Minisink Residents* confirms that nothing in the Certificate Policy Statement, nor any precedent construing it, indicates that the Commission must look beyond the market need reflected by the applicant's contracts with shippers.[40]

15.     Affiliation with a project sponsor does not lessen a shipper's need for capacity and its contractual obligation to pay for its subscribed service.[41]  The dissent asserts that the Commission must "carefully scrutinize the record to determine whether the Spire Pipeline is actually needed or just financially advantageous to the Spire Companies."[42] "[A]s long as the precedent agreements are long term and binding, we do not distinguish between pipelines' precedent agreements with affiliates or independent marketers in establishing market need for a proposed project."[43]  We find that the relationship between Spire STL and Spire Missouri will neither lessen Spire Missouri's need for new capacity

---

[38] *Appalachian Voices v. FERC*, No. 17-1271, at 3 (D.C. Cir. Feb. 19, 2019); *see City of Oberlin, Ohio v. FERC*, 937 F.3d 599, 605 (D.C. Cir. 2019) (finding petitioners' argument that precedent agreements with affiliates are not the product of arms-length negotiations without merit, because the Commission explained that there was no evidence of self-dealing and stated that the pipeline would bear the risk of unsubscribed capacity).

[39] Certificate Policy Statement, 88 FERC at 61,744 (citing *Transcontinental*, 82 FERC ¶ 61,084 at 61,316).  *See Millennium*, 100 FERC ¶ 61,277 at P 57 ("as long as the precedent agreements are long-term and binding, we do not distinguish between pipelines' precedent agreements with affiliates or independent marketers in establishing the market need for a proposed project").

[40] *Minisink Residents*, 762 F.3d at 112 n.10.  *See also Myersville Citizens for a Rural Community, Inc. v. FERC*, 783 F.3d 1301, 1311 (D.C. Cir. 2015) (*Myersville*) (rejecting argument that precedent agreements are inadequate to demonstrate market need).

[41] *See Mountain Valley Pipeline, LLC & Equitrans, L.P.*, 161 FERC ¶ 61,043, at P 45 (2018), *order on reh'g*, 163 FERC ¶ 61,197, at P 90, *aff'd*, *Appalachian Voices v. FERC*, No. 17-1271, at 3 (D.C. Cir. Feb. 19, 2019) (*Mountain Valley*).  *See also, e.g., Greenbrier Pipeline Co., LLC*, 101 FERC ¶ 61,122, at P 59 (2002), *reh'g denied*, 103 FERC ¶ 61,024 (2003).

[42] Dissent at P 7.

[43] *Millennium*, 100 FERC ¶ 61,277 at P 57 (citing *Tex. E. Transmission Corp.*, 84 FERC ¶ 61,044 (1998).

nor diminish Spire Missouri's obligation to pay for its capacity under the terms of its contract.[44] The Commission evaluated the record and did not find evidence of impropriety or self-dealing to indicate anti-competitive behavior or affiliate abuse.[45] The Commission is not in the position to evaluate Spire Missouri's business decision to enter a contract with Spire STL for natural gas transportation, which as described below will be evaluated by the state commission.[46]

16.     As the Certificate Order explained, issues related to a utility's ability to recover costs associated with its decision to subscribe for service on the Spire Project involve matters to be determined by the relevant state utility commissions; those concerns are beyond the Commission's jurisdiction.[47] The review that the Environmental Defense Fund seeks in this proceeding,[48] looking behind the precedent agreements entered into by state-regulated utilities, would infringe upon the role of state regulators in determining the prudence of expenditures by the utilities that they regulate.[49]

17.     When considering applications for new certificates, the Commission's sole concern regarding affiliates of the pipeline as shippers is whether there may have been undue discrimination against a non-affiliate shipper.[50] We affirm the Certificate Order's determination and find that no valid allegations of undue discrimination have been made against Spire STL.[51]

---

[44] Further, without compelling record evidence, we will not speculate on the motives of a regulated entity or its affiliate.

[45] *Id*. PP 77, 83 & 86.

[46] *Id*. at P 33; *see supra* n.32,

[47] *Id*. PP 85, 87.

[48] Environmental Defense Fund Request for Rehearing at 11, 16.

[49] Certificate Order, 164 FERC ¶ 61,085 at P 75.

[50] *See* 18 C.F.R. § 284.7(b) (2019) (requiring transportation service to be provided on a non-discriminatory basis).

[51] Certificate Order, 164 FERC ¶ 61,085 at P 75; *see City of Oberlin, Ohio v. FERC*, 937 F.3d at 605-606.

18.     The Environmental Defense Fund states that the Certificate Order erred by dismissing ample record evidence of affiliate abuse.[52]  Specifically, the Environmental Defense Fund argues that the Certificate Order missed the mark when it said that its primary concern with affiliate precedent agreements was whether the company unduly discriminated against a non-affiliate.[53]  Instead, the Environmental Defense Fund contends that the Commission should perform a heightened review of local distribution company (LDC)-affiliate midstream companies, because they raise the concern "that a franchised public utility and an affiliate may be able to transact in ways that transfer benefits from captive customers of the franchised public utility to the affiliate and its shareholders."[54]

19.     A majority of the Environmental Defense Fund's arguments regarding anticompetitive behavior and discrimination involve allegations against Spire Missouri, the affiliate shipper, rather than Spire STL, the regulated pipeline company in this case.[55]  We affirm the Certificate Order's finding that Spire Missouri is not regulated by this Commission and thus we have no authority to dictate its practices for procuring services.[56]  Our jurisdiction does not extend to costs incurred by LDCs or the rates they charge to their retail customers.  State regulatory commissions are responsible for approving any expenditures by state-regulated utilities.[57]

20.     We can and do require jurisdictional pipelines proposing to construct new capacity to have an open season to ensure that any new capacity is allocated among all potential shippers on a not unduly discriminatory basis.[58]  Spire STL held an open season for

---

[52] Environmental Defense Fund's Request for Rehearing at 11-12.

[53] *Id*. at 13.

[54] *Id*. (quoting *Cross-Subsidization Restrictions on Affiliate Transactions*, Order No. 707, 122 FERC ¶ 61,155, at P 4 (2008)).

[55] Environmental Defense Fund Request for Rehearing at 12.

[56] Certificate Order, 164 FERC ¶ 61,085 at P 76.

[57] *See*, *e.g.*, *Sabal Trail*, 154 FERC ¶ 61,080 at P 67 n.39 (where the Commission rejected an argument of a protestor that the project would result in subsidization because the Florida Public Service Commission issued an order stating that shipper Florida Power & Light may pass the costs of the pipeline onto its ratepayers).

[58] *See Pine Prairie Energy Center, LLC*, 135 FERC ¶ 61,168, at P 30 (2011), *order on reh'g*, 137 FERC ¶ 61,060, at P 21 (2011).

capacity on the Spire Project, and all potential shippers had an opportunity to contract for service. Following the open season, Spire STL entered into a long-term, firm precedent agreement with Spire Missouri for 87.5 percent of the full design capacity of the project.[59] This information was publicly available in the record.[60]

21.    Finally, project rates are calculated based on design capacity; therefore, Spire STL will be at risk for unsubscribed capacity, giving it a powerful incentive to market the remaining unsubscribed capacity and serving as strong deterrent to constructing pipelines not supported by market demand.[61] In addition, to confirm the legitimacy of the financial commitments agreed to in affiliate precedent agreements, and thereby confirm the financial viability of the project, Spire STL filed a written statement affirming that it executed contracts for service at the levels provided for in the precedent agreements as required by Ordering Paragraph (E) of the Certificate Order.[62] Therefore, Spire STL's identified affiliation with Spire Missouri does not alter the basis for our finding that there is a market need for the project and the project is required by the public convenience and necessity.

**b.    The Commission Found Sufficient Need for the Spire Project To Prevent Overbuilding**

22.    The Environmental Defense Fund argues that the Certificate Order failed to address any claims of overbuilding.[63] Specifically, the Environmental Defense Fund states that the Certificate Order failed to address its contention that there is no need for the project because the Spire Project brings duplicative sources of natural gas to the St.

---

[59] *See* Certificate Order, 164 FERC ¶ 61,085 at P 10.

[60] *See Myersville*, 783 F.3d at 1311 (observing that an affidavit and motions to intervene constituted substantial evidence that pipeline was subscribed).

[61] We also note that Spire STL will be required to comply with the Commission's Part 358 Standards of Conduct, which require Spire STL to treat all customers, whether affiliated or non-affiliated, on a non-discriminatory basis. 18 C.F.R. pt. 358 (2019). Spire STL's tariff incorporates these requirements. *See* Spire STL's Application at Exhibit P-1 (Tariff).

[62] *See* Spire STL's September 24, 2018 Letter. *See also* Certificate Order, 164 FERC ¶ 61,085 at Ordering Para. (E).

[63] Environmental Defense Fund's Request for Rehearing at 19.

Louis market area from REX and the Marcellus production region.[64] The dissent also contends that we ignored evidence of: (1) lack of market demand due to flat demand in the St. Louis market area and (2) evidence that Spire Missouri could have accessed its capacity from other projects.

23.    Commission policy is to examine the merits of individual projects and assess whether each project meets the specific need demonstrated. Projections regarding future demand often change and are influenced by a variety of factors, including economic growth, the cost of natural gas, environmental regulations, and legislative and regulatory decisions by the federal government and individual states. Given this uncertainty associated with long-term demand projections, where an applicant has precedent agreements for long-term firm service, the Commission deems the precedent agreements to be the better evidence of demand. We recognize that the current load forecasts for the St. Louis market area are flat and that the capacity created by the Spire Project will enable a diversification of supply alternatives, rather than necessarily supply additional volumes of gas to serve new demand.[65] However, where, as here, it is demonstrated that a specific shipper has entered into precedent agreements for project service, the Commission places substantial reliance on those agreements to find that the capacity to be provided by the project is needed.[66]

24.    As the Certificate Order explained, Spire Missouri noted several reasons other than load growth for entering into a precedent agreement with Spire STL, including: the ability to access supplies flowing on REX with direct access to a liquid supply point in close proximity to its distribution system and away from a seismic zone; enhancing the reliability of its system; the inability of current pipelines to provide an additional 350,000 Dth/day of firm transportation service; and the planned retirement of its propane peaking facilities and replacement with pipeline capacity.[67] We find these benefits sufficient to overcome any concerns of overbuilding. Based on the record, we find no reason to second guess the business decision of this shipper given the substantial

---

[64] *Id.*

[65] Certificate Order, 164 FERC ¶ 61,085 at P 107.

[66] *See Mountain Valley*, 161 FERC ¶ 61,043 at P 42, *order on reh'g*, 163 FERC ¶ 61,197 at PP 35-44, *aff'd*, *Appalachian Voices v. FERC*, No. 17-1271 at 2.

[67] Certificate Order, 164 FERC ¶ 61,085 at P 84.

financial commitment required under executed contracts,[68] and based on this policy and Commission precedent, we find no need to do so here.[69]

### c.    The Certificate Order Does Not Impact Missouri PSC's Review

25.    The Environmental Defense Fund argues that the Commission confuses its authority to determine whether there is need for the project with Missouri PSC's authority to review Spire Missouri's business decisions.[70]  The Environmental Defense Fund further disagrees with the Certificate Order's contention that the Missouri PSC will be able to disallow recovery of some of Spire Missouri's costs.[71]  The Environmental Defense Fund argues that Missouri PSC's retrospective Annual Cost Adjustment and Purchase Gas Adjustment processes are just and reasonable processes only when the Commission regulates transportation charges passed through that mechanism.[72]  The Environmental Defense Fund states that the Certificate Order created a gap in regulation when it held that issues of inappropriate self-dealing between the pipeline and its affiliate are issues properly before this Commission, but then failed to look behind the affiliate precedent agreements by arguing that evaluation of those agreements are properly before state regulators.[73]

---

[68] *See Millennium*, 100 FERC ¶ 61,277 at P 201.  *See also Midwestern Gas Transmission Co.*, 116 FERC ¶ 61,182, at P 42 (2006); *S. Natural Gas Co.*, 76 FERC ¶ 61,122, at 61,635 (1996), *order issuing certificate and denying reh'g*, 79 FERC ¶ 61,280 (1997), *order amending certificate and denying stay and reh'g*, 85 FERC ¶ 61,134 (1998), *aff'd*, *Midcoast Interstate Transmission, Inc. v. FERC,* 198 F.3d 960 (D.C. Cir. 2000) (*Southern Natural*).

[69] *See, e.g.*, *Mountain Valley*, 161 FERC ¶ 61,043 at P 53; *Atlantic Coast Pipeline, LLC*, 161 FERC 61,042, at PP 59-60 (2017); *E. Shore Natural Gas Co.*, 132 FERC ¶ 61,204, at PP 30-33 (2010) (*Eastern Shore*); *Southern Natural*, 76 FERC ¶ 61,122 at 61,635; *Williams Natural Gas Co.*, 70 FERC ¶ 61,306, at 61,924 (1995); *Tenn. Gas Pipeline Co.*, 69 FERC ¶ 61,239, at 61,901 (1994).

[70] Environmental Defense Fund Request for Rehearing at 15-17.

[71] *Id*. at 16-17.

[72] *Id*. at 15.

[73] *Id*. at 16.

26.    The Environmental Defense Fund misunderstands the Commission's and Missouri PSC's responsibilities.  First, as discussed at length in the Certificate Order, the Commission found that the Spire Project is required by the public convenience and necessity.[74]  The Commission did not delegate or attempt to delegate its NGA section 7 authority to any other entity.  Second, the Commission evaluates whether there is any inappropriate self-dealing between a pipeline and its affiliate.  As explained above, the Commission finds that Spire STL did not engage in anticompetitive behavior or affiliate abuse.[75]  The Certificate Order delegated none of these responsibilities to the Missouri PSC.

27.    As a state regulator, Missouri PSC evaluates issues related to Spire Missouri's ability to recover costs associated with its decision to subscribe for service on the Spire Project.  Those concerns are beyond the scope of the Commission's jurisdiction.  We affirm the Certificate Order's finding that Missouri PSC's Purchased Gas Adjustment and Annual Cost Adjustment processes protect Spire Missouri's customers from imprudently incurred costs.[76]  It is for this reason that the Certificate Order concluded that any attempt by the Commission to look behind the precedent agreements in this proceeding might infringe upon the role of state regulators in determining the prudency of expenditures by the utilities that they regulate.[77]  Our finding in no way diminishes Missouri PSC's processes for protecting customers from excessive rates or imprudently incurred costs.

28.    Further, the dissent and Environmental Defense Fund gloss over the important role played by the Missouri PSC, which is responsible for setting retail rates for Spire Missouri.[78]  As discussed above, the Missouri PSC will disallow costs that are not justified according to Missouri state law after considering the interests of Missouri

---

[74] Certificate Order, 164 FERC ¶ 61,085 at PP 72-84, 107-123.

[75] *See* P 17, *supra*.  *See also* Certificate Order, 164 FERC ¶ 61,085 at P 86.

[76] Certificate Order, 164 FERC ¶ 61,085 at P 86.

[77] *Id*. P 87.

[78] The Missouri PSC's supervision of the contracts boosts their probative value. *See Guardian Pipeline, L.L.C,* 91 FERC ¶ 61,285, at 61,966-67 (2000) (citing *Southern Natural*, 76 FERC ¶ 61,122 at 61,635) ("It is also the Commission's preference not to second guess the business decisions of end users or challenge the business decision of an end user on whether it is economic to undertake direct service from a pipeline supplier, particularly when that decision has been approved by the appropriate state regulatory body.").

ratepayers, among other interests.[79]  We reiterate that matters relating to Spire Missouri's retail rates are matters for the Missouri PSC and are beyond the scope of an NGA section 7 proceeding.[80]

> ### d.     The Certificate Order Balanced the Adverse Impacts on Existing Pipelines and Their Customers

29.     The Environmental Defense Fund argues that the Certificate Order avoids any substantive analysis of whether and to what extent the Spire Project provides an economic and rate benefit to Spire Missouri's customers.[81]  The Environmental Defense Fund disagrees with the Certificate Order's finding that any adverse impacts on existing pipelines or their customers are speculative;[82] rather, the Environmental Defense Fund asserts that existing pipelines in the area will see a drop in utilization when the project commences service.[83]

30.     The Certificate Order evaluated the Spire Project's impacts on existing pipelines and their customers.  Specifically, the order found that although the Spire Project would bring up to 400,000 Dth/day of new pipeline capacity into the St. Louis area, this capacity is not meant to serve new demand because current load forecasts for the region are flat for the foreseeable future.[84]  We agree with the Environmental Defense Fund's market characterization that without new demand, existing pipelines in the area, particularly

---

[79] The Missouri PSC has the jurisdiction and authority to regulate rates and charges for the sale of natural gas to consumers within Missouri.  *See* Missouri PSC February 2, 2017 Motion to Intervene (Accession No. 20170203-5054).

[80] *See* Certificate Order, 164 FERC ¶ 61,085 at P 87 n.38 ("Issues related to Spire Missouri's ability to recover costs associated with its decision to subscribe for service on the Spire STL Pipeline Project involve matters to be determined by the relevant state utility commissions; those concerns are beyond the Commission's jurisdiction.").

[81] Environmental Defense Fund Request for Rehearing at 17-18.

[82] *Id*. at 18 (citing Certificate Order, 164 FERC ¶ 61,085 at P 115).

[83] Environmental Defense Fund's Request for Rehearing at 18.

[84] Certificate Order, 164 FERC ¶ 61,085 at P 107.

MRT,[85] will likely see a drop in utilization once supplies begin to flow on the project.[86] Namely, Spire Missouri's contracted capacity on the Spire Project will replace the transportation capacity Spire Missouri holds on MRT's system. However, as acknowledged by Spire STL, Spire Missouri, and MRT, many of Spire Missouri's contracts with MRT reached or are approaching the end of their terms.[87] The Certificate Order evaluated cost differences of gas delivered to Spire Missouri from both the Spire Project and MRT's existing system and found that the differences in costs were not materially significant.[88] The extent to which the Spire Project will provide economic and rate benefits to Spire Missouri's customers, all go to the reasonableness and prudence of Spire Missouri's decision to switch transportation providers. All of those issues fall within the scope of the business decision of a shipper. Thus, we find Spire Missouri's evaluation of its contracts appropriate and will not second guess the business decisions of an end user.

31.    We acknowledge the dissent's concern that the Spire Project will lead to unsubscribed capacity on MRT's system and adversely impact its captive customers; however, there is no showing that these impacts are a result of unfair competition.[89] The

---

[85] MRT's East Line currently delivers gas to Spire Missouri via interconnections with the Natural Gas Pipeline Company of America, LLC and Trunkline.

[86] Certificate Order, 164 FERC ¶ 61,085 at P 107.

[87] *See id*. n.155 (citing MRT's February 27, 2017 Protest at 12-14) ("Spire Missouri's largest contract still in effect with MRT, Contract No. 3310, is for 660,329 Dth per day of capacity; 437,240 Dth per day of that capacity expires on July 31, 2018. However, on June 28, 2018, Spire Missouri and MRT executed a contract for 437,240 Dth per day of transportation service from August 1, 2018 to July 31, 2019. As of November 1, 2018, Spire Missouri's remaining contracts with MRT will be for 223,089 Dth per day under Contract No. 3310, expiring in 2020; and for 75,000 Dth per day under Contract No. 3311, expiring in 2020.").

[88] *Id*. P 108.

[89] *Certification of New Interstate Natural Gas Facilities*, 163 FERC ¶ 61,042, at P 29 (2018); *Questar Pipeline Co.*, 142 FERC ¶ 61,127, at P 17 n.15 (2013) ("The Commission explained what constitutes unfair competition in cases involving an interstate pipeline's proposal to bypass a local distribution company (LDC), over the LDC's objection, to directly serve the LDC's customer." (citing *Panhandle E. Pipe Line Co.*, 64 FERC ¶ 61,211, at 61,612 (1993); *William Natural Gas Co.*, 47 FERC ¶ 61,080, at 61,225 (1989)); *Ruby Pipeline*, 128 FERC ¶ 61,224, at P 37 (2009) ("We find that Ruby's proposal is consistent with Commission policy, as any adverse impacts of the proposal on competing pipelines and their existing customers will be the result of fair

USCA Case #20-1016    Document #1825564    Filed: 01/21/2020    Page 22 of 205

Commission has an obligation to ensure fair competition and we have done so here. The Certificate Policy Statement holds that the Commission must recognize a new project's impact on existing pipelines serving the market, but this recognition "is not synonymous with protecting incumbent pipelines from the risk of loss of market share to a new entrant."[90] Therefore, we affirm the Certificate Order's finding that unless a petitioner provides evidence of anticompetitive behavior, and here petitioners have not, it is not the role of the Commission to protect pipelines from new entrants when they offer a new opportunity for a shipper.[91] Further, in these cases, the Commission has refrained from second guessing the business decisions of LDCs to achieve what they deem to be more desirable service from new suppliers,[92] and relied on the fact that state public service commissions will assure that any cost shifting effects that do occur at the state level will be allocated reasonably and in accord with state goals and policies.[93]

### e. The Commission Appropriately Balanced the Need for the Project Against Harm to Landowners and Communities

32.    The Environmental Defense Fund states that the Certificate Policy Statement requires the Commission to balance the public need for the project with the harm to landowners and the environment, and claims that if the Commission appropriately balanced these interests, it would have denied the project.[94] The Environmental Defense Fund explains that the project's impact to landowners through the taking of land by eminent domain will have a "momentous effect" on landowners.[95]

---

competition."); *Guardian Pipeline, L.L.C.*, 91 FERC ¶ 61,285, at 61,977 (2000) ("The Commission's longstanding policy has been to allow pipelines to compete for markets and to uphold the results of that competition absent a showing of anticompetitive or unfair competition.").

[90] Certificate Policy Statement, 88 FERC ¶ 61,277 at 61,748.

[91] Certificate Order, 164 FERC ¶ 61,085 at P 122.

[92] *N. Natural Gas Co.*, 74 FERC ¶ 61,172, at 61,604 (1996).

[93] *Transcontinental Gas Pipe Line Corp.*, 87 FERC ¶ 61,136, at P 61,551 (1999).

[94] Environmental Defense Fund Request for Rehearing at 19-22.

[95] *Id*. at 20.

33.     Consistent with the Certificate Policy Statement,[96] the need for and benefits derived from the Spire Project must be balanced against the adverse impacts on landowners.  Here, the Commission balanced the concerns of all interested parties and did not give undue weight to the interests of any particular party.[97]

34.     The Commission concluded that Spire had taken sufficient steps to minimize adverse economic impacts on landowners and surrounding communities.[98]  The Commission considered the amount of acres and the land uses affected by the project. The Spire Project consists of two pipeline segments, totaling approximately 65 miles of pipeline, and three aboveground meter stations.  No major aboveground facilities (e.g., compressor stations) are proposed for the project.  The Commission found that operation of the project will affect approximately 415 acres, most of which is agricultural land,[99] defined as hayfields, pastures, and crop production land (for corn and soybeans), with approximately 16 acres permanently converted to natural gas use by the operation of the meter stations.[100]  Approximately 15 percent of the pipeline route would be adjacent to existing rights-of-way, and an additional 12 percent would be parallel to, but offset from, existing rights-of-way at varying distances ranging from 30 to 90 feet.[101]

35.     The Commission considered the steps that Spire STL took to avoid unnecessary impacts on landowners.  The Commission explained that Spire STL worked to minimize impacts on landowners by:  locating the pipeline on less-developed areas to reduce the overall impact to residential areas; reduce the pipeline construction right of way width to avoid or minimize impacts on residences; compensate landowners for crop production losses in accordance with terms of individual landowner agreements, due to the loss of

---

[96] Certificate Policy Statement, 88 FERC ¶ 61,227 at 61,744.  *See also National Fuel Gas Supply Corp.*, 139 FERC ¶ 61,037, at P 12 (2012) (*National Fuel*).

[97] Certificate Order, 164 FERC ¶ 61,085 at P 117.

[98] *Id.* P 119.

[99] Approximately 80 percent of the land required for the operation of the project is agricultural land (330 acres); the project also affects forested (35 acres), open (23 acres), and developed land (11 acres), as well as less than 8 acres each of land classified as wetlands and open water.  EA at 83.

[100] Construction of the project will affect approximately an additional 589 acres of land.  *Id.*

[101] EA at 9.

one growing season as a result of pipeline construction; and working to address new and ongoing landowner and community concerns and input.[102]

36.     The Commission also relied on its policy to urge companies to reach mutual negotiated easement agreements with all private landowners prior to construction.[103] Here, the Certificate Order recognized Spire STL's commitment to make good faith efforts to negotiate with landowners for any needed rights, and to resort only when necessary to the use of the eminent domain.[104]  We are mindful as the dissent also notes, that Spire STL has been unable to reach easement agreements with many landowners; however, for purposes of our consideration under the Certificate Policy Statement, we affirm the Certificate Order's finding that Spire STL has taken sufficient steps to minimize adverse impacts on landowners and surrounding communities.[105]

37.     The Environmental Defense Fund contends that the Commission should have balanced the project's need against adverse environmental effects, such as water and Karst terrain crossings, right-of-way clearing, construction of permanent roads, and degrading water quality.[106]  The EA analyzed these issues[107] and the Commission

---

[102] Certificate Order, 164 FERC ¶ 61,085, at P 118.

[103] *See Mountain Valley*, 163 FERC ¶ 61,197 at P 49.

[104] Certificate Order, 164 FERC ¶ 61,085 at P 118. The dissent appears to suggest that the Commission should have known the extent to which Spire STL would initiate condemnation proceedings to gain the rights to private land for construction and operation of the pipeline.  Under NGA section 7(h), once a natural gas company obtains a certificate of public convenience and necessity Congress conferred the right to exercise eminent domain in a U.S. District Court or a state court.  15 U.S.C. § 717f(h) (2018).  At the time the Commission issued the Certificate Order, it had no way of knowing precisely how much land Spire STL would need to condemn for construction and operation of the pipeline and encouraged Spire STL to continue to use good faith efforts to obtain the required easements.  Moreover, the number of eminent domain proceedings does not affect our determination that Spire STL took sufficient steps to avoid unnecessary landowner impacts.  Therefore, we find that the Commission appropriately balanced the adverse impacts to landowners and the potential use of eminent domain and found that those risks were outweighed by the benefits of the project.

[105] *Id*. P 119.

[106] Environmental Defense Fund Request for Rehearing at 19-20, n.88.

[107] EA at 44-45 (discussing mitigation measures for water and karst terrain crossing that would result in no significant impact); 65 (finding that impacts on

concluded that if constructed and operated in accordance with Spire STL's application and supplements, and in compliance with the environmental conditions in the appendix to this Certificate Order, the Commission's approval of the project would not constitute a major federal action significantly affecting the quality of the human environment.[108] The Certificate Policy Statement's balancing of adverse impacts and public benefits is an economic test, not an environmental analysis.[109] Only when the benefits outweigh the adverse effects on the economic interests will the Commission proceed to consider the environmental analysis where other interests are addressed. In addition, Spire STL filed a written statement affirming that it executed contracts for service at the levels provided for in the precedent agreements as required by the Certificate Order;[110] thus ensuring avoidance of unnecessary environmental impacts.

38.    Based on the foregoing, we affirm the Certificate Order's conclusion that Spire STL demonstrated public need for Spire Project.

### 2.    The Commission Properly Accepted a 14 Percent Return on Equity

39.    On rehearing, Missouri PSC argues that the 14 percent return on equity (ROE) is unsupported by substantial evidence and will result in excessive rates.[111] Missouri PSC asserts that by setting a 14 percent ROE the Commission afforded itself more discretion than the U.S. Supreme Court allows under *Atlantic Refining Co. v. Public Service Commission of New York* (*CATCO*), because the Commission abdicated its responsibility to carefully scrutinize the pipeline's initial rates and protect consumers.[112]

---

vegetation as a result of clearing the right-of-way would not be significant); 64, 67, 70 (impacts from the construction of roads will not be significant on vegetation, fisheries and aquatics, agricultural lands and will result in some short-term and long-term impacts on wildlife); and 52 (pipeline construction will result in temporary impacts to water quality).

[108] Certificate Order, 164 FERC ¶ 61,085 at P 263.

[109] *National Fuel*, 139 FERC ¶ 61,037 at P 12.

[110] *See* Spire STL September 24, 2018 Letter; *see also* Certificate Order, 164 FERC ¶ 61,085 at ordering para. (E).

[111] Missouri PSC Request for Rehearing at 3-4.

[112] *Id*. at 4 (citing *CATCO*, 360 U.S. 378).

40.     We find that setting a 14 percent ROE in no way abdicates the Commission's responsibilities described in *CATCO*.  In *CATCO*, the Court contrasted the Commission's authority under NGA sections 4 and 5 to approve changes to existing rates using existing facilities with its authority under section 7 to approve initial rates for new services and services using new facilities.  The Court recognized "the inordinate delay" that can be associated with a full-evidentiary rate proceeding and concluded that was the reason why, unlike sections 4 and 5, NGA section 7 does not require the Commission to make a determination that an applicant's proposed initial rates are or will be just and reasonable before the Commission certificates new facilities, expansion capacity, and/or services.[113] The Court stressed that under section 7, in deciding whether proposed new facilities or services are required by the public convenience and necessity, the Commission is required to "evaluate all factors bearing on the public interest," and an applicant's proposed initial rates are not "the only factor bearing on the public convenience and necessity."[114]  Thus, as explained by the Court, "Congress, in [section] 7(e), has authorized the Commission to condition certificates in such manner as the public convenience and necessity may require when the Commission exercises authority under section 7,"[115] and the Commission therefore has the discretion in section 7 certificate proceedings to approve initial rates that will "hold the line" and "ensure that the consuming public may be protected" while awaiting adjudication of just and reasonable rates under the more time-consuming ratemaking sections of the NGA.[116]

41.     We disagree that the treatment of ROE or the resulting recourse rates in these proceedings are flawed.  Because the establishment of recourse rates is based on estimates, the Commission's general policy is to accept the pipeline's cost components if they are reasonable and are consistent with Commission policy.[117]  For new pipelines, the Commission has determined that equity returns of up to 14 percent are acceptable as long as the equity component of the capitalization is no more than 50 percent.[118]  The

---

[113] *CATCO*, 360 U.S. at 390.

[114] *Id*. at 391.

[115] *Id*.

[116] *Id*. at 392.

[117] *See Transcontinental*, 82 FERC ¶ 61,084 at 61,315; *Southern Natural*, 76 FERC ¶ 61,122 at 61,637.

[118] *See, e.g.*, *Sabal Trail*, 154 FERC ¶ 61,080 at P 117, *reh'g denied,* 156 FERC ¶ 61,160 at P 20, *aff'd in relevant part sub nom. Sierra Club v. FERC,* 867 F.3d at 1377 (finding that the Commission "adequately explained its decision to allow Sabal Trail to

Certificate Order applied the Commission's established policy, which balances both consumer and investor interests, in establishing Spire STL's initial rates. Specifically, the Commission approved Spire STL's proposed 14 percent return on equity, based on a capital structure of 50 percent equity and 50 percent debt.[119]

42.    Missouri PSC argues that the Commission's approval of Spire STL's requested 14 percent ROE is arbitrary and capricious, as the Certificate Order does not perform a discounted cash flow analysis, or any other type of analysis to establish an appropriate ROE.[120]  Missouri PSC states that without performing a discounted cash flow analysis, the Commission cannot be certain that the 14 percent ROE satisfies the public interest standard.[121]

43.    Missouri PSC cites to NGA section 4 rate proceedings as evidence of the appropriate range of reasonableness that the Commission should use in section 7 cases to determine the ROE.[122]  As we explained in the Certificate Order, an initial rate is based on estimates until we can review Spire STL's cost and revenue study at the end of its first three years of actual operation.[123]  Spire STL's proposed initial rates are an estimate, which is not supported by any operating history, of what appropriate rates for the service should be.  The actual costs associated with constructing the pipeline and providing service may increase or decrease and the revenues recovered may not closely match the projected cost of service.  Conducting a more rigorous discounted cash flow analysis in an individual certificate proceeding when other elements of the pipeline's cost of service are based on estimates would not be the most effective or efficient way to determine an appropriate ROE and would unnecessarily delay proposed projects with time sensitive in-

---

employ a hypothetical capital structure" of 50 percent debt and 50 percent equity, with a 14 percent return on equity).

[119] Certificate Order, 164 FERC ¶ 61,085 at P 126.

[120] Missouri PSC Request for Rehearing at 6-7.

[121] *Id*. at 7.

[122] Missouri PSC Request for Rehearing at 6-7 (citing *El Paso Nat. Gas Co.*, 154 FERC ¶ 61,120 (2016) and *Portland Nat. Gas Trans. Sys.*, 142 FERC ¶ 61,197 (2013)).

[123] Certificate Order, 164 FERC ¶ 61,085 at P 138.

service schedules.[124]  In an NGA section 4 or 5 proceeding, parties have the opportunity to file and examine testimony with regard to the composition of the proxy group in the use of the discounted cash flow analysis, the growth rates used in the analysis, and the pipeline's position within the zone of reasonableness with regard to risk.  It would be difficult, if not impossible, to complete this type of analysis in section 7 certificate proceedings in a timely manner.  As stated above, the Commission's current policy is an appropriate exercise of our discretion to approve initial rates under the "public interest" standard of NGA section 7.[125]  As conditioned herein, the approved initial rates will "hold the line" and "ensure that the consuming public may be protected" until just and reasonable rates are adjudicated under NGA sections 4 or 5.[126]  Here, that opportunity for review is required no later than three years after the in-service date for Spire STL's facilities.[127]

44.    Missouri PSC contends that it is arbitrary and capricious to rely on this approach when market conditions have changed and argues that the Commission must use current market data given the current low cost of capital, as the Commission has done in the electric industry.[128]  Specifically, Missouri PSC points out that Spire STL's proposed ROE is inflated relative to other investments, such as the return for electric utilities.[129] The returns approved for other utilities, such as electric utilities and LDCs are not

---

[124] *See Transcontinental Gas Pipe Line Company, LLC*, 158 FERC ¶ 61,125, at P 39 (2017).

[125] The distinction between the Commission's approach to ROE under NGA sections 4 and 5, on the one hand, and NGA section 7, on the other hand, likewise demonstrates Missouri PSC's error in relying on the Commission's action in *Ass'n of Businesses Advocating Tariff Equity v. MISO*, 156 FERC ¶ 61,234 (2016).  *See* Missouri PSC's Request for Rehearing at 10.  That case arises under FPA section 206, 16 U.S.C. § 824e (2018), which is parallel to NGA section 5, and thus requires the Commission to apply the "just and reasonable" standard.  More specifically, the utilities at issue in *Ass'n of Businesses Advocating Tariff Equity* are unlike Spire STL here; as existing transmission-owning members of the Midcontinent Independent System Operator (MISO), their cost-of-service data is not, as here, based on estimates.

[126] *CATCO*, 360 U.S. at 392.

[127] Certificate Order, 164 FERC ¶ 61,085 at PP 138, 140.

[128] Missouri PSC Request for Rehearing at 5-6, 9-10.

[129] *Id*. at 10.

relevant because there is no showing that these companies face the same level of risk as faced by greenfield projects proposed by a new natural gas pipeline company.[130]

45.    Missouri PSC alleges that the Commission's justification for its ROE based on the business risk to similarly situated pipeline companies is flawed.[131]  Missouri PSC points out that rates of return approved in recent decisions, in NGA section 4 rate cases, were well below 14 percent and that the Commission has not adequately quantified the risk associated with the Spire Project.[132]  Missouri PSC further contends that Spire STL faces less risk because it is structured on affiliate agreements and has a parent company who is not a new entrant in the natural gas industry.[133]

46.    We are not persuaded that we should reconsider Spire STL's proposed ROE.  In the case cited by Missouri PSC, *Petal Gas Storage L.L.C.* (*Petal*),[134] the Commission decided that Petal proposed a moderate risk compared to other *established* pipeline companies, not new entrants, like Spire STL.[135]  Additionally, *Petal* does not reflect the Commission's current practice in determining the ROE in section 7 certificate proceedings.[136]  In *Petal*, the Commission established a proxy group to determine the appropriate ROE.  However, our current practice for established pipelines is to use the

---

[130] The Commission has previously concluded that distribution companies are less risky than a pipeline company. *See, e.g.*, *Trailblazer Pipeline Co.*, 106 FERC ¶ 63,005, at P 94 (2004) (rejecting inclusion of local distribution companies in a proxy group because they face less risk than a pipeline company).

[131] Missouri PSC Request for Rehearing at 8.

[132] *Id*. at 8, 11-12.

[133] *Id*. at 8, 12.

[134] Missouri PSC Request for Rehearing at 8 (citing 97 FERC ¶ 61,097, *on reh'g*, 106 FERC ¶ 61,325 (2001), *vacated in part*, *Petal Gas Storage, L.L.C., v. FERC*, 496 F.3d 695, 703 (D.C. Cir. 2007) (*Petal*)).

[135] *Petal*, 106 FERC ¶ 61,325 at PP 4, 29.

[136] *Transcontinental Gas Pipe Line Company, LLC*, 156 FERC ¶ 61,092, at P 27 (2016) ("The Commission's current policy of calculating incremental rates for expansion capacity using the Commission-approved ROEs underling pipelines' existing rates is an appropriate exercise of its discretion in section 7 certificate proceedings to approve initial rates that will "hold the line" until just and reasonable rates are adjudicated under section 4 or 5 of the NGA,").

last Commission-approved ROE underlying the pipeline's existing rates until just and reasonable rates are adjudicated under NGA sections 4 or 5.

47.    Further, we do not agree with Missouri PSC's argument that we must reevaluate the ROE because Spire STL only contracted with an affiliate.  As stated above, the Commission has determined that, for new pipelines, equity returns of up to 14 percent are reasonable until such time as the ROE may be further evaluated in an NGA section 4 or 5 proceeding.[137]

48.    Finally, Missouri PSC argues that granting a 14 percent ROE to new entrants incentivizes unnecessary new pipeline construction.[138]  We disagree.  There is no evidence that this ROE will incentivize the construction of an unneeded pipeline.  As discussed, the Commission conducts a separate public needs determination and is satisfied that there is demand for the Spire Project.[139]  Moreover, the Commission requires that initial rates be designed on 100 percent of the design capacity of the project, thereby placing the risk of underutilization on the pipeline.

### B.    National Environmental Policy Act Review

#### 1.    The EA Properly Assessed the Project's Purpose and Reasonable Alternatives

49.    Section 102(C)(iii) of the National Environmental Policy Act (NEPA) requires that an agency discuss alternatives to the proposed action in an environmental document.[140]  Based on a brief statement of the purpose and need for the proposed

---

[137] *See, e.g.*, *Sabal Trail*, 154 FERC ¶ 61,080 at P 117, *reh'g denied,* 156 FERC ¶ 61,160 at P 20, *aff'd in relevant part sub nom. Sierra Club v. FERC,* 867 F.3d at 1377 (finding that the Commission "adequately explained its decision to allow Sabal Trail to employ a hypothetical capital structure" of 50 percent debt and 50 percent equity, with a 14 percent return on equity).

[138] Missouri PSC Request for Rehearing at 10.

[139] *See supra* PP 12-34.

[140] 42 U.S.C. § 4332(C)(iii) (2012).  Section 102(E) of NEPA also requires agencies "to study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." *Id.* § 4332(E).

20191121-3092 FERC PDF (Unofficial) 11/21/2019

Docket No. CP17-40-002                                                          - 26 -

action,[141] the Council on Environmental Quality's (CEQ) regulations require agencies to evaluate all reasonable alternatives, including no-action alternatives and alternatives outside the lead agency's jurisdiction.[142]  Agencies use the purpose and need statement to define the objectives of a proposed action and then to identify and consider legitimate alternatives.[143]  Guidance from CEQ explains that reasonable alternatives "include those that are practical or feasible from the technical and economic standpoint and using common sense rather than simply desirable from the standpoint of the [permit] applicant."[144]  Yet CEQ has also stated that there is "no need to disregard the applicant's purposes and needs and the common sense realities of a given situation in the development of alternatives."[145]  For eliminated alternatives, agencies must briefly discuss the reasons for the elimination.[146]  An agency's specification of the range of reasonable alternatives is entitled to deference.[147]

50.    Ms. Viel asserts that the Commission defined the Spire Project's purpose and need so narrowly that all other alternatives were ruled out by definition.[148]

51.    We disagree.  The EA did not narrowly interpret the project purpose so as to preclude consideration of other alternatives.  While an agency may not narrowly define the proposed action's purpose and need, the alternative discussion need not be

---

[141] 40 C.F.R. § 1502.13 (2019).

[142] *Id*. § 1502.14.

[143] *See Col. Envtl. Coal. v. Dombeck,* 185 F.3d 1162, 1175 (10th Cir. 1999).

[144] *Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, 46 Fed. Reg. 18,026, 18,027 (Mar. 23, 1981).

[145] *Guidance Regarding NEPA Regulations,* 48 Fed. Reg. 34,262, 34,267 (July 22, 1983).

[146] *See* 40 C.F.R. § 1502.14(a) (2019).

[147] *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991).

[148] Ms. Viel Request for Rehearing at 2-3.

exhaustive.[149]  When the purpose of the project is to accomplish one thing, "it makes no sense to consider the alternative ways by which another thing might be achieved."[150]

52.    The EA adopted Spire STL's stated project purpose[151] "to provide 400,000 dekatherms per day of year-round transportation service of natural gas to markets in the St. Louis metropolitan area, eastern Missouri, and southwest Illinois."[152]  That purpose is supported by a precedent agreement executed for 87.5 percent of the firm transportation service of the project.  Here, the EA's statement of the purpose and need was defined appropriately to allow for the evaluation of reasonable alternatives to the proposed project.  Under NEPA, the description of the purpose of and need for the project must be "reasonable," and when, as here, "an agency is asked to sanction a specific plan . . . the agency should take into account the needs and goals of the parties involved in the application."[153]  The EA satisfied these requirements.[154]

53.    Moreover, we also disagree with Ms. Viel's claim that the Commission accepted without questioning the applicant's assertion that there is a need for the project.[155]  Ms. Viel appears to conflate the Commission's acceptance of Spire STL's description of the purpose of and need for the project for the purposes of the required NEPA review with the Commission's determination of "public need" under the public convenience and necessity standard of section 7(c) of the NGA.  As discussed above, when determining "public need," the Commission balances public benefits, including market need, against project impacts to captive retail customers, existing pipelines and their customers, and

---

[149] *See State of N.C. v. FPC*, 533 F.2d 702, 707 (D.C. Cir. 1976).

[150] *City of Angoon v. Hodel*, 803 F.2d 1016, 1021 (9th Cir. 1986).

[151] *City of Grapevine, Texas v. DOT*, 17 F.3d 1502, 1506 (D.C. Cir. 1994) (upholding federal agencies' use of applicants' identified objectives as the basis for evaluating alternatives).

[152] EA at 2.

[153] *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d at 196.

[154] We note that NEPA regulations require the agency to "briefly specify" the purpose and need for the projects.  40 C.F.R. § 1502.13.

[155] Ms. Viel Request for Rehearing at 2-3.

landowners and communities.[156]  The EA appropriately explained that some issues presented by commenters about the project purpose were beyond the scope of the environmental document (i.e., harm to existing pipelines and their customers);[157] under NGA section 7(c), the final determination of the need for the projects lies with the Commission (whereas the EA is a staff document).  Neither NEPA nor the NGA requires the Commission to make its determination of whether the project is required by the public convenience and necessity before its final order.

54.     The Environmental Defense Fund and Ms. Viel state that the Commission misconstrued and misapplied NEPA by failing to appropriately evaluate a no-action alternative for the project.[158]  Petitioners assert that the no-action alternative is the most appropriate option because:  (1) there is no need for the project, (2) alleged negative non-environmental consequences of the project will be avoided; (3) consumers will not be locked into an inflexible 20 year contract underwriting Spire STL; and (4) captive retail ratepayer will not be compelled to bear the risk of inter-affiliate contracting decisions to maximize profits to an LDC owner.[159]

55.     Courts review both an agency's stated project purpose and its selection of alternatives in association with its NEPA review under the "rule of reason," where an agency must reasonably define its goals for the proposed action, and an alternative is deemed reasonable if it can feasibly achieve those goals.[160]  When an agency is tasked to decide whether to adopt a private applicant's proposal, and if so, to what degree, a reasonable range of alternatives to the proposal includes rejecting the proposal, adopting

---

[156] *See supra* PP 12-34 (affirming the Certificate Order's public needs determination).

[157] EA at 147-148.

[158] Environmental Defense Fund Request for Rehearing at 22-23; Ms. Viel Request for Rehearing at 3.

[159] Environmental Defense Fund Request for Rehearing at 22-23; Ms. Viel Request for Rehearing at 3.

[160] *See, e.g.*, *Friends of Se.'s Future v. Morrison*, 153 F.3d 1059, 1066-67 (9th Cir. 1998) (stating that while agencies are afforded "considerable discretion to define the purpose and need of a project," agencies' definitions will be evaluated under the rule of reason.).  *See also City of Alexandria v. Slater*, 198 F.3d 862, 867 (D.C. Cir. 1999); 43 C.F.R. § 46.420(b) (2019) (defining "reasonable alternatives" as those alternatives "that are technically and economically practical or feasible and meet the purpose and need of the proposed action").

the proposal, or adopting the proposal with some modification.[161] An agency may eliminate those alternatives that will not achieve a project's goals or which cannot be carried out because they are too speculative, infeasible, or impractical.[162]

56.    The EA found that taking no action would avoid adverse environmental impacts, but would fail to fulfill the objective of the proposed project.[163] The EA recognized that the project was not developed to serve new demand; rather, the purpose of the project is to increase diversity of supply sources and transportation paths to lower delivered gas costs, improve security and reliability of supply, and achieve an operationally superior peak-shaving strategy.[164] Accordingly, we affirm the EA's recommendation that adoption of the no-action alternative is not appropriate.[165]

## 2.    The Potential Increase In Greenhouse Gases Is Not An Indirect Impact of the Spire Project

57.    Ms. Viel alleges that the Certificate Order and the EA failed to account for the indirect impacts of upstream natural gas production, downstream greenhouse gas emissions, and the resulting climate change impacts from these emissions.[166] Ms. Viel claims that the project would be responsible for enabling upstream gas production and

---

[161] *See Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 72-74 (D.C. Cir. 2011).

[162] *Fuel Safe Washington v. FERC*, 389 F.3d 1313, 1323 (10th Cir. 2004) (The Commission need not analyze "the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or ... impractical or ineffective.") (quoting *All Indian Pueblo Council v. United States,* 975 F.2d 1437, 1444 (10th Cir. 1992) (internal quotation marks omitted)); *Natural Resources Defense Council, Inc. v. Morton*, 458 F.2d 827, 837-38 (D.C. Cir. 1972) (same). *See also Nat'l Wildlife Fed'n v. FERC*, 912 F.2d 1471, 1485 (D.C. Cir. 1990) (NEPA does not require detailed discussion of the environmental effects of remote and speculative alternatives).

[163] EA at 147-148.

[164] *Id*. at 147.

[165] *Id*. at 148.

[166] Ms. Viel Request for Rehearing at 3-4.

downstream gas consumption – effects that would not occur absent the Commission's issuance of a certificate for the project.[167]

58.     The Certificate Order discussed why NEPA does not require the Commission to analyze the environmental impacts from upstream natural gas development as indirect impacts.[168]  On rehearing, Ms. Viel raises no new arguments disputing the Commission's reasoning; therefore, we need not address them in detail here.  Further, Ms. Viel fails to acknowledge, much less identify error with, the Commission's analysis of either the estimated upstream or downstream impact analyses.

59.     As discussed in the Certificate Order, CEQ defines "indirect impacts" as those "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."[169]  With respect to causation, "NEPA requires a 'reasonably close causal relationship' between the environmental effect and the alleged cause" in order "to make an agency responsible for a particular effect under NEPA."[170]  As the Supreme Court explained, "a 'but for' causal relationship is insufficient [to establish cause for purposes of NEPA]."[171]  Thus, "[s]ome effects that are 'caused by' a change in the physical environment in the sense of 'but for' causation" will not fall within NEPA if the causal chain is too attenuated."[172]  Further, the Court has stated that "where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect."[173]

---

[167] *Id*. at 4.

[168] Certificate Order, 164 FERC ¶ 61,085 at PP 247-252.

[169] *Id*. P 248.

[170] *Id*. P 249 (citing *U.S. Dep't of Transp. v. Pub. Citizen,* 541 U.S. 752, at 767 (2004) (*Pub. Citizen*) (quoting *Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, at 774 (1983))).

[171] Certificate Order, 164 FERC ¶ 61,085  at P 249 (quoting *Pub. Citizen*, 541 U.S. at 767).

[172] *Id*. P 249 (quoting *Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. at 774).

[173] *Id*. P 249 (quoting *Pub. Citizen*, 541 U.S. at 770).

60.     The Certificate Order thoroughly discussed the Commission's reasons for determining that the environmental effects resulting from natural gas production are generally neither caused by a proposed pipeline nor reasonably foreseeable consequences of an infrastructure project, as contemplated by the CEQ regulations.[174]  With respect to causation, we noted that a causal relationship sufficient to warrant Commission analysis of the non-pipeline activity as an indirect impact would only exist if the proposed pipeline would transport new production from a specified production area and that production would not occur in the absence of the proposed pipeline (i.e., there will be no other way to move the gas).[175]

61.     The Certificate Order added that even accepting, *arguendo*, that a specific pipeline project will cause natural gas production, such potential impacts, including greenhouse gas emissions impacts, resulting from such production are not reasonably foreseeable.[176] Courts have found that an impact is reasonably foreseeable if it is "sufficiently likely to occur that a person of ordinary prudence would take it into account in reaching a decision."[177]  Although courts have held that NEPA requires "reasonable forecasting," an agency is not required "to engage in speculative analysis" or "to do the impractical, if not enough information is available to permit meaningful consideration."[178]

62.     The Commission generally does not have sufficient information to determine the origin of the gas that will be transported on a pipeline; states, rather than the Commission, have jurisdiction over the production of natural gas and thus would be most likely to have the information necessary to reasonably foresee future production. Moreover, there are no forecasts on record which would enable the Commission to meaningfully predict production-related impacts, many of which are highly localized.[179] Thus, we found that, even if the Commission knows the general source area of gas likely

---

[174] *See id*. PP 251-252 (explaining that upstream production impacts are not indirect impacts of the Project, as they are neither causally related nor reasonably foreseeable, as contemplated by the CEQ regulations).  *See also* EA at 143-145.

[175] *Id*. P 251.

[176] Certificate Order, 164 FERC ¶ 61,085 at  P 252.

[177] *EarthReports, Inc*. *v. FERC*, 828 F.2d 949, 955 (D.C. Cir. 2016) (citations omitted); *see also Sierra Club v. Marsh*, 976 F.2d 763, 767 (1st Cir. 1992).

[178] *N. Plains Res. Council v. Surface Transp. Board*, 668 F.3d 1067, 1078 (9th Cir. 2011).

[179] Certificate Order, 164 FERC ¶ 61,085 at P 252.

to be transported on a given pipeline, a meaningful analysis of production impacts would require more detailed information regarding the number, location, and timing of wells, roads, gathering lines, and other appurtenant facilities, as well as details about production methods, which can vary by producer and depend on the applicable regulations in the various states.[180]  Accordingly, we found that here, the impacts of natural gas production are not reasonably foreseeable because they are "so nebulous" that "we cannot forecast [their] likely effects" in the context of an environmental analysis of the impacts of a proposed interstate natural gas pipeline.[181]

63.     Notwithstanding our conclusions regarding indirect impacts, the EA for the project provided a general analysis of the potential impacts, including greenhouse gas emissions impacts, associated with natural gas consumption, based on a publicly-available U.S. Environmental Protection Agency (EPA) methodology.[182]  Contrary to Ms. Viel's assertions,[183] the EA went beyond that which is required by NEPA, and quantified the estimated downstream greenhouse gas emissions, assuming that the project always transports the maximum quantity of natural gas each day and that the full quantity of gas is used for additional consumption.[184]

64.     Finally, we affirm the Certificate Order's finding that approval of the Spire Project will not spur additional identifiable gas consumption.[185]  Ms. Viel cites to *Sierra Club v. FERC*,[186] to support the presumption that the burning of gas is not only foreseeable but is the entire purpose of the project.[187]  We disagree that this case applies here.  The court held that where it is known that the natural gas transported by a project will be used for a specific end-use combustion, the Commission should "estimate[] the amount of power-

---

[180] *Id*. P 252.

[181] *Id*. P 252.

[182] EA at 144.

[183] Ms. Viel Request for Rehearing at 4-5.

[184] EA at 144.

[185] Certificate Order, 164 FERC ¶ 61,085 at P 253.

[186] 867 F.3d 1357.

[187] Ms. Viel Request for Rehearing at 4 (citing *Sierra Club v. FERC*, 867 F.3d at 1372).

plant carbon emissions that the pipelines will make possible."[188]  However, as the Certificate Order noted, the Southeast Market Pipelines Project at issue in *Sierra Club v. FERC* is factually distinct from the Spire Project.[189]  The record in that case indicated that natural gas would be delivered to specific customers – power plants in Florida – such that the court concluded that the consuming of the gas in those plants was reasonably foreseeable and the impacts of that activity warranted environmental examination.[190]  In contrast, here, the gas to be transported by the Spire Project will be delivered by the project's sole shipper, an LDC, who will provide the gas to improve the reliability and supply diversity for its customers.  The Spire Project is not intended to meet an incremental demand for natural gas above existing levels.  As the EA explained, the Spire Project would replace, rather than add to, other fuel sources that are currently contributing greenhouse gases to the atmosphere; thus, the EA did not anticipate that the end-use emissions would represent new greenhouse gas emissions to contribute incrementally to future climate change impacts.[191]

65.     Accordingly, we deny rehearing and affirm the Certificate Order's determination that the potential increase of greenhouse gas emissions associated with the production, processing, distribution, or consumption of gas are not indirect impacts of the Spire Project.[192]

### 3.     The Commission Evaluated the Cumulative Impacts of the Spire Project

66.     Ms. Viel asserts that the Commission failed to adequately consider cumulative impacts related to climate change impacts from the pipeline and upstream natural gas

---

[188] *Sabal Trail*, 867 F.3d at 1371.  *See also Friends of Capital Crescent Trail v. FTA*, 877 F.3d 1051, 1065 (D.C. Cir. 2017) (explaining that in *Sierra Club v. FERC*, "the court invalidated an indirect effects analysis because the agency had technical and contractual information on 'how much gas the pipelines [would] transport' to specific power plants, and so could have estimated with some precision the level of greenhouse gas emissions produced by those power plants.  The court also recognized that 'in some cases quantification may not be feasible.'") (citation omitted).

[189] Certificate Order, 164 FERC ¶ 61,085 at P 253.

[190] *Sabal Trail*, 867 F.3d at 1371.

[191] EA at 145.

[192] Certificate Order, 164 FERC ¶ 61,085 at P 254.

development.[193]  Ms. Viel argues that the Commission improperly limited its cumulative impacts analysis to the geographic scope of the proposed action.

67.    The CEQ regulations define cumulative impact as "the impact on the environment that results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions."[194]  The D.C. Circuit has held that a meaningful cumulative impact analysis must identify:  (1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions – past, present, and proposed, and reasonably foreseeable – that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate.[195]  The geographic scope of our cumulative impact analysis varies from case to case, and resource to resource, depending on the facts presented.

68.     Although the scope of our cumulative impacts analysis will vary from case to case, and resource to resource, depending on the facts presented, we have concluded that where the Commission lacks meaningful information about potential future natural gas production within the geographic scope of a project-affected resource, then production-related impacts are not reasonably foreseeable so as to be included in a cumulative impacts analysis.[196]

69.    Consistent with the CEQ guidance and case law, the EA identified the criteria that defined the project's geographic scope, and used that scope in the cumulative impact analysis to describe the general area for which the project could contribute to cumulative impacts.[197]  The EA determined that the Spire Project had a geographic scope for potential cumulative impacts of:  the construction workspace for soils and geologic resources; the hydrologic unit code 12 watershed for impacts on ground and surface water resources, wetlands, vegetation, and wildlife; overlapping impacts within the area of potential effect for cultural resources; a 1-mile radius for land use impacts; 0.25-mile

---

[193] Ms. Viel Request for Rehearing at 5-6.

[194] 40 C.F.R. § 1508.7 (2019).

[195] *Sierra Club v. FERC*, 827 F.3d 36, 39 (D.C. Cir. 2016) (*Freeport LNG*) (quoting *TOMAC, Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852, 864 (D.C. Cir. 2006); *Grand Canyon Trust v. FAA*, 290 F.3d 339, 345 (D.C. Cir. 2002)).

[196] *See Algonquin Gas Transmission, LLC*, 161 FERC ¶ 61,255, at P 120 (2017).

[197] EA at 131-145.

and existing visual access points for visual resources; overlapping noise sensitive areas for operational noise impacts; 0.25 mile surrounding the pipeline or aboveground facility for construction noise impacts and air quality (0.5 mile from horizontal direction drilling or direct pipe installation); and affected counties and municipalities for socioeconomics.[198]  In total, the EA identified 14 current, proposed, or reasonably foreseeable actions within the geographic scope of the project, including four active oil/gas wells;[199] however, the EA determined that the project will contribute a negligible to minor cumulative effect and would not be significant.[200]

70.    For the same reasons explained above with respect to indirect impacts, because the impacts of upstream natural gas production are not reasonably foreseeable, such impacts were correctly excluded from the EA's cumulative impacts analysis.  As we have also explained, the Commission generally does not have sufficient information to determine the origin of the gas that will be transported on a pipeline, and that is the case here.[201] We note that Ms. Viel identifies no specific locations within the Spire Project's geographic scope where additional production will occur as a result of the Spire Project, and believe that her failure to do so only highlights the speculative nature of the inquiry she advocates.  Accordingly, we continue to believe that broadly analyzing effects related to upstream production using generalized assumptions will not assist us in making a reasoned decision regarding the siting of proposed natural gas pipelines.[202]

### 4.    The EA Evaluated Impacts of Methane Emissions

71.    On rehearing, Ms. Viel reiterates her prior claims that the EA's review of methane emissions was too narrow in concluding that methane emissions would only occur during construction, and that the Commission inaccurately identified the global warming

---

[198] *Id*. at 133, Table B-25.

[199] *Id*. at 132.

[200] *Id*. at 145.

[201] *See supra* P 57.

[202] We are not "aware of any basis that indicates the Commission is required to consider environmental effects that are outside of our NEPA analysis of the proposed action in our determination of whether a project is in the public convenience and necessity under section 7(c)." *Dominion Transmission*, 163 FERC ¶ 61,128 at P 43 (citing *NAACP v. FPC*, 425 U.S. 662, 669-70 (1976)).

20191121-3092 FERC PDF (Unofficial) 11/21/2019

potential for methane.[203]  Ms. Viel contends that the EA did not evaluate fugitive emissions from the project.[204]  Finally, Ms. Viel urges the Commission to use the global warming potential for methane from the Intergovernmental Panel on Climate Change Fifth Assessment Report, which provides a 100-year global warming potential for methane of 36 or a 20-year global warming potential for methane of 87.[205]

72.    We disagree.  On rehearing, Ms. Viel raises no new arguments disputing the Commission's reasoning, therefore we need not address them in detail.  As explained in the Certificate Order and the EA,[206] emissions of greenhouse gases are typically quantified in terms of carbon dioxide equivalents by multiplying emissions of each greenhouse gas by its respective global warming potential.  Methane emissions were included in the total estimated carbon dioxide equivalent emissions for the project.[207] Estimates of applicable emissions that would be generated during construction and operation of the project are presented in the EA, including fugitive emissions of methane.[208]  The EA's use of the global warming potential for methane designated as 25, is appropriate and specifically follows EPA guidance for methane.[209]  The use of a 100-year global warming potential for methane of 25 is the current scientific methodology used for consistence and comparability with other emissions estimates in the United States and internationally, including the EPA's Greenhouse Gas Mandatory Reporting Rule.[210]  This context would be lost if we used Ms. Viel's suggested 100-year global

---

[203] Ms. Viel Request for Rehearing at 6-7.

[204] *Id*. at 6.

[205] *Id*. at 7.

[206] Certificate Order, 164 FERC ¶ 61,085 at P 244.  EA at 111, 143-144.

[207] *See* EA at 110-111 (explaining that the EPA added greenhouse gases to its definition of pollutant and specified that those greenhouse gases include carbon dioxide, methane, nitrous oxide, hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride).

[208] *Id*. at 113, 114.

[209] Available at:  https://www.epa.gov/sites/production/files/2018-01/documents/2018_complete_report.pdf.

[210] *See* EPA Revisions to the Greenhouse Gas Reporting Rule and Final Confidentiality Determinations for New or Substantially Revised Data Elements, 78 Fed. Reg. 71,903 (Nov. 29, 2013).  *See also Texas E. Transmission*, *Lp*, 146 FERC ¶ 61,086, at P 122 (2014) (explaining that the Commission uses the global warming potentials in EPA's Greenhouse Gas Reporting Rule in effect when the NEPA document is prepared);

Docket No. CP17-40-002                                                        - 37 -

warming potential for methane of 36 or a 20-year global warming potential for methane
of 87.   Accordingly, we deny rehearing.

The Commission orders:

    (A)    The Missouri Public Service Commission's, the Environmental Defense
Fund's, and Juli Viel's requests for rehearing are dismissed or denied.

    (B)    Juli Viel's motion for stay is dismissed as moot.

    (C)    Enable Mississippi River Transmission, LLC's request for rehearing is
withdrawn.

By the Commission.  Commissioner Glick is dissenting with a separate statement
                        attached.

( S E A L )




                                Kimberly D. Bose,
                                  Secretary.

---

*Dominion Transmission, Inc.*, 158 FERC ¶ 61,029, at P 4 (2017) (applying the global
warming potential for methane from EPA's 2013 Greenhouse Gas Reporting Rule).

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Spire STL Pipeline LLC                                    Docket No. CP17-40-002

(Issued November 21, 2019)

GLICK, Commissioner, *dissenting*:

1.     I dissent from today's order because there is nothing in the record to suggest that this interstate natural gas pipeline is needed.  Prior to receiving a certificate pursuant to section 7(c) of the Natural Gas Act (NGA),[1] a pipeline developer must demonstrate a need for its proposed project.[2]  Today's order turns this requirement into a meaningless check-the-box exercise.

2.     The Commission is supposed to "consider all relevant factors reflecting on the need for the project"[3] and balance the evidence of need against the project's adverse impacts.[4]  Today's order, however, falls well short of that standard, failing utterly to provide the type of meaningful assessment of need that Commission precedent and the basic principles of reasoned decisionmaking require.  The record suggests that this project—the Spire STL Pipeline Project (Spire Pipeline)—is more likely an effort to enrich the shared corporate parent of the developer, Spire STL Pipeline LLC (Spire STL), and its only customer, Spire Missouri, Inc. (Spire Missouri), than a response to a genuine need for new energy infrastructure.  Yet today's order refuses to engage with that

---

[1] 15 U.S.C. § 717f(c) (2018).

[2] *See, e.g. Certification of New Interstate Nat. Gas Pipeline Facilities*, 88 FERC ¶ 61,227, 61,747-48 (1999) (1999 Certificate Policy Statement); *see also Spire STL Pipeline LLC*, 164 FERC ¶ 61,085, at P 26 (2018) (Certificate Order) (beginning the Commission's discussion of the 1999 Certificate Policy Statement with a discussion of the "criteria for determining whether there is a need for a proposed project"); *see also Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1309 (D.C. Cir. 2015) ("To ensure that a project will not be subsidized by existing customers, the applicant must show that there is market need for the project.").

[3] 1999 Certificate Policy Statement, 88 FERC ¶ 61,227 at 61,747.

[4] *Id.* at 61,748 ("The amount of evidence necessary to establish the need for a proposed project will depend on the potential adverse effects of the proposed project on the relevant interests.").

evidence or seriously consider the arguments against giving the Spire Pipeline the Commission's stamp of approval.  As a result, the Commission's conclusion that the Spire Pipeline is required by the public convenience and necessity is arbitrary and capricious.

*       *       *

3.     One of the foundational principles of administrative law is that an agency may not ignore an important aspect of the issue it is addressing.[5]  Especially where a statute vests an agency with a broad and flexible mandate, failing to wrestle with an important "aspect of the problem" is the essence of what it means to be arbitrary and capricious.[6]  But that is exactly what the Commission has done here.  The record is replete with evidence suggesting that the Spire Pipeline is a two-hundred-million-dollar effort to enrich Spire's corporate parent rather than a needed piece of energy infrastructure.[7]  Unfortunately, the Commission refuses to grapple with that evidence, instead insisting that a precedent agreement between two corporate affiliates is all that is required to conclude that a proposed pipeline is needed, regardless of the contrary evidence in the record.  That is not reasoned decisionmaking.  Whatever probative weight that agreement has, the Commission cannot simply point to the agreement's existence and then ignore the evidence that undermines the agreement's probative value.  In so doing, the Commission ignores arguably the most import aspect of the problem in this case:  Whether the precedent agreement on which it rests its entire determination of need actually tells us anything about the need for this pipeline.

4.     The relevant evidence is straightforward and largely undisputed.  The parties agree that demand for natural gas in the region is flat and that Spire Missouri is merely shifting

---

[5] *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (*State Farm*) (listing the "normal[]" bases for finding an agency action arbitrary and capricious, including that the agency "entirely failed to consider an important aspect of the problem"); *SecurityPoint Holdings, Inc. v. TSA*, 867 F.3d 180, 185 (D.C. Cir. 2017) ("[T]he court must vacate a decision that 'entirely failed to consider an important aspect of the problem, or offered an explanation for its decision that runs counter to the evidence before the agency.'").

[6] *Cf. Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015) (explaining that, even where a statutory "term leaves agencies with flexibility, an agency may not 'entirely fail to consider an important aspect of the problem'" (quoting *State Farm,* 463 U.S. at 43)).

[7] Certificate Order, 164 FERC ¶ 61,085, at P 9 (2018) ("Spire estimates that the cost of the proposed facilities will be approximately $220,276,167.").

its capacity subscription from an existing pipeline to a new one owned by its affiliate.[8] Indeed, some record evidence suggests that natural gas demand in the region may actually be declining.[9]  In any case, neither Spire Missouri nor Spire STL has explained why the capacity available on the pre-existing pipeline, owned by Enable Mississippi River Transmission, LLC (MRT), is not sufficient to meet Spire Missouri's needs.  In short, the record does not contain any evidence—let alone substantial evidence— suggesting a need for additional interstate natural gas pipeline capacity in the St. Louis region.

5.      If there is no need for new capacity, one might think that the project would at least reduce the cost of natural gas delivered to the region.[10]  But the Commission itself concluded that the natural gas transported through the Spire Pipeline would not be any cheaper than that transported through existing infrastructure.[11]  Nor does the record show that the Spire Pipeline would meaningfully diversify Spire Missouri's access to different sources of natural gas.  Although Spire STL claimed that the project might access new supplies, MRT convincingly explained how its existing pipeline could provide access to the same natural gas basins[12]—an explanation that today's order does not rebut.

6.      Given that evidence, it should come as no surprise that Spire Missouri repeatedly rejected opportunities to contract for capacity on proposed pipelines that were substantially similar to the Spire Pipeline.[13]  But it may be surprising that Spire Missouri

---

[8] *See Spire STL Pipeline LLC*, 169 FERC ¶ 61,135, at P 24 (2019) (Rehearing Order) ("We recognize that the current load forecasts for the St. Louis market area are flat.").

[9] *See* MRT Comments at 13-15 (Oct. 25, 2019) (discussing evidence that may indicate demand for natural gas is actually falling).

[10] *Cf. Empire Pipeline, Inc.*, 166 FERC ¶ 61,172 (2018) (Glick, Comm'r, dissenting at P 6) ("[I]f a proposed pipeline neither increases the supply of natural gas available to consumers nor decreases the price that those consumers would pay, it is hard to imagine why that pipeline would be 'needed' in the first place.").

[11] Rehearing Order, 169 FERC ¶ 61,135 at P 30 ("The Certificate Order evaluated cost differences of gas delivered to Spire Missouri from both the Spire Project and MRT's existing system and found that the differences in costs were not materially significant.").

[12] *See, e.g.*, MRT February 27, 217 Protest at 22.

[13] Certificate Order, 164 FERC ¶ 61,085 at P 57; MRT April 10, 2017 Answer at 3; *see also* Missouri PSC February 27, 2017 Protest at 10 (listing additional projects that

has now decided to enter into a contract to support the development of the Spire Pipeline, especially since Spire STL held an open season to solicit customers for the Spire Pipeline and no one but Spire Missouri signed up.[14]  Of course, there is a critical difference between the Spire Pipeline and the similar pipelines that Spire Missouri spurned:  The profits Spire STL makes off Spire Missouri's purchases of natural gas transportation service will go to their shared corporate parent, rather than an unaffiliated third party.

7.      That may make good business sense for the Spire corporate family, but that does not necessarily mean that the project is in the public interest or consistent with the public convenience and necessity.  The Spire companies' obvious financial motive coupled with the abundant record evidence casting doubt on the need for the project ought to have caused the Commission to carefully scrutinize the record to determine whether the Spire Pipeline is actually needed or just financially advantageous to the Spire companies.  Instead, the Commission asserts that the existence of the precedent agreement between Spire STL and Spire Missouri is sufficient, in and of itself, to find that the Spire Pipeline is needed, no matter the contrary evidence.[15]  But, as explained below, the Commission's failure to consider that contrary evidence renders today's order arbitrary and capricious and not the product of reasoned decisionmaking.

## I.      The Commission Failed to Adequately Consider Whether Spire Is Needed

8.      The first step in reviewing an application for an NGA section 7 certificate to develop a new, stand-alone interstate natural gas pipeline is to determine whether there is a need for that project.  A finding that a proposed pipeline is not needed would presumably mean that the project is not consistent with the public convenience and *necessity* since the project's benefits would, almost by definition, not outweigh its

---

were proposed, including projects to connect the region to the REX pipeline, but that Spire Missouri did not take service from).

[14] Certificate Order, 164 FERC ¶ 61,085 at P 10.  Spire STL asserts that it "received interest from multiple prospective shippers," but provides no evidence to substantiate that claim.  Spire STL March 17, 2017 Answer at 6; *see* Certificate Order, 164 FERC ¶ 61,085 at n.13.

[15] *See* Rehearing Order, 169 FERC ¶ 61,135 at P 14 ("We disagree and affirm the Certificate Order's finding that the Commission is not required to look behind precedent agreements to evaluate project need, regardless of the affiliate status of the project shipper").

adverse impacts.[16]  Accordingly, given the importance of the need determination, reasoned decisionmaking requires the Commission to engage in a thorough review of the record that considers all relevant evidence.

9.      In recent years, however, the Commission has adopted an increasingly doctrinaire position that the mere existence of agreements between a pipeline developer and one or more shippers to contract for capacity on the proposed pipeline is *sufficient*, by itself, to demonstrate the need for the proposed pipeline.  The Commission describes this policy as an unwillingness to "look behind" a precedent agreement.[17]  But, in practice, it amounts to a "policy" of ignoring any record evidence that might undermine its decision to issue an NGA section 7 certificate.  Applied to this proceeding, that policy is arbitrary and capricious in several respects.

10.     First and foremost, it permits the Commission to ignore the record evidence suggesting that the Spire Pipeline may not actually be needed.  As discussed above, there is ample evidence suggesting that Spire Missouri's decision to contract with Spire STL may have reflected a business decision by the Spire companies to capture the profit margin on Spire Missouri's purchase of natural gas transportation service instead of paying that margin to another company that owns an existing pipeline.[18]  In addition to that clear financial motive, Spire Missouri's pattern of behavior should have concerned the Commission.  As noted, Spire Missouri repeatedly declined to enter into precedent agreements with similar pipelines and no party other than Spire Missouri was willing to contract with Spire STL for capacity on the Spire Pipeline.[19]  Furthermore, there is no evidence that the Spire Pipeline will provide the typical benefits of a new interstate natural gas pipeline, such as satisfying new demand or reducing the price of delivered natural gas.

---

[16] *See Sierra Club v. FERC*, 867 F.3d 1357, 1379 (D.C. Cir. 2017) ("If FERC finds market need, it will then proceed to balance the benefits and harms of the project, and will grant the certificate if the former outweigh the latter.").

[17] *See, e.g.*, Rehearing Order, 169 FERC ¶ 61,135 at P 14.

[18] The Commission makes much of its refusal to question a company's business decision.  Rehearing Order, 169 FERC ¶ 61,135 at PP 15, 24, 30.  But the fact that building a new interstate pipeline may be in a particular company's business interest does not necessarily mean that it is required by the public convenience and necessity or in the public interest, which is what the Commission is actually charged with evaluating.

[19] *See supra* n.14 and accompanying text.

11.    In light of that contrary evidence, the Commission must do more than simply point to the limited evidence that it believes supports its conclusion.[20]  At the very least, it must consider and weigh the evidence that casts doubt on the probative value of the agreement between Spire Missouri and Spire STL and explain why that agreement is sufficient to establish a need for the Project notwithstanding the contrary evidence.  Simply pointing to the existence of a precedent agreement does not cut it.

12.    That is not to say that the Commission could never have shown that the Spire Pipeline is needed or that a precedent agreement, even one among affiliated companies, is irrelevant to the question of need.  But where the record raises serious questions about the probative value of the single precedent agreement, the Commission cannot rely only on the evidence that supports its preferred conclusion and ignore the evidence that undermines that finding.[21]

13.    In my view, the record in this proceeding indicates that Spire STL has not met its burden to show that the pipeline is required by the public convenience and necessity.[22]  Although a precedent agreement can serve as an important indicator of need, an agreement between two affiliates carries less weight because that agreement will not necessarily be the result of the two parties' independent business decisions or reached through arms-length negotiations.  When viewed in light of the considerable record evidence casting doubt on the need for the Spire Pipeline, I do not believe that the

---

[20] *Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018) ("[A]n agency cannot ignore evidence that undercuts its judgment; and it may not minimize such evidence without adequate explanation."); *id.* ("'Conclusory explanations for matters involving a central factual dispute where there is considerable evidence in conflict do not suffice to meet the deferential standards of our review.'"  (quoting *Int'l Union, United Mine Workers v. Mine Safety & Health Admin.*, 626 F.3d 84, 94 (D.C. Cir. 2010)); *see also Lakeland Bus Lines, Inc. v. NLRB*, 347 F.3d 955, 962 (D.C. Cir. 2003) (explaining that a court "may not find substantial evidence 'merely on the basis of evidence which in and of itself justified [the agency's conclusion], without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn'" (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).

[21] *See, e.g.*, *Genuine Parts*, 890 F.3d at 312.

[22] *See Atl. Ref. Co. v. FPC*, 316 F.2d 677, 678 (D.C. Cir. 1963) ("The burden of proving the public convenience and necessity is, of course, on the natural gas company."); see *Williams Gas Processing—Gulf Coast Co., L.P. v. FERC*, 331 F.3d 1011, 1021 (D.C. Cir. 2003) ("In a public interest analysis, the burden of proof is on the applicant for abandonment to show . . . the public convenience and necessity." (internal quotation marks omitted)).

precedent agreement between Spire Missouri and Spire STL is sufficient—on its own—to satisfy Spire STL's burden to show that the project is in the public interest and required by the public convenience and necessity. Accordingly, I would deny its application for an NGA section 7 certificate. But it is not necessary to agree my reading of the record to see why the Commission's reasoning is arbitrary and capricious. By focusing only on the presence of a precedent agreement between Spire Missouri and Spire STL and refusing to consider the evidence suggesting that the Spire Pipeline is primarily an effort to benefit the Spire corporate family, today's order fails to consider "an important aspect of the problem" and is arbitrary and capricious.[23]

14.    In addition, today's order is also arbitrary and capricious because it is an unreasonable application of the Commission's 1999 Certificate Policy Statement. As noted, the 1999 Policy Statement provides that the Commission will "consider all relevant factors reflecting on the need for the project" with no single factor being determinative.[24] Those factors "might include, but would not be limited to, precedent agreements, demand projections, potential cost savings to consumers, or a comparison of projected demand with the amount of capacity currently serving the market."[25] Contrary to the suggestion in today's order, the 1999 Certificate Policy Statement never adopted the position that the Commission would not look behind precedent agreements, at least in some circumstances. And it certainly never suggested that a single precedent agreement between affiliated entities could excuse a full review of the record, particularly where that record raised doubts about whether unaffiliated parties would have entered the same agreement.[26] Indeed, if the Commission had believed that precedent agreements were always sufficient to establish the need for a project, there would have been no need to list

---

[23] *State Farm*, 463 U.S. at 43.

[24] 1999 Certificate Policy Statement, 88 FERC ¶ 61,227 at 61,747; *see also* Rehearing Order, 169 FERC ¶ 61,135 at P 14 (summarizing the 1999 Certificate Policy Statement, including the examples of evidence that the Commission might consider).

[25] 1999 Certificate Policy Statement, 88 FERC ¶ 61,227 at 61,747.

[26] In addition, the Commission's 1999 Certificate Policy Statement explained that the amount of evidence needed to demonstrate the need for a project will vary, and, for example, "projects to serve new demand might be approved on a lesser showing of need and public benefits than those to serve markets already served by another pipeline." *Id.* at 61,748. But the approach in today's order does not allow for varying displays of need. Instead, contrary to the 1999 Certificate Policy Statement, a single binary consideration—whether or not the developer has obtained one or more precedent agreements—is the only factor that the Commission relies upon to show need. That too is inconsistent with the policy statement and arbitrary and capricious.

20191121-3092 FERC PDF (Unofficial) 11/21/2019

the other types of evidence it considers alongside precedent agreements.[27]   To the extent that the Commission relies on its 1999 Certificate Policy Statement as support for its refusal to look behind the single precedent agreement in this proceeding, its explanation is arbitrary and capricious.[28]

15.    The Commission also points to two cases from the United States Court of Appeals for the District of Columbia Circuit (D.C. Circuit) to support its exclusive reliance on the precedent agreement between Spire Missouri and Spire STL:  *Minisink Residents for Environmental. Preservation and Safety v. FERC*[29] and *Myersville Citizens for a Rural Community v. FERC*.[30]  Both cases are readily distinguishable since neither one involved a precedent agreement among affiliates.  Recognizing that fact, the Commission responds by referencing a pair of more recent D.C. Circuit decisions, which did involve precedent agreements among affiliates.[31]  But those cases are not much help to the Commission either.  All the court held in both cases was that basing a finding of need on precedent agreements among affiliates was not inherently unreasonable.[32]  Those cases certainly do

---

[27] *Id.* at 61,747.

[28] *See, e.g.*, *Cal. Pub. Utilities Comm'n v. FERC*, 879 F.3d 966, 977 (9th Cir. 2018) (finding the Commission's interpretation of its own rule to be unreasonable and arbitrary and capricious).

[29] 762 F.3d 97 (D.C. Cir. 2014).

[30] 783 F.3d 1301 (D.C. Cir. 2015).

[31] Rehearing Order, 169 FERC ¶ 61,135 at P 14.

[32] Both cases indicate that the court was rejecting the specific arguments advanced by the petitioners, not categorically blessing reliance on precedent agreements among affiliates.  *See City of Oberlin, Ohio v. FERC*, 937 F.3d 599, 605 (D.C. Cir. 2019) ("The Commission rationally explained that it fully credited Nexus's precedent agreements with affiliates because it found no evidence of self-dealing (a finding Petitioners do not dispute).");  *Appalachian Voices v. FERC*, No. 17-1271, 2019 WL 847199, at *1 (D.C. Cir. Feb. 19, 2019) ("The fact that [the pipeline's] precedent agreements are with corporate affiliates does not render FERC's decision to rely on these agreements arbitrary or capricious; the Certificate Order reasonably explained that an affiliated shipper's need for new capacity and its obligation to pay for such service under a binding contract are not lessened *just because* it is affiliated with the project sponsor. (emphasis added) (internal quotation marks omitted)).

not stand for the proposition that relying on a precedent agreement among affiliates is always reasonable or will always be a sufficient basis to find need.

16.     In addition, both cases expressly did not address the situation in which the record contained evidence of potential self-dealing or evidence that the affiliated parties may have had ulterior motives for entering the relevant precedent agreement.[33]  Here, by contrast, there is considerable evidence indicating that Spire Missouri's decision to enter into a precedent agreement with Spire STL may have been motivated more by a desire to benefit the Spire corporate family than a response to a genuine need for a new pipeline. Indeed, the principal point of this entire dissent is that the record before us suggests that it is unreasonable to rely on the Spire Missouri-Spire STL precedent agreement *because* of all the record evidence indicating that it should not be taken at face value.  The weight that the Commission places on a series of cases that, by their own measure, do not touch the circumstances before us is some of the best evidence yet that the Commission's issuance of an NGA section 7 certificate was not the product of reasoned decisionmaking.

17.     Finally, the Commission's response to the concerns raised in the various rehearing requests are themselves arbitrary and capricious.[34]  In response to the Environmental Defense Fund's (EDF) contention that it is arbitrary and capricious for the Commission to rely exclusively on a precedent agreement between affiliated entities,[35] the Commission asserts that an affiliation between the parties does not lessen the binding nature of a precedent agreement or a shipper's need for capacity.[36]  Similarly, in a variation on that theme, the Commission states that where a shipper has entered a precedent agreement with a pipeline, the Commission places substantial reliance on that agreement, even where there is no evidence of incremental demand.[37]

18.     Neither argument is a reasoned response.  The point is not that a precedent agreement among affiliates is not an actual agreement; it surely is.  Rather, the point is

---

[33] *See, e.g.*, *City of Oberlin*, 937 F.3d at 605 (noting that the petitioners did not question the Commission's finding that there had been no inappropriate self-dealing among the affiliates).

[34] *See also Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012) ("We review an agency's response to comments under the same arbitrary-and-capricious standard to which we hold the rest of its actions.").

[35] EDF Rehearing Request at 10-14.

[36] Rehearing Order, 169 FERC ¶ 61,135 at P 15.

[37] *Id.* P 23.

that the Spire companies may have had reasons other than a genuine market need for natural gas transportation capacity to enter into their precedent agreement and, therefore, that it is arbitrary and capricious to treat that agreement as conclusive evidence of need for the Spire Pipeline. Similarly, even if Spire Missouri would eventually have to pay for the capacity it reserved on the Spire Pipeline, that does not address the concern that Spire Missouri entered that agreement primarily for the purpose of benefitting its corporate parent, meaning that the agreement may not reflect a genuine need for that capacity.[38]

19.      In addition, the Commission responds by repeatedly attempting to pass the buck to the Missouri PSC using the theory that looking behind a precedent agreement would "infringe" on state regulators' prudence reviews.[39] Not so. For one thing, that is exactly the kind of review that the Missouri PSC—the entity over whose jurisdiction the Commission professes to be concerned—urged us to undertake here so that we could develop a complete picture of the need for the project.[40] Indeed, the Missouri PSC expressly argued that a precedent agreement among affiliates will not always be dispositive of need and that the Commission must "carefully review" the need for the Spire Pipeline.[41] Moreover, although the Missouri PSC has authority to conduct a prudence review of Spire Missouri's decision to take service from Spire STL rather than another pipeline,[42] that review takes the Commission-jurisdictional rates as a given and will not necessarily be able to address whether it was prudent to build the pipeline in the

---

[38] By the same token, even if the Commission is correct that precedent agreements are generally superior predictors of demand than a detailed market study, *id.*—an open question from my perspective—that statement does not explain how *this* precedent agreement is a superior indicator of need, given the record evidence calling its probative value into question.

[39] *Id.* at P 16; *see id.* P 27 & nn. 78-79.

[40] Missouri PSC February 27, 2017 Protest at 4-5 ("request[ing] the Commission thoroughly examine all of the circumstances and impacts of the proposed pipeline as the Commission determines whether Spire has shown that construction of the pipeline is in the public interest" and stating that "it is not clear that there is need for the project").

[41] *Id.* at 4-5; *see id.* at 4 ("[A] precedent agreement is not always dispositive of need.").

[42] *See Pike County Light & Power Co. v. Pennsylvania Pub. Util. Comm'n*, 465 A.2d 735 (Pa. 1983).

first place.[43]  Accordingly, the Missouri PSC's review of Spire Missouri's contracting decisions is not a substitute for the Commission's assessment of need.

20.    In any case, section 7 of the NGA makes it the Commission's responsibility to determine whether a proposed pipeline is required by the public convenience and necessity—a determination that requires the Commission to consider more than just the wholesale rates and terms under its jurisdiction.[44]  And the Commission regularly relies on factors that it cannot regulate directly when assessing the need for a proposed pipeline.[45]  Indeed, the Commission's entire argument for why the Spire Pipeline is needed rests on the prudence of Spire Missouri's decision to enter into a precedent agreement with Spire STL—a decision that, by its own admission, the Commission lacks authority to evaluate.[46]  The practical effect of the approach in today's order is that no regulatory body would ever be able to conduct a holistic assessment of the need for a proposed pipeline simply by virtue of the fact that Congress divided jurisdiction over the natural gas sector between the federal and state governments.  As I explained in my dissent from the Certificate Order, if we are really going to "abdicate this responsibility to state commissions, then Congress might as well return responsibility for the entire siting process to the states, as there would be little remaining purpose to Commission review of proposed pipelines."[47]

21.    Next, the Commission responds to EDF's argument that Spire STL and Spire Missouri may have abused their affiliate relationship to drum up a false picture of the

---

[43] *See* EDF Rehearing Request at 16-17 (explaining that the Missouri PSC's retrospective review of rates for natural gas transportation service does not consider whether the pipeline was needed in the first place).

[44] *Atl. Ref. Co. v. Pub. Serv. Comm'n of N.Y.*, 360 U.S. 378, 391 (1959) (holding that in consideration an application for a section 7 certificate, the Commission must consider "all factors bearing on the public interest").

[45] The D.C. Circuit recently explained that attempting to ignore factors relevant to the public interest because the Commission lacks authority to regulate those factors directly is a "line of reasoning [that] get the Commission nowhere."  *Birckhead v. FERC*, 925 F.3d 510, 519 (D.C. Cir. 2019).

[46] *See* Rehearing Order, 169 FERC ¶ 61,135 at P 16 ("Looking behind the precedent agreements entered into by state-regulated utilities, would infringe upon the role of state regulators in determining the prudence of expenditures by the utilities that they regulate.").

[47] Certificate Order, 164 FERC ¶ 61,085 (Glick, Comm'r, dissenting at 6).

need for the project by asserting (1) that it lacks jurisdiction to regulate Spire Missouri and (2) that it required Spire STL to conduct an open season.[48]  Both responses are beside the point.  The argument is not that the Commission should regulate Spire Missouri, but rather that Spire Missouri's conduct provides evidence that is relevant to a decision that is squarely within the Commission jurisdiction:  Whether there is a need for the Spire Pipeline.  As noted above, that Commission cannot justify ignoring that conduct simply because it lacks authority to regulate it directly.[49]   Similarly, Spire STL's open season does not indicate there was a need for the project in the first place.[50]  Indeed, the fact that Spire STL conducted an open season and only Spire Missouri entered a precedent agreement would, on its face, seem to strengthen EDF's argument, not undermine it.

22.     Lastly, in what might charitably be described as a throw-away paragraph, the Commission attempts to bolster its finding of need by pointing to some of the other purported benefits that the Spire Pipeline might provide.[51]  That paragraph cannot transform the Commission's determination into a product of reasoned decisionmaking. For one thing, it does not change the fact the Commission's position is that the precedent agreement itself is the basis for its determination of need.  In any case, the Commission recites the supposed non-capacity benefits of the project and then characterizes those issues as ones that fall within the scope of a shipper's "business decision."[52]  As best as I can tell, that phrase is intended to suggest that those other purported benefits could potentially have supported Spire Missouri's decision to enter into an agreement with Spire STL and so the Commission will not question that agreement.

23.     But the invocation of a "business decision" dredges up the same concerns regarding the precedent agreement between the two Spire companies.  Under ordinary

---

[48] Certificate Order, 164 FERC ¶ 61,085 at PP 20, 27.

[49] After all, as noted above, the Commission's entire basis for finding that the Project is needed—the prudence of Spire Missouri's decision to enter a contract with Spire STL—is a decision that the Commission, by its own admission, lacks jurisdiction to regulate.  *See* Rehearing Order, 169 FERC ¶ 61,135 at P 16.  The Commission cannot have it both ways.

[50] An open season is an important protection against concerns that a pipeline is giving a preference to an affiliated shipper over one or more unaffiliated shippers, but it does not necessarily tell us anything about need, especially when it is undersubscribed and the only entity that does subscribe is an affiliate.

[51] Rehearing Order, 169 FERC ¶ 61,135 at P 24.

[52] *Id.*; *see id.* P 30.

circumstances, deference to companies' business judgments makes sense because they presumably reflect the product of disinterested decisionmaking and/or arms-length negotiations.  Where those factors are not present, the invocation of a 'business decision' "is simply a talismanic phrase that does not advance reasoned decision making."[53] Deferring to a "business decision" is particularly problematic here because Spire Missouri has captive customers to which it will, in the ordinary course of business, pass on whatever costs it incurs taking service from Spire STL.  That means that there is little risk that the affiliates' shared corporate parent will not recover its investment in the Spire Pipeline plus a handsome rate of return.[54]  As a result, the financial risk that typically disciplines a business's judgment simply is not present in the same way.  Accordingly, although the precedent agreement is technically the result of a business decision, it does not have anywhere near the probative value of an agreement reached through an arms-length transaction with actual money seriously at risk.  The Commission, however, never wrestles with those concerns, instead simply repeating its talismanic phrase.[55]  The Commission's failure to meaningfully respond to these arguments on rehearing is yet another reason its finding that the Spire Pipeline is needed was not the product of reasoned decisionmaking.[56]

---

[53] *TransCanada Power Mktg. Ltd. v. FERC*, 811 F.3d 1, 13 (D.C. Cir. 2015) (rejecting an argument that "is simply a talismanic phrase that does not advance reasoned decision making").

[54] The Commission granted the Spire STL an initial return on equity of 14 percent. Rehearing Order, 169 FERC ¶ 61,135 at P 40.

[55] EDF Rehearing Request at 11.

[56] *See Lilliputian Sys., Inc. v. PHMSA*, 741 F.3d 1309, 1312 (D.C. Cir. 2014) ("The arbitrary and capricious standard in the Administrative Procedure Act, includes a requirement that the agency respond to relevant and 'significant' public comments." (internal citations, quotation marks, and alterations omitted)).  The Commission's failure to respond to these detailed criticisms of its decision highlights the error it made in refusing to hold a hearing to explore the significant issues of material fact regarding these considerations.  *See* EDF Rehearing Request at 4-10.  The issues raised regarding these other purported sources of need for the Spire Pipeline are exactly the type of issue for which the evidentiary record developed in a hearing would have been useful. The Commission might also then be able to point to actual evidence one way or another rather than relying on unsupported incantations of a "business decision."

## II.    The Commission Failed to Adequately Weigh the Pipeline's Benefits and Adverse Impacts

24.    Today's order is also arbitrary and capricious because the Commission failed to adequately balance the project's benefits and adverse impacts.  The Commission's 1999 Certificate Policy Statement explains that it must weigh a proposed pipeline's benefits against its adverse impacts and that it will require more evidence of benefits in response to greater adverse impacts.[57]  For example, the Commission noted that, where a project developer was unable to acquire all the land needed to build and operate the project, meaning that some degree of eminent domain would be necessary, "a showing of significant public benefit might outweigh the modest use of federal eminent domain authority."[58]

25.    Today's order does not contain any serious effort to weigh the Spire Pipeline's benefits against the adverse impacts.  The Certificate Order included a single conclusory sentence stating that the benefits outweigh the potential impacts[59] and today's order reaches the same conclusion in a similarly terse fashion.[60]  There is no effort to balance the benefits of the project against Spire STL's extensive use of eminent domain, even though that is the very example contemplated in the policy statement.[61]  It was clear when the Commission issued the underlying order that building Spire Pipeline could well require extensive use of eminent domain.[62]  And, in fact, it did:  Spire STL prosecuted

---

[57] 1999 Certificate Policy Statement, 88 FERC ¶ 61,227 at 61,748.

[58] *Id.* at 61,749.

[59] Certificate Order, 164 FERC ¶ 61,085 at P 123 ("We find that the benefits that the Spire STL Project will provide to the market, including enhanced access to diverse supply sources and the fostering of competitive alternatives, outweigh the potential adverse effects on existing shippers, other pipelines and their captive customers, and landowners or surrounding communities.").

[60] *See, e.g.*, Rehearing Order, 169 FERC ¶ 61,135 at P 24 ("We find the[ stated] benefits sufficient to overcome any concerns of overbuilding.")

[61] 1999 Certificate Policy Statement, 88 FERC ¶ 61,227 at 61,749 ("The strength of the benefit showing will need to be proportional to the applicant's proposed exercise of eminent domain procedures.").

[62] Certificate Order, 164 FERC ¶ 61,085 at P 119 (noting that Spire has yet to "finalize easement agreements with affected landowners for most of the land required for the project").

eminent domain actions against over 100 distinct entities and involving well over 200 acres of privately owned land.[63]  For comparison, the Environmental Assessment (EA) estimated that the entire 65-mile project would affect roughly 400 acres in the course of its permanent operations.[64]  All told, it appears that Spire prosecuted condemnation proceedings against roughly 40 percent of the relevant landowners in Missouri and 30 percent of the relevant landowners in Illinois.[65]  It should go without saying that such extensive use of eminent domain has a considerable effect on landowners and surrounding communities.  The Commission, however, made no effort to weigh the harm caused by the then-likely, and now actual, use of extensive eminent domain or explain why the benefits of the Spire Pipeline outweighed those potential adverse impacts.  Instead, the Commission notes that it encouraged Spire STL to work with landowners to secure the necessary rights of way and that it believes that Spire STL "took sufficient

---

[63] Spire STL brought condemnation actions against roughly 180 acres of land in Missouri, *see* Docket, *Spire STL Pipeline LLC v. 3.31 Acres of Land,* No. 4:2018-CV-1327 (RWS) (DDN) (E.D. Mo.) (listing consolidated condemnation actions against roughly 150 acres of land); *Spire STL Pipeline LLC v. 3.31 Acres of Land*, No. 4:2018-CV-1327 (RWS) (DDN), 2018 WL 6528667, at *1 (E.D. Mo. Dec. 12, 2018) (granting Spire STL's motion to condemn the land in the consolidated actions); Memorandum Supporting Second Motion for a Preliminary Injunction, No. 2018-cv-1327 (Feb. 8, 2019), Exh. A (describing an additional roughly 30 acres of land that Spire STL sought to condemn); *Spire STL Pipeline LLC v. 3.31 Acres of Land*, No. 4:2018-CV-1327 (RWS) (DDN), 2019 WL 1232026, at *1 (E.D. Mo. Mar. 15, 2019) (granting Spire STL's second motion), and roughly 80 acres in Illinois, *see* Verified Complaint for Condemnation of Pipeline Easements, No. 3:18-CV-1502 (NJR) (SCW) (S.D. Ill. Aug. 15, 2018) (listing consolidated condemnation actions against roughly 80 acres); *Spire STL Pipeline, LLC v. Turman*, No. 3:18-CV-1502 (NJR) (SCW), 2018 WL 6523087, (S.D. Ill. Dec. 12, 2018) (granting Spire STL's motion).

[64] Rehearing Order, 169 FERC ¶ 61,135 at P 34.

[65] *Spire STL Pipeline LLC v. 3.31 Acres of Land*, No. 4:2018-CV-1327 (RWS) (DDN), 2018 WL 7020807, at *4 (E.D. Mo. Nov. 26, 2018), *report and recommendation adopted as modified*, No. 4:2018-CV-1327 (RWS) (DDN), 2018 WL 6528667 (E.D. Mo. Dec. 12, 2018) (stating that Spire STL was able to reach agreements with roughly 60 percent of the relevant landowners before beginning condemnation proceedings); *Spire STL Pipeline, LLC v. Turman*, 2018 WL 6523087, at *2 (stating that Spire STL was able to reach agreements with roughly 70 percent of the relevant landowners before beginning condemnation proceedings).

steps to avoid unnecessary landowner impacts."[66] But those statements relate to how Spire STL acted with the authority it had, not whether it was appropriate to give it eminent domain authority in the first place.[67] The failure to consider the adverse impacts caused by eminent domain is an arbitrary and capricious unexplained departure from the balancing required by the 1999 Certificate Policy Statement.[68]

26.     In addition, the Commission's limited discussion of many of the Spire Pipeline's adverse impacts was itself not the product of reasoned decisionmaking. Most importantly, today's order gives short shrift to the record evidence indicating that the Spire Pipeline will cause a substantial increase in the rates for MRT's remaining customers. If the development of a new pipeline will cause certain customers to pay higher rates—because, for example, they must now bear a higher share of an existing pipeline's fixed costs—those rate impacts are something the Commission must consider when evaluating whether the pipeline is consistent with the public interest.[69] That is

---

[66] Rehearing Order, 169 FERC ¶ 61,135 at n.104.

[67] The Commission responds by noting that, "[u]nder NGA section 7(h), once a natural gas company obtains a certificate of public convenience and necessity it may exercise the right of eminent domain in a U.S. District Court or a state court." *Id.* That is exactly the point. Because a section 7 certificate comes with eminent domain authority that the Commission cannot circumscribe, we must seriously consider whether conveying eminent domain authority is consistent with the public interest *before* issuing a section 7 certificate. Exhortations to work with landowners are no substitute for considering whether the pipeline should be built in the first place.

[68] *ABM Onsite Servs.-W., Inc. v. Nat'l Labor Relations Bd.*, 849 F.3d 1137, 1142 (D.C. Cir. 2017) ("Because an agency's unexplained departure from precedent is arbitrary and capricious, we must vacate the Board's order."); *Nat'l Treasury Employees Union v. Fed. Labor Relations Auth.*, 404 F.3d 454, 457 (D.C. Cir. 2005) ("[A]ny agency's 'unexplained departure from prior agency determinations' is inherently arbitrary and capricious in violation of [the Administrative Procedure Act].").

[69] 1999 Certificate Policy Statement, 88 FERC 61,227 at 61,748 ("The interests of the existing pipeline's captive customers are slightly different from the interests of the pipeline. The interests of the captive customers of the existing pipelines are affected because, under the Commission's current rate model, they can be asked to pay for the unsubscribed capacity in their rates."); *Atl. Ref. Co.*, 360 U.S. at 391 (holding that the NGA requires the Commission to consider "all factors bearing on the public interest").

particularly so here because the pre-existing pipelines in the region had *already* filed with the Commission to substantially increase their rates because of the Spire Pipeline.[70]

27.     Although the Commission "acknowledge[s]" this concern,[71] it refuses to do anything about it.  Instead, the Commission notes that any adverse impacts are the result of Spire's business decisions and that the Commission's review of adverse impacts "is not synonymous with protecting incumbent pipelines from the risk of loss of market share to a new entrant."[72]  That misses the point.  As an initial matter, the fact that adverse impacts are the result of business decisions does not excuse the Commission from adequately considering those impacts.  As noted, our responsibility is to evaluate whether a proposed project is required by the public convenience and necessity; not whether it is the result of business decisions (as it typically will be).[73]  Similarly, although the Commission is not in the business of protecting existing pipelines from competition, we are very much in the business of protecting customers[74]—a task that we cannot accomplish if we refuse to consider the impact of a new pipeline on existing

---

[70] *See* MRT Transmittal Letter, Docket No. RP18-923-00, at 3-4 (June 29, 2018) (proposing a rate increase primarily due to the decision by Spire Missouri to shift its capacity reservations to the Spire Pipeline); MoGas Transmittal Letter, Docket No. RP18-877-000, at 2 (May 31, 2018) (explaining that a rate discount for Spire Missouri was one of the principal causes of its proposed rate increase); MoGas Answer, Docket No. RP18-877-000, at 4-5 (June 18, 2018) (explaining that MoGas was forced to offer Spire Missouri the discounted rate because of the Spire Pipeline); *see also Spire STL Pipeline LLC*, 169 FERC ¶ 61,074 (2019) (Glick, Comm'r, dissenting at P 2) ("Three major pipelines serving the region have proposed significant rate increases that are all due, at least in part, to the Spire Pipeline.")

[71] Rehearing Order, 169 FERC ¶ 61,135 at P 31.

[72] *Id.*

[73] In addition, even if this type of "business decision" test is often the appropriate standard of review, the evidence suggesting that Spire Missouri's agreement with Spire STL may not have been an arms-length or disinterested business decision should have caused the Commission to pause before relying on that standard to brush aside the Spire Pipeline's impact on existing ratepayers.  *See supra* P 23.

[74] *See, e.g.*, *City of Chicago, Ill. v. FPC*, 458 F.2d 731, 751 (D.C. Cir. 1971) ("the primary purpose of the Natural Gas Act is to protect consumers." (citing, *inter alia*, *City of Detroit v. FPC*, 230 F.2d 810, 815 (1955)).

customers.[75]  When the record indicates that building a new pipeline will harm existing customers, as it does here,[76] the Commission must carefully consider that evidence and weigh it against the purported benefits of the pipeline.  Refusing to do so by framing any such inquiry as amounting to the protection of an incumbent pipeline ignores one of the Commission's fundamental responsibilities under the NGA and is arbitrary and capricious.[77]

28.     All told, the Commission failed to seriously weigh the meager evidence of the need for the pipeline against the harms caused by its construction, including the harms to ratepayers, landowners and communities (e.g., through eminent domain), and the environment.[78]  As noted, the Commission's 1999 Certificate Policy Statement explains that "[t]he amount of evidence necessary to establish the need for a proposed project will depend on the potential adverse effects of the proposed project on the relevant

---

[75] It appears that the Commission would prefer to limit its inquiry only to those impacts that it deems to be the result of "unfair" competition, however that is defined, *see* Rehearing Order, 169 FERC ¶ 61,135 at P 31.  But nothing in the 1999 Certificate Policy Statement or the concept of the public interest generally supports taking such a blindered review of the impact on existing customers.  1999 Certificate Policy Statement, 88 FERC ¶ 61,227 at 61,748 ("The interests of the existing pipeline's captive customers are slightly different from the interests of the pipeline. The interests of the captive customers of the existing pipelines are affected because, under the Commission's current rate model, they can be asked to pay for the unsubscribed capacity in their rates.").

[76] *See supra* note 70.

[77] In addition, the Commission suggests that any adverse impacts on existing customers is a matter to be resolved under the Missouri PSC's jurisdiction.  Rehearing Order, 169 FERC ¶ 61,135 at P 31.  Once again though, the Missouri PSC disagrees, urging the Commission to consider these adverse impacts when assessing the public interest and not leave it to the state to triage the harm caused by a pipeline that was not in the public interest in the first place.  Missouri PSC Protest at 9-10.

[78] The Commission notes that the Environmental Assessment performed in this proceeding found that the Spire Pipeline would not significantly affect the human environment.  Rehearing Order, 169 FERC ¶ 61,135 at P 4.  But the fact that those adverse impacts may not have required the preparation of the Environmental Impact Statement does mean that they should go unmentioned in the Commission's public interest analysis.  As EDF noted, the project could potentially have a variety of adverse impacts including through "water and Karst terrain crossings, right-of-way clearing, construction of permanent roads, and degrading water quality."  EDF Rehearing Request n.88 and accompanying text.

interests."[79]  It follows from that proposition that, where the evidence of need is extremely limited, as it is here, the Commission must carefully scrutinize the adverse impacts to ensure that they do not actually outweigh the need for the project and whatever benefits it might provide.  Nothing in today's order indicates that the Commission conducted that careful assessment or considered the strength of Spire STL's demonstration of need when assessing whether the Spire Pipeline's benefits outweigh its adverse impacts, as required by the 1999 Certificate Policy Statement.  For that reason too, today's order is arbitrary and capricious.

## III.    The Commission's Consideration of the Spire Pipeline's GHGs Emissions

29.    Today's order rehashes many of the Commission's usual reasons for refusing to give the greenhouse gas (GHG) emissions caused by a new natural gas pipeline the 'hard look' that the law demands.  But, for once, the stakes of the Commission's GHG analysis are relatively low.  Unlike most other natural gas infrastructure projects that come before the Commission—which are usually designed to facilitate a sizeable increase in natural gas production or consumption and can sometimes produce considerable direct emissions themselves—the EA concludes that there is little chance that the Spire Pipeline will cause a considerable increase in GHG emissions.[80]

30.    That makes sense.  After all, as noted, there is no additional demand for natural gas in the region and there is no evidence that the Spire Pipeline will reduce the cost of natural gas in the region, which could spur production or consumption of natural gas even without an increase in demand.  Under those circumstances, the Commission's estimate that the project will cause roughly 15,000 tons of GHG emissions per year during construction and roughly 10,000 tons per year after that both seems reasonable and suggests that is unlikely to significantly contribute to climate change.[81]  But although that may be good news for the climate, it only underscores my concerns about whether the project is needed in the first place.

## IV.    The Commission Has Been Fundamentally Unfair to the Litigants

31.    Finally, I would be remiss in failing to mention the profound unfairness of how the Commission has handled the rehearing requests and the motion for stay filed by Juli Viel.

---

[79] 1999 Certificate Policy Statement, 88 FERC ¶ 61,227 at 61,748.

[80] EA at 144 ("[W]e do not anticipate that the end-use would represent new GHG emissions.").

[81] EA Tables B-16 & B-17.

The Commission issued its certificate order via a 3-2 vote on August 3, 2018.[82]  Four rehearing requests were filed by early September.  Ms. Viel subsequently requested a stay pending the Commission's decision on rehearing.[83] The Commission is finally acting on those requests today, nearly 15 months[84] after they were filed and more than a year after the Commission granted Spire's request to begin construction of the pipeline.[85]

32.     While rehearing was pending—and before any party had an opportunity to challenge the Commission's decision in court—Spire disturbed what it the Certificate Order estimated to be over 1,000 acres of land and brought eminent domain proceedings against over 100 distinct entities.[86]  Indeed, as noted, Spire successfully prosecuted eminent domain proceedings involving well over roughly 200 acres of privately owned land—a number equivalent to more than half of total number of acres needed to permanently operate the pipeline.[87]  Those eminent domain proceedings all took place when the Commission's order was "final enough for [the pipeline] to prevail in an eminent domain action," but "non-final" for the purposes of judicial review.[88]

33.     That is fundamentally unfair.  Although the rehearing requests in this proceeding were not filed by landowners fighting eminent domain, as they were in *Allegheny Defense Project*, and therefore do not implicate identical due process concerns to those at

---

[82] Certificate Order, 164 FERC ¶ 61,085.

[83] *See* Juli Viel Motion for Stay (Nov. 16, 2018).  Ms. Veil's motion requested a stay only until the Commission acted on rehearing.  The Commission denies the stay request not on the merits, but only on the basis that it has become moot after the Commission finally ruled on the merits of the rehearing requests, 11 months later.

[84] During that time, one of the parties, MRT, withdrew its rehearing request after it had sat at the Commission for over a year.  Rehearing Order, 169 FERC ¶ 61,135 at P 6.

[85] Spire STL requested authorization to commence construction on November 1 and the Commission granted it two business days later on November 5th.  *Compare* Spire STL Request for Notice to Proceed (Nov. 1, 2018) *with* Delegated Letter Order re: Notice to Proceed with Construction (Nov. 5, 2018).

[86] Certificate Order, 164 FERC ¶ 61,085 at P 117 & n.212; *supra* note 64.

[87] *See supra* note 64.

[88] *Allegheny Def. Project v. FERC*, 932 F.3d 940, 949 (2019) (D.C. Cir. 2019) (Millett, J., concurring).

issue in that case,[89] good government is about more than meeting the absolute minimum of constitutional due process. In this proceeding, several parties were stuck in limbo, unable to even seek judicial relief, while Spire STL seized land and proceeded to build the pipeline. A regulatory construct that allows a pipeline developer to build its entire project while simultaneously preventing opponents of that pipeline from having their day in court ensures that irreparable harm will occur before any party has access to judicial relief.[90] That ought to keep every member of this Commission up at night. Under those circumstances, dismissing as moot Ms. Viel's year-old request for a stay pending rehearing because the Commission finally issued an order on rehearing[91] is a level of bureaucratic indifference that I find hard to stomach.

34.    The Commission can and should do better. After all, there were plenty of options available for the Commission to act before irreparable harm occurred. For example, it could have stayed the project pending its decision on rehearing, either on its motion or by granting Ms. Veil's request. Alternatively, the Commission could have taken "the easiest path of all" by simply denying the rehearing requests by not issuing its standard tolling order.[92] Either approach would have given the parties an opportunity to pursue their day in court before Spire STL built the project. Instead, by relying on what Judge Millett correctly described as "twisted . . . precedent" and a "Kafkaesque regime,"[93] the Commission has guaranteed substantial irreparable harm occurs before any party can even set foot in court.

For these reasons, I respectfully dissent.

_____

Richard Glick
Commissioner

_____

[89] *Id.* at 953-54 (Millett, J., concurring).

[90] *Id.* at 954 (Millett, J., concurring) (citing *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987) and *National Wildlife Fed'n v. Burford*, 835 F.2d 305, 323-325 (D.C. Cir. 1987)).

[91] Rehearing Order, 169 FERC ¶ 61,135 at P 8.

[92] *Allegheny Def.*, 932 F.3d at 956 (Millett, J., concurring) ("[T]he Commission could try the easiest path of all: take absolutely no action on the rehearing application. That would have the effect of denying the request as a matter of law. And that approach would have opened the courthouse doors. (internal citations omitted)).

[93] *Id.* at 948 (Millett, J., concurring).

USCA Case #20-1016     Document #1825564        Filed: 01/21/2020     Page 64 of 205
Documents(Content(s)

CP17-40-002.DOCX...............................................1-58

**EXHIBIT B**

164 FERC ¶ 61,085
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION


Before Commissioners:  Kevin J. McIntyre, Chairman;
                        Cheryl A. LaFleur, Neil Chatterjee,
                        Robert F. Powelson, and Richard Glick.


Spire STL Pipeline LLC                      Docket Nos. CP17-40-000
                                                        CP17-40-001


ORDER ISSUING CERTIFICATES

(Issued August 3, 2018)

1.      On January 26, 2017, Spire STL Pipeline LLC (Spire) filed an application, as amended,[1] pursuant to section 7(c) of the Natural Gas Act (NGA)[2] and Part 157 of the Commission's regulations[3] requesting authorization to construct and operate a new, 65-mile-long interstate natural gas pipeline system, extending from an interconnection with Rockies Express Pipeline LLC (REX) in Scott County, Illinois, to interconnections with both Spire Missouri Inc. (Spire Missouri)[4] and Enable Mississippi River Transmission, LLC (MRT) in St. Louis County, Missouri (Spire STL Pipeline Project or Spire Project).  Spire also requests approval of its proposed *pro forma* gas tariff, a blanket certificate under Part 157, Subpart F of the Commission's regulations to perform certain routine construction activities and operations, and a blanket certificate under Part 284, Subpart G of the Commission's regulations to provide open-access firm and interruptible natural gas transportation and transportation-related services.

2.      For the reasons discussed below, the Commission grants the requested authorizations, subject to the conditions described herein.

---

[1] Spire amended its application on April 21, 2017, in Docket No. CP17-40-001.

[2] 15 U.S.C. § 717f(c) (2012).

[3] 18 C.F.R. pt. 157 (2017).

[4] Spire Missouri was formerly known as Laclede Gas Company.

## I.   Background and Proposal

3.     Spire is a limited liability company organized and existing under the laws of Missouri.  Spire has requested certificate authorization to construct, operate, and maintain the Spire STL Pipeline Project.[5]  As a new company, Spire does not currently own any existing interstate natural gas pipeline facilities and is not engaged in any jurisdictional natural gas transportation or storage operations.  Upon receipt of its requested certificate authorizations and commencement of pipeline operations, Spire will become a natural gas company, as defined by section 2(6) of the NGA, subject to the Commission's jurisdiction.

4.     Spire Missouri is a local distribution company (LDC) and affiliate of Spire.  It provides natural gas distribution service to approximately 650,000 customers in the St. Louis metropolitan area and surrounding counties in eastern Missouri.  Spire Missouri's rates and services are regulated by the Missouri Public Service Commission (Missouri PSC).  Over 87 percent of Spire Missouri's upstream firm transportation capacity is currently under contract with MRT.[6]

5.     MRT is an approximately 670-mile-long interstate pipeline that extends from Texas to Illinois.  MRT's East Line brings natural gas supplies from pipeline interconnections in central Illinois west to the St. Louis area.  The East Line terminates at a delivery point with Spire Missouri at Chain of Rocks in St. Louis County, Missouri.

### A.   New Facilities

6.     Spire proposes to construct and operate two segments of new, 24-inch-diameter steel pipeline, totaling 65 miles in length.  The first segment will originate at a new

---

[5] Spire is an indirect wholly-owned subsidiary of Spire Inc. (formerly The Laclede Group, Inc.).  Spire Inc. is a natural gas public utility holding company which, through its gas utilities, provides service to approximately 1.7 million customers in Alabama, Mississippi, and Missouri.

[6] In addition to MRT, Spire Missouri receives natural gas directly from MoGas Pipeline LLC (MoGas).  Spire Missouri also holds firm transportation capacity on five other pipelines that do not directly interconnect with Spire Missouri:  Natural Gas Pipeline Company of America LLC (NGPL), Trunkline Gas Company, LLC (Trunkline), Panhandle Eastern Pipe Line Company, LP (Panhandle), Enable Gas Transmission (EGT), and REX.  NGPL and Trunkline interconnect with MRT and can access supplies flowing on REX.  MoGas also can access supplies flowing on REX through its interconnection with REX.

interconnection with REX in Scott County, Illinois,[7] and extend approximately 59 miles south through Green and Jersey Counties in Illinois before crossing the Mississippi River and extending east through St. Charles County, Missouri, and across the Missouri River into St. Louis County, Missouri.  This pipeline segment will terminate at a new interconnection with Spire Missouri's Lange Delivery Station.  The second segment of the proposed pipeline, known as the North County Extension, will extend six miles from the Spire Missouri/Lange interconnection[8] through the northern portion of St. Louis County and terminate at a new, bi-directional, interconnection with both MRT and Spire Missouri.  This interconnection will require reconfiguration of MRT's existing Chain of Rocks interconnection with Spire Missouri.[9]

7.      Spire also proposes to construct and operate three new, aboveground, meter and regulation stations:  (1) the REX Receipt Station in Illinois; (2) a Spire Missouri/Lange Delivery Station in Missouri; and (3) the bi-directional Chain of Rocks Station (with two individual meters referred to as MRT-Chain of Rocks and Spire Missouri-Chain of Rocks).[10]  In addition, Spire will install pig launchers and receivers at each meter and regulation station.  Spire does not propose any compression for its pipeline.  The Spire pipeline is designed to provide 400,000 dekatherms (Dth) per day of firm transportation service.

8.      Spire's proposed pipeline will have two physical delivery points into Spire Missouri's system – one at the Spire Missouri/Lange Delivery Station and the other at the

---

[7] REX is a bi-directional interstate natural gas pipeline that extends from Wyoming and northwestern Colorado to Ohio.

[8] The original and amended applications referred to the interconnection as the Laclede/Lange Delivery Station; this order will refer to the interconnection as the Spire Missouri/Lange Delivery Station throughout the document.

[9] In its January 26, 2017 application, Spire proposed to acquire, operate, and refurbish Spire Missouri's Line 880, an approximately 7-mile-long, 20-inch-diameter natural gas pipeline that extends from the Spire Missouri/Lange Delivery Station to the interconnection with MRT at the Chain of Rocks delivery point.  In its amended application, Spire altered this proposal and replaced it with the proposal to construct and operate the North County Extension.  Spire proposes to construct the North County Extension in close proximity to Line 880, but in a less densely populated area with fewer residential properties.

[10] Originally, Spire proposed to construct a fourth meter and regulation station by reconfiguring the existing Spire Missouri/Redman Station located on Line 880 in St. Louis County, but the adoption of the North County Extension as Spire's preferred route eliminated the need for this proposed station.

Spire Missouri/Chain of Rocks Station, both of which are located in St. Louis County. Following the proposed modification of the existing Chain of Rocks interconnection with MRT, Spire will deliver into Spire Missouri's facilities at Chain of Rocks both the new gas supplies transported by the project, as well as any existing MRT's gas deliveries to Spire Missouri.  Thus, although MRT will continue to make physical deliveries at Chain of Rocks, those deliveries will be received into Spire's facilities for redelivery to Spire Missouri, rather than directly into Spire Missouri's facilities.  In addition, the new bi-directional Chain of Rocks Station will enable Spire to also make physical or displacement deliveries into MRT's system at the Chain of Rocks Station, to the extent permitted by MRT.  All changes associated with the MRT Chain of Rocks interconnect will be performed at the sole cost of Spire.

9.      Spire estimates that the cost of the proposed facilities will be approximately $220,276,167.[11]

## B.    Market Support and Need

10.      Spire held an open season for all interested shippers from August 1 to 19, 2016. Following the open season, Spire entered into a binding precedent agreement with Spire Missouri as a foundational shipper for 350,000 Dth per day of firm transportation service, which represents 87.5 percent of the total design capacity of the project.  The precedent agreement is for a 20-year term.[12]  Spire Missouri is the only shipper that subscribed for capacity on the project.[13]

11.      Spire states that its proposed pipeline is intended to connect the St. Louis area to competitively priced and productive natural gas supply areas in the eastern and western United States.  Specifically, Spire contends that the proposed pipeline, by directly interconnecting with the bi-directional REX pipeline system, will offer access to multiple supply basins including the Rocky Mountain and the Appalachian Basins, increasing the supply diversity for Spire Missouri which, in turn, will increase the reliability of Spire Missouri's system and the security of its supply, as well as result in access to lower-priced gas supplies.  Spire notes that current transportation paths to the St. Louis area generally require service across multiple pipelines and, as a consequence, "rate

---

[11] *See* Spire April 21, 2017 Amended Application at 10.

[12] Spire requests confidential treatment of the precedent agreement and has included a form of protective agreement in Exhibit Z of its application.

[13] Spire states that it received expressions of interest from other prospective shippers during and after the open season and is hopeful that additional precedent agreements will be executed for the 12.5 percent of unsubscribed project capacity prior to the in-service date for the pipeline.  Spire March 17, 2017 Answer at 6.

stacking" on upstream pipelines must occur. Spire also states that the creation of a new firm transportation path for gas supply to the St. Louis area will eliminate Spire Missouri's need to rely on propane peak-shaving facilities behind its city gate to meet critical system requirements during periods when demand exceeds Spire Missouri's transportation and storage withdrawal capabilities.

## C.    **Proposed Services and Rates**

12.    Spire proposes to provide open-access firm and interruptible transportation service, as well as interruptible parking and lending service, under Rate Schedules FTS, ITS, and PALS, respectively.[14] Spire proposes to provide these services at both cost-based recourse rates and negotiated rates.[15] Spire states that it will provide transportation service to Spire Missouri under Rate Schedule FTS at negotiated rates. Under the negotiated rate agreement, if its initial, authorized maximum recourse rate increases in the future due to construction cost overruns, Spire states that it may also increase Spire Missouri's negotiated reservation rate by the same percentage increase as the recourse rate, subject to a cap.

## D.    **Blanket Certificates**

13.    Spire requests a Part 284, Subpart G blanket certificate of public convenience and necessity pursuant to section 284.221 of the Commission's regulations authorizing it to provide transportation service to customers requesting and qualifying for transportation service under its proposed tariff, with pre-granted abandonment authorization.[16]

14.    Spire also requests a blanket certificate of public convenience and necessity pursuant to section 157.204 of the Commission's regulations authorizing future facility construction, operation, and abandonment as set forth in Part 157, Subpart F of the Commission's regulations.[17]

---

[14] Spire January 26, 2017 Application at Exhibit P-1.

[15] The terms of Spire's negotiated rate authority are detailed in section 6.18 of the General Terms and Conditions of its tariff.

[16] 18 C.F.R. § 284.221 (2017).

[17] 18 C.F.R. § 157.204 (2017).

## II.     Procedural Issues

### A.     Notice, Interventions, Protests, and Comments

15.     Notice of Spire's application in Docket No. CP17-40-000 was published in the *Federal Register* on February 17, 2017.[18]  Notice of Spire's amended application in Docket No. CP17-40-001 was published in the *Federal Register* on May 5, 2017.[19]  Spire Missouri, Ameren Services Company (Ameren), MRT, MoGas Pipeline, LLC (MoGas), Southern Star Central Gas Pipeline, Inc., Panhandle, REX, and the Missouri PSC filed timely, unopposed motions to intervene in Docket No. CP17-40-000.  MVP Gas Services, LLC filed a timely motion to intervene in Docket No. CP17-40-001.  Ms. Juli Viel intervened during the comment period for the Environmental Assessment.  Timely, unopposed motions to intervene are granted by operation of Rule 214 of the Commission's Rules of Practice and Procedure.[20]

16.     EQT Energy, LLC, a natural gas marketer with firm transportation capacity on REX, and the Plumbers' and Pipefitters' Welfare Educational Fund, a landowner, filed late motions to intervene in Docket No. CP17-40-000.  The Environmental Defense Fund (EDF) filed a late motion to intervene in Docket No. CP17-40-001.  The Commission granted the late motions to intervene.[21]

17.     MRT, the Missouri PSC, EDF, and Ameren, the second largest shipper on both MRT and MoGas, protested Spire's application.  On March 17, 2017, Spire filed a motion to answer the protests, prompting numerous rounds of answers to answers by the protestors, Spire Missouri, and Spire.  MRT and EDF filed protests to Spire's amended application.  These protests led to answers to answers from Spire, Spire Missouri, MRT, and EDF.  Although the Commission's Rules of Practice and Procedure generally do not permit answers to protests or answers to answers,[22] our rules also provide that we may, for good cause, waive this provision.[23]  We will accept all the responsive pleadings filed in this proceeding because they have provided information that assisted us in our decision-making process.

---

[18] 82 Fed. Reg. 11,028 (2017).

[19] 82 Fed. Reg. 21,224 (2017).

[20] 18 C.F.R. § 385.214(c) (2017).

[21] Secretary of the Commission April 19, 2018 Notice Granting Late Interventions.

[22] 18 C.F.R. § 385.213(a)(2) (2017).

[23] 18 C.F.R. § 385.101(e) (2017).

18.     The overriding concern of the protestors is that Spire's proposed new pipeline is unneeded to meet what is described as flat demand in the St. Louis metropolitan area. They allege that the project will create adverse revenue and rate impacts to existing competing pipelines and their captive customers, as well as the captive customers of Spire Missouri, as a result of Spire Missouri's decontracting of capacity on pipelines where it currently holds firm transportation contracts.  They also argue that the precedent agreement between Spire and Spire Missouri cannot be presumed to demonstrate significant market need because Spire Missouri is an affiliate of Spire with captive retail customers who will be at risk for the project costs.  Further, the protestors assert that the purpose of the project is not to fulfill a genuine need for additional capacity or access to new supplies, but simply to increase the rate base and earnings of Spire's parent company, Spire Inc., and that the project is an uneconomic option for Spire Missouri's ratepayers.  The protestors also raise concerns regarding unfair competition and market power by Spire and Spire Missouri due to their affiliate relationship.  The protestors maintain that the benefits of the project are outweighed by the potential adverse impacts.

19.     Spire Missouri, REX, the Industrial Energy Consumers of America, the Natural Gas Supply Association, and the Independent Petroleum Association of America filed comments in support of Spire's proposed project.[24]  Senator Richard Durbin of Illinois, Representatives Darrin LaHood and Rodney Davis of Illinois, Missouri State Senators Gina Walsh and William Eigel, and Missouri State Representatives Tommie Pierson filed letters in support of the project.

### B.     Motion to Stay the Proceeding or Reject the Application

20.     On February 17, 2017, prior to Spire filing its amended application, MRT filed a motion to either:  (1) stay the proceeding until Spire decides whether to acquire Line 880 or construct the North County Extension; or (2) reject Spire's application and require Spire to refile an application to accurately reflect the project's scope.  On February 21, 2017, Spire filed an answer in opposition to MRT's motion.

21.     The Commission finds MRT's motion moot, as Spire filed, on April 21, 2017, an amended application proposing to construct the North County Extension.

---

[24] In addition, the St. Louis County Soil & Water Conservation District; the U.S. Department of the Interior, National Park Service, Lewis and Clark Historical Trail; and the Tribal Historic Preservation Officer for the Miami Tribe of Oklahoma filed environmental comments in response to Spire's January application.  The Commission will address these comments in the environmental analysis section of this order.

### C.    Requests for Evidentiary Hearing

22.    MRT and EDF request an evidentiary hearing to examine what they assert are generalized and unsupported claims of benefits contained in Spire Missouri's Concentric Study.[25]  EDF argues that the Concentric Study and Spire Missouri's answers raise several specific issues of material fact that require a hearing to resolve.[26]  EDF also requests a hearing to examine the extent of market need for the project, including an analysis of impacts to captive customers of other pipelines, to ensure that the affiliate precedent agreement in this case represents bona fide market need.

23.    Although the Commission's regulations provide for a hearing, neither section 7 of the NGA nor our regulations require that such hearing be a formal, trial-type evidentiary hearing.[27]  When, as is usually the case, the written record provides a sufficient basis for resolving the relevant issues, it is our practice to provide for a hearing based on the written record.[28]  That is the case here.  We have reviewed the requests for an evidentiary hearing and conclude that all issues of material fact relating to Spire's proposals are capable of being resolved on the basis of the written record.  Accordingly, we will deny the requests for an evidentiary hearing.

### D.    Motion to Lodge

24.    On January 9, 2018, EDF filed a motion to lodge an excerpted transcript and EDF's Initial Post-Hearing Brief from Spire Missouri's rate case proceeding before the Missouri PSC in Case Nos. GR-2014-0215 and GR-2017-0216.  EDF states that the transcript and initial brief contain arguments concerning issues that substantially overlap with matters pending in this proceeding, and involve the Commission's analysis of need

---

[25] Concentric Energy Advisors, Inc. prepared the study for Spire Missouri to evaluate the benefits to Spire Missouri's customers that would result from the Spire STL Pipeline Project capacity.  Spire Missouri July 14, 2017 Answer at app. B.

[26] EDF July 31, 2017 Answer at 8-9.

[27] *See Minisink Residents for Envtl. Pres. & Safety v. FERC*, 762 F.3d 97, 114 (D.C. Cir. 2014) (*Minisink*) (stating "FERC's choice whether to hold an evidentiary hearing is generally discretionary.").

[28] *See NE Hub Partners, L.P.*, 83 FERC ¶ 61,043, at 61,192 (1988), *reh'g denied*, 90 FERC ¶ 61,142 (2000); *Pine Needle LNG Co., LLC*, 77 FERC ¶ 61,229, at 61,916 (1996).  Moreover, courts have recognized that even where there are disputed issues, the Commission need not conduct an evidentiary hearing if the disputed issues "may be adequately resolved on the written record."  *Minisink*, 762 F.3d at 114 (quoting *Cajun Elec. Power Coop., Inc. v. FERC*, 28 F.3d 173, 177 (D.C. Cir. 1994).

under the Certificate Policy Statement. Specifically, EDF contends that the transcript and initial brief demonstrate that there is a gap in federal and state oversight of affiliate precedent agreements because the Missouri PSC relies, in part, on the Commission's regulation of interstate pipeline rates to confirm their reasonableness as part of the Missouri PSC's after-the-fact prudency review, but the Commission declines to look at the specific terms of affiliate precedent agreements in approving new pipeline infrastructure.[29] Given the relevance of the transcript and initial brief, EDF requests that the Commission grant its motion and include both as part of the record in this case. EDF filed the transcript and initial brief with its motion; therefore, it is part of our record and we find EDF's motion to lodge unnecessary.

## III.  **Discussion**

25.     Since the proposed facilities will be used to transport natural gas in interstate commerce, subject to the jurisdiction of the Commission, the construction and operation of the facilities are subject to the requirements of subsections (c) and (e) of section 7 of the NGA.

### A.     **Application of Certificate Policy Statement**

26.     The Certificate Policy Statement provides guidance for evaluating proposals to certificate new pipeline construction.[30] The Certificate Policy Statement establishes criteria for determining whether there is a need for a proposed project and whether the proposed project will serve the public interest. The Certificate Policy Statement explains that in deciding whether to authorize the construction of major new facilities, the Commission balances the public benefits against the potential adverse consequences. The Commission's goal is to give appropriate consideration to the enhancement of competitive transportation alternatives, the possibility of overbuilding, subsidization by existing customers, the applicant's responsibility for unsubscribed capacity, the avoidance of unnecessary disruptions of the environment, and the unneeded exercise of eminent domain in evaluating new pipeline construction.

27.     Under this policy, the threshold requirement for pipelines proposing new projects is that the pipeline must be prepared to financially support the project without relying on subsidization from its existing customers. The next step is to determine whether the applicant has made efforts to eliminate or minimize any adverse effects the project might

---

[29] Spire filed an answer in opposition to the motion and MRT filed an answer in support of the motion to lodge. Spire Missouri filed an answer to MRT's answer.

[30] *Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227 (1999), *clarified*, 90 FERC ¶ 61,128, *further clarified*, 92 FERC ¶ 61,094 (2000) (Certificate Policy Statement).

have on the applicant's existing customers, existing pipelines in the market and their captive customers, or landowners and communities affected by the route of the new pipeline. If residual adverse effects on these interest groups are identified after efforts have been made to minimize them, the Commission will evaluate the project by balancing the evidence of public benefits to be achieved against the residual adverse effects. This is essentially an economic test. Only when the benefits outweigh the adverse effects on economic interests will the Commission proceed to consider the environmental analysis where other interests are addressed.[31]

### 1.    Subsidization

28.    As discussed above, the threshold requirement for pipelines proposing new projects is that the pipeline must be prepared to financially support the project without subsidization from existing customers. Because Spire is a new pipeline entrant with no existing customers, the Commission has consistently found that there is no potential for subsidization or degradation of service to existing customers on Spire's system.[32]

29.    However, MRT argues that because Spire and Spire Missouri are both wholly owned by the same entity, Spire Inc., Spire Missouri's existing captive retail customers should be viewed as customers of Spire for purposes of the Certificate Policy Statement's no-subsidization requirement. MRT then claims that Spire Missouri's existing retail customers will subsidize the project because Spire Missouri can pass-through to those customers the costs associated with its gas transportation contracts.[33] In addition, MRT contends that the cost overrun provision in the negotiated rate agreement with Spire Missouri represents an additional subsidization of the project by Spire Missouri and its ratepayers.[34] MRT also argues that Spire failed to adequately reflect the costs of the

---

[31] On April 19, 2018, the Commission issued a Notice of Inquiry seeking information and stakeholder perspectives to assist the Commission as it determines whether, and if so how, it should review its approach under the current Certificate Policy Statement. However, until such time as the Commission decides to revise the Certificate Policy Statement, the current Certificate Policy Statement remains in effect and will be applied to natural gas certificate proceedings pending before the Commission as appropriate. *Certification of New Interstate Natural Gas Facilities, Notice of Inquiry*, 163 FERC ¶ 61,042 (2018).

[32] *See Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043, at P 32 (2017), *order on reh'g*, 163 FERC ¶ 61,197 (2018) (*Mountain Valley*); *Atlantic Coast Pipeline, LLC*, 161 FERC 61,042, at P 28 (2017), *order denying reh'g*, 163 FERC ¶ 61,098 (2018) (*Atlantic Coast*).

[33] MRT February 27, 2017 Protest at 28.

[34] *Id.* at 38. Further, MRT argues that *pro forma* general terms and conditions

Chain of Rocks meter and regulation station, the interconnection of which MRT contends will require it to make additional expenditures.[35]  MRT also states that Spire Missouri's customers are currently entitled to revenues ranging from 70 to 100 percent of the income from certain off-system sales and capacity releases made by Spire Missouri.  Thus, MRT asserts that if Spire is constructed, Spire Missouri's current income derived from released capacity and interruptible transportation will be diminished.[36]

30.    The Missouri PSC acknowledges that the intent of the threshold requirement is to ensure that existing customers do not subsidize new customers, but argues that the pipeline must be prepared to shoulder some of the risks of its project even if it is a new pipeline.  Thus, the Missouri PSC claims that this project impermissibly shifts all of the risk of construction away from Spire, the pipeline, and to its customer, Spire Missouri.[37]  The Missouri PSC argues that the Commission should not approve or validate the Precedent Agreement because the Missouri PSC has declined to pre-approve or pre-reject the agreement and would not do so until a future Actual Cost Adjustment case is filed with the Missouri PSC.[38]

### a.    Commission Determination

31.    The Commission's requirement of no subsidization under the first prong of the Certificate Policy Statement relates to the subsidization impacts on existing customers of the pipeline applicant.  The affiliate relationship between Spire and Spire Missouri does not make Spire Missouri's retail customers effectively Spire's customers, as MRT appears to argue.  Thus, where an applicant is a new pipeline entrant with no existing customers, this threshold test is inapplicable.[39]

32.    Furthermore, the Commission does not consider it subsidization for a shipper to pay rates designed to recover the costs of facilities constructed to serve that shipper.  Spire Missouri's payment of rates for transportation service on the Spire STL Pipeline

---

(GT&C section) 18.5, affording Spire the right to seek to recover from other shippers the costs of the rate reductions it negotiated with Spire Missouri (i.e., the difference between its negotiated rates and maximum recourse rates), places the risk of the project on unaffiliated parties.  *Id.* at 30-31.

[35] *Id.* at 30.

[36] *Id.*

[37] Missouri PSC February 27, 2017 Protest at 5.

[38] Missouri PSC March 23, 2018 Answer at 3.

[39] Certificate Policy Statement, 88 FERC at 61,746.

Project is not a "subsidy" because Spire Missouri will receive a service and benefits associated with the service in exchange for its payment of rates.[40]  The extent to which it is appropriate for Spire Missouri to in turn pass those costs through to its rate payers is not within the Commission's jurisdiction.[41]

33.    The Missouri PSC expresses concern that Spire has shifted all the risk for construction of its project onto its shipper.  We note that the Commission's Certificate Policy Statement encourages pipelines and their shippers to negotiate cost sharing agreements in their precedent agreements.[42]  Such contract provisions provide certainty to both parties involved should certain situations arise before construction commences.  We recognize that Spire and Spire Missouri are affiliates, but to an extent, that may actually limit Spire's ability to divest itself of risk, as responsibility for cost recovery will remain within the corporate family.  We also point out that Spire's recourse rates will be based on the design capacity of its pipeline, thereby placing it at risk for any unsubscribed capacity.  The recourse rate is derived from the pipeline's billing determinants based on the project's design capacity, not subscribed capacity.  Thus, a customer who pays the recourse rate will only be responsible for its share of costs associated with the design capacity and bears no responsibility for any unsubscribed capacity.[43]  The Commission is not in the position to evaluate Spire Missouri's business decision to enter a contract with Spire for natural gas transportation, which as described below will be evaluated by the state commission.

34.    MRT's claim that it will subsidize the construction costs associated with interconnecting the Chain of Rocks meter and regulation station with Spire STL Pipeline Project are unfounded.  The record does not show that upgrades to the Chain of Rocks

---

[40] *See* Order Clarifying Certificate Policy Statement, 90 FERC at 61,393.

[41] *See*, *e.g.*, *Florida Southeast Connection,* LLC, 154 FERC ¶ 61,080, at P 67 n.39 (2016), *order on reh'g*, 156 FERC ¶ 61,160 (2016), *vacating sub nom Sierra Club v. FERC*, 867 F.3d 1357 (D.C. Cir. 2017) (*Sabal Trail*) (where the Commission rejected an argument of a protestor that the project would result in subsidization because the Florida Public Service Commission issued an order stating that shipper Florida Power & Light may pass the costs of the pipeline onto its ratepayers).

[42] Certificate Policy Statement, 88 FERC at 61,746 ("This does not mean that the project sponsor has to bear all the financial risk of the project; the risk can be shared with the new customers in preconstruction contracts, but it cannot be shifted to existing customers.").  *See also Mountain Valley* Rehearing Order, 163 FERC ¶ 61,197 at P 56.

[43] *See Cameron Interstate Pipeline, LLC*, 160 FERC ¶ 61,009, at P 11 (2017); *Alliance Pipeline L.P.*, 142 FERC ¶ 62,048, 64,099 (2013); *Kinder Morgan Interstate Gas Transmission LLC*, 122 FERC ¶ 61,154, at P 28 (2008).

meter and regulation station, as discussed below,[44] would require additional costs for interconnection or operational requirements beyond those for which Spire states it will pay.[45] Moreover, although the point will be bidirectional, Spire does not propose to flow gas from Spire through the Chain of Rocks station onto MRT's system.

## 2. Need for the Project

35.     The protestors challenge the need for the Spire STL Pipeline Project. They argue that Spire has not demonstrated sufficient need for the project, for the following reasons: (1) a single precedent agreement with an affiliated LDC is inadequate to demonstrate project need; (2) the project does not serve an increase in demand for natural gas in the St. Louis market; (3) existing infrastructure can meet the project purposes; (4) similar, previously proposed projects were rejected by Spire Missouri; (5) the precedent agreement entered into by Spire Missouri will not be reviewed by the Missouri PSC until after the project is in service; and (6) Spire Missouri's decision to contract for capacity to increase system reliability is insufficient to support project need.

### a. Precedent Agreement with Affiliated LDC

36.     MRT and EDF argue that the Commission should not rely on the precedent agreement with Spire Missouri as evidence of need because: (a) the two companies are affiliates and Spire Missouri, an LDC, can pass on the costs of the project to its predominantly captive retail customers; (b) it is the only precedent agreement supporting the project; and (c) it is for less than 100 percent of the project capacity. They argue that without looking behind the precedent agreement the Commission cannot determine whether the project is needed since affiliated shippers have no incentive to seek out the lowest cost transportation for their gas. They argue that, instead, an affiliated LDC-shipper is incentivized to contract with an affiliated pipeline because the costs, including the rate of return of 14 percent, are recoverable from captive ratepayers. MRT asserts that the project would not be financially viable if not for the fact that Spire Missouri will have the ability to recover the costs of transportation service from its captive retail customers and then Spire Missouri will make payments for transportation service to an affiliate (i.e., essentially to itself). The protestors argue that all of these facts call into question the true need for the project, and require heightened scrutiny by the Commission in determining whether there is an actual market need for the project.

37.     Both MRT and EDF rely on the Commission's statement in the Certificate Policy Statement that "a project that has precedent agreements with multiple new customers may

---

[44] *See infra* PP 191-197.

[45] Spire is proposing to install, at its sole cost, a bi-directional interconnect with MRT at the Chain of Rocks station. Spire March 13, 2018 Data Response at 27.

present a greater indication of need than a project with only a precedent agreement with an affiliate."[46]  EDF posits that the affiliate model distorts the economic theory underpinning of the Certificate Policy Statement – that arms-length precedent agreements demonstrate significant market need.[47]  Additionally, MRT maintains that although the Commission may require different amounts of evidence to determine need, the Certificate Policy Statement states that "the evidence necessary to establish the need for the project will usually include a market study," and can include generally available market studies showing projections of market growth.[48]  MRT contends that whereas market studies would not be required where a project is fully subscribed by non-affiliated parties, here, with a single affiliate shipper "the mere existence of such a precedent agreement is insufficient to show adequate market demand."[49]  Ameren also asserts that Spire's application is deficient in failing to include a market study.[50]  MRT further asserts that given the flat market in St. Louis and complete absence of incremental demand for new capacity, the obvious primary impetus of the project is to increase rate base and earnings at the wholesale level, supported or "backstopped" by Spire Missouri and its underlying retail ratepayers.[51]

38.    MRT argues that the fact that Spire has entered into a single precedent agreement for its project with an affiliated shipper in and of itself provides evidence of impropriety or abuse in the formation of the precedent agreement and renders the agreement the product of improper and unfair competition.  MRT claims that "[Spire Missouri] and its corporate parent decided upon the project and subsequently Spire held an open season. Spire received *no* capacity subscriptions.  [Spire Missouri] then requested 350,000 Dth per day."[52]  MRT complains that Spire Missouri neither made any request for proposals for 350,000 Dth per day of load, nor prospectively issued a statement of standards to be

---

[46] Certificate Policy Statement, 88 FERC at 61,748.

[47] EDF May 23, 2017 Protest at 6-7 (citing *Granite State Gas Transmission, Inc.*, 83 FERC ¶ 61,194, at 61,820 (1998)).

[48] MRT February 27, 2017 Protest at 7-8.

[49] *Id.* at 8. "[Spire Missouri] has not submitted any evidence that Spire has satisfied a competitive market test demonstrating a need for the Project."  MRT July 31, 2017 Answer at 4.

[50] Ameren February 27, 2017 Protest at 8.

[51] MRT April 3, 2017 Answer at 1-3.

[52] MRT February 27, 2017 Protest at 37-38.

USCA Case #20-1016      Document #1825564      Filed: 01/21/2020      Page 80 of 205

used to review and judge the merits of any responses made to such a request.[53]  MRT asserts that Spire Missouri's evaluation process for new transportation was not transparent to non-affiliated parties and that Spire Missouri has not provided information regarding proposals from other unaffiliated project sponsors it considered.  Thus, MRT argues that Spire, due to its affiliate relationship, is familiar with Spire Missouri's methods to assess proposed pipeline projects and has been afforded an unfair advantage over competitors not privy to such information.[54]  Further, MRT argues that Spire Missouri now relies upon certain project benefits which it refused to accept when associated with an earlier non-affiliated project,[55] and that the precedent agreement includes terms that are more favorable to its affiliate than Spire Missouri was willing to offer to an earlier non-affiliated project sponsor.[56]

39.     MRT further argues that the NGA "protects the public against the monopsony power of shippers,"[57] which it argues Spire Missouri is exercising by "strong-arming" existing interstate pipelines serving St. Louis to shift costs away from Spire Missouri to other customers on those systems.  MRT points to the fact that effective March 1, 2017, Spire Missouri was able to amend the rate under its existing firm transportation agreement with MoGas without modification of its full maximum daily quantity level.[58]  MRT argues that the Commission has an obligation to ensure that monopsonist market power is not being exercised, and cannot presume that fair competition is currently taking place.[59]  EDF questions Spire and Spire Missouri's jointly filed response to Commission

---

[53] MRT July 31, 2017 Answer at 3.

[54] *Id.* at 4.

[55] MRT Protest February 27, 2017 at 38.  *See* discussion of prior unsuccessful projects, *infra* at PP 57-60.

[56] MRT July 31, 2017 Answer at 4 n.4.

[57] MRT April 3, 2017 Answer at 6 (citing *Maritimes & Northeast Pipeline, L.L.C.*, 154 FERC ¶ 61,084, at P 31 (2016) (*Maritimes*)).

[58] *Id.*  MRT states that as of the proposed in-service date of the Spire STL Pipeline Project (October 31, 2018), the rate under the MoGas-Spire Missouri agreement will drop from a monthly maximum recourse rate of $12.385 per Dth to $6.386 per Dth, resulting in $4.5 million of annual costs that may be shifted to other billing determinants on MoGas' system.

[59] In addition, MRT argues that due to overlapping personnel and the intermixing of roles within the Spire corporate family arising from the affiliate relationship between Spire and Spire Missouri, the Spire STL Pipeline Project will result in unfair competition.  *See* MRT April 3, 2017 Answer at 8-10.  We address these arguments regarding the

staff's February 21, 2018 data request.[60] EDF believes the joint preparation of the data response by Spire and Spire Missouri engaged in unfair competition by mixing the roles of personnel between entities.

40.     MRT also argues that the Commission should permit it to review the terms of the precedent agreement to understand the substance of Spire's and the Missouri PSC's discussion of the precedent agreement.[61] MRT states that the unavailability of the precedent agreement is particularly troubling since it is the only contractual support for the project.[62] MRT further argues that since the negotiated rate agreement between Spire and Spire Missouri will have to be publicly filed when Spire commences service, it should be permitted to review, subject to a protective agreement, the precedent agreement and the Missouri PSC's redacted comments on the precedent agreement now, at what it states is a crucial stage.

41.     In response to the protestors' arguments, Spire asserts that its precedent agreement with its affiliate Spire Missouri, for 87.5 percent of the firm capacity created by the project, is substantial and compelling evidence of market need, and that the protestors' arguments that the precedent agreement should be disregarded because it is a single shipper commitment with an affiliate for less than 100 percent of the capacity are inconsistent with clear Commission precedent and policy.[63] Spire adds that the U.S. Court of Appeals for the D.C. Circuit reaffirmed the Commission's longstanding reliance on precedent agreements as evidence of need.[64]

---

alleged future competitive impact of the project on other pipelines and their captive customers due to affiliate personnel sharing, *infra* Part III.A.3 – Existing Pipelines and Their Captive Customers.

[60] EDF March 26, 2018 Answer at 5.

[61] The precedent agreement was filed confidentially, and a portion of the agreement forms the basis for the Missouri PSC's protest. As a result the Missouri PSC filed a privileged version of its pleading, redacting language pertaining to the precedent agreement.

[62] MRT April 3, 2017 Answer at 21-22.

[63] Spire March 17, 2017 Answer at 5 (citing *Rover Pipeline LLC*, 158 FERC ¶ 61,109, at PP 43-45 (2017); *Constitution Pipeline Co., LLC*, 149 FERC ¶ 61,199, at P 28 (2014), *reh'g denied in relevant part*, 154 FERC ¶ 61,046, at P 19 (2016) (*Constitution*)).

[64] *Id.* at 6 n.9 (citing *Myersville Citizens for a Rural Community, Inc. v. FERC*, 783 F.3d 1301, 1311 (D.C. Cir. 2015) (*Myersville*); *Minisink*, 762 F.3d at 111 n.10).

42.     Spire states that the Commission has approved numerous projects in which there was a single, affiliated shipper, including those with less than 100 percent project capacity under contract.[65]  Spire asserts that the fact that there is only one shipper currently under contract for the project has no bearing on need, and adds that given that it received expressions of interest during the open season from multiple prospective shippers, it remains hopeful it will sell some, if not all, of the remaining 50,000 Dth per day of firm capacity before the project's in-service date.  Spire asserts that the fact that the precedent agreement is for only 87.5 percent of the capacity and not 100 percent of the capacity also has no bearing on need for the project.  Spire states that under the Certificate Policy Statement, project applicants are no longer required to demonstrate any level of subscribed capacity under precedent agreements, but rather the absence of reliance on shipper subsidies.[66]

43.     Further, Spire asserts that Commission precedent is clear that the fact of shipper affiliation with a project sponsor does not affect its consideration of the precedent agreement where there is no evidence of impropriety such as self-dealing.[67]  Spire also argues that additional evidence beyond a precedent agreement, such as a market study, is not required by the Certificate Policy Statement, the NGA, or the Commission's regulations.[68]  Spire contends that the Commission's decision in *Eastern Shore*, in which

---

[65] *Id.* at 6 n.10 (citing *Equitrans, L.P.*, 153 FERC ¶ 61,381 (2015) (*Equitrans*) (issuing a certificate where the pipeline company had executed a precedent agreement with only one affiliated shipper for approximately 76 percent of the project's capacity); *Northwest Pipeline GP*, 129 FERC ¶ 61,136 (2009) (approving the project in which there was a single affiliated shipper); *Entrega Gas Pipeline, Inc.*, 112 FERC ¶ 61,177, *order on reh'g*, 113 FERC ¶ 61,327 (2005) (*Entrega*) (approving a project in which there was one affiliated shipper receiving service pursuant to discounted rates)).

[66] *Id.* at 6-7 (citing Certificate Policy Statement, 88 FERC at 61,748.  Spire also cites *Sabal Trail*, 154 FERC ¶ 61,080 at P 83 (finding, with respect to the substantially larger Sabal Trail new interstate pipeline project, that "subscription of 84 percent of the project's total capacity is evidence of sufficient public benefit to outweigh the residual adverse effects on the economic interests" that had been claimed to result from the project); *Eastern Shore Natural Gas Co.*, 132 FERC ¶ 61,204 (2010) (*Eastern Shore*) (where the Commission approved a project with firm capacity subscriptions by two affiliated LDCs, equaling 80 percent of the total proposed project capacity).

[67] *Id.* at 7 (citing *Sabal Trail*, 154 FERC ¶ 61,080 at P 84 ("an affiliation between project shippers and the owners of the pipelines is not, by itself, evidence of self-dealing which might call into question the need for the projects")).

[68] *Id.* at 9 (citing *Constitution* Certificate Order, 149 FERC ¶ 61,199 at P 28 (where the Commission rejected arguments that a market study was needed in light of the affiliation between the pipeline company and one of its two shippers)).

the Commission rejected the same affiliate-related arguments made by protestors, including one of the state public service commissions, makes clear that the affiliation of Spire and Spire Missouri does not diminish the precedent agreement's status as compelling evidence of need or affect the integrity of the contracting process.[69]

44.     Regarding MRT's claims of the existence of unfairness and abuse in connection with the precedent agreement due to the affiliate relationship between Spire and Spire Missouri, Spire first maintains there is nothing inappropriate or unfair about the development of the project.  Spire asserts that since its inception, the project has been driven by the needs of its foundation shipper, Spire Missouri, and that doing so – developing a project based on the specific needs of the market that is to be served – is not a novel concept.[70]  Spire states that although it entered into a precedent agreement with Spire Missouri, it also held a public open season and invited all interested parties to become a shipper or foundation shipper, making public all "foundation shipper" terms, and thereby affording no favoritism to Spire Missouri.

45.     Second, with respect to MRT's claims that Spire Missouri, as a shipper, is using its monopsony power to gain undue preference from other interstate pipelines serving St. Louis, Spire asserts that it has not given undue preference to Spire Missouri, nor have there been any allegations of undue preference by Spire to Spire Missouri raised in this proceeding.[71]  With respect to MRT's reference to the recently amended firm transportation agreement between Spire Missouri and MoGas, Spire notes that although it is unclear if MRT believes MoGas has given undue preference to Spire Missouri, MRT apparently is now alleging, without support, that Spire Missouri is negotiating too good a deal for its ratepayers.  Spire maintains that these claims are irrelevant to this proceeding, and are indicative of MRT's anticompetitive stance and fear of fair and much needed competition for interstate pipeline service into St. Louis.

46.     Finally, in response to MRT's request that it be permitted to review the precedent agreement and the substance of the Missouri PSC's claims, Spire states that MRT has

---

[69] *Id.* at 7-8 (citing *Eastern Shore*, 132 FERC ¶ 61,204 at P 13 n.13).

[70] Spire June 6, 2017 Answer at 9.  Spire notes that there have been multiple projects in recent years where the pipeline began the project development with a designated "anchor" or "foundation" shipper, and in other cases approved by the Commission where the shipper had an equity interest or other affiliation with the pipeline project sponsor.

[71] Spire states that *Maritimes*, upon which MRT relies, stands for the opposite proposition from that maintained by MRT – that interstate pipelines are prohibited from giving any undue preference to a particular shipper.  *Id.* at 10.

already been provided nearly the entire precedent agreement, subject to its execution of a protective agreement, with the only portions of the agreement redacted from MRT's access being the actual rate and rate-related terms (i.e., the form negotiated rate agreement and a few very limited rate provisions). Spire asserts that MRT has no need to see the negotiated rate as it has full access to the proposed recourse rate and underlying cost information and calculations submitted in Exhibits K, L, and N of the application. Moreover, Spire argues that Commission precedent recognizes the need to withhold sensitive rate information from competitors, such as MRT, during the course of a certificate proceeding in order to prevent them from undercutting the proposed project.[72] In addition, Spire states that it filed the redacted form of the precedent agreement with the U.S. Securities and Exchange Commission (SEC) seeking protection of the negotiated rate and the SEC has authorized the continued confidential treatment of the negotiated rate in the precedent agreement until October 1, 2018.[73]

47.     In their answers responding to Spire and Spire Missouri's answers, MRT and EDF argue that all of the cases that Spire relies on are readily distinguishable from the instant case. For example, MRT and EDF state that in *Equitrans*, *Entrega*, and *Northwest*, the affiliate in each of those cases was a marketer or entity without captive customers. The protestors maintain that the rationale underlying approval of precedent agreements with an affiliate marketer is substantially different from that present with captive customers assuming the risk for a new pipeline and note that affiliated marketers are potentially subject to greater regulatory oversight than non-affiliates. The protestors argue that *Sabal Trail* is distinguishable because the Florida Public Service Commission had found, in advance of the Commission's approval, a need for additional firm capacity. In addition, the protestors argue that *Eastern Shore* is distinguishable because the Commission found that project would not affect the incumbent pipeline's market for firm transportation and there would be no adverse effects on other pipelines in the market and their captive customers.

48.     Thus, the protestors argue that although the Commission may have approved projects in various cases where there was only a single shipper, or the shipper was an affiliate of the pipeline or an affiliated LDC, or where less than 100 percent of the project capacity had been subscribed, or where no market study had been provided or state agency need findings made, Spire has not cited any single prior case in which the Commission approved a pipeline project with all of these characteristics, or

---

[72] *Id.* at 18 (citing *Kinder Morgan Interstate Gas Transmission LLC*, 122 FERC ¶ 61,154, at PP 40-42 (2008)).

[73] *Id.* at 19 and Attachment A. *See* Spire Inc. & Laclede Gas Co., File Nos. 1-16681 and 1-01822, CF#35045 (May 27, 2017) (delegated order granting confidential treatment).

"deficiencies."[74]  They contend that Spire's piecemeal reliance on a different case to refute each alleged problematic aspect of the Spire Project and failure to identify a single prior case that features facts and circumstances analogous to the unique set of facts presented in this case highlights that Spire's proposed project is particularly problematic and a case of first impression.  The protestors argue that the aggregation of deficiencies in this case warrants looking behind the precedent agreement in this case to establish need.

### b.    Level of Natural Gas Demand in St. Louis Market

49.    MRT contends that Spire did not make any showing of future demand growth in the St. Louis area.[75]  MRT points out that Ameren has delayed plans to build additional natural-gas fired generation facilities and in recent open seasons held by MRT and MoGas, Spire did not produce a single bid for capacity.[76]  MRT also notes that President Trump signed an executive order on March 28, 2017, that "rolls back the Clean Power Plan and whatever impact that would have had in prompting coal-to-methane conversions of power plants."[77]  MRT further points to the additional 50,000 Dth per day of gas that remains unsubscribed on the system.[78]  Similarly, the Missouri PSC and EDF each emphasize that Spire's project does not support an increase in demand for natural gas in the St. Louis area.[79]  EDF also asserts that Spire Missouri overstates the market need for Spire by relying on a cold-weather event that occurred 82 years ago, as opposed to the 20 to 30 year old data most companies rely on.[80]  Spire responds that the project was not developed to serve new demand.[81]

---

[74] *See* MRT April 3, 2017 Answer at 3-4, 19-21; MRT June 21, 2017 Answer at 2-3.

[75] MRT February 27, 2017 Protest at 13.

[76] MRT June 21, 2017 Answer at 3-4.

[77] MRT May 22, 2017 Answer at 4.

[78] MRT June 21, 2017 Answer at 4.

[79] Missouri PSC February 22, 2017 Protest at 11; EDF July 31, 2017 Answer at 7.

[80] EDF July 32, 2017 Answer at 5.

[81] Spire March 17, 2017 Answer at 10.

### c.    Ability of Existing Pipelines to Meet Project Purposes

50.    MRT asserts that the project is not needed because Spire Missouri already has ample access to gas flowing on REX via existing pipelines – NGPL, Trunkline, and MoGas – which have interconnections with REX.[82]  MRT contends that Spire Missouri could access REX by using 170,000 Dth per day of its subscribed capacity on MRT's East Line from MRT's points of interconnection with NGPL and Trunkline and its 62,800 Dth per day of subscribed capacity on MoGas.[83]  MRT also questions Spire's statement that the project will avoid rate stacking for gas supplies from the Appalachian region.  In addition, MRT points out that Spire Missouri also already has access to Marcellus and Utica supplies flowing on other pipelines besides REX.  MRT states that the Perryville Hub, accessible to Spire Missouri through MRT, is connected to Tennessee Gas Pipeline Company, LLC, ANR Pipeline Company, Texas Eastern Transmission, LP (Texas Eastern), and Columbia Gulf Transmission, LLC providing significant supply diversity possibilities.[84]

51.    Further, MRT asserts that the St. Louis market is not constrained because there is available, unsubscribed capacity on MRT (7,637 Dth per day on MRT's East Line, as well as unsubscribed capacity on MRT's Main Line), MoGas (9,264 Dth per day), and Illinois Intrastate Transmission (Illinois Intrastate) (40,000 Dth per day), an intrastate pipeline.[85]  Similarly, Ameren claims that Spire's assertion that existing pipelines are insufficient to access "the most competitively-priced and productive natural gas supply areas in both the eastern and western United States" is without support.[86]

52.    Spire Missouri responds that reliance on MRT's existing capacity is not an option since MRT does not have adequate capacity to meet the full 350,000 Dth per day of firm

---

[82] MRT April 3, 2017 Answer at 18.

[83] MRT February 27, 2017 Protest at 39-40.  MRT states that Spire Missouri currently holds a total of 90,000 Dth per day of capacity on Trunkline and 80,000 Dth per day of capacity on NGPL.  *Id.* at 13 n.45.  However, MRT notes that Spire Missouri's contracts with NGPL expire in 2018, as does Spire Missouri's contract with Trunkline providing 80,000 Dth per day out of the 90,000 Dth per day it holds on Trunkline.  *Id.*

[84] MRT July 31, 2017 Answer at 5.

[85] MRT February 27, 2017 Protest at 15, 40; *see also* MRT June 21, 2017 Answer at 5.

[86] Ameren February 27, 2017 Protest at 9 (quoting Spire January 26, 2017 Application at 5, 9).

capacity from REX that Spire would provide.[87]  Spire Missouri also maintains that even if MRT had adequate capacity to offer, it would not provide access to the same liquid REX Zone 3 market for new producing basins that the proposed project would provide without rate stacking and transporting its supply on additional pipelines.[88]

53.    Spire and Spire Missouri refute MRT's claims and contend that the cost to transport gas from REX to Spire Missouri via MRT is actually more expensive than MRT states because MRT neglects to include the cost of using Trunkline or NGPL.[89]  They claim that once its project is completed, Spire Missouri would no longer need to purchase gas at Chicago or eastern market centers and pay for transportation on stacked pipelines. Rather, Spire Missouri could purchase gas from the liquid REX Zone 3.  Spire and Spire Missouri also assert that the project was developed to allow Spire Missouri to diversify its natural gas transportation, rather than serve new demand.

54.    Commission staff issued a data request on February 21, 2018, seeking additional information from Spire and MRT to assess the protestors' concerns and aid in considering whether the project would provide the economic benefits claimed by Spire and/or the potential economic harm claimed by the protesters.  Specifically, the data request asked that Spire provide projections for the cost of gas delivered to Spire Missouri through Spire's proposed pipeline over a 20-year period and to quantify operational benefits of Spire Missouri's replacement of the propane system.  Similarly, staff asked MRT to provide the costs of delivering gas from various supply basins to Spire Missouri over a 20-year period.

55.    In its response, Spire states that the scenarios presented in the data response, i.e.,: (1) Spire Missouri contracts for only an additional 160,000 Dth per day of capacity (to replace the peaking capabilities of its existing propane facilities) on a new pipeline sized to meet that level of demand or (2) Spire Missouri contracts for capacity through MRT's Main Line, MRT's East Line, and MoGas's system to deliver supplies from REX to Spire Missouri, do not offer a cost advantage over Spire Missouri taking service on the proposed 400,000 Dth per day Spire STL Pipeline Project.[90]  Spire asserts that as

---

[87] Spire Missouri March 22, 2017 Answer at 16-17.  Spire Missouri notes that MRT's Table 2 on page 15 of its protest, "Unsubscribed Capacity," lists MRT as having only 7,637 Dth per day.

[88] *Id.* at 17.

[89] *Id.* at 11.

[90] Spire prepared its response jointly with Spire Missouri because the information sought pertained to the needs, historical resources, cost impacts, and alternatives of the shipper, Spire Missouri.  EDF claims this joint-preparation of a response by Spire and Spire Missouri further implicates the intermixing roles of the pipeline and affiliated

compared to each of the hypotheticals, Spire Missouri would realize annual cost of service savings by taking service on the Spire STL Pipeline Project. Spire estimates that the cost of contracting for 350,000 Dth per day of service to Spire Missouri would average $5.59/Dth, including commodity and the delivery costs.[91] Alternatively, the cost of contracting for 160,000 Dth per day of service on a new, downsized pipeline would average $5.98/Dth.[92] Spire estimates that over a 20-year term, Spire Missouri would realize $31 million in costs savings by using the proposed Spire STL Pipeline compared to the downsized pipeline. Spire also analyzed an expansion on MRT's Main Line to provide the additional 160,000 Dth per day of firm service with an estimated delivered cost of $5.89 per Dth and found that the proposed Spire STL Pipeline Project would result in a savings of $24.3 million over the next 20 years.[93] Similarly, for the MRT East Line, Spire estimates a delivered cost of $5.88 per Dth with an increased annual cost of $24.3 million more than Spire Missouri's contract with Spire.[94] For a MoGas expansion, Spire calculates a delivered cost of $6.05 per Dth and the increased annual cost would be an additional $36.4 million over Spire Missouri's subscription for capacity on Spire.[95] All of these hypothetical alternatives resulted in higher average daily costs of delivered gas when compared to the Spire STL Pipeline Project.

---

shipper and supports its notion that the pipeline and affiliated shipper taint the entire project. EDF March 26, 2018 Answer at 5.

[91] Spire's estimate of $5.59/Dth is based on a 20-year average price of natural gas of $4.26/Dth, plus $1.30 transportation cost, plus $0.02 usage cost. Spire for all its estimates used forecasted natural gas pricing data from IHS Markit North American Natural Gas Monthly Briefing, February 2018, for each appropriate supply hub. Spire also assumes that Spire Missouri's firm natural gas requirements remain at their historical level of 79.3 Bcf per year. Spire March 13, 2018 Answer at 9, 18.

[92] Spire's estimate of $5.98/Dth is based on a 20-year average price of natural gas of $4.28/Dth, plus $1.67 transportation cost, plus $0.02 usage cost. *Id.* at 18.

[93] Spire's estimate of $5.89/Dth is based on a 20-year average price of natural gas of $4.32/Dth, plus $1.54 transportation cost, plus $0.03 usage cost. *Id.* at 19.

[94] Spire's estimate of $5.88/Dth is based on a 20-year average price of natural gas of $4.32/Dth, plus $1.53 transportation cost, plus $0.03 usage cost. *Id.* at 20.

[95] Spire's estimate of $6.05/Dth is based on a 20-year average price of natural gas of $4.33/Dth, plus $1.69 transportation cost, plus $0.03 usage cost. *Id.* at 23.

56.    MRT's data response included estimates for the delivered cost of natural gas to Spire Missouri.[96] MRT provided an estimate for the total cost of gas to be delivered via REX Zone 3, MRT via Columbia Gulf, MRT via Trunkline, MRT via Texas Gas, and MRT via Chicago citygate.  Under MRT's estimates for the following systems, gas would be purchased at the southern end of MRT's system, at the Perryville hub, and transported to Spire Missouri for the total delivered cost from Columbia Gulf ($4.91 per Dth),[97] Trunkline ($5.08 per Dth),[98] and Texas Gas ($5.08 per Dth).[99]  For the Chicago citygate scenario, gas would be transported at the northern end of MRT's system and transported to Spire Missouri at a total delivered cost of $5.07 per Dth.[100]  This is compared to an estimated total delivered cost from REX Zone 3, via Spire, of $5.15 per Dth using the recourse transportation rate,[101] or $5.05 per Dth using a hypothetical negotiated transportation rate.[102]

### d.    Prior Unsuccessful Projects

57.    MRT and the Missouri PSC question why Spire Missouri signed a precedent agreement with Spire when it previously declined to support pipeline projects with unaffiliated sponsors that provided both additional capacity and a connection with

---

[96] MRT's estimates are based on natural gas forecasts from RBAC's GPCM system price forecasting model for each appropriate supply hub.  The recourse rate is from Spire's recourse rate; while the negotiated rate is estimated to be 2/3 of the recourse rate.  MRT calculated the transportation cost assuming 100 percent load factor, and includes pipeline reservation rate, usage cost, fuel cost, and lost gas.  MRT March 14, 2018 Answer attachment 1(A) at 2-3.

[97] MRT's estimate of $4.91/Dth is based on a 20-year average price of natural gas of $4.69/Dth, plus $0.22 transportation cost.  *Id.*

[98] MRT's estimate of $5.08/Dth is based on a 20-year average price of natural gas of $4.85/Dth, plus $0.22 transportation cost.  *Id.*

[99] MRT's estimate of $5.08/Dth is based on a 20-year average price of natural gas of $4.85/Dth, plus $0.22 transportation cost.  *Id.*

[100] MRT's estimate of $5.07/Dth is based on a 20-year average price of natural gas of $4.97/Dth, plus $0.10 transportation cost.  *Id.*

[101] MRT's estimate of $5.15/Dth is based on a 20-year average price of natural gas of $4.84/Dth, plus $0.31 transportation cost.  *Id.*

[102] MRT's estimate of $5.05/Dth is based on a 20-year average price of natural gas of $4.84/Dth, plus $0.21 transportation cost.  *Id.*

REX.[103]  MRT cites two projects rejected by Spire Missouri:  the St. Louis Natural Gas Pipeline Project (St. Louis Project) proposed in 2011 and an expansion of MoGas's system proposed in 2015.[104]  MRT states that the St. Louis Project, with a proposed capacity of 200,000 Dth per day, would have connected Spire Missouri's system to REX via an 11-mile-long pipeline connecting Spire Missouri with NGPL, thereby allowing access to REX.[105]  It also states that the project would have provided access to Appalachian gas at lower prices, increased competition for transportation service in the region, and created an additional supply source that would help decrease service interruptions.  MRT contends that despite the fact the current proposal and the St. Louis Project would have met the same criteria, such as providing access to allegedly lower-cost gas and enhancing supply security, Spire Missouri refused to accept as valid the benefits from the St. Louis Project that Spire now relies upon.  Further, Spire Missouri stated in regard to the St. Louis Project that "the proposed pipeline did not make operational or economic sense for either [Spire Missouri] or its customers . . . ."[106]  MRT alleges that if the St. Louis Project did not satisfy Spire Missouri's needs, the more expensive Spire Project could not do so either.  Moreover, MRT cites Spire Missouri's various filings before the Missouri PSC where Spire Missouri claimed it could obtain supplies from the Appalachian region without the need to subscribe to the St. Louis Project.[107]

58.     Similarly, MRT asserts that Spire Missouri's decision to not subscribe to MoGas's contemplated 2015 capacity expansion indicates a lack of need for the present project.  MRT states that MoGas, which connects with REX and Panhandle, announced an open season in March 2015 to solicit interest in a system expansion of up to 300,000 Dth per day of firm service from REX and Panhandle.  MRT states that the unit cost of the MoGas project was about half of Spire's currently proposed recourse rate, and the required contract commitment was half of that for the Spire Project.[108]

---

[103] MRT April 10, 2017 Answer at 3.

[104] Neither contemplated project was proposed to the Commission.

[105] MRT February 27, 2017 Protest at 32.

[106] *Id.* at 34 (citing Spire Missouri's comments before the Missouri PSC).  *See also id.* at 34-36, 38.

[107] MRT April 3, 2017 Answer at 15-16.  *See also* MRT February 27, 2017 Protest at 41 quoting excerpts from Spire Missouri's 2016 Annual Report describing Spire Missouri's existing access to diverse supply regions.

[108] MRT February 27, 2017 Protest at 37.

59.    In addition to the St. Louis Project and the MoGas expansion project, the Missouri PSC identifies several other projects to serve St. Louis that had been contemplated, including a proposal by Ameren to build a 200,000 to 300,000 Dth per day interstate pipeline from REX in Illinois to the St. Louis area.  The Missouri PSC notes that none of these proposed projects were built.[109]  Thus, the Missouri PSC submits that in light of the history of failed projects to serve the St. Louis market, the Commission should be skeptical of an alleged need for capacity into the St. Louis market.

60.    Spire and Spire Missouri respond that the failure of the St. Louis Project is not relevant to this proceeding, noting that the St. Louis Project was essentially an 11-mile expansion of NGPL's system, which would not meet the needs of Spire Missouri because it would not provide a direct connection to REX.  They further state that the market conditions were different for the St. Louis Project because development of the liquid point on REX's Zone 3 had not yet occurred and access to Appalachian gas was not abundant.  Moreover, Spire and Spire Missouri state that the company proposing the St. Louis Project did not have experience in the interstate natural gas market and was not proposing a direct connection to REX.

### e.    Missouri's Prudency Review of the Precedent Agreement

61.    MRT, the Missouri PSC, and EDF assert that the review of the precedent agreement by the Missouri PSC will not occur until after construction of the project, and that Spire Missouri's decision to contract for firm transportation service on the Spire STL Pipeline Project will result in Spire Missouri's ratepayers being overcharged for natural gas transportation because of Spire's capital costs.[110]

62.    MRT argues that Spire Missouri's captive retail customers are being forced into a 20-year transportation arrangement under which the high gas supply and transportation costs associated with the project will be passed through to them.  Because Missouri regulatory law and practice do not provide the opportunity for an advance review and pre-approval by the Missouri PSC of an LDC's gas supply decisions,[111] MRT asserts that there has been no meaningful review of the precedent agreement and whether Spire Missouri should be able to recover the costs of the contract from its ratepayers.  MRT argues that an after-the-fact review of Spire Missouri's rates by the Missouri PSC will be inadequate to effectively examine Spire Missouri's decision to subscribe to Spire and

---

[109] Missouri PSC February 27, 2017 Protest at 10.

[110] *See, e.g.*, MRT February 27, 2017 Protest at 28-29.

[111] *See* Spire March 17, 2017 Answer at 19.

whether competition to provide interstate transportation service has been conducted fairly.[112]

63.    MRT states that the filed rate doctrine prevents state regulators from looking behind an approved, federally regulated transmission rate (e.g., the negotiated rate for service on the Spire STL Pipeline Project), and under a state prudence review pursuant to *Pike County Light and Power Company v. Pennsylvania Public Utilities Commission*,[113] the Missouri PSC will be limited to comparing Spire Missouri's federally-regulated rates on Spire to the federally-regulated rates of other interstate pipelines.[114] MRT argues that an after-the-fact *Pike County* review will be too late because that review will take place following Spire's in-service date and capacity turnback on existing systems and associated rate increases due to capacity decontracting will have already occurred and will distort the comparison between pipeline alternatives that would have been made in an arms-length commercial negotiation. In other words, MRT argues that the Missouri PSC will be left to compare the Spire rate to post-Spire rates on competing pipelines that are now higher. Hence, MRT contends that Spire Missouri has an incentive to decontract on existing pipelines to improve the post-Spire comparison relative to the lower rates in effect on existing pipelines before the effects of decontracting due to Spire are realized. Therefore, MRT insists that the Missouri PSC's after-the-fact *Pike County* review is not an adequate substitute for a fair competition before-the-fact analysis and comparison of alternatives. MRT is concerned that the issue of the role of the affiliate relationship between Spire and Spire Missouri in Spire Missouri's decision to contract with Spire will not be addressed at the state level and that Spire and Spire Missouri will argue that meaningful remedies will either be precluded, or too late.

64.    The Missouri PSC is concerned that the Commission's finding on the terms of the firm transportation service agreement included as Exhibit A of the precedent agreement not preclude the Missouri PSC's later review of Spire Missouri's prudence in entering into the contract for the project. The Missouri PSC states that Spire has requested that the Commission pre-approve the two non-conforming provisions in the firm transportation service agreement between Spire and Spire Missouri. The Missouri PSC states that although it does not object to these two non-conforming provisions, it does have concerns with other terms of the precedent agreement. Therefore, the Missouri PSC requests that the Commission:  (1) clearly state that it is not pre-approving the terms of the precedent agreement; and (2) explicitly confirm the Missouri PSC's exclusive

---

[112] MRT April 3, 2017 Answer at 12-13.

[113] 465 A.2d 735 (1983).

[114] MRT April 10, 2017 Answer at 2, 6-8.

jurisdiction relating to the reasonableness of Spire Missouri's participation in the project and Spire Missouri's charges to its Missouri retail customers.

65.    EDF argues that in light of the absence of any regulatory oversight or imprimatur from the state and the Missouri PSC's stated concerns that Spire's application does not contain sufficient detail reflecting new demand for natural gas capacity, the Commission must employ heightened regulatory scrutiny to the proposed project, and should set this case for hearing.[115]  Like MRT, EDF also argues that the retrospective Annual Cost Adjustment process through which the Missouri PSC examines and adjusts for prudence the supply costs passed through the Purchased Gas Adjustment process is inadequate to address the issues of project need in this case because it claims there will be economic harm and other impacts from building a pipeline that is not needed that will be unable to be undone.[116]  EDF asserts that there is a significant gap in regulatory oversight between the Commission's and the Missouri PSC's review of affiliate transportation agreements.[117]  EDF argues that because the Commission will not generally look behind the terms of an affiliate precedent agreement to assess the impetus for such an agreement, state commissions are left as the sole source of regulatory oversight.  But, EDF asserts that the Commission's reluctance to examine precedent agreements for need to avoid infringing upon the role of state regulators to determine prudence of utility expenditures, presumes state regulatory oversight is occurring and ignores the significant extent to which state commissions are limited by statute and law as to their review of these agreements.  EDF states that the Missouri PSC, unlike other state commissions, does not require utilities to obtain advance approval before entering into a long-term transportation contract with an affiliate.  EDF asserts that waiting until after a pipeline is built to assess prudency poses too much risk to retail customers and does not shield them from unreasonable costs resulting from an LDCs capacity decisions made at the corporate level.[118]

66.    Spire and Spire Missouri respond that the issue of the reasonableness and prudence of Spire Missouri's decision to enter into the precedent agreement in light of the market conditions in the St. Louis area and its impact on Spire Missouri's retail customers is not for this Commission to consider, and rather it will be appropriately considered by the Missouri PSC.  Spire states that the Commission's rate and tariff determinations with respect to the project have preemptive effect under the *Nantahala*

---

[115] EDF May 22, 2017 Protest at 8-10; EDF January 9, 2018 Motion to Lodge at 10.

[116] EDF July 31, 2017 Answer at 11-13.

[117] EDF January 9, 2018 Motion to Lodge at 5-7.

[118] *Id.* at 8.

doctrine,[119] but that this does not affect the Missouri PSC's jurisdiction over Spire Missouri's LDC purchasing practices or authority to conduct a prudence review of Spire Missouri's contracting decisions. Spire states that the Missouri PSC will have a full opportunity to review Spire Missouri's commercial decision making in the context of its entire gas supply portfolio management and there has been no pre-judgment regarding the reasonableness of Spire Missouri's participation in the project or the pass-through to its retail customers of the costs associated with the long-term FTS Agreement.

67.    Spire Missouri asserts that the Missouri PSC is fully capable of reviewing Spire Missouri's purchasing decisions and the Commission should assume that challenges to the prudence or reasonableness of decisions made by state-regulated utilities can and will be raised under state law.[120] Moreover, Spire Missouri argues that retrospective review of gas portfolio decisions by a state regulator imposes cost discipline on an LDC because the state regulator can and will disallow costs that it determines were imprudently incurred. Spire Missouri states that the threat of disallowance creates a powerful incentive for LDCs to incur costs prudently, particularly where the service provider is an affiliated entity. Spire Missouri further argues that by urging the Commission to engage in its own review of reasonableness in lieu of state commission review, MRT inappropriately suggests that the Commission should usurp the state regulator's role, and act as a "super-PSC."[121]

### f.    Decision to Contract for Capacity to Increase System Reliability

68.    Spire Missouri states that under its contract with Spire it will be able to end its reliance on a propane peaking facility.[122] It states that the propane peaking system has provided 160,000 Dth per day of peaking capabilities, but replacing the propane system with a firm pipeline supply will remove the impacts of injecting vaporized propane into its distribution system,[123] replace an aging propane peaking facility that is more than 40 years old, and reduce the propane it needs to obtain over time.[124]

---

[119] Nantahala Power & Light Co. v. Thornburg, 476 U.S. 953 (1986).

[120] Spire Missouri July 14, 2017 Answer at 5-6.

[121] *Id.* at 5.

[122] Spire Missouri March 22, 2017 Answer at 9.

[123] The injection of propane increases the Btu content of natural gas, which can negatively affect end-use equipment.

[124] *Id.*

69.    MRT and EDF assert that replacement of Spire Missouri's propane peaking facilities is unnecessary.  MRT posits that Spire Missouri's decision to replace an infrequently used propane peaking facility with an equivalent amount of firm transportation service is unwise and further signals affiliate abuse.[125]  MRT states that Spire Missouri has failed to demonstrate how retiring its propane facilities will allow Spire Missouri to lower its costs because:  (1) the propane facilities are largely depreciated, resulting in inexpensive peaking capacity; (2) according to Concentric's testimony, propane peak-shaving facilities "are the most economical means of meeting the limited number of days during the winter in which additional natural gas is needed to serve the spikes in demand;" and (3) Spire Missouri has failed to provide cost information to show the financial impact to its customers associated with replacing propane peaking capabilities with capacity from the Spire proposal.[126]  EDF also questions why Spire Missouri reserved 350,000 Dth per day of capacity when the propane peaking facility represents 160,000 Dth of capacity.[127]

70.    MRT claims that Spire Missouri's concern about earthquakes is without merit, stating that MRT has served St. Louis for over 80 years without a service interruption caused by seismic activity.  MRT also contends that portions of Spire Missouri's service territory are within the New Madrid seismic zone and could be affected by earthquakes, so the proposed Spire pipeline would have little effect.[128]

71.    Spire Missouri claims that MRT's pipeline crosses the most active portions of the New Madrid seismic zone, whereas Spire's project is outside the seismic zone.  Spire Missouri cites the U.S. Geological Survey and the Center for Earthquake Research and Information of the University of Memphis that estimates the potential for a major (magnitude 6.0) earthquake on the New Madrid Fault in the next 50 years as being 30 to 40 percent.[129]  Spire Missouri asserts that the fact that a portion of its system lies within the New Madrid seismic zone does not make it unreasonable to diversify its upstream supplies to make the supplies less vulnerable to risk.[130]

---

[125] MRT April 10, 2017 Answer at 17.

[126] MRT July 31, 2017 Answer at 13-14.

[127] EDF January 9, 2018 Motion to Lodge at 11.

[128] MRT February 27, 2017 Application at 41-42.

[129] Spire Missouri March 22, 2017 Answer at 14-15.

[130] Spire Missouri June 6, 2017 Answer at 15-16.

g.    **Commission Determination**

72.    The Certificate Policy Statement established a new policy under which the Commission would allow an applicant to rely on a variety of relevant factors to demonstrate need, rather than continuing to require that a particular percentage of the proposed capacity be subscribed under long-term precedent or service agreements.[131] These factors might include, but are not limited to, precedent agreements, demand projections, potential cost savings to consumers, or a comparison of projected demand with the amount of capacity currently serving the market.[132]  The Commission stated that it would consider all such evidence submitted by the applicant regarding project need. The policy statement made clear that, although precedent agreements are no longer required to be submitted, they are still significant evidence of project need or demand.[133] The Commission's longstanding reliance on precedent agreements as substantial and sufficient evidence of need was affirmed by the court in *Myersville*[134] and *Minisink*.[135]

73.    Spire has entered into a long-term precedent agreement with Spire Missouri for 350,000 Dth per day of firm transportation service, approximately 87.5 percent of the system's capacity.  Further, Ordering Paragraph (G) of this order requires that Spire file a written statement affirming that it has executed a final contract for service at the level provided for in the precedent agreement prior to commencing construction.  Spire Missouri will supply gas to retail customers and other end users and, as discussed below, has determined that the Spire STL Pipeline Project is the preferred provider of transportation service for the gas needed to meet its service obligations.  We find that Spire has sufficiently demonstrated that the project is needed in the market that the Spire STL Pipeline Project intends to serve.

74.    As noted above, the protestors argue that because the project is less than 100 percent subscribed by a single, affiliated LDC shipper with captive customers, we

---

[131] Certificate Policy Statement, 88 FERC at 61,747.  Prior to the Certificate Policy Statement, the Commission required a new pipeline project to have contractual commitments for at least 25 percent of the proposed project's capacity.  *See id.* at 61,743. The Spire STL Pipeline Project, at 87.5 percent subscribed, would have satisfied this prior, more stringent, requirement.

[132] *Id.* at 61,747.

[133] *Id.*  The policy statement specifically recognized that such agreements "always will be important evidence of demand for a project."  *Id.* at 61,748.

[134] 783 F.3d 1301.

[135] 762 F.3d 97.

should exercise heightened scrutiny in determining whether there is market demand for the project. Specifically, the protestors argue that additional evidence demonstrating project need and justifying project benefits is necessary, such as market studies analyzing the demand for natural gas in the St. Louis market.

75.     We disagree. The fact that Spire Missouri is affiliated with the project's sponsor does not require the Commission to look behind the precedent agreements to evaluate project need.[136] As the court affirmed in *Minisink*, the Commission may reasonably accept the market need reflected by the applicant's existing contracts with shippers and not look behind those contracts to establish need.[137] An affiliated shipper's need for capacity and its obligation to pay for such service under a binding contract are not lessened just because it is affiliated with the project sponsor.[138] When considering applications for new certificates, the Commission's primary concern regarding affiliates of the pipeline as shippers is whether there may have been undue discrimination against a non-affiliate shipper.[139] Here, no such allegations that Spire has discriminated against a non-affiliate shipper have been made. Rather, MRT appears to argue that Spire Missouri, the affiliate shipper in this case, has engaged in anticompetitive behavior and discriminated against non-affiliated pipelines by the manner in which it made its decision to obtain service from a pipeline to be built by its affiliate.

---

[136] *See Millennium Pipeline Co., L.P.*, 100 FERC ¶ 61,277, at P 57 (2002) ("as long as the precedent agreements are long-term and binding, we do not distinguish between pipelines' precedent agreements with affiliates or independent marketers in establishing the market need for a proposed project"); *see also* Certificate Policy Statement, 88 FERC at 61,748 (explaining that the Commission's policy is less focused on whether the contracts are with affiliated or unaffiliated shippers and more focused on whether existing ratepayers would subsidize the project); *id.* at 61,744 (the Commission does not look behind precedent agreements to question the individual shipper's business decisions to enter into contracts) (citing *Transcontinental Gas Pipe Line Corp.*, 82 FERC ¶ 61,084, at 61,316 (1998)).

[137] *Minisink*, 762 F.3d at 110 n.10 ("nothing in the Certificate Policy Statement or in any precedent construing it suggests that the policy statement requires, rather than permits, the Commission to assess a project's benefits by looking beyond the market need reflected by the applicant's existing contracts with shippers").

[138] *See, e.g.*, *Greenbrier Pipeline Company, LLC*, 101 FERC ¶ 61,122, at P 59 (2002), *reh'g denied*, 103 FERC ¶ 61,024 (2003).

[139] *See* 18 C.F.R. § 284.7(b) (2017) (requiring transportation service to be provided on a non-discriminatory basis).

76.     The Commission rejects MRT's argument that the precedent agreement is the result of unfair competition or affiliate abuse because Spire Missouri failed to issue a request for proposals or engage in an evaluation process transparent to unaffiliated parties.  Spire Missouri is not regulated by this Commission and thus we have no authority to dictate its practices for procuring services, although we can and do require any jurisdictional pipeline proposing to construct new capacity to have an open season to ensure that any new capacity is allocated among all potential shippers on a not unduly discriminatory basis.  EDF comments that "LDC's gas supply management decisions are becoming more nuanced and therefore require an updated regulatory paradigm in order to be properly assessed,"[140] however, we believe that such assessments are best made at the state level.

77.     Further, many pipeline projects are initiated first by a single anchor or foundation shipper expressing a desire for service to a particular, prospective pipeline sponsor.  That the precedent agreement was not the direct result of the open season, but stemmed from prior discussions between Spire, Spire Missouri, and their corporate parents is not indicative of abuse or self-dealing.  Our open season policy for new interstate pipeline construction only requires that a pipeline applicant eventually conduct a fair and transparent open season affording all potential shippers the opportunity to seek and obtain firm capacity rights.[141]  An open season also serves to provide the project sponsor with valuable information about market interest that it can utilize to properly design and size its project.[142]  Spire held a binding open season for capacity on the project before filing its application and all potential shippers had the opportunity to contract for service.  In general, the probative information is the amount of capacity subscribed, not when the project shipper decided to become involved with or subscribe to the project.[143]  We have found, as discussed above, that Spire did not discriminate against any potential shippers or engage in any anticompetitive behavior.  Moreover, Spire's tariff, as discussed below, ensures that any future shipper will not be unduly discriminated against.

---

[140] EDF January 9, 2018 Motion to Lodge at 11.

[141] *See Pine Prairie Energy Center, LLC*, 135 FERC ¶ 61,168, at P 30 (2011) (finding that an open season is intended to provide transparency to the market regarding new pipeline capacity and to assist the proponent with sizing its project).

[142] *Id.*

[143] *See, e.g.*, *National Fuel Gas Supply Corp.*, 158 FERC ¶ 61,145, at PP 10, 16, 32 (2017) (where Commission accepted precedent agreements executed prior to the open seasons for the project as valid evidence of market demand); *Tennessee Gas Pipeline Company, LLC*, 158 FERC ¶ 61,110, at P 4 (2017).

Docket Nos. CP17-40-000 and CP17-40-001                                     - 34 -

78.     The Commission is not persuaded by the protestors' argument that the aggregation of the facts in this case regarding the precedent agreement and the lack of a prior Commission case on point in all respects renders unreasonable our reliance on existing precedent.  As Spire has indicated, the Commission has clearly approved projects and found the precedent agreement to be adequate evidence of project need in various cases in which, variously, there was only one precedent agreement supporting the project, the project was not fully subscribed, the shippers were affiliates, or the affiliate shippers were LDCs with captive customers.  The protestors are correct that there has previously not been a case with all of these attributes.  However, simply because there has never a proposal before the Commission with all of these aspects present does not invalidate or negate the rationale supporting the Commission's policy regarding each individual aspect.

79.     Notwithstanding MRT's efforts to distinguish the cases, the Commission finds that *Eastern Shore*, although not on point in all respects, provides guidance for the Commission in this proceeding.[144]  There, Eastern Shore, an existing pipeline, proposed to extend its system to interconnect with an upstream pipeline, Texas Eastern, to enable its customers to access Appalachian natural gas supplies and thereby diversify their supply sources.  As in the instant case, the proposed project would not increase capacity or deliverability to meet any additional natural gas demand, but rather was designed to strengthen the reliability and flexibility of service to Eastern Shore's customers through enhancing supply diversity.  Like here, the two project shippers were affiliated LDCs with captive customers, and the total subscribed project capacity was less than 100 percent (80 percent in that case).  Further, in that case the Commission found there would be some adverse impact on an existing pipeline, Transcontinental Gas Pipe Line Corp., LLC (Transco), since Eastern Shore's project shippers would be reducing design day receipts from Transco by 37 percent and replacing that service with an equivalent amount of receipts from Texas Eastern.[145]  Also, like here, the project was opposed by one of the state public service commissions (as well as a non-affiliated shipper) on the

---

[144] 132 FERC ¶ 61,204.  In *Eastern Shore*, there were two affiliated LDC shippers rather than one, and the existing pipeline did not object to the project.  Neither difference is relevant to the question of need.  The presence of two shippers instead of one is irrelevant because both were affiliated and the project was not fully subscribed.

[145] *Id.* P 23.  Unlike here, Transco did not oppose the project or otherwise object to the displacement of some of its firm transportation service to Eastern Shore.  That MRT in this case raises objections to the project on the basis of the potential impacts to it and its customers is relevant only to the question whether the need established by the precedent agreement outweighs the projects impacts, not to whether the precedent agreement is inadequate evidence of need because of the affiliate relationship.

basis of need and alleged cost subsidization risk.[146]  However, the Commission found that these facts did not operate to diminish the validity of the precedent agreements as evidence of market demand or declined to require further data to establish demand. Rejecting the parties' affiliated-related arguments, the Commission stated:

> The Delaware PSC suggests that the mere fact that the agreements are with affiliates of Eastern Shore somehow raises questions regarding the shippers['] need for the service.  However, the Commission gives equal weight to contracts with affiliates and non-affiliates and does not look behind contracts to determine whether the customer commitments represent genuine growth in market demand.  The Commission has long recognized that a flexible and reliable interstate pipeline grid is essential to ensure ultimate consumers['] access to diverse supply options.  The prospective shippers of this project are LDCs with service obligations toward their retail customers.  The Commission has found it reasonable for LDCs, such as the Chesapeake LDCs to seek additional sources of supply, and has emphasized its disinclination to second-guess reasoned business decisions by pipelines' customers evidenced by precedent agreements, as well as binding contracts.  The Delaware PSC has presented no evidence of any impropriety or abuse in connection with the agreements.  The mere fact that the two [LDCs] are affiliates of Eastern Shore does not call into question their need for new capacity or their obligation to pay for it, or otherwise diminish the showing of market support.[147]

80.    The Commission also rejects the protestors' arguments that a market study either must or should be undertaken in this case to establish the need for the project.  The protestors rely on the Commission's statement in the Certificate Policy Statement that "the evidence necessary to establish the need for the project will usually include a market study . . . ."[148]  However, since the issuance of the Certificate Policy Statement, when precedent agreements for a substantial amount of capacity were presented, the Commission has relied on those agreements alone, even between affiliates in the absence of anticompetitive or discriminatory behavior, as adequate evidence of need.  Thus, although the Commission recognizes market studies as one type of evidence that can be used to demonstrate market need, market studies are not required to be submitted and an applicant need not satisfy, as MRT states, a "competitive market test demonstrating a need for the project"[149] if it has submitted a precedent agreement.[150]  We disagree with

---

[146] *Id.* PP 31-33.

[147] *Eastern Shore*, 132 FERC ¶ 61,204 at P 31 (citations omitted).

[148] Certificate Policy Statement, 88 FERC at 61,748.

[149] MRT July 31, 2017 Answer at 4.

MRT's stance that the "mere existence of a precedent agreement is insufficient to show adequate market demand" when a project is subscribed by affiliates for less than the full project capacity.[151]

81.    As discussed above, the submission of market studies are not required under the Certificate Policy Statement to demonstrate whether a project meets a need.  Under the circumstances of this proceeding, i.e., lack of evidence of anticompetitive behavior, we find the fact that a customer is willing to sign a binding contract to pay for service on the project shows need or demand for the project.  However, the protestors urge the Commission to undertake a further analysis.  Ameren recommends a market study to evaluate whether gas supplies from Appalachia and the Rocky Mountains are actually more competitively priced on a delivered basis than the supplies to which the existing pipelines have access.  In essence, the protestors argue that market studies are needed to quantify the economic and rate benefits to consumers that the project will provide so that the Commission can determine whether the deal is as beneficial to Spire Missouri and its ratepayers as Spire claims and/or whether the proposed project is the best service option for Spire Missouri.

82.    As Spire Missouri states:

> MRT asks the Commission to find, not whether the Project meets a need (which it does as evidenced by the Precedent Agreement), but whether [Spire Missouri] has a need for the Project given its retail load and current pipeline options.  MRT asks the Commission to decide whether [Spire Missouri] is entering into gas supply arrangements that will increase gas costs to its retail customers.  MRT also questions whether [Spire Missouri] could have made different and better choices for its retail customers. …

---

[150] *See Constitution* Rehearing Order, 154 FERC ¶ 61,046 at P 21 ("Although the Certificate Policy Statement broadened the types of evidence certificate applicants may present to show the public benefits of a project, it did not compel an additional showing … [and] [n]o market study or other additional evidence is necessary where … market need is demonstrated by contracts for 100 percent of the project's capacity.").

[151] Contrary to MRT's assertion, the Commission in *Eastern Shore* did not rely on a specific finding of increased demand for natural gas in the markets Eastern Shore serves as part of its evidence of need; rather, it found that it was unnecessary to rely on market studies where projects were supported by direct evidence of precedent agreements, because there was a general consensus, supported by generally available studies, that "the demand for natural [gas] has continued to increase."

This Application is not the forum for determining the issue of [Spire Missouri's] prudence, or the impact on its retail customers.[152]

83.     We agree.  The lengthy arguments the protestors make regarding whether Spire Missouri should have chosen to utilize existing infrastructure to meet the project purposes or committed to capacity on previously proposed projects, whether retiring Spire Missouri's propane peaking facilities and replacing them with capacity from the Spire Project is a cost effective approach, whether choosing a transportation path that avoids the New Madrid fault is unnecessarily cautious, and even, in the first instance, the extent to which the Spire STL Pipeline Project will provide economic and rate benefits to Spire Missouri's customers, all go to the reasonableness and prudence of Spire Missouri's decision to switch transportation providers.  All of those issues fall within the scope of the business decision of a shipper.  The Commission's policy is to not second guess the business decisions of pipeline shippers, LDCs, or end users (unless there is evidence of affiliate abuse), and this is supported by a long line of orders in which we have stated that we are reluctant to do so.[153]

84.     Spire Missouri has explained its decision to obtain service from Spire, rather than from other pipelines.  Spire Missouri chose the Spire STL Pipeline Project not just because it allows it to access supplies flowing on REX, but because it allows Spire Missouri to do so over a specific path, which Spire Missouri believes will provide certain benefits such as direct access to a liquid supply point in very close proximity to its distribution system, and the avoidance of transportation through a seismic zone.  Spire Missouri's decision was driven by more than just cost or price considerations, such as the desire to enhance the reliability of its system by diversifying its gas supply portfolio.  Additionally, Spire Missouri indicated that other pipelines could not provide the amount of capacity it desired.  Moreover, although not necessarily relevant to our decision, we recognize that Spire Missouri's arguments regarding its rejection of the 2011 St. Louis Project and the other prior failed projects, may well have merit.  Appalachian production has increased more than five-fold since 2011, from approximately 4 Bcf per day to over 22 Bcf per day.  In addition, the east-to-west pipeline capacity that is now in place, including the full REX flow reversal that took place in 2015, was not available in 2011.  Therefore, the market that existed in 2011 is not the same as today's market, and that difference could reasonably justify Spire Missouri's acceptance now of the similar Spire proposal.  Regardless, accepting for the purposes of our consideration of Spire's

---

[152] Spire Missouri March 22, 2017 Answer at 8-9.

[153] *See, e.g.*, *Mountain Valley* Certificate Order, 161 FERC ¶ 61,043 at P 53; *Atlantic Coast* Certificate Order, 161 FERC ¶ 61,042 at PP 59-60; *Eastern Shore*, 132 FERC ¶ 61,204 at PP 30-33; *Southern Natural Gas Co.*, 76 FERC ¶ 61,122, at 61,635 (1996); *Williams Natural Gas Co.*, 70 FERC ¶ 61,306, at 61,924 (1995); *Tennessee Gas Pipeline Co.*, 69 FERC ¶ 61,239, at 61,901 (1994).

application the decision of Spire Missouri to contract for 350,000 Dth per day of firm transportation capacity from REX to Spire Missouri's local distribution system remain squarely within the Commission's policy to defer to the business decisions of shippers.

85.    However, Spire Missouri's contractual decisions will not remain unchecked. Despite the apparent discomfort evidenced by the protestors, we believe that oversight of the procurement decisions of local distribution companies is best left to state regulators. The prudence and reasonableness of the considerations underlying Spire Missouri's decision to obtain transportation service from Spire and enter into the precedent agreement are squarely within the jurisdiction of the Missouri PSC.  Further, the Missouri PSC will examine Spire Missouri's gas supply planning decisions and determine whether Spire Missouri will be permitted to pass through to its retail customers the costs associated with its contract with Spire.  State utility regulators must approve any expenditures by state-regulated utilities, and this includes a prudence review.

86.    We disagree with commenters who suggest that once the Commission has made a determination in this proceeding, state regulators cannot effectively review the expenditures of utilities that they regulate.  As Spire Missouri points out, the Missouri PSC has been reviewing its purchasing decisions for many years, and state regulators can and will disallow costs that it determines were imprudently incurred.  That such review of gas portfolio purchase decisions is retrospective does not make it ineffective.  Moreover, the Commission rejects the protestors' specific argument based on *Pike County* that the Missouri PSC will be unable to make the relevant determination whether the service on Spire that Spire Missouri opted to receive was a prudent decision in light of the other choices Spire Missouri had available to it.  Spire Missouri notes that the Missouri PSC's statement of its review standard in its 2016 Annual Report refutes the protestors' claim: "PSC Staff will consider the financial impact on customers of the LDC's use of its gas supply, transportation, and storage contracts in light of the conditions and information available when the operational decisions were made."[154]  Further, we reject EDF's claim that the Purchased Gas Adjustment and Annual Cost Adjustment processes are inadequate to protect Spire Missouri's customers from imprudently incurred costs.  EDF essentially is arguing that these processes are inadequate to address whether there is market need for the Spire STL Pipeline Project and whether for purposes of our decision on Spire's application there has been inappropriate self-dealing between the pipeline and its affiliate – issues that are properly before this Commission, not the state commission. The Missouri's PSC's mechanisms are not meant to address such issues of pipeline need and, therefore, EDF's arguments are misplaced.  As explained above, the Commission finds that Spire did not engage in anticompetitive behavior or affiliate abuse.

---

[154] Spire Missouri July 14, 2017 Answer at 5 (citing Missouri PSC's statement of its review standards, as expressed in its 2016 Annual Report).

87.    In sum, we believe that any attempt by the Commission to look behind the precedent agreements in this proceeding might, in fact, interfere with state regulators' role in determining the prudence of expenditures by the utilities that they regulate. The Commission's policy of not looking beyond precedent agreements includes not limiting our reliance on such agreements to those which have been previously approved by a state public service commission. Issues related to Spire Missouri's ability to recover costs associated with its decision to subscribe for service on the Spire STL Pipeline Project involve matters to be determined by the relevant state utility commissions; those concerns are beyond the Commission's jurisdiction. Should Spire elect to construct the project before affirmative action by state regulators, Spire will be at risk of not being able to recover some, or any, of their costs.

### 3.    Existing Pipelines and Their Customers

#### a.    Existing Pipelines' Loss of Market Share and Rate Impacts to Their Captive Customers

88.    Many of the objections raised by the protestors are premised on the impacts they argue the project will have on existing pipelines, MRT and MoGas (and their customers, Ameren and others), who will lose Spire Missouri's business to Spire. They assert that as Spire Missouri's contracts with upstream pipelines expire,[155] Spire Missouri will not renew those contracts; that is, Spire Missouri will "decontract" or "turnback" the capacity under those contracts and replace it with the capacity on the Spire STL Pipeline Project.[156] The protestors argue that the cost of the decontracted capacity on the existing

---

[155] Many of the contracts Spire Missouri held on upstream pipelines at the time of Spire's filing of its application have recently expired. Spire Missouri's largest contract still in effect with MRT, Contract No. 3310, is for 660,329 Dth per day of capacity; 437,240 Dth per day of that capacity expires on July 31, 2018. However, on June 28, 2018, Spire Missouri and MRT executed a contract for 437,240 Dth per day of transportation service from August 1, 2018 to July 31, 2019. Spire Missouri's contract with MoGas for 62,800 Dth per day expired in 2014, but has been renewed under an evergreen provision requiring one year's notice to terminate. As of November 1, 2018, Spire Missouri's remaining contracts with MRT will be for 223,089 Dth per day under Contract No. 3310, expiring in 2020; and for 75,000 Dth per day under Contract No. 3311, expiring in 2020. Spire Missouri has a contract with Enable Gas for 60,000 Dth per day, expiring in 2019; with Panhandle for 10,000 Dth per day, expiring in 2021; with Trunkline for 10,000 Dth per day, expiring in 2021; and with REX for 20,000 Dth per day, expiring in 2031. MRT February 27, 2017 Protest at 12-14.

[156] Given that Spire has stated that the project is not designed to meet any substantial new demand in the St. Louis area, the protestors contend there is nothing that would require Spire Missouri to increase its reserved transportation capacity by

pipelines will be reallocated to and be borne by the existing pipelines' captive customers, as well as by the retail residential customers in the St. Louis market. Thus, they contend reductions in Spire Missouri's firm transportation contracts on MRT and MoGas could lead to substantial rate increases to Missouri gas consumers to cover the difference.

89.    The protestors argue that Spire's application fails to acknowledge such adverse rate impacts on captive customers of existing pipelines, and fails to identify any efforts on Spire's part to eliminate or mitigate these adverse impacts. Ameren states that without this information, the Commission cannot undertake the requisite balancing of adverse impacts against project benefits. Ameren states that the amount of unsubscribed capacity that will be created and who will bear the risk are matters properly before the Commission as part of that balancing process. Similarly, the Missouri PSC argues that because Spire believes the impacts of the project on the captive customers of incumbent pipelines are speculative and, thus, Spire provides insufficient analysis of such impacts, the Commission must undertake a much more rigorous review of these impacts.

90.    Whereas there was much discussion in the early pleadings in the case regarding whether Spire Missouri would, in fact, decontract or turnback its capacity on MRT and other pipelines in the future, including statements by Spire that it was unknown and highly unlikely there would be contract reductions by Spire Missouri,[157] Spire Missouri has admitted that if the Spire STL Pipeline Project is constructed, it could turnback up to 186,800 Dth per day of capacity on MRT (163,200 Dth per day of the 350,000 Dth per day of contracted capacity represents incremental demand to replace the capacity of Spire's on-system liquid propane facility that will be retired).[158] However, in its July 31, 2017 Answer, MRT states that on July 27, 2017, Spire Missouri notified MRT that Spire

_____

350,000 Dth per day, a nearly 50 percent increase over what Spire Missouri currently subscribes on MRT and MoGas. Therefore, they conclude the project most certainly will result in Spire Missouri reducing its firm transportation contracts on the other pipelines serving St. Louis. *See* MRT February 27, 2107 Protest at 16-17. The protestors take issue with Spire's statements that Spire Missouri's contractual commitments will be unaffected by the project. We note, though Spire's statement is technically correct, as we presume Spire Missouri is not breaking any existing contracts, neither Spire nor Spire Missouri represent that Spire Missouri will be renewing those contracts.

[157] Spire March 17, 2017 Answer at 12-14.

[158] Spire Missouri July 14, 2017 Answer at app. B (Concentric Study) at 17. Spire Missouri indicates that it will not decontract its contractual commitment on MoGas in the near term as that capacity is critical for maintaining pressure and serving customer demand on the west side of its system, which cannot be met by deliveries from other existing pipeline supply alternatives in its portfolio. *Id. See also* Spire Missouri March 22, 2017 Answer at 18.

Missouri would immediately begin the process necessary to terminate up to 437,240 Dth per day of its MRT transportation service under Contract No. 3310, expiring July, 31, 2018, effective on that date.[159]  On June 28, 2018, MRT executed a contract with Spire Missouri to provide 437,240 Dth per day of service from August 1, 2018 to July 31, 2019.

91.     In addition, MRT argues that Spire Missouri has underestimated the amount of capacity that will be turned back by ignoring:  (1) further potential decontracting related to Spire's incentive to secure a contract for the 50,000 Dth per day of available project capacity; (2) decontracting related to likely future expansions of the Spire pipeline; (3) storage service decontracting; and (4) the impact of the project on capacity release.[160]

92.     MRT argues that the Commission's Opinion No. 528 makes it clear that the cost of the capacity de-subscribed on existing pipelines will be recovered from the remaining billing determinants on those systems.[161]  MRT states that that would include both the billing determinants associated with MRT's and MoGas' other customers, such as Ameren, as well as any remaining billing determinants associated with continuing to serve Spire Missouri should it retain capacity on those pipelines.[162]

93.     In its original protest, MRT includes a table summarizing the estimated unit rate impacts associated with Spire Missouri's turnback of capacity in its Market and Field Zones under several different scenarios, including a 350,000 Dth per day capacity turnback in MRT's Market Zone.  MRT states that adjusting billing determinants from MRT's last section 4 general rate case settlement, Table 3 reflects estimated rate

---

[159] MRT July 31, 2017 Answer at 12.  MRT states that according to its tariff, Spire Missouri had until August 26, 2017 to exercise a right of first refusal (ROFR) on that terminated capacity.

[160] MRT April 10, 2017 Answer at 4-5.

[161] *See* MRT February 27, 2017 Protest 17-18.  Noting that the Commission has held that "[t]he NGA requires the Commission to approve rates that permit a pipeline to an opportunity to recover 100 percent of its costs," MRT contends that in Opinion No. 528, the Commission rejected arguments that the pipeline should share in the cost of its unsubscribed and discounted capacity and allowed all costs of de-subscribed capacity and discounted rate contracts to be recovered from remaining billing determinants on the system.

[162] *Id.* at 18, 31.

increases of as much as approximately 55 percent, depending on how the Spire Project affects MRT's level of capacity subscriptions.[163]

94.    Ameren estimates that if Spire Missouri were to decontract 350,000 Dth per day of firm forward haul contract capacity on MRT and replace it with 350,000 Dth per day of capacity on Spire, MRT will suffer a revenue reduction of approximately $22.3 million per year.[164]    Ameren asserts that the impact on MRT will be significant, reducing MRT's annual revenue by 27 percent to approximately $61.7 million, as MRT's last rate case settlement in Docket No. RP12-955-000 provided for an annual cost of service of $84 million.[165]    Ameren contends this revenue deficiency will undoubtedly cause MRT to seek a significant rate increase when it makes its next NGA Section 4 rate filing, which, under the terms of its last rate case settlement, is required to be filed with a proposed effective date of July 1, 2018, for the new rates.[166]    Although acknowledging that it is clear that the extent to which cost shifts will be permitted is a matter to be addressed in the individual pipeline's section 4 rate case, Ameren maintains that it is highly likely, given that the Commission's current rate model allows captive customers to be asked to pay for unsubscribed capacity, that MRT will seek to recover its stranded costs from Ameren and its other remaining customers through increased rates.

95.    Consequently, Ameren requests that a market study be performed that examines the amount of unsubscribed capacity that will be created by the project and the associated

---

[163] MRT February 27, 2017 Protest at 19.

[164] Ameren February 27, 2017 Protest at 5-6.    Ameren calculates this amount by multiplying 350,000 Dth per day times the currently-effective reservation rate for Field to Market Zone transportation times 12 (350,000 Dth x $5.3060 per Dth x 12 months). *Id.* at 6.    With respect to MoGas, Ameren states that although Spire Missouri is paying a significantly discounted rate for that capacity, if Spire Missouri were to terminate that contract, MoGas would suffer a revenue loss of almost $4.8 million per year – approximately 40 percent of MoGas' fixed cost revenue of $11.8 million (62,800 Dth x $6.324 (currently effective discounted rate for Zone 1 capacity on MoGas) x 12).   *Id.* at 7.

[165] *Id.* at 6.    Ameren also estimates the impact of Spire Missouri decontracting 190,000 Dth per day on MRT as a $12.1 million per year revenue loss.    Ameren April 4, 2017 Reply at 3 n.3.

[166] Ameren notes that since the proposed in-service date for the project is November 1, 2018, and because Spire Missouri must provide MRT with a minimum of one (1) year's notice of termination under the terms of MRT's tariff, MRT will have received Spire Missouri's notice of termination by the time it is required to file its section 4 rate case, making the stranded costs both "known and measurable."  Ameren February 27, 2017 Protest at 6.

impacts on the captive customers of MRT, as well as the downstream impacts on retail customers in the St. Louis area. Ameren seeks to ensure that the potential adverse impacts on MRT's remaining customers and Ameren's retail customers are properly considered by the Commission before it issues an order in this proceeding.[167]

96.    MRT contends that it will not be able to remarket the decontracted capacity because demand is flat in the St. Louis region and there is no evidence of any expected growth. The Missouri PSC, also maintains that the Commission should be skeptical of the ability of MRT and MoGas to develop new business to make up for the business lost to Spire in light of the number of projects that were proposed for the St. Louis area and failed.[168] The Missouri PSC states that MRT has previously indicated that high levels of capacity release were being used as an alternative to interruptible transportation service indicating that current firm transportation contracts were underutilized. MRT asserts that neither Spire, Spire Missouri, nor the Concentric study have produced concrete information regarding "real world incremental market opportunities" for MRT's soon-to-be de-subscribed capacity.[169]

97.    Further, MRT argues that Spire Missouri's delay in notifying MRT of its plans to turnback capacity, beyond the date of Spire's original application, has hampered MRT's ability both to remarket that capacity and to give the Commission a better idea of the consequences of that turned-back capacity. MRT states that finding a new market for significant amounts of turned back capacity could involve a multi-year process, including negotiations and potentially the construction of new facilities, and Spire Missouri's delay has delayed those steps. MRT also is concerned that Spire Missouri and Spire have had an unfair advantage throughout the proceeding in crafting various arguments regarding capacity turnback, presumably with the knowledge of the amount of capacity Spire Missouri would decontract on MRT's system, while simultaneously withholding such information from MRT and the Commission. MRT contends that the harm to its ability to remarket its capacity from Spire Missouri's lack of transparency is occurring now, and is not isolated to a future time period.

98.    In response to the protestors' arguments regarding the impacts on MRT and its customers from any potential capacity turnback, Spire argues that any effects on existing pipelines and subsequent adjustments due to the introduction of a new pipeline are not cognizable adverse impacts under the Certificate Policy Statement. Spire asserts that the Commission in the Certificate Policy Statement stated that "[t]he Commission's focus is not to protect incumbent pipelines from the risk of loss of market share to a new

---

[167] Ameren April 4, 2017 Answer at 3.

[168] Missouri PSC February 27, 2017 Protest at 13.

[169] MRT July 31, 2017 Answer at 15.

entrant[,]" and in subsequent cases has rejected arguments by incumbent pipelines that a new project would cause them adverse effects, finding that as long as the project was the result of fair competition, any effect on existing pipelines is competitive in nature and would not be considered adverse.[170]

99.     Spire asserts that MRT is grossly overstating the potential risk of adverse cost effects from any reduction in Spire Missouri's contract demand. Spire argues that there is no guarantee that in a future rate case a pipeline will be permitted to recover stranded capacity costs,[171] and that MRT has mischaracterized *El Paso Natural Gas Company*[172] upon which it relies. Spire contends that MRT overlooks the fact that a pipeline's ability to shift stranded capacity costs to its remaining customers is dependent, among other factors, upon the pipeline first demonstrating that it has taken all reasonable steps to remarket the unsubscribed capacity. Spire claims that MRT fails to recognize its ability, or to consider efforts, to mitigate such stranded costs. Spire states that until MRT is able to demonstrate that it has done all it can to cut costs to mitigate the impact of turned-back capacity, the Commission will protect MRT's existing customers from overreach.[173] Moreover, Spire argues that MRT's claims of harm from Spire Missouri's decontracting of capacity are inconsistent with public statements MRT's parent has previously made to investors asserting that it will be able to mitigate any impacts to MRT from Spire's project and that the project presents opportunities for MRT to benefit from the new source of Appalachian gas by being able to move that gas south to its Perryville Hub and providing additional flexibility to the MRT system.[174] Spire also points out that MRT previously acknowledged that Spire Missouri contract expirations were coming up on MRT, but stated that "that's kind of a normal recontracting process," undercutting MRT's position that dire consequences will result.[175]

---

[170] Spire January 26, 2017 Application at 19 (citing Certificate Policy Statement at 61,750; *Ruby Pipeline, LLC*, 128 FERC ¶ 61,224, at P 37 (2009) (*Ruby*); *Guardian Pipeline, LLC*, 91 FERC ¶ 61,285, at 61,977 (2000) (*Guardian*)).

[171] Spire March 17, 2017 Answer at 16 and June 6, 2017 Answer at 15 (citing *Mississippi River Transmission Corp.*, 95 FERC ¶ 61,460, at 62,659 (2001)).

[172] 145 FERC ¶ 61,040, at PP 389-91 (2010).

[173] Spire June 6, 2017 Answer at 15 (citing *Natural Gas Pipeline Co. of America*, 73 FERC ¶ 61,050, at 61,129 (2005)).

[174] *See* Spire March 17, 2017 Answer at 14-16.

[175] *Id.* at 13, 15, Attachment A (quoting Christopher T. Ditzel, MRT's Vice President Commercial – Transportation & Storage at Enable Midstream Partners, LP, Enable Midstream Q4 Earnings Conference Call and Webcast (Feb.17, 2016)).

100.    Spire insists that the alleged adverse impacts from capacity decontracting are uncertain and speculative, and argues, in any event, that any resultant cost shifting from decontracting is outweighed by the benefits provided by the project from the introduction of an additional pipeline competitor and new transportation paths to access new supply sources.

101.    In a similar vein, Spire Missouri maintains that it is highly uncertain whether a capacity turnback of 186,800 Dth per day would result in higher transportation rates on MRT due to both market and regulatory factors.  Spire Missouri argues that the harm associated with shifted costs is uncertain both because the regulatory treatment of capacity turnback that will be imposed is uncertain,[176] and there is no evidence that MRT will not be able to market the capacity.  Spire Missouri states that a pipeline has an obligation to develop new business opportunities and remarket capacity that is unsubscribed or turned back before recovering such costs from its remaining customers.[177]  Spire Missouri contends that there are a number of potential opportunities that could result in replacement revenues as a result of enhanced bidirectional capability and potential reversal of flow on MRT or through increased future natural gas demand from natural gas-fired generation or other industrial sources near MRT, or result in decreased costs to mitigate or eliminate the future rate impact of any capacity turnback.[178]

### b.    Alleged Anticompetitive Impacts to Existing Pipelines

102.    MRT claims that the overlapping job duties of personnel of Spire, Spire Missouri, Spire Energy Marking, and Spire, Inc., and chains of command within the Spire organization will result in inappropriate information sharing and unfairly impact third-party pipelines that serve Spire Missouri and compete with Spire, since such unaffiliated pipelines will not have the same knowledge regarding the goals of Spire Missouri that Spire enjoys.  MRT states that two individuals, each serving as Spire executives, also served as the lead negotiators representing Spire Missouri in contract negotiations with MRT.  MRT states that one of these individuals is described on Spire Inc.'s website as leading "the optimization of Spire's gas supply assets, including midstream and upstream projects" and guiding "the company's non-regulated business units, including its natural gas marketing affiliate, Spire Energy Marketing."[179]  MRT notes that it is not clear whether this two-person negotiation team is also dealing with other existing pipelines serving St. Louis.

---

[176] Spire Missouri July 14, 2017 Answer at app. B (Concentric Study) at 18-19.

[177] *Id.* at 18.

[178] *Id.* at 21-29.

[179] MRT April 3, 2017 Answer at 8.

103.    Specifically, MRT argues that the two Spire executives:  (1) will be instrumental in deciding how and under what terms the Spire capacity – both the 50,000 Dth per day of unsubscribed Spire capacity and any new expansion capacity – should be marketed to non-Spire Missouri loads; (2) will be aware of offers by others to use existing capacity on non-Spire systems held by Spire Missouri and Spire Energy Marketing and the terms under which such unaffiliated capacity could be released, thereby influencing their assessment of offers to acquire Spire capacity and plans to market Spire expansion capacity; (3) have been involved in negotiating the terms and extent of Spire Missouri's retention of capacity on MRT and other upstream pipelines; and (4) are in a position to influence decisions regarding what capacity on existing pipelines should be turned back by Spire Energy Marketing.  As a result, MRT argues these individuals will have an important voice in how competing pipelines' rates are established to account for the costs of capacity that Spire Inc. subsidiaries had previously held, and procurement (or relinquishment) of unaffiliated interstate pipeline capacity into the St. Louis market.[180]

104.    In response, Spire and Spire Missouri argue that MRT's claim that involvement by the same senior executives in both the development of Spire's pipeline and contract negotiations with MRT on behalf of Spire Missouri is indicative of unfair competition has no merit.  Spire argues that as a developing project that has not yet been certificated or constructed, much less put into service, Spire is not yet a "transmission service provider" and therefore not subject to the Commission's Order No. 717, *Standards of Conduct for Transmission Providers*.[181]  Spire also argues that it would be unduly burdensome and cost prohibitive to require separation of the pipeline development personnel from the experienced gas supply and operations personnel with the Spire organization at this time since there is no pre-existing FERC-jurisdictional management-level personnel with expertise to manage the early developmental stages of the project.[182]

---

[180] *Id.* at 8-10.

[181] Order No. 717, FERC Stats. & Regs. ¶ 31, 280 (2008) (cross-referenced at 125 FERC ¶ 61,064); *on reh'g*, Order No. 717-A, FERC Stats. & Regs. ¶ 31,297, *further clarified*, Order No. 717-B, 129 FERC ¶ 61,123 (2009), *further clarified*,  Order No. 717-C, 131 FERC ¶ 61,045 (2010), *further clarified*, Order No. 717-D, 135 FERC ¶ 61,017 (2011).  Spire notes that Commission's previous Standards of Conduct Order, Order No. 2004, provided that a new pipeline would have 30 days after it accepts its certificate or otherwise becomes subject to the Commission's jurisdiction to come into compliance with the Standards of Conduct.  Spire June 6, 2017 Answer at 11-12.  *See also* Spire Missouri July 14, 2017 Answer at 9-10.

[182] Spire further asserts the even after acceptance of a certificate but before service commences, the Commission has recognized that "not all aspects of the Standards of Conduct would apply to pipelines that had not yet been staffed or begun performing transmission functions."  *CenterPoint Energy Gas Transmission Co.*, 114 FERC ¶ 61,151,

Additionally, Spire maintains that its executives involved with the pipeline development have scrupulously safeguarded all prospective customer information associated with both the precedent agreement and inquiries received from other shippers, and has complied with the Standards of Conduct "no conduit" rule to ensure no such information was disseminated in a manner than could give Spire Missouri an unfair competitive advantage over any other prospective shipper.[183]

### c.    Operational and Cost Impacts on MRT from New Bidirectional Interconnection

105.    MRT states that Chain of Rocks is the western terminus of its East Line, where MRT provides unidirectional delivers gas into Spire Missouri's Line 880.  Spire's proposal would change the Chain of Rocks delivery point from a unidirectional into a bi-directional point.  MRT asserts that it would have to, among other things, make significant modifications on its East Line downstream of Chain of Rocks to accept deliveries from Spire and provide transportation on its system.[184]  MRT claims this introduction of 150,000 Dth of gas per day from Spire at Chain of Rocks would prevent it from meeting its existing service obligations from the East Line.[185]  Specifically, MRT asserts that receipt of this gas from Spire would reduce the volumes it could receive from NGPL and Trunkline on the east end of the East Line and eliminate the ability to receive gas from MoGas and Illinois Intrastate.[186]  MRT also questions the purpose of making Chain of Rocks bi-directional if it would only be bi-directional with respect to displacement as opposed to a physical transfer point of volume.[187]  MRT further claims that it will need to spend millions of dollars to ameliorate the consequences a bi-

---

at P19 (2006).

[183]  Spire June 6, 2017 Answer at 13.  We note that although the Standards of Conduct under Part 358 of the Commission's regulations do not apply to a transmission provider until it commences transactions with a marketing affiliate.  *See* 18 C.F.R. §358.8(a) (2017).  Section 4(b) of the NGA prohibits a natural gas company, such as Spire, from making or granting "any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage."  15 U.S.C. 717c(b) (2012).

[184]  MRT February 27, 2017 Protest at 3.

[185]  Spire states that it does not know why MRT believes it is proposing to physically deliver 150,000 Dth per day into MRT at the new Chain of Rocks interconnection with MRT as that is expressly not part of Spire's proposal.

[186]  MRT February 27, 2017 Protest at 48-50.

[187]  MRT April 3, 2017 Answer at 18.

directional interconnection will cause on its system.[188] MRT states that the Commission's interconnection policy in *Panhandle* enables a party desiring access to a pipeline to obtain an interconnection if it satisfies five conditions.[189] MRT contends that Spire's proposed interconnection does not satisfy the second (interconnection must not adversely affect the pipeline's operations) and third (interconnection and resulting transportation must not diminish service to the pipeline's existing customers) elements.

106.    In response, Spire asserts that its firm service agreement with Spire Missouri does not offer any primary delivery point rights with MRT at Chain of Rocks.[190] Spire contends that the proposed MRT-Chain of Rocks meter station is designed to receive gas from MRT (consistent with current operations where MRT delivers gas to Spire Missouri but, under the new configuration, MRT will deliver the gas to Spire for redelivery to Spire Missouri) and to deliver gas from Spire to MRT, but only subject to MRT's willingness and ability to receive such gas.[191] Moreover, Spire states that it will pay for the reconfiguring of the Chain of Rocks meter station so the interconnection is now between Spire and MRT instead of the present Spire Missouri and MRT configuration. Spire concludes that there is no adverse operational risk to MRT or any of its customers or interconnecting pipelines as a result of the proposed bi-directional point. Spire asserts that it meets the *Panhandle* test for interconnection and maintains that the interconnection will benefit MRT and that it remains willing to cooperate with MRT regarding the details of the proposed interconnection.[192]

### d.    <u>Commission Determination</u>

107.    The Spire STL Pipeline Project would bring up to 400,000 Dth per day of new pipeline capacity into the St. Louis area. All parties, including Spire, agree that the new capacity is not meant to serve new demand, as load forecasts for the region are flat for the foreseeable future. We acknowledge that without new demand, existing pipelines in the area will likely see a drop in utilization once supplies begin to flow on the project. Perhaps the largest impact will be on MRT's East Line, which currently delivers gas to Spire Missouri via interconnections with NGPL and Trunkline. The Commission

---

[188] *Id.* at 19.

[189] Panhandle Eastern Pipe Line Co., 79 FERC ¶ 61,016, order denying reh'g, 81 FERC ¶ 61,016 (1997), remanded Panhandle Eastern Pipe Line Co. v. FERC, 196 F.3d (D.C. Cir. 1999), order on remand, 91 FERC ¶ 61,037 (2000) (Panhandle).

[190] Spire March 17, 2017 Answer at 26.

[191] Spire June 6, 2017 Answer at 20.

[192] Spire March 17, 2017 Answer at 28.

acknowledges that Spire Missouri's capacity on Spire will replace some of the transportation Spire Missouri used on MRT's system. However, as both Spire, Spire Missouri, and MRT note, many of Spire Missouri's contracts with MRT reached or are approaching the end of their terms.[193]  Accordingly, this is a logical time for Spire Missouri to evaluate its transportation needs going forward and the company has elected to contract with Spire for transportation services to access REX Zone 3 and Appalachian supply sources.

108.    Data provided by Spire and MRT in response to Commission staff's February 21, 2018 data requests show that the difference in the cost of gas delivered to Spire Missouri via the proposed Spire STL Pipeline Project as compared with gas accessed via MRT's Main Line, East Line, or MoGas's system was not materially significant.  In their response to the data requests, MRT estimates that the 2018-2040 average price of gas delivered to Spire Missouri via the Spire STL Pipeline Project at an estimate of the negotiated rate is 2 cents lower per Dth for the total delivered cost of gas than deliveries to Spire Missouri from Chicago Citygate via the MRT East Line (the supply source that most closely resembles Spire Missouri's stated goal of obtaining Marcellus gas supply via REX).  For the same period, the combined average price for gas delivered to Spire Missouri on MRT along four different routes, Columbia Gulf Mainline, Trunkline Zone 1A, Texas Gas Zone 1, and Chicago Citygate, is at most 1.5 cents lower than deliveries on Spire.  Forecasting total delivered gas prices for a minimum of 20 years into the future is difficult at best, and any long term average estimate will likely differ from actual prices over time.  However, the price differentials between different pricing points reflect the convergence of gas prices across different supply areas in the United States as shale gas production began influencing the U.S. market.  For the past few years, price differentials between major gas pricing hubs have shrunk as traditional demand regions have become producing regions.  These circumstances have led Spire Missouri to take advantage of new supply regions, to diversify its supply portfolio, and to replace its aging propane peaking system.

109.    Because Spire's proposal includes building a bi-directional interconnect at the Chain of Rocks station, gas supplies flowing on Spire could potentially move east on to MRT's system, and in theory could provide a new path for REX gas to flow south.  However, neither Spire nor Spire Missouri propose, in this proceeding, to flow gas from Spire onto MRT's system.  MRT's Main Line may see a decrease in flows, especially during periods of low to moderate demand in the St. Louis region.  Flows on MoGas, from its western interconnect with REX and NGPL may not see a large impact from the new Spire STL Pipeline Project, as supplies from the Rockies are likely to remain competitive in the near future.

---

[193] *See supra* P 88 n.155.

110.    The Commission evaluated MRT's protest that the Spire STL Pipeline Project would require MRT to perform significant modification to its system to accommodate the future potential for bi-directional flows and also that the complete removal or a decrease in gas deliveries at Chain of Rocks would disrupt services elsewhere on MRT's system.[194]  Commission staff took the unique step of requesting additional information from MRT, a party to the proceeding, but not the applicant, in an attempt to verify MRT's claims.[195]  Staff was not able to verify, using the information provided in MRT's response, that the Spire STL Pipeline Project would require extensive modifications to the system.[196]  We agree with staff's analysis and find that MRT has not provided information to support its claim that a reduction in deliveries at Chain of Rocks to Spire Missouri would impact other parts of its system.  Moreover, Spire's firm transportation service agreement with Spire Missouri does not provide for any deliveries into MRT at the Chain of Rocks meter and regulation station.[197]

111.    The Commission in *Tennessee Gas Pipeline Co. v. Columbia Gulf Transmission Co.*, found that Columbia Gulf's denial of an interconnection with Tennessee Gas violated the Commission's *Panhandle* policy.[198]  Tennessee Gas agreed to pay all of the costs associated with the interconnection, but Columbia Gulf insisted that Tennessee Gas would need to pay for the costs associated with other modifications that may be required if a new meter was added.[199]  The Commission agreed with Tennessee Gas and found that all direct costs of the interconnection would be paid for by Tennessee Gas, the proponent, and any other potential costs to Columbia Gulf would be speculative especially since Tennessee Gas did not request to alter any flows on Columbia Gulf's system.[200]  Likewise, in the instant case Spire has agreed to pay for all costs to construct the Chain of Rocks station, and any additional costs that MRT alleges would be incurred along its system from the changes are speculative at best.

112.    Spire's proposed Chain of Rocks interconnection meets the second and third prong

---

[194] A discussion of operational impacts are included below.  *See infra* Part III.F - Engineering Analysis.

[195] *See* February 21, 2018 Data Request to MRT.

[196] *See infra* PP 191-197.

[197] Spire February 6, 2017 Application at Exhibit I.

[198] 112 FERC ¶ 61,118 (2005).  The Commission affirmed an Administrative Law Judge's Initial Decision in this proceeding.

[199] *Id.* at P 23.

[200] *Id.* at P 28.

of the *Panhandle* policy – the proposed interconnection not adversely affect the pipeline's operations and the proposed interconnection and resulting transportation not result in diminished service to the pipeline's existing customers.[201]  As explained below, MRT has not supported its claim that Spire's proposed interconnection at Chain of Rocks would adversely impact operations on MRT's system or impact transportation of other customers.  Spire satisfies the fourth prong – the proposed interconnection not cause the pipeline to be in violation of any applicable environmental or safety laws or regulations with respect to the facilities required to establish an interconnection with the pipeline's facilities – and the fifth prong – the proposed interconnection must not cause the pipeline to be in violation of its right-of-way agreements or any contractual obligations with respect to the interconnection facilities.  Thus, under the *Panhandle* Policy, we approve of Spire's proposed interconnection at Chain of Rocks.

113.    The Commission previously found it appropriate for an LDC to replace its expiring transportation contracts on an existing pipeline with new transportation contracts on a new proposed pipeline system.[202]  However, MRT and EDF argue that the Commission's prior precedent should not inform the Commission's decision in this case as orders, such as *Eastern Shore*, *Ruby*, and *Guardian*, are distinguishable.[203]  Protesters' narrow view on whether the Commission should interpret its prior precedent misses the point.  The policy statement and our precedent serve as guideposts for the Commission as it makes it decision, and the proposition that every proposed project must match an earlier proposal would create an unnecessary impediment upon the Commission and frustrate its authority under the NGA.

114.    In *Ruby*, the Commission approved Ruby's proposal to construct and operate a new 675-mile-long pipeline to provide 1.2 million Dth per day of capacity from Wyoming to the Oregon/California border.  The project included 14 different shippers.  As part of the project, one shipper, Pacific Gas and Electric (PG&E), decided to turnback capacity on Gas Transmission Northwest Corporation (GTN) system when its contracts expired as this capacity would be replaced by the Ruby Project.[204]  In this instance, the California Public Utilities Commission already approved PG&E's contractual decision to replace its capacity with capacity on the Ruby project.[205]  The Commission found that "GTN's concern that Ruby's pipeline will lead to unsubscribed capacity on GTN's

---

[201] *See Panhandle*, 91 FERC at 61,141.

[202] *See Ruby*, 128 FERC ¶ 61,224 at P 37; *Guardian*, 91 FERC at 61,978.

[203] *See, e.g.*, MRT June 21, 2017 Answer at 7; EDF March 26, 2018 Answer at 12.

[204] *Ruby*, 128 FERC ¶ 61,224 at PP 21, 37.

[205] *Id.* PP 26-29.

system and adversely impact its captive customers is premature and speculative."[206] Moreover, the Commission found that the potential loss of transportation service on GTN's system was attributed to the decline in gas supplies from production areas in western Canada.[207]

115. We find that although construction and operation of the Spire STL Pipeline Project may well have an impact on existing pipelines and their captive customers, at this point the extent of any impacts to MRT or other pipelines are speculative. We do recognize that in *Ruby* the state utility approved of PG&E's decision to turnback capacity as its contracts expired on GTN, but that fact did not serve to mitigate any eventual impact on GTN. As stated above, this Commission will not supplant the business decisions of LDC's nor the authority of a state utility commission to determine whether the actions of an LDC are appropriate.[208]

116. Consistent with section 358.8(a) of the Commission's regulations, Spire must be in compliance with the Standards of Conduct when it commences transportation transactions with its Marketing Affiliate.[209] However, regardless of the applicability of the Standards of Conduct, as a natural gas company governed by section 4(b) of the NGA, Spire is prohibited from providing an undue preference or advantage to any person.[210]

## 4. **Landowners and Communities**

117. The proposed Spire STL Pipeline Project, as amended, consists of two pipeline segments, totaling approximately 65 miles of pipeline, and three above-ground meter stations. No major above-ground facilities (e.g., compressor stations) are proposed for the project. The operation of the project will affect approximately 415 acres, most of which is agricultural land,[211] defined as hayfields, pastures, and crop production land (for

---

[206] *Id.* P 38.

[207] *Id.*

[208] *See supra* P 83; *see also*, *Guardian*, 91 FERC at 61,977 ("The Commission's longstanding policy has been to allow pipelines to compete for markets and to uphold the results of that competition absent a showing of anticompetitive or unfair competition.").

[209] 18 C.F.R. 358.8(a). *See also Standards of Conduct for Transmission Providers*, 125 FERC ¶ 61,064, at PP 26, 311-313 (2008) (Order No. 717).

[210] 15 U.S.C. § 717c(b) (2012).

[211] Approximately 80 percent of the land required for the operation of the project is agricultural land (330 acres); the project also affects forested (35 acres), open (23 acres), and developed land (11 acres), as well as less than 8 acres each of land classified as

corn and soybeans), with approximately 16 acres affected by the operation of the meter stations.[212] Approximately 15 percent of the pipeline route would be adjacent to existing rights-of-way, and an additional 12 percent would be parallel to, but offset from, existing rights-of-way at varying distances ranging from 30 to 90 feet.[213]

118.    Spire maintains that the project has been designed and will be constructed to minimize impacts on landowners, and that its goal is to limit the use of eminent domain to the greatest extent possible by negotiating mutually acceptable permanent and temporary workspace easement agreements with any impacted landowners or other stakeholders.[214] Spire completed environmental surveys for 92.8 percent of the pipeline route.[215] With the exception of the REX Receipt Station, which will be operated by REX, Spire will own and operate all equipment at the new meter stations. Spire indicates it is working to negotiate and finalize easements for properties where all aboveground facilities will be located. Spire asserts that although the North County Extension involves more new construction than the originally-planned refurbishment of existing Line 880, it is located in a significantly less-developed area and reduces the overall impact to residential areas, as compared to the Line 880 alternative.[216] Spire also intends to reduce the pipeline construction right of way width to avoid or minimize impacts on residences.[217] Additionally, since Spire anticipates that one growing season will be lost due to construction, it intends to compensate landowners for crop production losses in accordance with terms of individual landowner agreements.[218] Finally, we note that Spire participated in the Commission's pre-filing process,[219] and has been consistently working to address landowner and community concerns and input.

---

wetlands and open water. EA at 83.

[212] Construction of the project will affect approximately an additional 589 acres of land. *Id.*

[213] EA at 9.

[214] Spire April 21, 2017 Amended Application at 9.

[215] EA at 8.

[216] Spire April 21, 2017 Amended Application at 8-9.

[217] EA at 9.

[218] EA at 82.

[219] Docket No. PF16-9-000.

119.   In light of the above, although we are mindful that Spire still must finalize easement agreements with affected landowners for most of the land required for the project, we find that for purposes of our consideration under the Certificate Policy Statement, Spire has generally taken sufficient steps to minimize adverse economic impacts on landowners and surrounding communities. We note that, moreover, that no landowners moved to intervene or protest the project on the basis of the project's impact on their property values.

## 5.    Balancing of Adverse Impacts and Public Benefits

120.   The Commission, in Order No. 636, determined that all gas purchasers, including LDCs, should have the ability to make market-driven choices about the cost of delivering gas.[220]  In the Certificate Policy Statement, the Commission established that

> the impact of a new project on existing pipelines serving the market is not synonymous with protecting incumbent pipelines from the risk of loss of market share to a new entrant, but rather, is a recognition that the impact on the incumbent pipeline is an interest to be taken into account in deciding whether to certificate a new project.[221]

121.   The Certificate Policy Statement also requires the Commission to take notice that "a project built on speculation (whether or not it will be used by affiliated shippers) will usually require more justification than a project built for a specific new market when balanced against the impact on the affected interests."[222]  The Commission Policy Statement further directs that "elimination of all adverse effects will not be possible in every instance."[223]

122.   The Commission has found it reasonable for an LDC to seek additional and/or alternative sources of supply, and has emphasized its disinclination to second-guess reasonable business decisions by pipelines' customers evidenced by precedent

---

[220] Pipeline Service Obligations and Revisions to Regulations Governing Self-Implementing Transportation; and Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol, Order No. 636, FERC Stats. & Regs. ¶ 30,939, at 30,393, order on reh'g, Order No. 636-A, FERC Stats. & Regs. ¶ 30,950, order on reh'g, Order No. 636-B, 61 FERC ¶ 61,272 (1992), order on reh'g, 62 FERC ¶ 61,007 (1993), aff'd in part and remanded in part sub nom. United Dist. Cos. v. FERC, 88 F.3d 1105 (D.C. Cir. 1996), order on remand, Order No. 636-C, 78 FERC ¶ 61,186 (1997).

[221] Certificate Policy Statement, 88 FERC at 61,748.

[222] *Id.* at 61,747.

[223] *Id.*

agreements, as well as binding contracts.[224]  Similarly, the Commission, in the bypass cases, supported competition between interstate natural gas companies and LDCs vying for industrial customers.  In those cases, we allowed end-users to receive transportation service directly from interstate pipelines by bypassing the LDCs that had in the past provided local distribution service, holding that we will not shield LDCs from the effects of competitive forces in the natural gas market.[225]  The Commission expanded this principle to interstate pipelines finding that "[t]here is no reason why pipelines should be afforded any greater protection from bypass than LDCs."[226]  Thus, the Commission's precedent and policy is clear; in the absence of evidence of anticompetitive behavior, it is not the role of the Commission to protect pipelines from new entrants when they offer a new opportunity for a shipper.

123.    We find that the benefits that the Spire STL Project will provide to the market, including enhanced access to diverse supply sources and the fostering of competitive alternatives, outweigh the potential adverse effects on existing shippers, other pipelines and their captive customers, and landowners or surrounding communities.  Consistent with the criteria discussed in the Certificate Policy Statement and NGA section 7(e), and subject to the environmental discussion below, we find that the public convenience and necessity requires approval of Spire's proposal, as conditioned in this order.

## B.    Blanket Certificates

124.    Spire requests a Part 284, Subpart G blanket certificate in order to provide open-access transportation services.  Under a Part 284 blanket certificate, Spire will not require individual authorizations to provide transportation services to particular customers.  Spire filed a *pro forma* Part 284 tariff to provide open-access transportation services.  Since a Part 284 blanket certificate is required for Spire to offer these services, we will grant Spire a Part 284 blanket certificate, subject to the conditions imposed herein.

125.    Spire also requested a Part 157, Subpart F blanket certificate.  The Part 157

---

[224] See Millennium Pipeline Co., L.P., 100 FERC ¶ 61,277 at P 201; see also, Midwestern Gas Transmission Co., 116 FERC ¶ 61,182, at P 42 (2006); Southern Natural Gas Co., 76 FERC at 61,635, order issuing certificate and denying reh'g, 79 FERC ¶ 61,280 (1997), order amending certificate and denying stay and reh'g, 85 FERC ¶ 61,134 (1998), aff'd Midcoast Interstate Transmission, Inc. v. FERC, 198 F.3d 960 (D.C. Cir. 2000).

[225] E.g., Kinder Morgan Interstate Gas Transmission LLC, 123 FERC ¶ 61,018, at PP 8-10 (2008); CenterPoint Energy Gas Transmission Co., 108 FERC ¶ 61,180, reh'g denied, 109 FERC ¶ 61,197 (2004).

[226] *Panhandle*, 91 FERC at 61,142.

blanket certificate gives an interstate pipeline NGA section 7 authority to automatically, or after prior notice, perform certain activities related to the construction, acquisition, abandonment, and replacement and operation of pipeline facilities. Because Spire will become an interstate pipeline with the issuance of a certificate to construct and operate the proposed facilities, we will issue to Spire the requested Part 157, Subpart F blanket certificate.

## C.    Rates

### 1.    Initial Rates

126.    Spire proposes to provide firm (Rate Schedules FTS), interruptible (Rate Schedule ITS), and interruptible parking and lending (Rate Schedule PALS) transportation services under Part 284 of the Commission's regulations at cost-based recourse rates, and also requests the authority to offer service at negotiated rates. Spire's proposed cost of service includes a rate of return which utilizes a capital structure of 50 percent debt and 50 percent equity, a debt cost of 7.00 percent, and a return on equity of 14.00 percent. Spire proposes a depreciation rate of 2.00 percent.[227] Spire utilizes a straight-fixed variable rate design and designed its rates on a postage-stamp basis. Spire proposes an initial monthly Rate Schedule FTS reservation charge of $9.1086 per dekatherm (Dth)[228] and an initial Rate Schedule FTS usage charge of $0.00. Spire derived the proposed FTS recourse rates using the first year annual cost of service of $43,721,417 and annual reservation design determinants of 4,800,000 per Dth.[229]

127.    Spire also proposes initial Rate Schedule ITS and Rate Schedule PALS charges of $0.2995 per Dth, based on a 100 percent load factor of its Rate Schedule FTS reservation charge.[230]

128.    On January 26, 2018, in response to a staff data request, Spire provided an adjusted cost of service and recalculated its initial rates to reflect changes in the federal tax code as per the Tax Cuts and Jobs Act of 2017,[231] which became effective January 2018. Spire's work papers show that the effect of the tax code change is a reduction in the estimated year one cost of service to $40,181,937 and a reduction in the initial Rate

---

[227] Spire April 21, 2017 Amended Application at Exhibit N.

[228] Spire April 21, 2017 Amended Application at Exhibit N, Page 1 of 9.

[229] *Id.* The annual reservation design determinants are based on the project's daily design capacity of 400,000 Dth times 12.

[230] Spire January 26, 2017 Application at Exhibit N, Page 1 of 9.

[231] Pub            115-97, 131 Stat. 2054 (Dec. 22, 2017).

Schedule FTS monthly recourse reservation charge to $8.3296 per Dth, and initial Rate Schedule ITS and Rate Schedule PALS rates to $0.2738 per Dth. Spire's proposed Rate Schedule FTS usage charge of $0.00 remains unchanged. As Spire's January 26, 2018 calculation reflects the federal tax code that will be in effect when the project goes into service, the Commission will use the revised rates for the purpose of establishing the initial rates.[232]

129.    Spire states it will recover Fuel Use and Lost Gas through Fuel Use and Lost Gas percentages, which will be tracked and subject to a true-up mechanism. The project does not include any compression and Spire has proposed an initial Fuel Use percentage of 0.00 percent and a Lost Gas percentage of 0.25 percent. Spire states that going forward, it will then use actual fuel and loss volumes to calculate the fuel use and lost gas adjustment, which will be trued-up and updated through an annual filing made to the Commission.

### a.    Cost Estimates

130.    MRT and EDF contend that the Commission should scrutinize the project's overall cost estimate. Specifically, MRT states that despite the withdrawal of the proposal to acquire and operate Line 880 and the increase in the greenfield construction by more than 10 percent, MRT state that Spire's cost estimate in the initial and amended applications remains unchanged at $220,276,167.[233] For this reason, MRT calls into question the accuracy of Spire's initial and amended cost estimates.

131.    Spire states that the higher construction costs associated with the construction of the North County Extension are offset by its determination that it does not need as large a contingency line item due to the elimination of the costs associated with the refurbishment of Line 880. In addition, Spire states that other cost estimates from the initial application have been updated and in some cases lowered due to updated right-of-way cost estimates, the completion of a real estate valuation study, and an updated Allowance for Funds Used During Construction projection that was based on new project construction schedule estimates. Spire also states that although the overall cost of service for the project remained unchanged, it revised the cost components making up its cost of

---

[232] In an April 17, 2018, response to a staff data request, Spire noted that it proposes an income tax allowance of $5,701,698 and it will incur the income tax allowance in its own name. Additionally, Spire states that it is neither a Master Limited Partnership as the term is used in the "Revised Policy Statement on Treatment of Income Taxes" in Docket No. PL17-1-000 nor is it a pass-through entity.

[233] MRT May 22, 2017 Protest at 3; EDF May 22, 2017 Protest at 3-6.

service which resulted in a lower FTS reservation charge when compared to its initial application ($9.1086 per Dth from $9.1092 per Dth).[234]

132.    For the cost of facilities provided in Exhibit K of a certificate application, section 157.14(a)(14) of the Commission's regulations requires a "detailed estimate of total capital cost of the proposed facilities for which the application is made . . . includ[ing] a brief statement indicating the source of information used as the basis for the above estimate."  Spire submitted the estimates for the cost of facilities in the revised Exhibit K of its amended application.  In addition, Spire included statements on the source of the estimates in revised Exhibit K.[235]

133.    As Spire stated, its cost figures are estimates based on a variety of factors made several years in advance of the project's construction.  We see no reason to scrutinize these estimates further.[236]  Shippers and interested parties will have full access to the actual construction costs when the pipeline files its final cost report after construction is completed.[237]  In addition, as discussed below, we will require Spire to file a full cost and revenue study after three years of operation.  This will provide shippers with further access to cost and revenue data to help assess the reasonableness of Spire's initial rates.

**b.      Return on Equity**

134.    Missouri PSC contends that Spire's proposed return on equity of 14 percent is high and is premised upon an assumed Commission policy that greenfield pipelines receive a 14 percent return on equity.  Missouri PSC states that the Commission's approvals of 14 percent returns on equity date back to at least 1997 and, in many of these cases, the pipelines in question had highly leveraged capital structures, with some as high as 75 percent debt.  Missouri PSC argues that Spire has a much more balanced proposed capital structure.

135.    Missouri PSC further states that economic circumstances have undergone dramatic shifts since 1997, citing the Commission's recent decisions on the appropriate returns on equity for electric transmission rates.  For example, Missouri PSC states that MISO's return on equity was reduced from a Commission approved 12.38 percent in 2002 to

---

[234] Spire June 6, 2017 Answer at 2-4.

[235] For example, "Right of Way & Survey/Damages - Estimate based on previous experience and estimated land values," "Materials - Estimate based on current indicative vendor pricing," and "Construction/Contractor Labor - Estimate based on current indicative construction contractor pricing."

[236] E.g., *Algonquin Gas Transmission, LLC*, 157 FERC ¶ 61,011, at P 18 (2016).

[237] 18 C.F.R. § 157.21(c)(3) (2017).

10.32 percent in 2016. Accordingly, Missouri PSC states that the Commission should evaluate present economic conditions and the dramatic changes that have occurred since 1997 before authorizing a 14 percent return on equity for Spire's greenfield pipeline.

136. Spire states that Missouri PSC's arguments should be rejected because its proposed capital structure is consistent with recent Commission precedents involving greenfield pipeline projects and appropriately reflects the business risks of the project.[238] Spire states that claims that the Commission should compare Spire's proposed return on equity to recent decisions addressing the return on equity for electric transmission rates are completely unfounded and ignore entirely different business environments, investor risk, and Commission ratemaking policy.

137. For new greenfield pipelines, the Commission has approved equity returns of up to 14 percent as long as the equity component of the capitalization is no more than 50 percent.[239] The Commission's policy provides an appropriate incentive for new pipeline companies to enter the market and reflects the fact that greenfield pipelines undertaken by a new entrant in the market face higher business risks than existing pipelines proposing incremental expansion projects.[240] The returns approved for existing electric transmission systems are not relevant here because there is no showing that these companies face the same level of risk as faced by greenfield projects proposed by a new natural gas pipeline company. Thus, granting Spire a 14 percent return on equity as a new market entrant constructing a greenfield pipeline is appropriate and consistent with our current policy.

138. Further, as explained below, we are requiring Spire to file a cost and revenue study at the end of its first three years of actual operation to justify its existing cost-based rates. The three-year study will provide an opportunity for the Commission and the public to review Spire's original estimates upon which its initial rates are based, to determine whether Spire is over-recovering its cost of service with its approved initial rates, and whether the Commission should exercise its authority under section 5 of the NGA to establish just and reasonable rates. The public will have an opportunity to review Spire's proposed return on equity and other cost of service components at that time and will have

---

[238] Spire March 17, 2017 Answer at 29-30.

[239] *See, e.g.*, *Mountain Valley* Rehearing Order, 163 FERC ¶ 61,197 at PP 52-60; *Sabal Trail*, 154 FERC ¶ 61,080; *UGI Sunbury, LLC*, 155 FERC ¶ 61,115 (2016); *Constitution* Certificate Order, 149 FERC ¶ 61,199 at PP 48-49.

[240] *See, e.g.*, *Rate Regulation of Certain Natural Gas Storage Facilities*, Order No. 678, 115 FERC ¶ 61,343, at P 127 (2006) (explaining that existing pipelines who need only acquire financing for incremental expansions face less risk than "a greenfield project undertaken by a new entrant in the market.").

an opportunity to raise issues relating to the rate of return, as well as all other cost components.

139.   We have reviewed Spire's proposed cost of service and initial rates and generally find them reasonable for a new pipeline entity.  We accept Spire's proposed recourse rates as the initial rates for service on the pipeline.  In addition, we find Spire's initial fuel rates to be appropriate and approve them for use.

### c.     Three-Year Filing Requirement

140.   Consistent with Commission precedent, Spire is required to file a cost and revenue study no later than three months after the end of its first three years of actual operation to justify its existing cost-based firm and interruptible recourse rates.[241]  In its filing, the projected units of service should be no lower than those upon which Spire's approved initial rates are based.  The filing must include a cost and revenue study in the form specified in section 154.313 of the Commission's regulations to update cost of service data.[242]  Spire's cost and revenue study should be filed through the eTariff portal using a Type of Filing Code 580.  In addition, Spire is advised to include as part of the eFiling description, a reference to Docket No. CP17-40-000 and the cost and revenue study.[243]  After reviewing the data, we will determine whether to exercise our authority under NGA section 5 to investigate whether the rates remain just and reasonable.  In the alternative, in lieu of this filing, Spire may make a NGA general section 4 rate filing to propose alternative rates to be effective no later than three years after the in-service date for its proposed facilities.

### 2.     Negotiated Rates

141.   Spire states that it will provide service to the project's shippers under negotiated rate agreements pursuant to negotiated rate authority in its General Terms and Conditions (GT&C) section 6.18.  Spire must file either its negotiated rate agreements or tariff records setting forth the essential terms of the agreements in accordance with the Alternative Rate Policy Statement[244] and the Commission's negotiated rate policies.[245]

---

[241] *Bison Pipeline, LLC*, 131 FERC ¶ 61,013, at P 29 (2010); *Ruby*, 128 FERC ¶ 61,224 at P 57; *MarkWest Pioneer, L.L.C.*, 125 FERC ¶ 61,165, at P 34 (2008).

[242] 18 C.F.R. § 154.313 (2017).

[243] *Electronic Tariff Filings*, 130 FERC ¶ 61,047, at P 17 (2010).

[244] Alternatives to Traditional Cost-of-Service Ratemaking for Natural Gas Pipelines; Regulation of Negotiated Transportation Services of Natural Gas Pipelines, 74 FERC ¶ 61,076, clarification granted, 74 FERC ¶ 61,194 (1996), order on reh'g, 75 FERC ¶ 61,024 (1996).

Spire must file the negotiated rate agreements or tariff records at least 30 days, but not more than 60 days, before the proposed effective date for such rates.

### D.     Tariff

142.    Spire filed a *pro forma* tariff which includes the proposed rates, rate schedules, General Terms and Conditions that will govern all transportation services provided by Spire, and forms of service agreement.  We will approve Spire's tariff, subject to the changes discussed below.  We direct Spire to file actual tariff records reflecting the changes at least 30 days, but not more than 60 days, before the in-service date of the proposed facilities.

#### 1.     Statement of Currently Effective Rates

143.    In footnote 2 of the Statement of Currently Effective Rates, Spire reserves the right to not assess the fuel use percentage when no fuel is used.  We permit pipelines to exempt certain transactions on portions of its system from fuel charges, if the pipeline identifies the specific transactions it intends to exempt from fuel charges and demonstrates that those transactions do not require the use of fuel.  Once the pipeline has met these conditions, the exempted transactions are listed in the pipeline's tariff.  We established these requirements to assure there will be non-discriminatory availability of fuel-exempted transactions and to avoid unwarranted cost shifts to other customers. Thus, we direct Spire to eliminate footnote 2 and, if Spire intends to exempt any transactions from fuel charges, it must do so in accordance with our policy.[246]  Although Spire does not propose to charge fuel in its initial filing, in the event there is fuel use on Spire's system in the future, it can file to exempt any transactions it contends should not be assessed the corresponding fuel charge.

144.    Footnote 3 of the Statement of Currently Effective Rates states "Rate Schedule PALS Service will not be assessed Fuel Use and Lost Gas Percentages or the [annual charge adjustment] surcharge."[247]  Our policy states that parking and lending service transactions may not be assessed fuel as long as the pipeline can show that no fuel is used

---

[245] Natural Gas Pipelines Negotiated Rate Policies and Practices; Modification of Negotiated Rate Policy, 104 FERC ¶ 61,134 (2003), order on reh'g and clarification, 114 FERC ¶ 61,042 (2006), reh'g dismissed and clarification denied, 114 FERC ¶ 61,304 (2006).

[246] *El Paso Natural Gas Co.*, 129 FERC ¶ 61,280, at P 25 (2009); *Ozark Gas Transmission, L.L.C.*, 124 FERC ¶ 61,290, at P 15 (2008).

[247] Spire January 26, 2017 Application Exhibit P Statement of Currently Effective Rates at n.3.

in performing a transaction.[248]  However, Spire's PALS rate schedule provides for the possibility of the return of loaned quantities or the withdrawal of parked quantities at "mutually agreed upon point(s) on Spire's system."[249]  Thus, it is possible fuel could be assessed for these PALS transactions that use different points.  In addition, all parking and lending transactions are not exempt from being assessed a reimbursement quantity for lost gas.[250]  Accordingly, we direct Spire to revise its Statement of Currently Effective Rates.

## 2.    Unauthorized Overrun Service Charge (Rate Schedule FTS/ITS)

145.    Spire's proposed penalty for unauthorized overrun service for Rate Schedules FTS and ITS is the 100 percent load factor rate, plus a penalty equal to two times the daily index price for the day the overrun occurred.  In orders on pipeline filings to comply with Order No. 637, we found that pipelines had not adequately justified why substantial overrun penalties should apply on non-critical days.[251]  We explained that during non-critical periods, a shipper who scheduled overrun service would presumably receive the requested service.  Assessing a penalty for unauthorized overruns that is many times higher than the interruptible rate applicable to authorized overruns for failure to request service is excessive when the conduct would not likely cause harm to the system.  For this reason, we established a policy that a pipeline can propose a nominal penalty for unauthorized overruns during non-critical periods, not to exceed twice its interruptible rate, that is sufficient to provide an incentive to nominate overrun volumes but also takes into account the lessened impact such unauthorized overruns will have on the system.[252]  Alternatively, a pipeline could retain an existing higher penalty but must waive the unauthorized overrun penalty, if the unauthorized overrun does not cause operational problems.

146.    Spire's proposed penalty for unauthorized overruns during non-critical periods is inconsistent with this policy.  Given that the proposed penalty is two times the daily index price, plus the 100 percent load factor rate, the penalty would be significantly

---

[248] *Corpus Christi Liquefaction, LLC*, 149 FERC ¶ 61,283, at P 40 (2014); *Midwestern Gas Transmission Co.*, 139 FERC ¶ 61,276, at P 16 (2012).

[249] Spire January 26, 2017 Application Exhibit P Rate Schedule PALS Section 2.2(b).

[250] *Midwestern Gas Transmission Co.*, 139 FERC ¶ 61,276 at P 16.

[251] *See Gulf States Transmission Corp.*, 96 FERC ¶ 61,159 (2001) (*Gulf States*); *Trailblazer Pipeline Co.*, 97 FERC ¶ 61,056, at 61,306 (2001).

[252] *Questar Pipeline Co.*, 98 FERC ¶ 61,159, at 61,584 (2002).

higher than twice its ITS rate, and Spire's tariff contains no provision for waiving the penalty if an unauthorized overrun does not cause operational problems.[253] Therefore, Spire is directed to revise its unauthorized overrun charge consistent with Commission policy.

### 3.     Section 6.2 – Reservation of Capacity

147.     Section 6.2 states that "Spire shall have the right, at its option, to reserve existing firm transportation capacity that is either presently available or that will become available upon expiration or termination of a service agreement for a future expansion project pursuant to the terms of this action" and discusses the Open Season Requirement and Reservation Duration and Interim Sales of Reserved Capacity.  MRT contends that GT&C section 6.2(a) fails to conform with the Commission policy that prior to reserving any capacity for an expansion, the pipeline must "post and award all of its available capacity,"[254] as set forth in GT&C section 6.3 of its proposed tariff.  Spire's proposed tariff states that (1) the available capacity will be posted under GT&C section 6.2(a) and awarded under GT&C section 6.3(h), and (2) for the avoidance of doubt, only the capacity that remains available after an open season (i.e., capacity which has not been awarded under GT&C section 6.3(h)) can be reserved for a future expansion project under section 6.2(a).

148.     We find that GT&C section 6.2(a) of Spire's tariff fully complies with our policy. Under this provision, prior to reserving capacity for an expansion project, Spire will post such capacity on its website and hold an open season pursuant to GT&C section 6.3. Although section 6.2(a) does not explicitly contain the words "and award," the Commission reads section 6.2(a) to convey Spire's intent to award capacity to any qualified bidders making qualified bids when the capacity is posted on its website or made available through an open season.  No further changes are required.

149.     MRT asserts that neither GT&C sections 6.2(a) nor 6.3(a) specify that the available capacity "must be posted for at least five business days before it can be reserved," so that shippers have "a reasonable opportunity to bid on and win available capacity before the pipeline reserves it."[255]  Spire agrees that shippers should have a reasonable opportunity to bid on and win available capacity before it is reserved by the pipeline, but states that it is unaware of any Commission order requiring the proposed

---

[253] *See, e.g.*, *Gulf States*, 96 FERC at 61,696 (a $2.00 per Dth penalty on Gulf States' system is a greater than nominal penalty and therefore unjustified for non-critical periods), *Trailblazer Pipeline Co.*, 97 FERC ¶ 61,056.

[254] MRT February 27, 2017 Protest at 54 (citing *Midwestern Gas Transmission Co.*, 106 FERC ¶ 61,229, at P 10 (2004)).

[255] *Id.*

reserved capacity posting to be for not less than five business days, regardless of the corresponding length of reservation term associated with that capacity. Spire states pipelines have proposed, and the Commission has allowed, variations in the minimum posting notice.

150.    The Commission's regulations provide that interstate pipelines must provide "equal and timely access to information relevant to the availability of all transportation services whenever capacity is scheduled . . . ."[256] We have previously found that capacity being reserved for a future expansion project must be posted for at least five business days before the pipeline can reserve it in order to provide shippers a reasonable opportunity to bid on and win capacity.[257] We direct Spire to revise its tariff.

151.    MRT contends that GT&C section 6.2 does not require Spire to provide the following information when attempting to reserve capacity:

> (a) a description of the expansion project for which the capacity will be reserved; (b) the total quantity of capacity to be reserved; (c) the location of the proposed reserved capacity on the pipeline system; (d) whether, and if so, when Spire anticipates that an open season for the capacity will be held or it will otherwise be posted for bids under the expansion; (e) the projected in-service date of the expansion project; and (f) on a rolling basis, how much of the reserved capacity has been sold on a limited term basis.

MRT asserts that these conditions have been required of capacity on other pipelines in competition with Spire with similar tariff provisions.[258]

152.    Consistent with Commission policy, we direct Spire to revise its tariff to provide the information described above for the posting of reserved capacity for an expansion project. We have consistently required these elements to be included as part of a pipeline's tariff provisions implementing a capacity reservation process for new expansion projects and providing this information in its tariff will ensure that prospective shippers have sufficient information when determining whether to bid on capacity.[259]

---

[256] 18 C.F.R. § 284.13(d) (2017).

[257] MRT February 27, 2017 Protest at 54 (citing *Midwestern Gas Transmission Co.*, 106 FERC ¶ 61,229; *MoGas Pipeline LLC*, 126 FERC ¶ 61,064, at P 39 (2009)).

[258] *Id.* at 55 (citing *MoGas Pipeline LLC*, 126 FERC ¶ 61,064).

[259] *MoGas*, 126 FERC ¶ 61,064 at P 42; *Kern River Gas Trans. Co.*, 104 FERC ¶ 61,155 (2003).

153.    MRT contends that GT&C section 6.2 failed to include "solicitation procedures to ensure that excess and turnback capacity is posted prior to determining the reserved capacity needed for future expansion projects" and that such procedures take place "within 90 days or less of the expansion open season."[260]  We require that pipelines planning to file applications for expansion projects solicit turnback capacity, which Spire did not do.  Thus, we direct Spire to modify its tariff to include procedures for the solicitation of turnback capacity in association with any capacity reserved for an expansion project and to devise procedures to ensure that the solicitation of turnback capacity takes place within 90 days or less of the expansion open season.[261]

154.    MRT contends that contrary to longstanding Commission policy, GT&C section 6.2(a) would allow Spire to reserve capacity for up to 12 months prior to holding an open season related to a contemplated expansion project.  Then, if the open season is held within that 12-month period, MRT asserts that Spire may continue to reserve the capacity, provided Spire submits its certificate application within 12 months of the close of the open season.  As a result, MRT concludes that Spire could reserve capacity for up to 24 months prior to submitting a certificate application.  MRT states that Commission policy is clear that Spire may only reserve capacity for 12 months from the date it reserves such capacity, not the date Spire closes the open season or an additional 12-month period prior to the open season for the expansion project.[262]

155.    Spire asserts that it can reserve available capacity for a future expansion project for up to 12 months before it must hold an open season.  At that time, Spire states the capacity will be made available to any potential customers that would like to participate. If Spire receives *bona fide* expressions of interest sufficient to go forward with a project, Spire can maintain that reserved capacity so long as it makes a certificate application filing within 12 months.  Spire notes it will be required to make any reserved capacity available on an interim basis during the project development process.

156.    Our policy states that capacity may be reserved for an expansion project for only 12 months prior to the filing of a certificate application, and thereafter until either the project goes into service, the application is withdrawn, or the application is denied.[263] This policy is a safeguard to ensure that the pipeline is not reserving capacity to exercise

---

[260] MRT February 27, 2017 Protest at 55.

[261] *MoGas*, 126 FERC ¶ 61,064 at P 41.

[262] MRT February 27, 2017 Protest at 55.

[263] *Transcontinental Gas Pipe Line Corp.*, 118 FERC ¶ 61,234, at P 10 (2007); *Gas Transmission Northwest Corp.*, 109 FERC ¶ 61,141, at P 9 (2004).

its market power.[264]  Spire's proposed tariff allows it to reserve capacity for up to 12 months before an open season for the expansion project is held and for an additional 12 months before a certificate application is filed.  Thus, we direct Spire to revise its tariff so that it is only permitted to reserve capacity 12 months prior to the filing of a certificate application, and thereafter until either the project goes into service, the application is withdrawn, or the application is denied.

### 4.     Section 6.3 – Open Seasons for Available Capacity

157.    Section 6.3(b)(i) of the GT&C states that Spire will determine the best bid based on the highest present value of the per unit reservation charge to be paid over the term of the service, as determined in accordance with GT&C section 6.3iii.  However, GT&C section 6.3iii does not exist in Spire's tariff.  Spire states that the reference is incorrect and it should be to GT&C section 6.3(f).[265]  We direct Spire to revise its tariff.

158.    Section 6.3(e) of the GT&C states that in the event Spire receives two or more bids of equal value, the best bid shall be the bid with the shortest term under the method identified in GT&C section 6.3(a)(ii).  Spire clarifies that the reference to GT&C section 6.3(a)(ii) is incorrect and should be replaced by the method under GT&C section 6.3(b)(i).[266]  We direct Spire to revise its tariff.

### 5.     Section 9.4 – Emergency Reallocation

159.    In GT&C section 9.4, Spire proposes emergency reallocation tariff provisions that provide it with the ability to reallocate capacity and/or divert gas supplies to forestall an emergency in order to serve human needs or avoid substantial damage to property.  GT&C section 9.4(d) requires the customer declaring the emergency to pay Spire $20 per Dth for any gas supplies diverted, with Spire crediting the customer whose supplies were diverted.  GT&C section 9.4(e) requires the customer declaring the emergency to pay Spire $10 per Dth for any capacity reallocated, with Spire crediting the customer whose capacity was reallocated.

160.    Our policy requires that any shipper on an interstate pipeline that obtains an exemption from *pro rata* curtailment must compensate the non-emergency shippers for their increased curtailment.[267]  We have held that such compensation should generally be

---

[264] *Id.*

[265] Spire June 19, 2017 Data Response at 2.

[266] *Id.*

[267] *Texas Eastern Transmission Corp.*, 91 FERC ¶ 61,105 (2000) (on remand from *Process Gas Consumers Group vs. FERC*, 158 F.3d 591 (D.C. Cir. 1998)).

limited to the payment of an additional reservation charge for the capacity exempted from the *pro rata* curtailment. Thus, the exempted shipper need not compensate the non-emergency shippers for any loss of gas supply they experience as a result of their increased capacity curtailment. A non-emergency shipper that believes it has suffered disproportionate damages during a curtailment may file a request with the Commission for compensation from the emergency customer. A non-emergency shipper may also seek to recover damages in court from any party against which it has a legal cause of action. Thus, we direct Spire to delete section 9.4(d) from its tariff.

## 6.     **Section 15 – Termination of Service/Right of First Refusal**

161.    GT&C section 15 outlines the provisions within a qualifying customer's service agreement that enables it to continue service under a right of first refusal (ROFR) pursuant to its existing rate schedule and service rights. Our policy requires that a ROFR customer's election of whether to retain its capacity or what portion of its capacity to retain is not required until the service provider has notified the existing shipper of the best bid(s) received from third parties for all, or a portion of, the expiring capacity.[268] Spire proposes to add the following sentence to GT&C section 15.10:

> Shipper is not required to notify Spire of the amount of capacity it will retain through the process set forth in this Section 15 until after the Shipper receives notification from Spire of the best offer(s) for the expiring capacity.[269]

162.    In addition, Spire proposes to revise its proposed GT&C section 15.10 as follows:

> the ROFR Customer's existing FTS Agreement shall be deemed extended at the maximum lawful rate, for the same quantities (or such lesser volumetric portion as the ROFR Customer may elect) and other terms for <u>a term of ROFR Customer's choice</u> ~~a period of one (1) year~~, after which the ROFR Customer's FTS Agreement shall expire and Spire will have all necessary abandonment authority under the Natural Gas Act and be released from any further obligation to the ROFR Customer upon such FTS Agreement expiration; <u>provided that if ROFR Customer's extended term is for one year or longer and at the maximum lawful rate, then ROFR</u>

---

[268] *Sierrita Gas Pipeline, LLC*, 147 FERC ¶ 61,192, at P 77 (2014); *Transcontinental Gas Pipe Line Corp.*, 101 FERC ¶ 61,267, at P 26 (2002).

[269] Spire June 19, 2017 Data Response at 9.

<u>Customer will be eligible for the Right of First Refusal under this Section 15 at the conclusion of the extended term.</u>[270]

163.   We find that GT&C section 15.10, as revised by Spire, is consistent with the Commission's policy.  Thus, we direct Spire to revise its tariff.

## 7.   <u>Section 16.3 – Billing, Statements, Payment and Records</u>

164.   GT&C section 16.3 outlines Spire's procedure for handling a customer's failure to make a full payment of any portion of any bill for services received.  It states, in part, that "[i]f failure to pay continues for thirty (30) days after payment is due, Spire, upon ten (10) days' prior written notice to Customer, may suspend further receipt and/or delivery of Gas until such past due amount is paid, or satisfactory credit arrangements have been made in accordance with Section 23 of these General Terms and Conditions."

165.   We allow pipelines to suspend service on a shorter time period than the 30-day notice period required for terminating service.  However, since the pipeline is not providing the service required under the contract during suspension, we have not permitted pipelines to impose reservation charges during the period of suspension.  This is to ensure there is no incentive to suspend service by making this a more attractive alternative than contract termination.[271]  Thus, we direct Spire to include additional language specifying that Spire will not impose reservation charges during any period in which it suspends service.

## 8.   <u>Section 17.1 – Discounted Rates</u>

166.   GT&C section 17.1 provides:

> If and when Spire discounts the rates and charges applicable for service under any rate schedule, the components of the currently applicable maximum rate shall be discounted in the following order:  *The first item of the overall charge discounted will be any surcharge, followed by the base rate charge.* (emphasis added)

167.   Our policy provides that discounts be attributed last to surcharges which the pipeline recovers through a periodic true-up mechanism that permits the pipeline to seek

---

[270] *Id.*

[271] Policy Statement on Creditworthiness for Interstate Natural Gas Pipelines and Order Withdrawing Rulemaking Proceeding, FERC Stats. & Regs. ¶ 31,191, at P 24 (2005); Sabal Trail, 154 FERC ¶ 61,080 at P 206.

recovery of 100 percent of the costs in question.[272]  To the extent that the surcharges referenced in this section are subject to periodic true-up mechanisms, we direct Spire to revise the emphasized language to provide that such surcharges are the last component to be attributed discounts, consistent with Commission regulations.[273]

### 9.    Section 20.3 – Fuel Use and Lost Gas Adjustments

168.    GT&C section 20.2 provides that the effective fuel use percentage "shall be the sum of the current Fuel Use Percentage and the Annual Fuel Use Surcharge" and that the effective lost gas percentage "shall be the sum of the current Lost Gas Percentage and the Annual Lost Surcharge."  GT&C section 20.3, which provides the calculation of the current fuel use and lost gas percentages, states:

> (a) Fuel Use Percentage:  The current Fuel Use Percentage shall be determined on the basis of the projected quantities of Gas that shall be used for the routine operation and maintenance of Spire's pipeline system divided by the estimated quantities of Gas for transportation under Rate Schedules FTS and ITS for the Recovery Period.

> (b) Lost Gas Percentage:  The current Lost Gas Percentage shall be determined on the basis of the projected quantities of Gas that shall be required for Lost Gas divided by the estimated quantities of Gas for transportation under Rate Schedules FTS and ITS for the Recovery Period.

169.    Section 154.403(c)(10) of the Commission's regulations[274] states that "a step-by step explanation of the methodology used to reflect changes in the fuel reimbursement percentage including the allocation and classification of the fuel use and unaccounted-for natural gas" must be included in the GT&C.  Spire's proposed language in GT&C section 20.3 explains that the current fuel use and lost gas percentages shall be determined based on "projected quantities of gas" and "estimated quantities of gas," but does not explain the methodology Spire will use to produce those projections and estimates.  Thus, we direct Spire to revise GT&C section 20.3 to include an explanation of how Spire will produce the projections and estimates to be used in the computation of the fuel use and lost gas percentages.

---

[272] *Columbia Gas Transmission Corp.*, 109 FERC ¶ 61,355, at PP 27-28 (2004); *Natural Gas Pipeline of America*, 69 FERC ¶ 61,029, at 61,117 (1994).

[273] 18 C.F.R. § 154.109(c) (2017).

[274] 18 C.F.R. § 154.403(c)(10) (2017).

## 10.   Section 35.1 – Reservation Charge Credits – Force Majeure Events

170.   Spire proposes that it will share the risk of a *force majeure* event with its customers through the adoption of the "no-profit" reservation charge crediting methodology.  GT&C section 35.1(a) provides that Spire's reservation charge credit "shall be limited to that portion of the daily Reservation Rate that represents Spire's equity return and associated income taxes."  GT&C section 35.1(b) states that "the equity return and associated income taxes shall be that portion of the applicable Reservation Rate that exceeds the cost of service component of the otherwise applicable maximum recourse Reservation Rate, where such a cost of service component is equal to the maximum recourse Reservation Rate less the equity return and associate taxes component."

171.   We recognize that all parties bear part of the risk of a *force majeure* event.  Under the no-profit method, customers will only bear the limited burden of paying the portion of the reservation charge that represents the cost of service component consisting of Spire's equity return and income taxes.  This is an acceptable methodology.  Spire's tariff, however, does not clearly indicate what the equity return and associated income tax quantities or percentages are for the purposes of calculating the reservation charge credits.  Thus, we direct Spire to revise its tariff to clearly state the equity return and associated income tax components for the purposes of calculating reservation charge credits.

## 11.   North American Energy Standards Board

172.   Spire requests extensions of time to comply with (1) certain North American Energy Standards Board (NAESB) standards, including those related to Electronic Data Interchange (EDI) and Electronic Data Management (EDM); (2) NAESB standards governing pooling; and (3) NAESB standards related to index-based capacity releases.  Spire states it is a small pipeline with only one shipper and believes its operational and market circumstances warrant an extension of time to comply with certain NAESB standards.

173.   MRT protests Spire's request, stating that it would put Spire at a competitive advantage to other pipelines in the region.  MRT contends that Spire would only implement the NAESB standards following the receipt of a *bona fide* request from a Spire shipper, and Spire's only shipper, its affiliated LDC, might never request Spire's compliance with the NAESB standards.  In addition, MRT asserts that in each of the cases cited by Spire, where the Commission granted an extension of time for certain NAESB standards, the pipelines were considerably smaller than Spire.[275]  MRT also

---

[275] MRT February 27, 2017 Protest at 53-54 (citing *Missouri Interstate Gas, LLC*, 119 FERC ¶ 61,074, at P 33 (2007) (MRT avers Missouri Gas had capacity of 20,000 Dth

argues that failure to have a confirmation ability would dissuade the use of Spire by potential Part 284 customers.

174.    Spire answers that its requested extensions of time to comply with certain NAESB standards are reasonable and consistent with the extensions that the Commission has granted to comparably sized pipelines and are necessary to avoid burdening Spire and its customer with unnecessary cost and electronic infrastructure requirements that are not needed for a small, one-customer pipeline with two receipt and two delivery points. Further, Spire contends that the confirmation issues raised by MRT are irrelevant to the issue of whether Spire offers pooling service or index-based capacity releases.[276]

175.    Consistent with our action in regard to previous requests for an extension of time to comply with NAESB standards, we will grant Spire's requests as discussed below.  In Order No. 587-V, the Commission set out the principles it would apply generally to waiver and extension of time requests.[277]  Spire's proposal here complies with the directives of that order.  Granting Spire's requested extension of time to comply with certain of the NAESB standards until a Part 284 customer requests that Spire offer such transactions or data through its website is consistent with our policy.  We see no reason to require Spire to incur the costs to comply with standards it does not believe will be used.[278]  Although the pipelines cited by MRT were significantly smaller than Spire, we have previously granted extensions of time for pipelines of similar size as Spire and will do so here.[279]

---

per day); *Unocal Windy Hill Gas Storage, LLC*, 115 FERC ¶ 61,218, at P 5 (2006) (MRT avers Windy Hill had storage capacity of 1,500,000 Dth of working gas); *Rendezvous Gas Services, L.L.C.*, 112 FERC ¶ 61,141, at PP 5, 30 (2005) (capacity of 330,000 Dth per day and a total cost of $11 million)).

[276] Spire March 17, 2017 Answer at 31 (citing *Venice Gathering System, L.L.C.*, 153 FERC ¶ 61,321, at PP 9-10 (2015) (*Venice*)).

[277] *Standards for Business Practices of Interstate Natural Gas Pipelines*, Order No. 587-V, FERC Stats. & Regs. ¶ 31,332, at PP 38-39 (2012).

[278] Order No. 587-V, FERC Stats. & Regs. ¶ 31,332 at P 38 ("Waivers are not appropriate in those circumstances in which no shipper has requested service, but the pipeline is able to provide the service if requested by a shipper.  In those circumstances, the Commission will grant the pipeline an extension of time to comply with the standard until such time as a shipper requests the standard").

[279] *See, e.g.*, *MoGas Pipeline LLC*, 157 FERC ¶ 61,036 (2016) (approving extension for larger system certificated in 2007); *MarkWest Pioneer, LLC*, 125 FERC ¶ 61,165; *Cimmarron River Pipeline, LLC*, 124 FERC ¶ 61,069 (2008).

176.    MRT asserts that in *Venice Gathering System, L.L.C.*, the Commission explained the importance of ensuring implementation of the benefits of NAESB standards "across the national pipeline grid," to avoid, among other things, "confirmation problems with interconnected pipelines."[280]  In *Venice*, we rejected the pipeline's request for an extension of time to comply with the NAESB Wholesale Gas Quadrant (WGQ) Version 3.0 Standard, which addresses the current nomination timeline.[281]  We held that not implementing the standard reflecting the current nomination timeline by April 1, 2016 would result in the pipeline not having a nomination schedule consistent with that of the rest of the industry, potentially increasing the administrative requirements of its shippers and leading to confirmation problems with interconnected pipelines.  However, that is not an issue here, as Spire is not requesting that timelines be extended for nomination and capacity release promulgated by Order Nos. 587-W[282] and 809.[283]  Thus, Spire will comply with standard 1.3.2, which governs the current day-ahead and intra-day nomination timelines, and standard 5.3.2, which governs the timeline for the notification and processing of biddable and non-biddable firm capacity releases.  Accordingly, we find that Spire's failure to comply with NAESB will not adversely disadvantage MRT or result in confirmation problems with interconnected pipelines.

a.    **Extensions of Time of Electronic Data Interchange Data Sets, Electronic Delivery Mechanism Standards, and Internet Electronic Transport Requirements**

177.    Spire requests an extension of time to comply with the NAESB WGQ Version 3.0 Standards related to EDI[284] datasets, EDM[285] standards, and the Internet Electronic

---

[280] MRT February 27, 2017 Protest at 54 (citing *Venice*, 153 FERC ¶ 61,321 at PP 10-11).

[281] *Venice*, 153 FERC ¶ 61,321 at PP 9-10.

[282] Standards for Business Practices of Interstate Natural Gas Pipelines; Coordination of the Scheduling Processes of Interstate Natural Gas Pipelines and Public Utilities, Order No. 587-W, FERC Stats. & Regs. ¶ 31,373 (2015), order on reh'g, Order No. 587-X, FERC Stats & Regs. ¶ 31,381 (2016).

[283] Coordination of the Scheduling Processes of Interstate Natural Gas Pipelines and Public Utilities, Order No. 809, FERC Stats. & Regs. ¶ 31,368, order on clarification, 152 FERC ¶ 61,095, order on reh'g, 152 FERC ¶ 61,212, order on clarification, 153 FERC ¶ 61,049 (2015).

[284] EDI standards require pipelines to maintain and operate an interactive web site.

[285] EDM standards relate to the use of the internet for pertinent business practice and electronic communications.

Transport (IET) Requirements section of its website.[286]  In support of its request, Spire asserts that it is a small one-customer pipeline with two receipt points and two delivery points.  Further, Spire states that it will rely heavily on a third-party software provider to help manage its informational postings website, because it has no prior experience or infrastructure in place to manage and maintain the electronic systems.  Spire asserts that its informational postings website will include links to capacity information, index of customers, notices, organizational charts, its tariff, and transactional reporting.

178.    Spire states that it plans to work with Spire Missouri to develop the most efficient and effective alternative forms of communication such as electronic mail, in lieu of EDI/EDM.  Spire states that it has discussed this approach and Spire Missouri has raised no objections or concerns.  Spire asserts that complying with the EDI/EDM standards at this time would be unnecessarily burdensome and would provide little or no benefit to Spire Missouri.  Accordingly, Spire asserts its operational and market circumstances warrant an extension of time to comply with the EDI/EDM standards.

179.    For good cause shown, we grant Spire's extensions of time, as requested.[287]  The extensions of time are limited to the NAESB WGQ Version 3.0 Standards promulgated by Order No. 587-W,[288] and will be in effect until 150 days following its receipt of a

---

[286] NAESB WGQ Version 3.0 Standards 1.3.3, 1.3.6, 1.3.9, 1.3.11, 1.3.13, 1.3.20, 1.3.21, 1.3.23, 1.3.48, 1.3.53, 1.3.55, 1.3.56, 1.3.58, 1.3.62, 1.4.2, 1.4.7, 2.3.5, 2.3.6, 2.3.11, 2.3.13, 2.3.14, 2.3.32, 2.3.40, 2.4.2, 2.4.6, 2.4.7, 2.4.8, 3.3.23, 3.3.24, 3.4.1, 3.4.2, 3.4.3, 3.4.4, 4.3.1, 4.3.2, 4.3.3, 4.3.42, 4.3.43, 4.3.44, 4.3.45, 4.3.46, 4.3.47, 4.3.49, 4.3.50, 4.3.52, 4.3.53, 4.3.54, 4.3.55, 4.3.57, 4.3.58, 4.3.60, 4.3.61, 4.3.62, 4.3.66, 4.3.67, 4.3.68, 4.3.69, 4.3.72, 4.3.75, 4.3.78, 4.3.79, 4.3.80, 4.3.81, 4.3.82, 4.3.83, 4.3.84, 4.3.85, 4.3.86, 4.3.87, 5.3.10, 5.3.11, 5.3.12, 5.3.70, 5.3.71, 5.3.72, 5.4.14, 5.4.15, 5.4.16, 5.4.17, 5.4.20, 5.4.21, 5.4.22, 5.4.23, 5.4.24, 5.4.25, 5.4.26, 5.4.27, 10.3.5, 10.3.6, 10.3.7, 10.3.8, 10.3.9, 10.3.10, 10.3.11, 10.3.14, 10.3.15, 10.3.22, 10.3.23, and 10.3.24.

[287] *See, e.g.*, *Trans-Union Interstate Pipeline L.P.*, 141 FERC ¶ 61,167 (2012); *WestGas InterState, Inc.*, 99 FERC ¶ 61,206 (2002) (where the Commission granted an extension of time of the EDI/EDM standards, but required the pipeline to comply with the Commission's communications and reporting requirements through means that do not require an interactive web site or adoption of EDI datasets and EDM Standards (e.g., by posting information on the pipeline's informational postings website, e-mail, phone, or fax)).

[288] Order No. 587-W, FERC Stats. & Regs. ¶ 31,373, *order on reh'g*, Order No. 587-X, FERC Stats & Regs. ¶ 31,381.  *See B-R Pipeline Co.*, 128 FERC ¶ 61,126, at P 6 (2009) (*B-R Pipeline*) (each time the Commission adopts new versions of the standards, a pipeline seeking to retain an existing extension of time must request an extension of time of the new standards).

request for service from a Part 284 customer to offer the EDI, EDM, and IET transactions or data via its website. Further, Spire must be fully compliant with the NAESB WGQ Version 3.0 Standards as it relates to proprietary location codes.[289]

## b.    Extension of Time of Pooling Standards

180.    Spire requests an extension of time of the NAESB WGQ Version 3.0 Standards related to pooling, explaining that it is a small pipeline system with two receipt and delivery points and expects that any pooling activity will occur upstream of the interconnection between Spire and REX or MRT. Spire states that the Commission has granted such extensions of time in the past to other pipeline systems with similar characteristics.[290] Based on the information provided in the record, we find pooling is feasible on Spire's system. Nevertheless, we will grant Spire an extension of time to comply with the NAESB WGQ Standards relating to pooling[291] until 150 days following its receipt of a request for service from a Part 284 customer, at which time it must commence compliance with the NAESB WGQ Version 3.0 Standards relating to pooling.[292]

## c.    Extension of Time of Requirement to Support Index-Based Capacity Releases

181.    *Spire* requests an extension of time until 150 days following its receipt of a request for service from a Part 284 customer until it must commence compliance with the NAESB WGQ Version 3.0 business practice standards that require a pipeline to support index-based capacity releases.[293] Spire asserts that its shippers are unlikely to request

---

[289] *See Equitrans L.P.*, 153 FERC ¶ 61,320, at PP 9-13 (2015) (where the Commission explained that compliance with the requirements set forth in the standards as they apply to the posting on a pipeline's Internet web site of information on proprietary location codes (i.e., the codes assigned by the transportation service providers for the identification of locations) does not require an interstate pipeline to incur substantial additional software upgrade costs, and enables the Commission and customers to continue to identify active interconnection points referenced in the Index of Customers through the website postings).

[290] *MoGas Pipeline LLC*, 157 FERC ¶ 61,036 at P 8.

[291] NAESB WGQ Version 3.0 Standards 1.3.17, 1.3.18, and 3.3.6.

[292] The extensions of time are limited to the NAESB WGQ Version 3.0 Standards promulgated by Order No. 587-W. *See B-R Pipeline*, 128 FERC ¶ 61,126 at P 6.

[293] NAESB WGQ Version 3.0 Standards 5.3.62 through 5.3.69.

such releases and the administrative and technical adjustments necessary to support such releases pose an unnecessary burden. Consistent with the Commission's prior rulings[294] and Spire's contention that its shippers are unlikely to request such releases, we will grant Spire an extension of time to comply with NAESB WGQ Version 3.0 Standards 5.3.62 through 5.3.69 and their requirement to support at least two non-public price index references until a releasing shipper presents an index-based capacity release.

### d.    Other Waivers

182.    In GT&C section 6.2.6, NAESB Standards and Internet Website, Spire provides in relevant part that "[i]n addition and related to the data sets listed [in Spire's tariff record], to the extent any of the *other* standards incorporated by reference in this Section [6.2.6 of the GT&C] implicate the EDI/EDM, that requirement is waived." (emphasis added). We will deny the requested waivers because Spire's request fails to specify the "other" standards incorporated by reference in its tariff, by standard number, for which it seeks a waiver relating to EDI/EDM in the section titled "Standards for Extension of Time to Comply have been granted." If Spire makes a revised request for waiver, it needs to identify those "other" standards, by standard number, for which it requests an extension or waiver, as well as providing the reason why such a waiver is needed.[295] Accordingly, we direct Spire to remove the aforementioned proposed tariff language.

### e.    Other NAESB Compliance Issues

183.    Spire reflects tariff provisions in GT&C section 6.2, NAESB Standards and Internet Website, implementing the NAESB WGQ Version 3.0 business practice standards that the Commission incorporated by reference in its regulations.[296] We direct Spire to:

(1)    revise the text of the Timely Nomination Cycle in GT&C section 6.9(f)(i),

---

[294] *MoGas Pipeline LLC*, 157 FERC ¶ 61,036 at PP 10-11.

[295] *See* Order No. 587-W, FERC Stats. & Regs. ¶ 31,373 at P 42 (pipelines requesting [waiver] must include in their tariff a statement identifying any standards for which the pipeline has been granted a waiver, extension of time, or other variance with respect to compliance with the standard).

[296] In Order No. 587-W, we stated that to implement the current NAESB standards each interstate natural gas pipeline will be required to file a separate tariff record reflecting the changed standards. We explained in footnote 31 of the Final Rule that "[t]o aid in compliance, promptly after issuance of this Final Rule, the Commission will post a sample tariff record on the Commission's website . . . All pipelines are to file their tariff records in conformance with this sample tariff record."

Nominations, Scheduling and Curtailment, to provide that: (i) at 1:15 p.m., nominations are received by Spire (including from Title Transfer Tracking Service Providers (TTTSPs); (ii) at 1:30 p.m., Spire sends the Quick Response to the Service Requester; (iii) at 5:00 p.m., Service Requester and Point Operator receive scheduled quantities from Spire; and (iv) scheduled quantities resulting from Timely Nominations should be effective at the start of the next Gas Day;

(2)    revise the text of the Evening Nomination Cycle to provide that: (i) at 6:15, p.m. nominations are received by Spire (including from TTTSPs); (ii) at 6:30 p.m., Spire sends the Quick Response to the Service Requester; and (iii) scheduled quantities resulting from Evening Nominations should be effective at the start of the next Gas Day;

(3)    revise the text of the Intraday 1 Nomination Cycle to provide that: (i) at 10:15 a.m., nominations are received by Spire (including from TTTSPs); and (ii) at 10:30 a.m., Spire sends the Quick Response to the Service Requester;

(4)    revise the text of the Intraday 2 Nomination Cycle to provide that: (i) at 2:45 p.m., nominations are received by Spire (including from TTTSPs); (ii) at 3:00 p.m., Spire sends the Quick Response to the Service Requester; and (ii) at 5:30 p.m., Spire provides scheduled quantities to the affected Service Requester and Point Operator, including bumped parties (notice to bumped parties);

(5)    revise the text of the Intraday 3 Nomination Cycle to provide that: (i) at 7:15 p.m., nominations are received by Spire (including from TTTSPs); (ii) at 7:30 p.m., Spire sends the Quick Response to the Service Requester; and (iii) bumping is not allowed during the Intraday 3 Nomination Cycle;

(6)    revise the text of GT&C section 6.9(f)(i)(F), Nominations, Scheduling and Curtailment, to provide that for purposes of NAESB WGQ Standard No. 1.3.2 ii, iii, iv, and v (Section 6.9.1(f)(i)(B)-(E) above), that "provide" shall mean for transmittals pursuant to Standards 1.4.x (electronic data interchange) receipt at the designated site, and for purposes of other forms of transmittal, it shall mean send or post;

(7)    revise the text of GT&C section 6.14.4(b), Capacity Release, to provide that: (i) the contract is issued within one hour of the Award posting (with a new contract number, when applicable), and (ii) nomination is possible beginning at the next available nomination cycle for the effective date of the contract;

(8)    revise the text of GT&C section 6.14.4(c), Capacity Release, to provide that: (i) the contract is issued within one hour of the Award posting (with a new contract number, when applicable), and (ii) nomination is possible beginning at the next available nomination cycle for the effective date of the contract;

(9)    revise the text of GT&C section 6.14.5(c)(iv), Pre-Arranged Replacement Customers, to provide that the contract is issued within one hour of the Award posting (with a new contract number, when applicable); and

(10)    remove the sentence "[i]n addition, and related to the data sets listed above, to the extent any of the other standards incorporated by reference in this Section 2 of the [GT&C] implicate the EDI/EDM, that requirement is waived," in GT&C section 6.2.6, NAESB Standards and Internet Website.

184.    Further, we direct Spire to:

(1)    remove one reference to NAESB WGQ Version 3.0 standard 4.3.31 in the section titled "Quadrant Electronic Delivery Mechanism Related Standards" in GT&C section 6.2.6, NAESB Standards and Internet Website, because standard 4.3.31 is incorporated by reference twice;

(2)    remove standards 5.3.10, 5.3.11, 5.3.12, 5.4.14, 5.4.15, 5.4.16, 5.4.17, 5.4.20, 5.4.21, 5.4.22, and 5.4.23 from the section titled "Standards Incorporated by Reference" in GT&C section 6.2.6, NAESB Standards and Internet Website, because standards 5.3.10, 5.3.11, 5.3.12, 5.4.14, 5.4.15, 5.4.16, 5.4.17, 5.4.20, 5.4.21, 5.4.22, and 5.4.23 are included in the section titled "Standards for which Extension of Time to Comply have been granted;"

(3)    either include standards 5.3.13 and 5.3.14 in the section titled "Standards Incorporated by Reference" in GT&C section 6.2.6, NAESB Standards and Internet Website, or include the text of the standards;

(4)    remove asterisk [*] from standard 5.4.23;

(5)    include an asterisk [*] for standards 5.4.16, 5.4.20, and 5.4.21;

(6)    change the reference for NAESB WGQ Version 3.0 standard 0.4.1 from the section titled "Operating Capacity and Unsubscribed," to a section titled "Storage Information:" under the heading "Additional Standards:" in GT&C section 6.2.6, NAESB Standards and Internet Website;

(7)    remove NAESB WGQ Version 3.0 standard 5.3.44 from the section titled "Standards Incorporated by Reference" in GT&C section 6.2.6, NAESB

Standards and Internet Website, because the text of the standard is included in GT&C section 6.14.12(d)(i) through (vi), Capacity Release – Recalls and Reputs; and

(8)     remove NAESB WGQ Version 3.0 standard 5.3.73 from section titled "Standards Incorporated by Reference" in GT&C section 6.2.6, NAESB Standards and Internet Website, because the text of the standard is included in GT&C section 6.14.2(b), Capacity Release – Availability.

## E.    Non-Conforming Provisions and Precedent Agreement

185.    Spire states that it granted Spire Missouri, as its foundation shipper, two contractual rights which constitute material deviations from the *pro forma* FTS agreement set forth in its proposed tariff.  The two-non-conforming provisions are:  Spire Missouri's unilateral extension right for up to two five-year terms and Spire Missouri's ability to obtain foundation or anchor shipper status in the event of a future Spire project. Spire states that neither of the non-conforming provisions affect the actual terms or quality of service on its proposed pipeline and that it offered such benefits to all interested shippers during the open season.  Spire requests that the Commission find that the non-conforming provisions to be included in the service agreement with Spire Missouri are not unduly discriminatory.

186.    Missouri PSC states that it does not object to the two non-conforming provisions, but that it does have concerns with other terms of the precedent agreement.  Specifically, Missouri PSC requests that the Commission clearly state in its order that it is not approving the precedent agreement in total.

187.    In *Columbia Gas Transmission Corp.*, we clarified that a material deviation is any provision in a service agreement that:  (a) goes beyond filling in the blank spaces with the appropriate information allowed by the tariff, and (b) affects the substantive rights of the parties.[297]  We prohibit negotiated terms and conditions of service that result in a shipper receiving a different quality of service than that offered other shippers under the pipeline's generally applicable tariff or that affect the quality of service received by others.[298]  However, not all material deviations are impermissible.  As we explained in *Columbia*,[299] provisions that materially deviate from the corresponding *pro forma* agreement fall into two general categories:  (a) provisions the Commission must prohibit

---

[297] *Columbia Gas Transmission Corp.*, 97 FERC ¶ 61,221, at 62,002 (2001) (*Columbia*).

[298] *Monroe Gas Storage Co., LLC*, 130 FERC ¶ 61,113, at P 28 (2010).

[299] *Columbia*, 97 FERC at 62,003-62,004.

because they present a significant potential for undue discrimination among shippers, and (b) provisions the Commission can permit without a substantial risk of undue discrimination.[300]

188.    We find that the incorporation of the two non-conforming provisions in Spire Missouri's service agreement do constitute material deviations from Spire's *pro forma* form of FTS Agreement.  However, in other proceedings, we have found that non-conforming provisions may be necessary to reflect the unique circumstances involved with the construction of new infrastructure and to provide the needed security to ensure the viability of the project.[301]  Here, we find the non-conforming provisions identified by Spire are permissible because they do not present a risk of undue discrimination, do not adversely affect the operational conditions of providing service, and do not result in any customer receiving a different quality of service.[302]  As discussed further below, when Spire files its non-conforming service agreements, we will require Spire to identify and disclose all non-conforming provisions or agreements affecting the substantive rights of the parties under the tariff or service agreement.  This required disclosure includes any such transportation provision or agreement detailed in a precedent agreement that survives the execution of the service agreement.

189.    At least 30 days, but not more than 60 days, before providing service to any project shipper under a non-conforming agreement, Spire must file an executed copy of the non-conforming service agreement and identify and disclose all non-conforming provisions or agreements affecting the substantive rights of Spire Missouri under the tariff or service agreement.  This required disclosure includes any such transportation provision or agreement detailed in a precedent agreement that survives the execution of the service agreement.  Consistent with section 154.112 of the Commission's regulations, Spire must also file a tariff record identifying the agreements as non-conforming agreements.[303]  In addition, the Commission emphasizes that the above determination relates only to those items described by Spire and not to the entirety of the precedent agreement or the language contained in the precedent agreement.[304]

---

[300] *Equitrans, L.P.*, 130 FERC ¶ 61,024, at P 5 (2010).

[301] *See, e.g.*, *Tennessee Gas Pipeline Co.*, 144 FERC ¶ 61,219 (2013); *Midcontinent Express Pipeline LLC*, 124 FERC ¶ 61,089, at P 82 (2008).

[302] See, e.g., Columbia Gulf Transmission, LLC, 152 FERC ¶ 61,214 (2015); Transcontinental Gas Pipe Line Co., LLC, 145 FERC ¶ 61,152, at P 34 (2013).

[303] 18 C.F.R. § 154.112 (2017).

[304] A Commission ruling on non-conforming provisions in a certificate proceeding does not waive any future review of such provisions when the executed copy of the non-

190.    With regard to Missouri PSC's request that we clearly state in this order that we are not approving the precedent agreement with Spire Missouri, we affirm that is the case.  We look at precedent agreements as evidence of market support and will rule on individual provisions in the agreement if requested.  However, our approval of the project by no means signifies acceptance of any individual provision in the agreement (other than those explicitly addressed above).

### F.    **Engineering Analysis**

191.    On February 27, 2017, MRT filed a protest claiming that the Spire STL Pipeline Project would have negative consequences on MRT's system.  MRT claims that receipt of firm deliveries at Chain of Rocks from Spire would adversely affect MRT's operations and existing services unless significant modifications are made to MRT's facilities.  Specifically, MRT states that accepting 150,000 Dth per day of firm deliveries from Spire at Chain of Rocks into existing MRT facilities will render a portion of the traditional path for service from the interconnections with Trunkline, NGPL, and the St. Jacob storage field to the St. Louis area contractually unavailable.[305]  MRT provides a statement from Dr. Harri K. Kytomaa, an engineering witness, stating that removing the current gas deliveries from MRT to Spire Missouri would cause pressures on MRT's pipeline south of Horseshoe Lake compressor station to exceed the maximum allowable operating pressure, and a 30 percent increase of delivery capacity to MRT's Reticulated System.[306]

192.    On March 17, 2017, Spire filed an answer to MRT's protest and states that the source of MRT's concerns regarding the firm physical delivery of 150,000 Dth per day into MRT's system at Chain of Rock is not clear.  Spire references Appendix 1 to Firm Transportation Service Agreement between Spire and Spire Missouri filed in the Exhibit I of the application that specifies primary receipt and delivery rights, reflecting continuation of the status quo in which MRT makes physical deliveries of gas to Spire

---

conforming agreement(s) and a tariff record identifying the agreement(s) as non-conforming are filed with the Commission, consistent with section 154.112 of the Commission's regulations.  *See, e.g.*, *Tennessee Gas Pipeline Co., L.L.C.*, 150 FERC ¶ 61,160, at P 44 n.33 (2015).

[305] MRT February 27, 2017 Protest at 50.

[306] MRT February 27, 2017 Protest at Exhibit MRT-001.  MRT's system is reticulated in the St. Louis metropolitan area north of, and including, the Meramec and Columbia meter and regulation stations on the Mainlines, and west of, and including, the A206 interconnection on the East Line.

Missouri at Chain of Rocks.[307]  Spire further states that because the project does not
include a compressor station, Spire's ability to accomplish physical deliveries into MRT
at Chain of Rocks is uncertain; further, Spire states that MRT will have full control
regarding any receipts into its system at Chain of Rocks.  Therefore, Spire concluded that
there will be no adverse operational risk to MRT, any of its customers, or interconnecting
pipelines from the new configuration of Chain of Rocks.

193.   Spire emphasizes that the bi-directional Chain of Rocks point is a physical
interconnection designed to receive natural gas from MRT for delivery to Spire Missouri;
physical delivery of natural gas from Spire to MRT would only occur subject to MRT's
willingness and ability to receive such physical gas.[308]  Spire has not offered any primary
delivery rights to Spire Missouri at Chain of Rocks under the Firm Transportation
Service Agreement.[309]

194.   Commission staff was also unclear as to MRT's concerns about receiving
150,000 Dth per day of firm transportation service at Chain of Rocks.  To clarify and
further evaluate MRT's claims, staff issued a data request to MRT on February 21, 2018,
requesting:  (1) a list of facilities that MRT expects would be required on its system if the
Spire STL Pipeline Project were to be built; (2) a list of assumptions used in MRT's
analysis; and (3) the supporting engineering flow diagrams and hydraulic models.  Staff
also requested a hydraulic model to support Dr. Kytomaa's statements regarding the
effects of removing current gas deliveries to Spire Missouri.

195.   On March 14, 2018, MRT filed an answer to the data request.  Due to the
following inconsistences and incomplete information, we find that MRT was not able to
support its positions.

196.   As part of its data request response, MRT provided the results of its engineering
analysis (Exponent Analysis).[310]  The results included three scenarios and a list of
operational and configuration changes that MRT claims would be needed if the Spire
STL Pipeline Project is constructed.  The three scenarios in the Exponent Analysis are:

    a.    Case 1 (base case or existing operating conditions) – combined
        257,000 Dth per day[311] receipt at Trunkline and NGPL interconnections and
        142,000 Dth per day delivery at Chain of Rocks;

---

[307] Spire March 17, 2017 Answer at 26.

[308] Spire June 6, 2017 Answer at 20.

[309] Spire Application at Exhibit I.

[310] MRT March 14, 2018 Answer at attachment 2(A)-1.

[311] MRT included measurements in thousand standard cubic feet (MMscf) per day.

   b.    Case 2 (effects of removing all gas deliveries to Spire Missouri) –
         257,000 Dth per day receipt at Trunkline and NGPL interconnections and
         no deliveries at Chain of Rocks; and

   c.    Case 3 (post-Spire operating conditions) – no receipt at Trunkline and
         NGPL interconnections and 150,000 Dth per day receipt at Chain of Rocks.

197.   However, MRT's response did not include corresponding hydraulic models to
support any of the three cases in the Exponent Analysis. Thus, the Commission cannot
validate any of MRT's operating condition scenarios presented in the Exponent Analysis.
The flow diagram and corresponding hydraulic model that MRT provided as their
existing operating conditions show no deliveries being made from MRT to Spire
Missouri at Chain of Rocks and no gas being received at the interconnections with
Trunkline and NGPL. This contradicts MRT's repeated statement that the operation of
its system depends on delivering gas at Chain of Rocks and that the Trunkline and NGPL
interconnects are active receipt points; thus, we conclude that the flow diagram and
hydraulic models provided by MRT as demonstrating the existing operating conditions
(and Case 1 as described in the Exponent Analysis) are inaccurate. Without
representative modeling of existing operating conditions, any meaningful analysis of pre-
and post-Spire STL Pipeline Project scenario is impossible.

198.   Further, the Commission could not verify the validity of Case 2 as a feasible
operating condition scenario for MRT's system. It is unclear why MRT assumes
that its net receipts would remain unchanged if its net deliveries were to decrease by
142,000 Dth per day as a result of the cessation of the delivery of gas to Spire Missouri.

199.   Similarly, we found that MRT's claim of adverse effects to be caused by the
receipt of 150,000 Dth per day on a firm basis into its system at Chain of Rocks is not
supported in the record. First, there is no evidence in the record that any Spire shipper
has or intends to contract for such service. Further, without modeling of the base case
scenario, the Commission is unable to assess the validity of the impacts MRT alleges
would result if such a scenario occurred. Therefore, we reject MRT's protest regarding
operational impacts as a result of the Spire STL Pipeline Project.

## G.    Environmental Analysis

200.   On July 22, 2016, Commission staff began its environmental review of the
Spire STL Pipeline Project by granting Spire's request to use the pre-filing process
in Docket No. PF16-9-000. As part of the pre-filing review, staff participated in

---

A conversion factor of 1 MMscf per day = 1,000 Dth per day was applied. MRT's
February 27, 2017 Protest Exhibit MRT-001 (establishing the conversion factor).

five open houses that Spire sponsored in Scott, Greene, and Jersey Counties, Illinois, and St. Charles and St. Louis Counties, Missouri, between August 16 and 24, 2016, to explain the Commission's environmental review process to interested stakeholders.

201.    On October 26, 2016, the Commission issued a *Notice of Intent to Prepare an Environmental Assessment* (NOI).[312]  After the issuance of the NOI, Spire filed with the Commission a pipeline route alternative in St. Louis County.  On March 3, 2017, the Commission issued a *Supplemental Notice of Intent to Prepare an Environmental Assessment* (Supplemental NOI).  The NOI and Supplemental NOI were each published in the *Federal Register* and mailed to interested entities, including:  federal, state, and local officials; agency representatives; environmental and public interest groups; Native American tribes; local libraries and newspapers; and affected property owners.[313] In response to the NOI and Supplemental NOI, we received 50 comment letters, which included letters from the U.S. Environmental Protection Agency (EPA); Missouri Department of Natural Resources; Illinois State Historic Preservation Office; Missouri Department of Conservation; Osage National Tribal Historic Preservation Office; Miami Tribe of Oklahoma; Winnebago Tribe; various labor unions and teamsters; the Treasurer of New Piasa Chautauqua; representatives from Principia College; and 12 individuals (including landowners).

202.    On November 14, 15, and 16, 2016, Commission staff conducted public scoping sessions in North St. Louis, Missouri, and Dow and Carrollton, Illinois, respectively, to provide the public with an opportunity to learn more about the project and provide comments on environmental issues that should be addressed in the Environmental Assessment (EA).  In total, 12 individuals provided oral comments on the project at the scoping sessions.  Transcripts of the scoping sessions were entered into the public record in Docket No. PF16-9-000.

203.    To satisfy the requirements of the National Environmental Policy Act of 1969 (NEPA),[314] our staff prepared an EA for Spire's proposal.  The EA was prepared with the cooperation of the U.S. Army Corps of Engineers (Corps) and the Illinois Department of Agriculture.  The EA addresses geology, soils, water resources, wetlands, vegetation, fisheries, wildlife, threatened and endangered species, land use, recreation, visual resources, socioeconomics, cultural resources, air quality, noise, safety, cumulative impacts, and alternatives.  All substantive comments filed in response to the NOI and Supplemental NOI were addressed in the EA.

---

[312] NOI, 82 Fed. Reg. 11,028 (2017).

[313] Supplemental NOI, 82 Fed. Reg. 13,327 (2017).

[314] 42 U.S.C. § 4321 *et seq*. (2012).

204.    The EA was issued for a 30-day comment period and placed into the public record on September 29, 2017.  On November 22, 2017, the Commission announced the opening of an additional comment period in recognition of the delay some stakeholders experienced in receiving the EA.  The Commission received comments on the EA from the U.S. Fish and Wildlife Service (FWS), EPA, the Consolidated North County Levee District (Consolidated Levee District), EDF, MRT, two landowners (Julie Viel and the Plumbers' and Pipefitters' Welfare Educational Fund (Plumbers and Pipefitters)), and Spire.  The primary concerns raised by commenters pertain to:  project purpose and need; project alternatives; agency correspondence and consultation requirements; the need to prepare an environmental impact statement (EIS) for this project; geological hazards along the pipeline alignment, including at horizontal direction drill (HDD) locations; water resource and wetland impacts; climate change and greenhouse gas emissions; land use; and socioeconomics, including environmental justice.  After issuance of the EA, Spire proposed several pipeline route adjustments.

205.    By the time the second comment period closed on December 22, 2017, we had received 13 additional comment letters.  Eight comment letters express support for the project (including one from Spire).  The nature of four comment letters was generally similar to the comments received during the designated comment periods.  Lastly, FWS provided additional comments on the EA when it submitted its final Biological Opinion.

206.    On May 22, 2018, the Consolidated Levee District filed a notice to withdraw its comments filed on December 26, 2017, and February 21, 2018.  In its filing, the Consolidated Levee District states that Spire and the district held numerous discussions to resolve all of the concerns raised in its two filings.  The Consolidated Levee District considers all of the issues and concerns previously raised to be satisfactorily resolved.

## 1.    Purpose and Need and Alternatives Analyses

207.    Several commenters contend that the purpose and need and alternatives analyses in the EA were inadequate.  Ms. Viel asserts that the EA defined the project's purpose and need too narrowly.  MRT comments that the EA does not consider whether a flat or declining demand for natural gas in the St. Louis area negates the need for this project.[315] MRT also questions whether the benefits for this project outweigh the adverse impacts. Commenters focus on other existing pipelines in the area with available capacity that could serve as alternatives to the Spire STL Pipeline Project and question the project's impact on existing customers.  EDF comments that the affiliate relationship between Spire and Spire Missouri taints the need for the project.

---

[315] MRT October 25, 2017 Comments at 13 (citing Ameren Missouri 2017 Integrated Resource Plan, https://www.ameren.com/missouri/ environment/integrated-resource-plan).

208.   MRT contends the system alternatives analysis in the EA lacks rigor and erroneously rejects the NGPL and MoGas Systems as alternatives based on an inflated capacity of 400,000 Dth per day, fails to evaluate aboveground facility sites, and neglects to consider other system alternatives that could collectively met the goals of the project, including MRT's Mainline and East Line, and Illinois Intrastate Transmission (Illinois Intrastate) line.

209.   The Council on Environmental Quality's (CEQ) regulations require that an EA provide a brief discussion of the need for the proposal.[316]   Courts have upheld federal agencies' use of applicants' identified project purpose and need as the basis for evaluating alternatives.[317]   Where an agency is asked to sanction a specific plan, the agency should take into account the needs and goals of the parties involved in the application.[318]   We acknowledge that a project's purpose and need should not be so narrowly defined as to preclude consideration of what may actually be reasonable alternatives.[319]   But, an agency need only consider alternatives that will bring about the ends of the proposed action, and the evaluation is shaped by the application at issue and by the function that the agency plays in the decisional process.[320]   The EA explains that the purpose and need for the proposed Spire STL Pipeline Project is to provide 400,000 Dth per day of firm transportation service to the St. Louis Metropolitan area, eastern Missouri, and southwest Illinois in order to provide the region with a new source of supply and improve reliability and diversity for Spire Missouri.[321]   Here, the EA's statement of the purpose and need was defined appropriately to allow for the evaluation of reasonable alternatives to the proposed project.

210.   Commenters also confuse the Commission's determination of need under the public convenience and necessity standard of section 7(c) of the NGA and the project

---

[316] 40 C.F.R. § 1508.9(b) (2017).

[317] *See, e.g., City of Grapevine v. U.S. Dep't of Transp.*, 17 F.3d 1502, 1506 (D.C. Cir. 1994).

[318] *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991) (*Busey*).

[319] *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1085 (9th Cir. 2013); *Simmons v. U.S. Army Corps of Eng'rs*, 120 F.3d 664, 669 (7th Cir. 1997); *Busey*, 938 F.2d at 198-99.

[320] *Busey*, 938 F.2d at 195.

[321] EA at 2.

purpose and need statement required under NEPA.[322]  The Commission's public convenience and necessity standard requires us to evaluate the need for the project and then engage in a balancing of public benefits against project impacts, as described above in our certificate policy analysis.  This analysis is distinct from that required by CEQ regulations, which specify that environmental documents contain a "purpose and need statement" used to determine the objectives of the proposed action and then to identify and consider reasonable alternative actions.[323]  Thus, comments by EDF, MRT, and Ms. Viel that the EA's purpose and need statement does not address the market need are misplaced.

211.    The Commission is not required to consider alternatives that are not consistent with the purpose and need of a proposed project.[324]  To select alternatives for evaluation, the EA explicitly asks if they would meet the project's objectives, be technically and economically feasible, and provide a significant environmental advantage over the proposed project.[325]  Based on the statement of purpose and need, the EA evaluates pipeline route alternatives, system alternatives that would make use of existing or other proposed natural gas transmission systems, and a no-action alternative.[326]

212.    We disagree with the commenters and find that the EA's alternatives analysis was appropriate.  NEPA requires the Commission to identify and analyze reasonable alternatives during its review of a project.  NEPA does not define what constitutes "reasonable alternatives;" however, the CEQ provides that "a reasonable range of alternatives depends on the nature of the proposal and the facts in each case."[327]  The Commission does not need to consider alternatives that are not consistent with the purpose and need of a proposed project.  Thus, Commission staff identified and analyzed three existing systems serving the St. Louis region that could meet the project objectives: NGPL, MoGas, and Spire Missouri's Line 880 as system alternatives for the Spire STL

---

[322] The EA includes a discussion that explains the Commission's process under section 7(c) of the NGA and how the Commission relies upon its certificate policy statement to determine whether to grant a certificate.  EA at 2-3.

[323] 40 C.F.R. § 1502.13 (2017).

[324] *See, e.g., Pacific Coast Fed'n of Fishermen's Ass'ns v. Blank*, 693 F.3d 1084, 1100 (9th Cir. 2012).

[325] EA at 146.

[326] EA at 146-160.

[327] Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,027 (1981).

Pipeline Project. Staff found that use of these facilities/systems as an alternative to the proposed project would not provide a significant environmental advantage.[328] Commission staff also considered major route alternatives that would route the proposed Spire pipeline to the east or west and found these alternatives would result in greater impacts.[329] We accept the EA's evaluation and elimination of these alternatives.[330]

213.    MRT claims that its East Line, NGPL's system, MoGas's system, or Enable's Illinois Intrastate pipeline could meet the project need and should be considered as system alternatives. However, as MRT's own comment notes, the East Line and the Illinois Intrastate pipeline do not have adequate available capacity to meet the needs of the Spire STL Pipeline Project.[331] To serve as a reasonable system alternative, the East Line or Illinois Intrastate would require modifications or additions that could result in environmental impacts that are less than, similar to, or greater than those of the Spire STL Pipeline Project. Because uncertain modifications would be required to meet the needs of the project, we agree with Commission staff's decision to not analyze these alternatives in the EA. Similarly, the alternatives analysis in the EA found that the NGPL and MoGas systems each lacked available capacity and would require upgrades, including looping and compression or new pipeline construction, and thus, the EA did not recommend these alternatives.[332]

214.    MRT argues that the EA failed to analyze a system alternative that combined transportation on MRT's Mainline, East Line, and Illinois Intrastate, which it claims could meet the required capacity of Spire's project. However, this alternative, consisting of several transportation paths, would not meet the stated purpose and need of the project as it would not increase reliability by diversifying the source of gas supplied to the St. Louis Region. The Commission's approach for analyzing alternatives is consistent with precedent that finds an agency may take into account an applicant's needs and goals, so long as it does not limit the alternatives to only those that would adopt the applicant's

---

[328] EA at 150-151.

[329] EA at 153-154.

[330] *See, e.g.*, *Myersville*, 783 F.3d at 1323 ("consideration of alternatives in an [EA] need not be as rigorous as the consideration of alternatives in an EIS").

[331] MRT October 25, 2017 Comments at 17 (highlighting the 40,000 Dth per day of available capacity on Illinois Intrastate and 7,637 Dth per day of available unsubscribed capacity (up to 97,637 Dth per day on August 1, 2018) on MRT's East Line).

[332] EA at 150.

proposal.[333]

215.    MRT also questions the EA's conclusion that the 1-mile-long extension of the MoGas system to connect with Spire Missouri's system at the Spire Missouri/Lange Delivery Station, would have "larger" impacts than the project's 65 miles of greenfield construction.  MRT's misinterprets the EA's findings.  Commission engineering staff examined the MoGas system and determined that such a capacity increase would require not only a 1-mile long extension to connect with Spire Missouri at the Lange Delivery Station, but that at least half of the approximately 80-mile-long segment of MoGas's system from its interconnection with REX to the Lange Delivery Station would need to be looped.  The finding that the MoGas system extension would require similar, if not larger, impacts than the project is based on the total construction that would be required to increase the system's capacity.

216.    EDF asserts that the project does not serve increased demand for gas capacity in the St. Louis region, the affiliate transaction between Spire and Spire Missouri equates to unfair competition, and the project would result in potential rate increases for current retail customers of Spire Missouri.  As discussed above, these issues are addressed in the Certificate Policy Statement section of this order.  The EA is clear that the purpose of Spire's project is to provide an additional, alternative source of gas supply and further recognizes that if the project were not to be constructed, the current market demand would continue to be met by systems already in place and serving the area.[334]

217.    EDF claims that the EA failed to employ a "degree of skepticism in dealing with self-serving statements from a prime beneficiary of the project" when the EA dismissed the no-action alternative.[335]  MRT contends that the no-action alternative is a superior alternative as demand is flat for natural gas in the St. Louis area.  Ms. Viel asserts that the no-action alternative meets the needs of the proposed action because the EA concedes there is no additional demand for natural gas supply in the region and that the Commission "cannot restrict its analysis to those alternative means by which a particular applicant can reach his goals."[336]  The no-action alternative provides policymakers and the public with a baseline to compare the environmental impacts of the proposed action

---

[333] *See Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 72-74 (D.C. Cir. 2011).

[334] EA at 147.

[335] EDF October 30, 2017 Comments at 15 (quoting *Simmons v. U.S. Army Corps of Engr's*, 120 F.3d 664, 669 (7th Cir. 1997) (*Simmons*)).

[336] Viel October 30, 2017 Comments at 2 (quoting *Simmons*, 120 F.3d at 669 (internal quotations removed)).

with the status quo.[337]  Here, we agree with Commission staff, that under the no-action alternative impacts on the environment would not occur and the current conditions described in the EA would persist.[338]  However, selection of the no-action alternative would not meet the needs of the project; i.e., to provide direct access to additional, alternative sources of supply.  Thus, we find Commission staff's decision to not recommend the no-action alternative in lieu of the proposed action is appropriate.

## 2.    Agency Correspondence

218.    EDF claims the EA ignores critical information necessary to determine the impacts on numerous environmental resources because it contains multiple placeholders for future agency correspondence and mitigation plans, including ongoing consultation between the Commission and FWS, Spire and Illinois Department of Natural Resources, and comments on the project from the State Historic Preservation Offices.

219.    The inclusion of environmental conditions that require Spire to complete consultation and submit mitigation plans does not violate NEPA.  In fact, NEPA "does not require a complete plan be actually formulated at the onset, but only that the proper procedures be followed for ensuring that the environmental consequences have been fairly evaluated."[339]  Here, the EA identified baseline conditions for all relevant resources.  Later-filed mitigation plans will not present new environmentally-significant information nor pose substantial changes to the proposed action that would otherwise require supplemental analysis.  Moreover, as we have explained in other cases, practicalities require the issuance of orders before completion of certain reports and studies because large projects, such as this, take considerable time and effort to develop.[340]  Perhaps more important, the completion of reports and studies is subject to many variables whose outcomes cannot be predetermined.  Further, as we found elsewhere, in some instances, the certificate holder may need to access property in order

---

[337] *See Center for Biological Diversity v. U.S. Department of Interior*, 623 F.3d 633, 642 (9th Cir. 2010).

[338] NEPA does not impose an obligation to select the most environmentally benign alternative.  *Robertson v. Methow Valley Citizens Council*, 490 U.S 332, 349 (1989) ("[I]t is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process.").

[339] Robertson v. Methow Valley Citizens Council, 490 U.S. at 352.

[340] *See, e.g., Algonquin Gas Transmission, LLC*, 154 FERC ¶ 61,048, at P 94 (2016); East Tennessee Natural Gas Co., 102 FERC ¶ 61,225, at P 23 (2003), aff'd sub nom. Nat'l Comm. for the New River, Inc. v. FERC, 373 F.3d 1323 (D.C. Cir. 2004).

to acquire the necessary information.[341] Accordingly, post-certification studies may properly be used to develop site-specific mitigation measures. It is not unreasonable for the EA to deal with sensitive locations in a general way, leaving specificities of certain resources for later exploration during construction.[342] What is important is that the agency make adequate provisions to assure that the certificate holder will undertake and identify appropriate mitigation measures to address impacts that are identified during construction.[343] We have and will continue to demonstrate our commitment to assuring adequate mitigation.[344]

220.    In this proceeding, staff initiated formal consultation with FWS as part of the EA. Following issuance of the EA, FWS completed its review under the Endangered Species Act (ESA), as described below. This review was completed after issuance of the EA because FWS relies, in part, on Commission staff's EA and Biological Assessment to develop its Biological Opinion. Finally, Environmental Conditions 18 through 20 in the appendix to this order require Spire to continue consulting with applicable agency representatives, develop certain site-specific plans and mitigation measures for staff review, prior to commencing construction, and file the outstanding information to the docket where it will be available to the public.

221.    As part of its comments, Spire filed updated species-specific reports and associated agency correspondence and clarifications to the EA. Spire notes that its bald eagle survey report and associated FWS correspondence satisfy environmental recommendation 17 of the EA.[345] No eagles or nests were found during Spire's survey.[346] Therefore, environmental recommendation 17 from the EA is no longer necessary and is not included as a condition of this order.

222.    On October 26, 2017, FWS concurred with the determinations in the Biological Assessment[347] that the project is not likely to adversely affect the gray bat, least tern, piping plover, red knot, and pallid sturgeon. FWS further states that its programmatic biological opinion for the final 4(d) rule satisfies the Commission's responsibility under

---

[341] Midwestern Gas Transmission Company, 116 FERC ¶ 61,182 at P 92.

[342] *Mojave Pipeline Co.*, 45 FERC ¶ 63,005, at 65,018 (1988).

[343] *Id.*

[344] *Id.*

[345] EA at 72, 167.

[346] Spire October 6, 2017 Supplemental Information at app. 3-B.

[347] The Biological Assessment was included as appendix K of the EA.

the ESA section 7(a)(2) for the northern long-eared bat, and acknowledges receipt of the Northern Long-eared Bat 4(d) Streamlined Consultation Form. Surveys conducted for the decurrent false aster subsequent to the Biological Assessment indicate the absence of this plant species. Therefore, FWS concludes, and we agree, that the project will have no effect on the decurrent false aster. Thus, consultation is complete for all seven of these species.

223.   On February 28, 2018, FWS provided its Biological Opinion for the project. The FWS states that the project, as proposed, is not likely to jeopardize the continued existence of the Indiana bat. Accordingly, the EA's environmental recommendation 18 is no longer necessary and is not included as a condition of this order. However, we have included a new Environmental Condition 17 in the appendix to this order, which requires Spire to adhere to the Incidental Take Statement, which includes implementing the reasonable and prudent measures and adopting the Terms and Conditions in FWS' Biological Opinion into Spire's project-specific implementation plan. These measures outline monitoring and reporting protocols for the Indiana bat, as well as other impact-reduction requirements. With implementation of these measures we conclude our consultation with the FWS under section 7 of the ESA.

224.   Subsequent to issuance of the EA, Spire filed additional cultural resources information addressing a portion of the associated recommendation in the EA. Thus, we have modified Environmental Condition 19 in the appendix to this order.

225.   EPA recommends that Spire comply with all of the Commission's recommendations included in the EA. All of staff's environmental recommendations in the EA have been retained as environmental conditions, unless otherwise discussed in this order.

226.   EPA states that the Commission should require Spire to complete coordination with state agencies to identify underground storage tanks prior to construction. EPA also asks the Commission to require that Spire hire third-party environmental monitors to be present during construction at the following: across streams, wetlands, and karst areas; areas characterized as having steep slopes and highly erodible soils; and where Spire proposes to implement an HDD crossing method.

227.   As described in the EA, in the event that contamination is encountered during construction, Spire would stop work and implement its Unanticipated Discovery of Contamination Plan. Spire conducted a search of the EPA National Priority List Superfund Sites to identify sites in proximity to the project and found that the closest site was about 8.5 miles southeast of the project.[348] Based on the project's crossing of Coldwater Creek within a designated metropolitan no-discharge stream reach, Spire

---

[348] EA at 41.

coordinated with the Corps' Formerly Utilized Sites Remedial Action Program. As reported in the EA, the Corps determined that sources of contaminants have been removed upstream and that there would be no contamination at the proposed crossing location.[349] Spire has received applicable permits for crossing Coldwater Creek.

228.    Spire has committed to hire at least one environmental inspector per construction spread. The EA found this commitment sufficient, and we agree.[350] The Commission does have a third-party compliance monitoring program, but this is a voluntary program that may or may not be implemented for Spire's project. However, regardless of a company's decision to participate in the third-party monitoring program, all certificated projects are monitored by our staff during construction and restoration, including regularly scheduled compliance inspections.

### 3.    Geological Hazards and Horizontal Direction Drilling Impacts

229.    MRT and EDF argue that the EA erroneously concludes the project would not increase the risk of landslides because the Commission has not reviewed Spire's site-specific steep slope and landslide hazard assessment plan.

230.    We disagree. As stated in the EA, mapping compiled by the U.S. Geological Survey shows that landslide incidence for the majority of the pipeline is considered low.[351] The one area identified as having steep slopes and high susceptibility to landslide incidences includes parcels where survey access has not been allowed. For this reason, Spire has not been able to finalize its site-specific plans. As stated above, it is not uncommon for final plans to be filed for Commission review after the issuance of the NEPA document due to denied access. The EA bases its conclusions on the best available information, which includes staff's experience and expertise in evaluating project impacts, aerial photos, maps, habitat and terrain descriptions, as well as mitigation measures proposed by Spire based on this information. Staff recommendations in the EA, which later become mandatory conditions unless completed before certificate authorization, serve as a backstop to allow additional review of property-specific or resource-specific details prior to construction.

231.    To this end, Spire has identified, and the EA discusses, specialized construction techniques that are recognized, established methods for areas classified as steep slopes and susceptible to landslides.[352] These methods include: (1) installation of the pipeline

---

[349] EA at 41, 49.

[350] EA at 24.

[351] EA at 32.

[352] EA at 33.

in a direction opposite to the steep slope; (2) installation of temporary conductor casing at the HDD pit to support the soils and stabilize the borehole; and (3) installation of temporary erosion controls closer together with more frequent maintenance until permanent erosion controls are established.  Spire also has committed to conducting routine inspections of these areas during construction to identify signs of distress and development of head scarps and will install swales or water bars in areas of observed distress.  As needed, Spire proposes to install drainage materials or re-grade lands to relieve drainage.  Finally, the EA recognizes the pending need for review and approval of such a plan with the recommendation, which we adopted as Environmental Condition 12, that Spire file this plan prior to construction.[353]  If, upon review of the plan, staff finds that Spire's plan is insufficient, the Commission will require Spire to develop additional mitigation measures, subject to review and approval.

232.    EDF asserts that the EA fails to acknowledge the risk of inadvertent releases of HDD fluids and to discuss the composition of the HDD fluids.  EDF points to environmental violations on another project as a recent example.

233.    The EA does not ignore the risk of inadvertent releases.  As discussed in the EA, Spire has developed an Horizontal Directional Drill Contingency Plan (HDD Plan), which addresses the prevention, detection, notification, and response regarding inadvertent returns in upland areas, wetlands, and waterbodies.[354]  The EA requires Spire to improve the inadvertent return detection, notification, and response procedures.[355]  The EA assesses the potential impacts from inadvertent returns on soils, water resources (wetlands and waterbodies), vegetation, fisheries, and special status species.[356]  Environmental Conditions 14 and 16 in the appendix to this order contain specific protections regarding HDD crossings to ensure adequate protection of water resources.  To ensure adequate protection of surface and groundwater resources, we have modified Environmental Condition 16 to require Spire to provide the Commission with a list of environmentally safe drilling fluid additives it will use prior to construction.

234.    EPA comments on the potential for project construction impacts in areas characterized as karst topography and potential impacts on nearby water supply wells.  Ms. Viel claims that the EA largely ignores the issue of karst terrain in the project area

---

[353] EA at 33.

[354] EA at 18-20.

[355] See Spire Amended Application at app. 1-L; Spire October 6, 2017 Answer to Staff's Data Request at app 6-B.

[356] EA at 41 (soils); 49, 52, 57 (water resources); 62 (vegetation); 66 (fisheries); 80 (special status species).

and that limited geologic investigations were conducted.

235.    We disagree that the EA ignores the potential impact of construction near karst terrain.  The EA identifies 16 karst features that are within 1,500 feet of the project.[357] The geology and soils and water resources and wetlands sections of the EA describe the potential for the project to cross karst features and assesses potential impacts of construction in these areas.[358]  After issuance of the EA, Spire filed additional geotechnical investigation reports for areas where karst features were likely to occur in the vicinity of the Coldwater Creek and Spanish Lake HDD crossings.[359]  However, these reports do not specifically address the likelihood of success of completing the drill.  Thus, we adopt staff's recommendation for Spire to conduct additional geotechnical investigations at the Coldwater Creek and Spanish Lake HDD crossings to determine the presence and extent of potential karst features as Environmental Condition 13 in the appendix to this order.

236.    We also agree with the commenters that Spire needs to ensure that it minimizes impacts on water supplies within karst terrain during its HDD construction.  Thus, we are including Environmental Condition 14 in the appendix to this order, which requires Spire to file a Water Resource Identification and Testing Plan for each HDD through karst terrain.

237.    The EA requires Spire to obtain a No-Rise Certification from county floodplain managers, which involves an engineering analysis of all regulatory floodway crossings to assess potential increase flood heights.[360]  Also, as Consolidated Levee District states, the EA requires Spire to develop a Flood Action Plan for the portion of the project that will cross lands within the levee district, which will outline the actions Spire will implement when rivers are projected to reach and/or exceed flood storage stages.  In its comments, Spire clarified that in addition to ongoing coordination with county and local floodplain permitting authorities in Missouri, it submitted a Flood Action Plan to the Consolidated Levee District on December 15, 2017.[361]  We recognize that this plan is required as part of Spire's Corps section 408 permit.  For public disclosure and a consolidated public record, we have added Environmental Condition 22 in the appendix to this order, which requires that Spire file the Flood Action Plan prior to construction.  Further, as described

---

[357] EA at 34.

[358] EA at 33-35, 45.

[359] Spire October 6, 2017 Answer to Staff's Data Request at app 6-B.

[360] EA at 51.

[361] Spire January 4, 2018 Answer at 7-8.

in the EA, Spire will install one or more flume pipes for each dry-ditch flume crossing to temporarily divert *maximum* water flow,[362] and Spire will use temporary slope breakers, trench plugs, sediment, and/or mulch during construction to minimize erosion impacts.[363] Also, Spire will install the pipeline at a minimum depth of seven feet within the floodplains of the Mississippi and Missouri Rivers (at the point of the pipeline's crossing of the levee, Spire proposes a crossing depth of 116 feet).[364]  The EA found, and we agree, that implementation of the project plans discussed above, in conjunction with Environmental Conditions 14, 16, and 22, will sufficiently mitigate impacts on the levee and nearby resources.  We agree.

### 4.    Need for an EIS

238.    Under NEPA, agencies must prepare an EIS for major federal actions that may significantly impact the environment.[365]  However, if an agency determines that a federal action is not likely to have significant adverse effects, it may rely on an EA for compliance with NEPA.[366]

239.    Commenters have requested that the Commission prepare an EIS for the project. Specifically, EDF claims that the project's crossings of the Mississippi and Missouri Rivers are significant enough to trigger the need for an EIS.  It references another project reviewed by the Commission that included a crossing of the Mississippi River, for which an EIS was prepared.[367]  Typically, a single river crossing, when executed with proper

---

[362] EA at 18.

[363] EA at 35 and 36.

[364] EA at appendix J.

[365] 42 U.S.C. § 4332(2)(C) (2012); 40 C.F.R. § 1502.4 (2017).

[366] 40 C.F.R. § 1501.3-1501.4 (2017).  An EA is meant to be a "concise public document ... that serves to ... [b]riefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or finding of no significant impact."  40 C.F.R. § 1508.9(a) (2017).  Pursuant to the Commission's regulations, if an EA is prepared first, "[d]epending on the outcome of the environmental assessment, an [EIS] may or may not be prepared." 18 C.F.R. § 380.6(b) (2017).

[367] The project EDF referenced is Texas Gas Transmission, LLC's Fayetteville/Greenville Expansion Project (Docket No. CP07-417-000).  That project included 262.6 miles of 36-inch-diameter pipeline, a new 10,650 horsepower compressor station, modifications at an existing compression station, numerous meter and regulation stations, and other appurtenant facilities.  *Texas Gas Transmission, LLC*, 123 FERC ¶ 61,118 (2008) (Order Issuing Certificate).

mitigation measures does not result in a level of impact intensity requiring an EIS. The Texas Gas Transmission, LLC (Texas Gas) project referenced by EDF is different from the Spire STL Pipeline Project. Although both projects include a crossing of the Mississippi River, the Texas Gas project also involved construction of approximately four times the length of pipe as the Spire STL Pipeline Project, and crossed 16 other major waterbodies, including 4 listed on the National River Inventory. These project details, combined with information on other resources affected by the Texas Gas project (e.g., forested wetlands, conservation lands, national wildlife refuges, an historic and scenic parkway, and others), and the impacts that could result from that project were taken into consideration by Commission staff, which concluded that the Texas Gas project warranted preparation of an EIS. The Commission evaluates each project based on its own merits, the specific environmental setting, and the potential impacts that could result from that project. The EA for the Spire STL Pipeline Project appropriately considers and discloses the environmental impacts of the project, and supports a finding of no significant impact. The EA also describes measures to mitigate anticipated environmental impacts—which the public was able to review and comment upon—and recommends that many such measures be incorporated as conditions if the Commission issues a certificate for the project.[368] Therefore, we conclude that an EIS is not required for this project.

240. EDF states that the EA's conclusion that the project would not constitute a major federal action significantly affecting the quality of the human environment is unsupported. EDF provides a list of adverse impacts to support its claim.

241. The list compiled by EDF reiterates many of the resource impacts considered in the EA, but does not provide an argument or expand on why EDF's opinion on the level of impacts should be substituted for staff's analysis. The EA analyzes the anticipated level of impact on all applicable resources and discusses Spire's commitment to implement specific mitigation measures to reduce such impacts. Those mitigation measures include adoption, with specific deviations, of the Commission guidelines as outlined in our *Upland Erosion Control, Revegetation, and Maintenance Plan*[369] (Plan) and *Wetland and Waterbody Construction and Mitigation Procedures*[370] (Procedures), as

---

[368] *National Parks Association v. Babbitt*, 241 F.3d 722, 735 (9th Cir. 2001) (citing *Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222 F.3d 1105, 1121 (9th Cir. 2000) (mitigation measures deemed sufficient to justify an agency's decision to forego issuing an EIS)); *Friends of the Ompompanoosuc v. FERC*, 968 F.2d 1549, 1555 (2d Cir. 1992) (the Commission's consideration of mitigation measures is a rational basis for a finding of no significant impact).

[369] A copy of the Plan is available at www.ferc.gov/industries/gas/enviro/plan.pdf.

[370] A copy of the Procedures is available at www.ferc.gov/industries/gas/enviro/procedures.pdf.

well as additional construction, restoration, and mitigation plans prepared specifically for the project, including: Spill Prevention, Control, and Countermeasures Plan; Unanticipated Discovery of Contamination Plan; HDD Plan; Unanticipated Discoveries Plans for Cultural Resources in Missouri and Illinois; Winter Construction Plan; Karst Mitigation Plan; Blasting Plan; Fugitive Dust Control Plan, and the project-specific Agricultural Impact Mitigation Agreement. Where staff concluded additional protective measures were warranted, the EA included an environmental recommendation. As discussed above, these recommendations are included in this order, as applicable, as mandatory conditions.

242.    Based on our review, we conclude that the potential environmental impacts of the Spire STL Pipeline Project do not rise to a level of significance that would require preparation of an EIS. Accordingly, we affirm that preparation of a thorough, detailed EA was appropriate in this case.

### 5.    Impacts of Methane Emissions

243.    Ms. Veil claims that the EA's review of methane emissions was too narrow in concluding that that methane emissions would only occur during construction, and that the Commission inaccurately identified the global warming potential (GWP) for methane. EDF questions why the project did not consider powering existing compressor stations with electric power instead of natural gas. Ms. Veil and EDF also assert that the EA ignored fugitive emissions from the project. Ms. Viel specifically asserts that the Commission should use the GWP for methane from the Intergovernmental Panel on Climate Change (IPCC) Fifth Assessment Report, which provides a 100-year GWP for methane of 36 or a 20-year GWP of 87.

244.    We disagree. As stated in the EA,[371] emissions of GHGs are typically quantified in terms of carbon dioxide equivalents by multiplying emissions of each GHG by its respective global warming potential. Methane emissions were included in the total estimated carbon dioxide equivalent emissions for the project. Estimates of applicable emissions that would be generated during construction and operation of the project are presented in the EA, including fugitive emissions of methane.[372] The EA's use of the GWP for methane designated as 25 specifically follows EPA guidance for methane.[373] EDF's request that the Commission analyze the use of electric-powered compressor stations is not relevant, since this project does not include a proposal to construct or

---

[371] EA at 111, 143-144.

[372] EA at 113, 114.

[373] Available at https://www.epa.gov/sites/production/files/2018-01/documents/2018_complete_report.pdf.

modify any compression facilities.

### 6.   Climate Change

245.   Ms. Viel argues that the EA failed to examine the impacts of the project on climate change.  Ms. Viel relies on *Sierra Club v. FERC*[374] to support her argument that the Commission should know, at least approximately, where the gas will come from and that the effects are reasonably foreseeable and can be reasonably forecasted.

246.   With respect to impacts from GHG, the EA discusses the direct GHG emissions from construction (15,195.83 metric tons per year CO2 equivalent (tpy $CO_{2e}$))[375] and operation (11,797.28 metric tpy $CO_{2e}$).[376]  The EA also includes a discussion of climate change impacts in the region and the regulatory structure for GHG emissions under the Clean Air Act.[377]

247.   It is the Commission's policy to analyze in its environmental documents GHG emissions associated with the upstream production activities or downstream consumption of the transported gas when those effects are indirect or cumulative impacts of the proposed infrastructure project as contemplated by the CEQ regulations.[378]

248.   Indirect effects are defined as those "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."[379] Additionally, indirect effects "may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems."[380] Accordingly, to determine whether an impact should be studied as an indirect impact, the Commission must determine whether it is:  (1) caused by the proposed action; and (2) reasonably foreseeable.[381]

---

[374] 867 F.3d 1357.

[375] EA at 113 (table B-16).

[376] EA at 114 (table B-17).

[377] EA at 110-11.

[378] *Dominion Transmission, Inc.*, 163 FERC ¶ 61,128, at P 42 (2018).

[379] 40 C.F.R. § 1508.8(b) (2017).

[380] *Id.*

[381] *See id.*; *see also id.* § 1508.25(c).

249.    With respect to causation, "NEPA requires 'a reasonably close causal relationship' between the environmental effect and the alleged cause"[382] in order "to make an agency responsible for a particular effect under NEPA[.]"[383]  As the Supreme Court explained, "a 'but for' causal relationship is insufficient [to establish cause for purposes of NEPA]."[384]  Thus, "[s]ome effects that are 'caused by' a change in the physical environment in the sense of 'but for' causation," will not fall within NEPA if "the causal chain is too attenuated."[385]  Further, the Court has stated that "where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect."[386]

250.    If an effect is "sufficiently likely to occur that a person of ordinary prudence would take it into account in reaching a decision," then that effect is deemed to be "reasonably foreseeable."[387]  Although NEPA requires "reasonable forecasting,"[388] an

---

[382] *U.S. Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, at 767 (2004) (Pub. Citizen) (quoting *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, at 774 (1983)).

[383] *Pub. Citizen*, 541 U.S. at 767.

[384] *Id.*; *see also Sierra Club v. FERC*, 827 F.3d 36, at 46 (D.C. Cir. 2016) (*Freeport LNG*) (finding that the Commission need not examine everything that could conceivably be a but-for cause of the project at issue); *Sierra Club v. FERC*, 827 F.3d 59, 68 (D.C. Cir. 2016) (*Sabine Pass LNG*) (recognizing that the Commission's order authorizing the construction of liquefied natural gas export facilities is not the legally relevant cause of increased production of natural gas).

[385] *Metro. Edison Co.*, 460 U.S. at 774.

[386] *Pub. Citizen*, 541 U.S. at 770; *see also Freeport LNG*, 827 F.3d at 49 (affirming that *Public Citizen* is explicit that the Commission need not consider effects, including induced production, that could only occur after intervening action by the DOE); *Sabine Pass LNG*, 827 F.3d at 68 (same); *EarthReports, Inc. v. FERC*, 828 F.3d 949, 956 (D.C. Cir. 2016) (same).

[387] *Sierra Club v. Marsh*, 976 F.2d 763, 767 (1st Cir. 1992); *City of Shoreacres v. Waterworth*, 420 F.3d 440, 453 (5th Cir. 2005) (quoting *Sierra Club v. Marsh*, 976 F.2d 763, 767 (1st Cir. 1992)).

[388] N. Plains Res. Council, Inc. v. Surface Transp. Bd., 668 F.3d 1067, 1079 (9th Cir. 2011) (quoting *Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 962 (9th Cir. 2003)).

agency "is not required to engage in speculative analysis"[389] or "to do the impractical, if not enough information is available to permit meaningful consideration."[390]

251.   As we have previously concluded in natural gas infrastructure proceedings, the environmental effects resulting from natural gas production are generally neither caused by a proposed pipeline project nor are they reasonably foreseeable consequences of our approval of an infrastructure project, as contemplated by CEQ regulations.[391]   A causal relationship sufficient to warrant Commission analysis of the non-pipeline activity as an indirect impact would only exist if the proposed pipeline would transport new production from a specified production area and that production would not occur in the absence of the proposed pipeline (i.e., there will be no other way to move the gas).[392]   Contrary to the assertion that approval of transportation projects spurs the production of natural gas, there is nothing in the record that indicates that is the case here.[393]   The fact that natural gas production and transportation are all components of the general supply chain required to bring natural gas to market is not in dispute.  However, this does not mean that the Commission's action of approving a particular pipeline project will cause or induce the effect of additional shale gas production.  Rather, a number of factors, such as domestic natural gas prices and production costs, drive new drilling.[394]

---

[389] *Id.* at 1078.

[390] *Id.* (quoting *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1014 (9th Cir. 2006) (internal quotation marks and citation omitted)).

[391] *See, e.g.*, *Central New York Oil and Gas Co., LLC*, 137 FERC ¶ 61,121, at PP 81-101 (2011), *order on reh'g*, 138 FERC ¶ 61,104, at PP 33-49 (2012), *petition for review dismissed sub nom.  Coal. for Responsible Growth v. FERC*, 485 F.App'x. 472, 474-75 (2nd Cir. 2012) (unpublished opinion).

[392] *See cf. Sylvester v. U.S. Army Corps of Eng'rs*, 884 F.2d 394, 400 (9th Cir. 1989) (upholding the environmental review of a golf course that excluded the impacts of an adjoining resort complex project).  *See also City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1162 (9th Cir. 1997) (acknowledging that existing development led to planned freeway, rather than the reverse, notwithstanding the proposed freeway's potential to induce additional development); *Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d 517, 525 (9th Cir. 1994) (upholding the EIS's determination that the proposed highway would not result in further growth because the surrounding land was already developed or otherwise committed to uses not contingent on highway construction).

[393] *See Dominion Transmission Inc.*, 163 FERC ¶ 61,128 at P 60.

[394] *See, e.g.*, *Rockies Express Pipeline LLC*, 150 FERC ¶ 61,161, at P 39

252.    Even if a causal relationship between the proposed action here and upstream production were presumed, the scope of the impacts is not reasonably foreseeable.[395]  As we have explained, neither the Commission nor the applicant generally has sufficient information to determine the origin of the gas that will be transported onto a pipeline. We disagree with the assertion that we have access information about specific upstream production, or downstream uses.[396]  To be clear, the Commission only has jurisdiction over the pipeline applicant, whose sole function is to transport gas from and to the

---

(2015).  *See also Sierra Club v. Clinton*, 746 F. Supp. 2d 1025, 1045 (D. Minn. 2010) (holding that the U.S. Department of State, in its environmental analysis for an oil pipeline permit, properly decided not to assess the transboundary impacts associated with oil production because, among other things, oil production is driven by oil prices, concerns surrounding the global supply of oil, market potential, and cost of production); *Florida Wildlife Fed'n v. Goldschmidt*, 506 F. Supp. 350, 375 (S.D. Fla. 1981) (ruling that an agency properly considered indirect impacts when market demand, not a highway, would induce development).

[395] "Reasonable foreseeability" does not include "highly speculative harms" that "distort[] the decision-making process" by emphasizing consequences beyond those of "greatest concern to the public and of greatest relevance to the agency's decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. at 355-56 (internal quotation marks and citations omitted).  *See Dominion Transmission Inc.*, 163 FERC ¶ 61,128 at P 61 n.143.

[396] Although obtaining additional information might be possible, it is not clear how such information would alter our conclusion regarding causation, as opposed to simply providing more detail on environmental impacts of actions, i.e., upstream production and downstream GHG emissions, which we have determined, consistent with CEQ regulations and case law, are not caused by the Spire STL Pipeline Project.  Further, the "reasonably close causal relationship" required under NEPA is analogous but not identical to proximate causation from tort law.  As courts have noted:  "We 'look to the underlying policies or legislative intent in order to draw a manageable line between those causal changes that may make an actor responsible for an effect and those that do not.'"  *Sierra Club v. DOE*, 867 F.3d 189, 198 (D.C. Cir. 2017) (quoting *Pub. Citizen*, 541 U.S. at 767 (2004) (quoting *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 774 (1983) (*Metropolitan Edison*)).  *See also New Jersey Dep't of Envtl. Prot. v. U.S. Nuclear Regulatory Comm'n*, 561 F.3d 132, 141 (3d Cir. 2009) (quoting *Metropolitan Edison* for the proposition that the agency must "draw a manageable line between those causal changes that may make an actor responsible for an effect and those that do not," and observing that "this line appears to approximate the limits of an agency's area of control").  *See Dominion Transmission Inc.*, 163 FERC ¶ 61,128 at P 63 n.154.  However, a "but for" causal relationship is insufficient to establish a cause for purposes of NEPA.

contracted for delivery and receipt points.[397]  Although the shippers might contract with a specific producer[398] for their gas supply, the shipper would not know the source of the producer's gas, and, for that matter, producers are not required to dedicate supplies to a particular shipper and thus likely will not know in advance the exact source of production.[399]  Moreover, there are no forecasts in the record which would enable the Commission to meaningfully predict production-related impacts, many of which are highly localized.  The specific source of natural gas to be transported via the Spire STL Pipeline Project is currently unknown and will likely change throughout the project's operation.  Furthermore, where there is not even an identified general supply area for the gas that will be transported on the project, any analysis of production impacts would be so generalized it would be meaningless.[400]  Accordingly, even assuming that natural gas

---

[397] *Dominion Transmission Inc.*, 163 FERC ¶ 61,128 at P 61.

[398] Conversely the shippers may purchase gas from marketers at a hub.

[399] Not even the states, which have jurisdiction over the production of natural gas, would have information regarding where (other than in a general region) gas that will be delivered into a particular new pipeline will be produced, or whether the gas will come from existing or new wells.  *See generally Sierra Club v. DOE*, 867 F.3d at 200 (DOE's obligation under NEPA to "drill down into increasingly speculative projections about regional environmental impacts [of induced natural gas production] is also limited by the fact that it lacks any authority to control the locale or amount of export-induced gas production, much less any of its harmful effects") (citing *Pub. Citizen*, 541 U.S. at 768).  *See Dominion Transmission*, 163 FERC ¶ 61,128 at P 61 n.146.

[400] Even where there is a general source area, the Commission would still need more detailed information regarding the number, location, and timing of wells, roads, gathering lines, and other appurtenant facilities, as well as details about production methods, which can vary by producer and depending on the applicable regulations in the various states, to develop a meaningful impacts analysis.  *Dominion Transmission*, 163 FERC ¶ 61,128 at P 61 n.148.  *Habitat Education Center v. U.S. Forest Service*, 609 F.3d 897, 902 (7th Cir. 2010) (finding that impacts that cannot be described with enough specificity to make their consideration meaningful need not be included in the environmental analysis).  *See also Sierra Club v. DOE*, 867 F.3d at 200 (accepting DOE's "reasoned explanation" as to why the indirect effects pertaining to induced natural gas production were not reasonably foreseeable where DOE noted the difficulty of predicting both the incremental quantity of natural gas that might be produced and where at the local level such production might occur, and that an economic model estimating localized impacts would be far too speculative to be useful).  We note that there is publically available information that identifies, on a generic, high-level basis, potential environmental impacts associated with unconventional natural gas production.  *See U.S.* Department of Energy, *Addendum to Environmental Review Documents Concerning*

production is induced by the Spire STL Pipeline Project, the impacts of that production and consumption are not reasonably foreseeable because they are "so nebulous" that we "cannot forecast [their] likely effects."[401]  Contrary to Ms. Viel's contentions, knowledge of these and other facts would be necessary in order for the Commission to fully analyze the related effects.

253.    Furthermore, we do not find that approval of the Spire STL Pipeline Project will spur additional identifiable gas consumption.  The D.C. Circuit Court of Appeals in *Sierra Club v. FERC*,[402] held that where it is known that the natural gas transported by a project will be used for a specific end-use combustion, the Commission should "estimate[] the amount of power-plant carbon emissions that the pipelines will make possible."[403]  However, we note that the Southeast Market Pipelines Project at issue in *Sierra Club v. FERC* is factually distinct from the Spire STL Pipeline Project.  The record in that case indicated that natural gas would be delivered to specific customers – power plants in Florida – such that the court concluded that the consuming of the gas in those plants was reasonably foreseeable and the impacts of that activity warranted environmental examination.[404]  In contrast, here, the gas to be transported by the Spire STL Pipeline Project will be delivered by the project's sole shipper, an LDC, who will provide the gas to improve the reliability and supply diversity for its customers.  As emphasized by the protestors, the Spire STL Pipeline Project is not intended to meet an incremental demand for natural gas above existing levels.

---

*Exports of Natural Gas from the United States*, 79 Fed. Reg. 48,132 (2014), http://energy.gov/sites/prod/files/2014/08/f18/Addendum.pdf.

[401] *Id.*  The requirement that an impact must be "reasonably foreseeable" to be considered in a NEPA analysis applies to both indirect and cumulative impacts.  To the extent that Ms. Viel argues that the upstream effects are cumulative impacts, we disagree.  There is nothing in the record that demonstrates such upstream effects are reasonably foreseeable or within the geographic scope of the proposed action.

[402] 867 F.3d 1357.

[403] *Id.* at 1371.  *See also Friends of Capital Crescent Trail v. FTA*, 877 F.3d 1051, 1065 (D.C. Cir. 2017) (explaining that in *Sierra Club v. FERC*, "the court invalidated an indirect effects analysis because the agency had technical and contractual information on 'how much gas the pipelines [would] transport' to specific power plants, and so could have estimated with some precision the level of greenhouse gas emissions produced by those power plants.  The court also recognized that 'in some cases quantification may not be feasible.'") (citation omitted).

[404] 867 F.3d at 1371.

254.    Accordingly, the potential increase of GHG emissions associated with the production, processing, distribution, or consumption of gas are not indirect impacts of the Spire STL Pipeline Project.

## 7.    Land Use

255.    Ms. Viel expresses concerns about impacts from construction and operation of the project on nearby landowners and recreationists of Spanish Lake Park, including impacts on existing aesthetics; reduced environmental value; and noise from construction, operation, and maintenance of Spire's pipeline and the nearby Chain of Rocks Station.

256.    The EA assesses the impacts from the project's construction and operation on public land and recreation areas in the project area.[405]  The EA analyzes 18 special use areas within 0.25 mile of the project, including special use areas based on comments received during the scoping process (e.g., lands enrolled in conservation easements, currently or potentially in the future, and the Lewis and Clark National Historic Trail).[406] The EA concludes that impacts from the project on these resources will be highly localized and limited primarily to the period of construction.  Although impacts on the viewshed associated with the aboveground facilities, including the Chain of Rocks Station, were found to have a permanent impact, these impacts would be appropriately minimized by Spire's commitment to utilize color schemes consistent with the surrounding environment and to maintain existing vegetation where feasible, such that impacts would not be significant.  Similarly, based on Spire's proposed mitigation measures and Environmental Condition 20 in the appendix to this order, requiring a site-specific noise mitigation plan for the Spanish Lake Park HDD, the EA finds that expected noise level increases associated with construction of the project would be temporary and would be appropriately mitigated.[407]  We agree.

## 8.    Environmental Justice

257.    Executive Order 12898, *Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations*, requires federal agencies to consider whether impacts on human health or the environment (including social and economic aspects) would be disproportionately high and adverse for minority and low-income populations and would appreciably exceed impacts on the general population or another comparison group.[408]  Ms. Viel states that the environmental justice analysis in the EA is

---

[405] EA 88-93 (recreation resources); 93-94 (visual resources).

[406] EA at 89-90 (table B-11).

[407] EA at 118.

[408] 59 Fed. Reg. 7629 (1994).

inadequate, and that it fails to consider the disproportionate impacts on minority and low-income communities or consider alternatives that would avoid or minimize impacts on these populations.

258.   We disagree.  In response to comments received during preparation of the EA, Commission staff employed the EPA's Environmental Justice Screening and Mapping Tool.  Staff's use of the tool and research identifies the presence of minority and low-income populations in proximity to the North County Extension.  The EA finds that the overall potential impacts on the natural and human environments would be minimized or mitigated to a negligible or minor degree such that no racial, ethnic, or socioeconomic group would bear a disproportionate share of impacts.[409]  Additionally, the EA evaluates a system alternative (acquisition of Line 880) to the North County Extension that would avoid the construction of the new, greenfield pipeline in St. Louis County, Missouri. This alternative did not provide an environmental advantage to the North County Extension due to greater impacts on the local communities, including the need to interrupt service for those currently receiving natural gas service from this system.[410]

## 9.   Inadequate Notice

259.   Plumbers and Pipefitters, a landowner, states that they were not provided adequate notice of Spire's intent to construct a pipeline across its property and that Spire did not provide notice of the application after the Commission's issuance of the February 6, 2017 Notice of Application.[411]  Plumbers and Pipefitters claims they received their first correspondence regarding the project on approximately November 6, 2017, outside the time period prescribed by the Commission's regulations.[412]

260.   Spire responded that the Plumbers and Pipefitters' property, a golf course, was not initially proximate to Spire's original certificate application, but notice of the initial application was still provided on February 9, 2017.[413]  Spire also stated that when it amended its application, it provided the Plumbers and Pipefitters the requisite notice as

---

[409] EA at 99.

[410] EA at 150-152.

[411] Plumbers' and Pipefitters' Welfare Educational Fund December 19, 2017 Motion to Intervene Out of Time.  We note that the Plumbers' and Pipefitters' motion was timely because Plumbers and Pipefitters filed the motion during the Supplemental NOI comment and intervention period.

[412] Plumbers' and Pipefitters' December 19, 2017 Motion (citing 18 C.F.R. § 157.6(d) (2017)).

[413] Spire December 29, 2017 Comments at 2.

an impacted landowner.[414] Spire states that it met with representatives of the Plumbers and Pipefitters regarding potential impacts to the property in question.[415] Commission staff also sent all applicable project-related correspondence to this entity at the address identified in the comment letter beginning in March 2017 and continuing through the issuance of and notices for the EA for the project. Accordingly, the record does not reflect evidence of bad faith by Spire.[416] Plumbers and Pipefitters did not suffer injury because it intervened and participated in the proceedings prior to the issuance of this order.

## 10. Spire's Minor Route Changes

261. On October 6, 2017, Spire filed supplemental information requesting that the Commission approve several route adjustments and variations, as well as workspace adjustments. We approve some of the changes, but three changes are not approved, as listed below. The pipeline route changes we approve are minor, with shifts of less than 40 feet, located within the existing survey corridor, and do not result in additional impacts on environmental resources. In addition, Spire states that these adjustments are consistent with the plat maps it provided to affected landowners. We also approve Spire's adjustments in workspace based on updated survey information as the modifications are minor, with shifts of less than 5 feet, located within the existing survey corridor, and do not result in environmental impacts distinctly different than those analyzed in the EA.

262. However, we will not approve the three route adjustments included in Spire's October 6 filing (mileposts (MP) 2.2R to 2.9, MP 49.3, and MP 5.8 to 6.0) because they could cause additional impacts not addressed in the EA or landowners have not been given the opportunity to comment. Spire has not filed completed environmental surveys and is continuing to conduct easement negotiations with landowners for route variations between MP 2.2R and 2.9 and MPs 49.3 and 50.1R. Also, it is unclear to us whether Spire has consulted the landowner associated with the adjustment along the North County

---

[414] *Id.* at 2-3.

[415] *Id.*

[416] Although it is the Commission's strong preference that all affected landowners receive actual notice, "[i]t is a well-established principle of law that notice by publication in the Federal Register constitutes adequate notice to all parties subject to or affected by its contents. Actual notice is not required ... the notice in the Federal Register was clearly sufficient to make [the party] aware that its interests were potentially at stake before the Commission . . . ." *Williams Natural Gas Co.*, 54 FERC ¶ 61,190, at 61,572 (1991). As indicated above, notice of the Spire's application and amendment was published in the *Federal Register*.

Extension between MPs 5.8 and 6.0, which Spire states is now needed for constructability. Thus, we will not approve these three specific route adjustment requests, but will authorize the corresponding route and associated workspaces proposed in Spire's application and as described and evaluated in the EA. The originally proposed routes at these three locations, which were evaluated in the EA, will not result in any significant environmental impacts nor unacceptable construction constraints. If Spire is able to negotiate landowner approval for any or all of the three route adjustments included in its October 6 filing (MP 2.2R to 2.9, MP 49.3 to 50.1R, and MP 5.8 to 6.0), Spire may propose them for consideration as variance requests, according to the procedures established in Environmental Condition 5 in the appendix to this order.

263.    Based on the analysis in the EA, as supplemented herein, we conclude that if constructed and operated in accordance with Spire's application and supplements, and in compliance with the environmental conditions in the appendix to this order, our approval of this proposal would not constitute a major federal action significantly affecting the quality of the human environment. Compliance with the environmental conditions appended to our orders is integral to ensuring that the environmental impacts of approved projects are consistent with those anticipated by our environmental analyses. Thus, Commission staff carefully reviews all information submitted. Only when satisfied that the applicant has complied with all applicable conditions will a notice to proceed with the activity to which the conditions are relevant be issued. We also note that the Commission has the authority to take whatever steps are necessary to ensure the protection of environmental resources during construction and operation of the project, including authority to impose any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of the order, as well as the avoidance or mitigation of unforeseen adverse environmental impacts resulting from project construction and operation.

264.    Any state or local permits issued with respect to the jurisdictional facilities authorized herein must be consistent with the conditions of this certificate. The Commission encourages cooperation between interstate pipelines and local authorities. However, this does not mean that state and local agencies, through application of state or local laws, may prohibit or unreasonably delay the construction or operation of facilities approved by this Commission.[417]

---

[417] *See* 15 U.S.C. § 717r(d) (2012) (state or federal agency's failure to act on a permit considered to be inconsistent with Federal law); *see also Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 310 (1988) (state regulation that interferes with FERC's regulatory authority over the transportation of natural gas is preempted); *Dominion Transmission, Inc. v. Summers*, 723 F.3d 238, 245 (D.C. Cir. 2013) (noting that state and local regulation is preempted by the NGA to the extent it conflicts with federal regulation, or would delay the construction and operation of facilities approved by the Commission).

265.    The Commission on its own motion received and made part of the record in this proceeding all evidence, including the application, as amended and supplemented, and exhibits thereto, and all comments submitted, and upon consideration of the record,

The Commission orders:

(A)    A certificate of public convenience and necessity is issued to Spire, authorizing it to construct and operate the proposed Spire STL Pipeline Project, as described and conditioned herein, and as more fully described in the application.

(B)    The certificate authority issued in Ordering Paragraph (A) is conditioned on:

> (1)    Spires's proposed project being constructed and made available for service within two years of the date of this order pursuant to section 157.20(b) of the Commission's regulations;

> (2)    Spires's compliance with all applicable Commission regulations, particularly the general terms and conditions set forth in Parts 154, 157, and 284, and paragraphs (a), (c), (e), and (f) of section 157.20 of the Commission's regulations; and

> (3)    Spire's compliance with the environmental conditions listed in the appendix to this order.

(C)    A blanket construction certificate is issued to Spire under Subpart F of Part 157 of the Commission's regulations.

(D)    A blanket transportation certificate is issued to Spire under Subpart G of Part 284 of the Commission's regulations.

(E)    Spire shall file a written statement affirming that it has executed firm contracts for the capacity levels and terms of service represented in signed precedent agreements, prior to commencing construction.

(F)    Spire's initial rates and tariff are approved, as conditioned and modified in this order.

(G)    Spire shall file actual tariff records that comply with the requirements contained in the body of this order at least 60 days, prior to the commencement of interstate service consistent with Part 154 of the Commission's regulations.

(H)    Spire must file at least 30 days, but not more than 60 days before the in-service date of the proposed facilities, an executed copy of the non-conforming agreement with Spire Missouri reflecting the non-conforming language and a tariff

record identifying the agreement as a non-conforming agreement consistent with section 154.112 of the Commission's regulations.

(I)     No later than three months after the end of its first three years of actual operation, as discussed herein, Spire must make a filing to justify its existing cost-based firm and interruptible recourse rates. Spire's cost and revenue study should be filed through the eTariff portal using a Type of Filing Code 580. In addition, Spire is advised to include as part of the eFiling description, a reference to Docket No. CP17-40-000 and the cost and revenue study.

(J)     Spire's requests for waivers and extensions of time are granted in part and denied in part, as discussed in the body of this order, and the extensions of time granted herein are limited to the NAESB WGQ's Version 3.0 Standards promulgated by Order No. 587-W.

(K)     MRT's motion to stay is deemed moot.

(L)     MRT's and EDF's requests for an evidentiary hearing are denied.

(M)     Spire shall notify the Commission's environmental staff by telephone or e-mail of any environmental noncompliance identified by other federal, state, or local agencies on the same day that such agency notifies Spire. Spire shall file written confirmation of such notification with the Secretary of the Commission within 24 hours.

By the Commission. Commissioners LaFleur and Glick are dissenting with separate statements attached.

( S E A L )

Nathaniel J. Davis, Sr.,
Deputy Secretary.

USCA Case #20-1016     Document #1825564        Filed: 01/21/2020      Page 175 of 205

## Appendix

## Environmental Conditions

As recommended in the Environmental Assessment (EA) and modified herein, this authorization includes the following conditions:

1.    Spire STL Pipeline LLC (Spire) shall follow the construction procedures and mitigation measures described in its application and supplements (including responses to staff data requests) and as identified in the EA, unless modified by the order.  Spire must:

      a.    request any modification to these procedures, measures, or conditions in a filing with the Secretary of the Commission (Secretary);
      b.    justify each modification relative to site-specific conditions;
      c.    explain how that modification provides an equal or greater level of environmental protection than the original measure; and
      d.    receive approval in writing from the Director of the Office of Energy Projects (OEP) **before using that modification**.

2.    The Director of OEP, or the Director's designee, has delegated authority to address any requests for approvals or authorizations necessary to carry out the conditions of this order, and take whatever steps are necessary to ensure the protection of environmental resources during construction and operation of the project.  This authority shall allow:

      a.    the modification of conditions of the order;
      b.    stop-work authority; and
      c.    the imposition of any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of the order as well as the avoidance or mitigation of unforeseen adverse environmental impact resulting from project construction and operation.

3.    **Prior to any construction**, Spire shall file an affirmative statement with the Secretary, certified by a senior company official, that all company personnel, environmental inspectors (EI), and contractor personnel will be informed of the EI's authority and have been or will be trained on the implementation of the environmental mitigation measures appropriate to their jobs **before** becoming involved with construction and restoration activities.

4.    The authorized facility locations shall be as shown in the EA, as supplemented by filed alignment sheets.  **As soon as they are available, and before the start of construction**, Spire shall file with the Secretary any revised detailed survey

alignment maps/sheets at a scale not smaller than 1:6,000 with station positions for all facilities approved by the order. All requests for modifications of environmental conditions of the order or site-specific clearances must be written and must reference locations designated on these alignment maps/sheets.

Spire's exercise of eminent domain authority granted under the Natural Gas Act (NGA) section 7(h) in any condemnation proceedings related to the order must be consistent with these authorized facilities and locations. Spire's right of eminent domain granted under the NGA section 7(h) does not authorize it to increase the size of its natural gas pipeline facilities to accommodate future needs or to acquire a right-of-way for a pipeline to transport a commodity other than natural gas.

5.    Spire shall file with the Secretary detailed alignment maps/sheets and aerial photographs at a scale not smaller than 1:6,000 identifying all route realignments or facility relocations, and staging areas, new access roads, and other areas that would be used or disturbed and have not been previously identified in filings with the Secretary. Approval for each of these areas must be explicitly requested in writing. For each area, the request must include a description of the existing land use/cover type, documentation of landowner approval, whether any cultural resources or federally listed threatened or endangered species would be affected, and whether any other environmentally sensitive areas are within or abutting the area. All areas shall be clearly identified on the maps/sheets/aerial photographs. Each area must be approved in writing by the Director of OEP **before construction in or near that area**.

This requirement does not apply to extra workspace allowed by the Commission's *Upland Erosion Control, Revegetation, and Maintenance Plan* and/or minor field realignments per landowner needs and requirements which do not affect other landowners or sensitive environmental areas such as wetlands.

Examples of alterations requiring approval include all route realignments and facility location changes resulting from:

a.    implementation of cultural resources mitigation measures;
b.    implementation of endangered, threatened, or special concern species mitigation measures;
c.    recommendations by state regulatory authorities; and
d.    agreements with individual landowners that affect other landowners or could affect sensitive environmental areas.

6.    **Within 60 days of the issuance of the order and before construction begins**, Spire shall file an Implementation Plan with the Secretary for review and written

approval by the Director of OEP.  Spire must file revisions to the plan as schedules change.  The plan shall identify:

a.  how Spire will implement the construction procedures and mitigation measures described in its application and supplements (including responses to staff data requests), identified in the EA, and required by the order;

b.  how Spire will incorporate these requirements into the contract bid documents, construction contracts (especially penalty clauses and specifications), and construction drawings so that the mitigation required at each site is clear to onsite construction and inspection personnel;

c.  the number of EIs assigned per spread, and how the company will ensure that sufficient personnel are available to implement the environmental mitigation;

d.  company personnel, including EIs and contractors, who will receive copies of the appropriate material;

e.  the location and dates of the environmental compliance training and instructions Spire will give to all personnel involved with construction and restoration (initial and refresher training as the project progresses and personnel change), with the opportunity for OEP staff to participate in the training sessions;

f.  the company personnel (if known) and specific portion of Spire's organization having responsibility for compliance;

g.  the procedures (including use of contract penalties) Spire will follow if noncompliance occurs; and

h.  for each discrete facility, a Gantt or PERT chart (or similar project scheduling diagram), and dates for:

(1)  the completion of all required surveys and reports;

(2)  the environmental compliance training of onsite personnel;

(3)  the start of construction; and

(4)  the start and completion of restoration.

7.  Spire shall employ at least one EI per construction spread.  The EIs shall be:

a.  responsible for monitoring and ensuring compliance with all mitigation measures required by the order and other grants, permits, certificates, or other authorizing documents;

b.  responsible for evaluating the construction contractor's implementation of the environmental mitigation measures required in the contract (see condition 6 above) and any other authorizing document;

c.  empowered to order the correction of acts that violate the environmental conditions of the order, and any other authorizing document;

d.  a full-time position, separate from all other activity inspectors;

    e.    responsible for documenting compliance with the environmental conditions of the order, as well as any environmental conditions/permit requirements imposed by other federal, state, or local agencies; and

    f.    responsible for maintaining status reports.

8.    Beginning with the filing of its Implementation Plan, Spire shall file updated status reports with the Secretary **on a weekly basis until all construction and restoration activities are complete**.  On request, these status reports will also be provided to other federal and state agencies with permitting responsibilities. Status reports shall include:

    a.    an update on Spire's efforts to obtain the necessary federal authorizations;

    b.    the construction status of each spread, work planned for the following reporting period, and any schedule changes for stream crossings and forested area clearing, or work in other environmentally-sensitive areas;

    c.    a listing of all problems encountered and each instance of noncompliance observed by the EI during the reporting period (both for the conditions imposed by the Commission and any environmental conditions/permit requirements imposed by other federal, state, or local agencies);

    d.    a description of the corrective actions implemented in response to all instances of noncompliance;

    e.    the effectiveness of all corrective actions implemented;

    f.    a description of any landowner/resident complaints which may relate to compliance with the requirements of the order, and the measures taken to satisfy their concerns; and

    g.    copies of any correspondence received by Spire from other federal, state, or local permitting agencies concerning instances of noncompliance, and Spire's response.

9.    Spire must receive written authorization from the Director of OEP **before commencing construction of any project facilities**.  To obtain such authorization, Spire must file with the Secretary documentation that it has received all applicable authorizations required under federal law (or evidence of waiver thereof).

10.    Spire must receive written authorization from the Director of OEP **before placing the project into service**.  Such authorization will only be granted following a determination that rehabilitation and restoration of the right-of-way and other areas affected by the project are proceeding satisfactorily.

11.    **Within 30 days of placing the authorized facilities in service**, Spire shall file an affirmative statement with the Secretary, certified by a senior company official:

    a.    that the facilities have been constructed and installed in compliance with all applicable conditions, and that continuing activities will be consistent with all applicable conditions; or

    b.    identifying which of the conditions in the order Spire has complied with or will comply with. This statement shall also identify any areas affected by the project where compliance measures were not properly implemented, if not previously identified in filed status reports, and the reason for noncompliance.

12.    **Prior to construction,** Spire shall file with the Secretary, for review and written approval of the Director of OEP, its site-specific steep slope and landslide hazard assessment plan for the bluffs near the Mississippi River crossing.

13.    **Prior to construction**, Spire shall file with the Secretary, for review and written approval of the Director of OEP, additional geotechnical investigations at the Coldwater Creek and Spanish Lake Park horizontal directional drill (HDD) crossings to determine the presence and extent of potential karst features and whether an HDD is expected to be successful.

14.    **Prior to construction**, Spire shall file with the Secretary, for review and written approval of the Director of OEP, a Water Resource Identification and Testing Plan for each HDD through karst terrain (for the North County Extension from milepost [MP] 1.6 to MP 2.2, and MP 3.8 to MP 4.5). The Water Resource Identification and Testing Plan shall include:

    a.    the results of a fracture trace/lineament analysis coupled with the results of existing dye trace studies, if any, showing potential groundwater flow direction from source (drill alignment) to receptors (wells, springs, and waterbodies); and

    b.    identification of all water supply wells, springs, and surface water intakes within 1,000 feet down-gradient of each HDD that crosses karst terrain (for the North County Extension from MP 1.6 to MP 2.2 and MP 3.8 to MP 4.5) and provide the following for each water source identified:

        (1)    written verification of Spire's offer to conduct, with the landowner's permission, pre- and post-construction water quality and yield monitoring of all karst area water supply wells and springs. Water quality monitoring shall consist of the following parameters: oils and greases, volatile organic compounds, turbidity, total and fecal coliform bacteria, total suspended solids; and

        (2)    confirmation that Spire will restore or replace all affected karst area water supplies to pre-construction conditions with respect to both quality and yield.

15. **Prior to construction**, Spire shall file with the Secretary:

    a. the location of all wells and springs within 150 feet of proposed work areas;

    b. an update on pre-construction testing for the wells at MP 9.0, or documentation that the landowner has opted not to have pre-construction testing;

    c. a description of protective measures of how the wells within the work area would be protected during construction;

    d. verification that both pre- and post-construction testing has been offered to all landowners with wells within 150 feet of work areas; and

    e. updated alignment sheets depicting the 200- and 400-foot no refueling areas for applicable wells.

16. **Prior to construction**, Spire shall file with the Secretary a revised HDD Plan, for review and written approval by the Director of OEP, that includes:

    a. additional monitoring requirements, including but not limited to, a commitment to monitor the entire path of each HDD for evidence of an inadvertent return daily during active drilling activities; and

    b. a list of environmentally-safe drilling fluid additives that Spire will use during HDD operations, developed in consultation with the appropriate state resource agencies.

17. Spire shall adhere to the Incidental Take Statement, which includes implementing the reasonable and prudent measures and adopting the terms and conditions outlined in the U.S. Fish and Wildlife Service's February 2, 2018 Biological Opinion for the Indiana bat into its implementation plan. Spire shall provide the Commission and the U.S. Fish and Wildlife Service with the post-construction monitoring results as outlined in the Biological Opinion.

18. **Prior to construction**, Spire shall file with the Secretary its Conservation Plan to obtain an Incidental Take Authorization for timber rattlesnakes, as well as results of its consultation with the Illinois Department of Natural Resources on its Conservation Plan.

19. **Spire shall not begin construction** of facilities and/or use of staging, storage, or temporary work areas and new or to-be-improved access roads **until**:

    a. Spire files with the Secretary, the Illinois and Missouri State Historic Preservation Offices' (SHPO) comments on the Addendum V Phase I Archaeological Survey reports;

b.      Spire files with the Secretary, the Missouri SHPO's comments on the November 10, 2017 Architectural and Historic Resources Reconnaissance Report;

c.      Spire files with the Secretary remaining cultural resources survey report(s) and revised reports; any required site evaluation report(s) and avoidance/treatment plan(s); and the Missouri and Illinois SHPOs' comments on the reports and plans;

d.      the Advisory Council on Historic Preservation is afforded an opportunity to comment if historic properties would be adversely affected; and

e.      the Commission staff reviews and the Director of OEP approves the cultural resources reports and plans, and notifies Spire in writing that treatment plans/mitigation measures (including archaeological data recovery) may be implemented and/or construction may proceed.

All materials filed with the Commission containing **location, character, and ownership information** about cultural resources must have the cover and any relevant pages therein clearly labeled in bold lettering: **"CUI//PRIV - DO NOT RELEASE."**

20.   **Prior to construction of the Spanish Lake Park HDD**, Spire shall file with the Secretary, for review and written approval by the Director of OEP, a site-specific noise mitigation plan that identifies measures to reduce the projected noise level attributable to the proposed drilling operations at nearby noise sensitive areas (NSAs).  During drilling operations, Spire shall implement the approved plan, monitor noise levels, and make all reasonable efforts to restrict the noise attributable to the drilling operations to no more than a day-night sound level ($L_{dn}$) of 55 decibels (dBA) or 10 dBA above ambient levels at the NSAs.

21.   Spire shall file noise surveys with the Secretary **no later than 60 days after placing the Chain of Rocks Station in service**.  If a full load condition noise survey is not possible, Spire shall provide an interim survey at the maximum possible power load and provide the full power load survey **within six months**.  If the noise attributable to the operation of all the equipment at the facility at interim or full power load conditions exceeds 55 dBA $L_{dn}$ at any nearby NSAs, Spire shall file a report on what changes are needed and shall install additional noise controls to meet the recommended noise level **within one year** of the in-service date. Spire shall confirm compliance with the above requirement by filing a second noise survey with the Secretary **no later than 60 days after it installs the additional noise controls**.

USCA Case #20-1016     Document #1825564     Filed: 01/21/2020     Page 182 of 205

22.   **Prior to construction**, Spire shall file with the Secretary its final Flood Action Plan.

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Spire STL Pipeline LLC                                  Docket Nos.   CP17-40-000
                                                                     CP17-40-001

(Issued August 3, 2018)

LAFLEUR, Commissioner, *dissenting*:

Today's order grants Spire STL Pipeline LLC's (Spire) request for authorization to construct and operate the Spire STL Pipeline Project (Spire Project).[1]  Under the Certificate Policy Statement, which sets forth the Commission's approach to evaluating proposed projects under the Natural Gas Act (NGA), the Commission must find that a pipeline is needed and in the public interest before concluding that it is required by the public convenience and necessity.[2]  The Certificate Policy Statement further explains that the Commission must balance benefits against potential adverse consequences before authorizing the construction of major new pipeline facilities.[3]

After determining the applicant can financially support the project without subsidization from existing customers, the Commission must determine whether the economic benefits outweigh the adverse effects that the project will likely have on other existing pipelines in the market and their captive customers, as well as the landowners and communities affected by new pipeline infrastructure.[4]  In so doing, it is the Commission's responsibility to give appropriate consideration to the enhancement of competitive transportation alternatives, the possibility of overbuilding, the applicant's responsibility for unsubscribed capacity, the avoidance of unnecessary disruptions of the environment, and the unneeded exercise of eminent domain.[5]  For the reasons set forth herein, I cannot conclude this project is required by the public convenience and

---

[1] *Spire STL Pipeline LLC*, 164 FERC ¶ 61,085 (2018) (Certificate Order).

[2] *Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227 (1999), *clarified*, 90 FERC ¶ 61,128, *further clarified*, 92 FERC ¶ 61,094 (2000) (Certificate Policy Statement).

[3] Certificate Policy Statement at 18.

[4] Certificate Policy Statement at 18.

[5] Certificate Policy Statement at 2.

necessity.[6] Thus, I respectfully dissent.

The Spire Project is the unusual case of a pipeline application that squarely fails the threshold economic test. The record does not demonstrate a sufficient need for the project. The Spire Project has a single precedent agreement with Spire Missouri, its local distribution company (LDC) affiliate,[7] and will force duplicative gas transportation capacity into a regional market of flat demand, shifting gas supply away from an existing pipeline and adversely impacting rates for the existing pipeline captive customers. While the Commission does not typically look beyond signed precedent agreements to make a finding of economic need, it can certainly do so under the Certificate Policy Statement. As the majority itself notes, the Certificate Policy Statement indicates that besides precedent agreements, the Commission can consider other indicators of need including, but not limited to, "demand projections, potential cost savings to consumers, or comparison of projected demand with the amount of capacity currently serving the market."[8] The majority, however, did not consider any such evidence, which I believe we should in this case.

Spire Missouri's precedent agreement for 350,000 Dth/day from the Spire Project does not reflect any incremental demand or market growth, as acknowledged by both the applicant and protestors.[9] Rather, the precedent agreement reflects a desire to shift Spire Missouri's firm transportation capacity from an existing pipeline with Mississippi River Transmission (MRT) to the Spire Project.[10] Spire asserts that the project will enhance reliability and diversity of gas supply resulting in "access to lower priced gas supplies."[11]

---

[6] 15 U.S.C. § 717f(c) (2012).

[7] Spire Missouri was formerly known as Laclede Gas Company.

[8] Certificate Order at P 72 quoting the Certificate Policy Statement at 23. The Commission can consider other indicators of benefits, including "meeting unserved demand, eliminating bottlenecks, access to new supplies, lower costs to consumers, providing new interconnects that improve the interstate grid, providing competitive alternatives, increasing electric reliability, or advancing clean air objectives." Certificate Policy Statement at 25.

[9] Certificate Order at P 49.

[10] MRT contends that to the extent Spire Missouri wants to access the REX pipeline to receive Appalachian gas, "Spire Missouri could access REX by using 170,000 Dth per day of its subscribed capacity on MRT's East Line from MRT's points of interconnection with NGPL and Trunkline and its 62,800 Dth per day of subscribed capacity on MoGas." Certificate Order at P 50.

[11] Certificate Order at P 11.

But parties dispute the potential cost savings of the new pipeline.[12]  The second largest shipper[13] on both the MRT and MoGas pipelines contends that a market study, another indicia of need, would evaluate whether gas supplies from Appalachia and the Rocky Mountains are actually more competitively priced on a delivered basis than the supplies to which existing pipelines have access.[14]  But the majority declines to require a market study which could have helped answer this question.[15]  The majority should either reach a determination regarding these economic claims or find that there are material issues of fact in dispute and send the case to hearing.[16]

Further, because the Commission's need determination relies solely on Spire's precedent agreement with its affiliate Spire Missouri, it is particularly troubling that Spire Missouri's regulator, the Missouri Public Service Commission (Missouri PSC), raises serious concerns regarding the need for the pipeline[17] and the terms of Spire's precedent

---

[12] Certificate Order at PP 55-56. Spire Missouri estimated cost savings of $20 million over 20 years, versus the MRT data which suggests the unit cost used by Spire Missouri in their calculations significantly overstates the unit cost of gas delivered on the MRT system.

[13] Ameren is the second largest shipper on both MRT and MoGas. Ameren also asserts that Spire's application is deficient in failing to include a market study. Ameren February 27, 2017 Protest at 8.

[14] Certificate Order at PP 80-81. Multiple protestors argue that a market study either must or should be undertaken in this case to establish need for the project.  The protestors rely on Certificate Policy Statement which says the "evidence necessary to establish the need for the project will usually include a market study" Certificate Policy Statement at 25.

[15] In fact, the majority declines all requests for market studies, stating, "when precedent agreements for a substantial amount of capacity were presented, the Commission has relied on those agreements alone […]." Certificate Order at P 80.

[16]  MRT and Environmental Defense Fund (EDF) request an evidentiary hearing to examine and resolve several issues of material fact. The majority declines the requests and states that the "written record provides a sufficient basis for resolving the relevant issues" which is the normal practice. Certificate Order at P 22.

[17] The Missouri PSC asserts that there is no clear need for the Spire Project given no new demand for gas capacity, a mature St. Louis market, and a track record of failed projects proposing to bring gas from an interconnect with REX to the St. Louis market. Missouri PSC February 27, 2017 Protest at 10-11.

agreement.[18]  The Missouri PSC's protest also questions Spire's "revenue requirement components for capital structure, debt, and return on equity, and whether $43 million revenue can be supported by customers."[19]  Notably, despite the majority's expressed confidence that Spire Missouri's precedent agreement will be reviewed by state regulators,[20] the Missouri PSC itself asserts an inability to conduct a prudence review prior to the Commission's certificate authorization.[21]

In addition to demonstrating project need, the Commission must "determine whether the applicant has made efforts to eliminate or minimize any adverse effects the project might have on the existing customers of the pipeline proposing the project, existing pipelines in the market and their captive customers, or landowners and communities affected by the route of the new pipeline" in order to ultimately balance the public benefits against the potential adverse consequences of an application.[22]  In cases where adverse effects are present, as is the case here, the amount of evidence necessary to establish need increases.[23]

The Commission must consider the probable consequences of Spire's entry of new capacity into the market.  The record demonstrates that there will be adverse financial effects on incumbent pipelines and their captive customers, as well as potential adverse operational impacts on the existing pipelines.  As noted by the protestors, the Spire Project presents a case that involves no demand growth in the regional market served by the proposed project, demonstrated adverse impacts on an existing pipeline and their captive customers, and a protest by the state regulatory authority, which together appear

---

[18] Missouri PSC February 27, 2017 Protest at 8 ("Accordingly, the MoPSC urges the Commission to require modification of the Precedent Agreement to properly allocate risk to Spire.").

[19] Missouri PSC February 27, 2017 Protest at 3.

[20] Certificate Order at P 87.

[21] I agree with Commissioner Glick that given the lack of authority to review and approve a LDC's supply decisions or contracts with affiliates prior to construction, "state review cannot be an effective backstop in this circumstance."

[22] Certificate Policy Statement at 18.

[23] Certificate Policy Statement at 25 ("The amount of evidence necessary to establish the need for a proposed project will depend on the potential adverse effects of the proposed project on the relevant interests. Thus, projects to serve new demand might be approved on a lesser showing of need and public benefits than those to serve markets already served by another pipeline.").

to clearly outweigh the only benefit articulated, a precedent agreement.

The cost of de-contracted capacity on the existing pipelines will be reallocated to and borne by the existing pipelines and their captive customers.[24]  The record demonstrates that the existing pipeline currently serving Spire Missouri, MRT's East Line, and its captive customers could potentially see a 194 percent increase in rates if Spire Missouri executes turnback capacity and shifts the capacity to the Spire Project.[25]  The majority acknowledges that existing pipelines will likely see a drop in utilization once supplies begin to flow on the Spire Project, with the largest impact on MRTs East Line.[26]  With no growth in market demand in the St. Louis region, there is real concern that existing pipelines would not be able to develop new business and make up for the loss of Spire Missouri.  While the Commission does not and should not protect incumbent pipelines from a risk of loss of market share, adverse impacts on the incumbent pipeline in this case are relevant to whether the project need established by the precedent agreement outweighs the overall project's adverse effects.[27]  In this case, where need has not been demonstrated, I believe that adverse effects on incumbent pipelines and their captive customers outweigh benefits.

Besides adverse financial effects on existing pipeline and their captive customers,

---

[24] *See* Missouri PSC February 27, 2017 Protest at 9 ("If the Commission certificates the instant project and it is built, but there is not 400,000 Dth of expanded gas demand in the region, Spire will not be impacted because it has its contract with its affiliate.  Laclede (Spire Missouri) will not be impacted because it has competitive alternatives and can demand discounted rates.  But captive customers of MRT and MoGas lack such a benefit.  Those captive customers may be forced to make up revenues formerly sourced from Laclede.").

[25] *Enable Mississippi River Transmission, LLC,* 164 FERC ¶ 61,075 (2018).  MRT is a wholly owned subsidiary of Enable Mississippi River Transmission.  The Commission set Enable MRT's general Section 4 rate case for hearing due to issues of material fact regarding the impact of the Spire STL Pipeline on MRT rates.  MRT estimates in the rate case that rates would increase 194 percent in order to recover the cost of Spire Missouri's turnback capacity.

[26] Certificate Order at P 107.

[27] Giving further credence to these concerns, the Missouri PSC says "Spire minimized the Commission's obligation to consider the impact on captive customers of incumbent pipelines" and "Spire provides insufficient analysis of the impacts on captive customers."  Missouri PSC February 27, 2017 Protest at 9.

there may also be adverse operational impacts. Commission staff asked MRT to provide additional evidence to show that significant modification to its system to accommodate the future potential for bi-directional flows and also the compete removal or a decrease in gas delivered would disrupt services elsewhere on the system.[28] It seems that MRT did not provide sufficient data and information and thus Commission staff could not verify MRT's claims.[29] Rather than seek to clarify this material issue of fact, the majority disposes of the operational concerns by implying the argument is immaterial because Spire does not currently say it will make deliveries into MRT.[30] However, because Spire proposes to install a bi-directional interconnection, it would appear that it is doing so to allow for future deliveries onto the MRT system, supporting MRT's claims.

The majority relies on *Eastern Shore*[31] as a guidepost for approval of the Spire Project, stating there is a similar fact pattern including no additional natural gas demand, precedent agreements solely with affiliates, and adverse impacts to existing pipelines. However, *Eastern Shore* is distinguishable from the Spire Project because the Commission's conclusion in *Eastern Shore* relies on the findings that the proposed pipeline would not affect the incumbent pipeline's market for firm transportation, there would be no adverse effects on other pipelines and their captive customers, and the incumbent pipeline did not oppose the project.[32] As discussed above, the Spire Project runs counter to all of these findings.

The Commission must also consider the adverse impacts on landowners and communities.[33] Here, the disruption to landowners and communities, unnecessary right-of-way, and the potential eminent domain action further tip the scale against any potential benefits the Spire Pipeline could have.[34] I believe the adverse impacts on landowners have not been appropriately balanced in the Commission's economic test.

Ultimately, because need has not been demonstrated, there is a significant risk of

---

[28] Certificate Order at P 110.

[29] Certificate Order at P 110.

[30] Certificate Order at P 110.

[31] *Eastern Shore Natural Gas Co.*, 132 FERC ¶ 61,204 (2010) (*Eastern Shore*).

[32] Certificate Order at P 79 and n.145.

[33] Certificate Policy Statement at 24.

[34] I note that Spire must still negotiate easement agreements with affected landowners for most of the land required for the project. Certificate Order at P 119.

overbuilding into a region that cannot support additional pipeline infrastructure.[35] Pipelines are long-lived assets and we should be careful not to authorize infrastructure that is not needed. The Commission has not established need, and has not shown the pipeline's benefits outweigh its harms. I do not find the proposed project is required by the public convenience and necessity.

Finally, I do not believe the Commission has met it obligations and responsibilities under National Environmental Policy Act (NEPA) to consider alternatives to the proposed project. The majority fails to adequately consider the "no action alternative," as required during the NEPA environmental review. The no action alternative would by definition cause no environmental damage and no additional eminent domain authority, while still achieving the Spire Project's stated objective of delivering supply of 400,000 Dth/day to the St. Louis market area.[36] Given the lack of demonstrated need for the project, this environmental harm can be avoided altogether.

In virtually every pipeline order, the Commission explains its obligation to balance the public benefits against residual adverse effects. This is not simply a mantra to recite, but a standard that must be met to find a project in the public convenience and necessity. In light of the lack of demonstrated need, potential adverse economic and operational impacts, unnecessity use of eminent domain, and avoidable environmental impacts, I cannot make that finding in this case.

For these reasons, I respectfully dissent.

_____

Cheryl A. LaFleur
Commissioner

_____

[35] As I mentioned, the Commission must give consideration to overbuilding. Certificate Policy Statement at 2.

[36] Spire STL Pipeline Project Environmental Assessment at 146 ("With regard to the first criteria and for the purposes of NEPA, Spire's stated objectives for the Project are to provide about 400,000 Dth/d of year-round transportation service of natural gas to markets in the St. Louis metropolitan area, eastern Missouri, and southwest Illinois, and to enhance reliability.").

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Spire STL Pipeline LLC                     Docket Nos.   CP17-40-000
                                                         CP17-40-001

(Issued August 3, 2018)

GLICK, Commissioner, *dissenting*:

In today's order, the Commission grants Spire STL Pipeline LLC's (Spire) request for authorization to construct and operate the Spire STL Pipeline Project (Spire Project).[1] Before issuing a certificate of public convenience and necessity under section 7 of the Natural Gas Act (NGA), the Commission must find both that the pipeline is needed, and that, on balance, the pipeline's potential benefits outweigh its potential adverse impacts.[2] The record in this proceeding is patently insufficient to make these determinations, as there is neither evidence that the Spire Project is needed nor that its limited benefits outweigh its harms. Congress' directive that the Commission determine whether a proposed pipeline is in the public interest surely requires more than the anemic review provided by today's order.[3] I am particularly disappointed with the order because it lends credence to the critique that the Commission does not meaningfully review section 7 applications.

## I.      The Record Does Not Demonstrate that the Project Is Needed

Today's order concludes that the Spire Project is needed based on a single precedent agreement between Spire and its local distribution company (LDC) affiliate[4]— Spire Missouri—while turning a blind eye to the many concerns raised in the record. Critically, as relevant parties acknowledge,[5] the precedent agreement does not correspond

---

[1] *Spire STL Pipeline LLC*, 164 FERC ¶ 61,085 (2018) (Certificate Order).

[2] 15 U.S.C. § 717f (2012).

[3] *Atl. Refining Co. v. Pub. Serv. Comm'n of N.Y.*, 360 U.S. 378, 391 (1959) (Section 7 of the NGA "requires the Commission to evaluate all factors bearing on the public interest.").

[4] Spire Missouri subscribed to 350,000 dekatherms (Dth) per day in its precedent agreement with Spire, which is 87.5 percent of the total capacity on the Spire Project. *See* Certificate Order, 164 FERC ¶ 61,085 at P 10.

[5] *Id.* PP 35, 49, 58.

to any incremental demand or market growth.  Rather, the precedent agreement merely documents Spire Missouri's intent to shift its firm transportation capacity from an existing pipeline owned and operated by Mississippi River Transmission (MRT) to the Spire Project.[6]

Precedent agreements are one of several types of evidence that can be valuable in assessing the market demand for a pipeline.  However, contracts among affiliates, such as the one at issue in this proceeding, are less probative of need because they are not necessarily the result of an arms-length negotiation.[7]  There are several potential business reasons why Spire's corporate parent might prefer to own a pipeline rather than simply take service on it, such as the prospect of earning a 14 percent return on equity rather than paying rates to MRT or another pipeline company.

In addition, the Missouri Public Service Commission (Missouri PSC) points to ample record evidence that casts doubt on whether the precedent agreement actually reflects a need for the Spire Project, such as the fact that demand for natural gas in the St. Louis market is flat and, partly as a result, the several other new pipeline projects that have been proposed to serve the St. Louis area have all failed.[8]  It is especially noteworthy that Spire Missouri rejected offers to purchase new pipeline capacity from other proposed projects before turning around and entering into an agreement to purchase that capacity from its affiliate.[9]  To conclude that a precedent agreement between

_____

[6] And it is far from certain that a facility as significant as the Spire Project is needed to achieve this goal.  MRT explains that, to the extent Spire Missouri wants to access the REX pipeline to receive Appalachian gas, "Spire Missouri could access REX by using 170,000 Dth per day of its subscribed capacity on MRT's East Line from MRT's points of interconnection with NGPL and Trunkline and its 62,800 Dth per day of subscribed capacity on MoGas."  *Id.* P 50.

[7] *Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227, at 61,749 (1999) (Certificate Policy Statement), *clarified*, 90 FERC ¶ 61,128, *further clarified*, 92 FERC ¶ 61,094 (2000) ("A project that has precedent agreements with multiple new customers may present a greater indication of need than a project with only a precedent agreement with an affiliate.").  Furthermore, the Commission's "longstanding reliance" on *Minisink* is inapt.  In that proceeding, the court discussed only the Commission's reliance on precedent agreements generally—not precedent agreements among affiliates—and, therefore, the case provides no response to the unique concerns posed by affiliate precedent agreements. *Minisink Residents for Envtl. Pres. & Safety v. FERC*, 762 F.3d 97, 111 n.10 (D.C. Cir. 2014).

[8] Missouri PSC Protest at 9.

[9] Spire Missouri's lack of interest in purchasing capacity on an unaffiliated pipeline

affiliates will always represent accurate, impartial, and complete evidence of need, as the Commission appears to suggest today,[10] is to abdicate our responsibility under the NGA.

Under these circumstances, the Commission must consider additional evidence regarding the need for the pipeline. The Commission's Certificate Policy Statement contemplates a range of additional indicia of need including, but not limited to, "demand projections, potential cost savings to consumers, or comparison of projected demand with the amount of capacity currently serving the market."[11] This evidence would permit the Commission to make an independent assessment of the need for the project, rather than relying entirely on a single precedent agreement between affiliated parties.[12]

The Commission rejects protestors' argument that a market study is necessary in order to adequately evaluate the need for a project by observing that "when precedent agreements for a substantial amount of capacity were presented, the Commission has

---

casts doubt on its assertions that enhanced reliability and diversity of supply are its reasons for purchasing capacity on this project. At the very least, the evidence in the record indicating that Spire Missouri was willing to enter into a precedent agreement with an affiliate, but not any other entity developing a similar project, should lead the Commission to question the probative value of the precedent agreement when assessing the need for the Spire Project.

[10] Certificate Order, 164 FERC ¶ 61,085 at P 73 ("Spire has entered into a long-term precedent agreement with Spire Missouri . . . We find that Spire has sufficiently demonstrated that the project is needed in the market that Spire STPL Pipeline Project intends to serve.").

[11] Certificate Policy Statement, 88 FERC at 61,747.

[12] Spire also asserts that its pipeline will enhance the reliability and diversity of gas supply in St. Louis and potentially result in "access to lower priced gas." Certificate Order, 164 FERC ¶ 61,085 at P 11. The Commission acknowledges the lack of initial information about the possibility of cost savings to consumers. In fact, the Commission issued a supplemental data request to the existing pipeline, MRT, and Spire in order to compare the cost of various scenarios. Spire Missouri's data provides an estimated cost savings over 20 years, suggesting certain "hypothetical alternatives" on the MRT system would result in higher average daily costs when compared to the Spire Project. However, MRT's data suggests the unit cost used by Spire Missouri in its calculations overstate MRT's comparable cost. The Commission does not resolve the dispute presented by this record evidence regarding whether the Spire Project would provide savings and, at the very least, this matter requires further investigation. Certificate Order, 164 FERC ¶ 61,085 at PP 54-56.

relied on those agreements alone, even between affiliates in the absence of anticompetitive or discriminatory behavior."[13] But it is unclear how the Commission could identify "anticompetitive or discriminatory behavior" so long as it refuses to make any effort to look behind the precedent agreement. The Commission's uncritical acceptance of the precedent agreement in this proceeding is particularly concerning because the agreement was not the result of an open season, but rather the product of internal discussions between Spire, Spire Missouri, and their corporate parent, which provide no transparent measure of the need for the Spire Project.[14]

My point is not that precedent agreements are completely irrelevant to the determination of need. But where the parties have raised considerable, credible concerns about whether a precedent agreement is, in fact, a reliable indicator of need, reasoned decisionmaking requires the Commission do more than simply reiterate its policy of accepting precedent agreements at face value. Under these circumstances, the Commission should, consistent with its own Certificate Policy Statement, also consider other evidence to rigorously evaluate whether the project is really needed. Anything less is arbitrary and capricious.

## II.    The Commission Does Not Adequately Consider the Adverse Impacts of the Spire Project

Even where an applicant has demonstrated that a proposed pipeline is needed—which, again, is not the case here—the Commission may grant a section 7 certificate only where the pipeline's benefits outweigh its harms.[15] When the evidence of project need is limited, the Commission must engage in an especially searching review of the project's potential harms to ensure that the project is, in fact, in the public interest.[16] The relevant harms include adverse effects on existing pipelines and their captive customers as well as

---

[13] Certificate Order, 164 FERC ¶ 61,085 at P 81 ("Under the circumstances of this proceeding, i.e., lack of evidence of anticompetitive behavior, we find the fact that a customer is willing to sign a binding contract to pay for service on the project shows need or demand for the project.").

[14] *Id.* P 77.

[15] Certificate Policy Statement, 88 FERC at 61,748 ("To demonstrate that its proposal is in the public convenience and necessity, an applicant must show public benefits that would be achieved by the project that are proportional to the project's adverse impacts.").

[16] *Id.* ("The amount of evidence necessary to establish the need for a proposed project will depend on the potential adverse effects of the proposed project on the relevant interests.").

on landowners, communities, and the environment.  The Commission has failed to adequately weigh those harms in this proceeding.

First, the Commission gives little weight to the Spire Project's potential effect on MRT and its captive customers, who will be forced to bear additional costs as a result of Spire Missouri's decision to move its business to the Spire Project.[17]  The record demonstrates that the captive customers of the existing pipeline system currently serving Spire Missouri could be stuck with a 23 percent increase in cost-of-service, as a result of the Spire Project.[18]  With demand in the St. Louis region remaining flat, the protestors are right to be concerned that it is unrealistic to expect MRT to make up for Spire Missouri's exit by attracting new customers and that MRT's customers will be left with the bill for Spire Missouri's decision to facilitate an affiliate's effort to build a new pipeline.

The Commission summarily concludes that it is simply a "logical time" for Spire Missouri to re-evaluate its transportation needs since its contract with MRT was approaching the end of its term.[19]  But that statement does not relieve the Commission from the NGA's requirements.  Although the Commission is under no obligation to protect incumbent pipelines from a loss of market share, the increased rates that MRT will likely need to charge its captive customers is a concern that goes to the core of the Commission's statutory responsibilities to evaluate adverse impacts and that, unfortunately, receives far too little weight in today's order.  Given the potential for abuse of an affiliate relationship, the Commission must undertake an especially searching review of the project's potential harms to ensure that the project is in fact in the public

---

[17] *See* Missouri PSC Protest at 9 ("If the Commission certificates the instant project and it is built, but there is not 400,000 Dth of expanded gas demand in the region, Spire will not be impacted because it has its contract with its affiliate.  [Spire Missouri] will not be impacted because it has competitive alternatives and can demand discounted rates.  But captive customers of MRT and MoGas lack such a benefit.  Those captive customers may be forced to make up revenues formerly sourced from [Spire Missouri].").

[18] *Enable Mississippi River Transmission, LLC*, 164 FERC ¶ 61,075, at PP 6-7 (2018) (MRT Rate Case) (MRT is a wholly owned subsidiary of Enable Midstream Partners, LP.  The Commission set MRT's general Section 4 rate case for hearing as the proposed tariff adjustments have not been shown to be just and reasonable, which were adjusted "primarily due to the removal of billing determinants associated with Spire Missouri's termination of contracts."  In the rate case, MRT proposes a cost-of-service increase of 23 percent, resulting in a potential increase of 194 percent in reservation rates, in order to recover the cost of Spire Missouri's turnback capacity.).

[19] However, Spire Missouri has re-contracted for 437,240 Dth/day of capacity on MRT's system for an additional year.  *See* MRT Rate Case, 164 FERC ¶ 61,075 at P 4.

interest, especially when the affiliate precedent agreement is not the product of an open season process, as it was not here.

The Commission suggests that no further review is necessary because state regulatory bodies have the opportunity to conduct a prudence review of affiliated contracts. But no matter how much the Commission may want to limit the scope of the Commission's inquiry into a proposed pipeline, it cannot escape the NGA's requirement that the Commission must find that a project is in the public interest. If we abdicate this responsibility to state commissions, then Congress might as well return responsibility for the entire siting process to the states, as there would be little remaining purpose to Commission review of proposed pipelines.

Further, as the Missouri PSC and other protestors point out, state review cannot be an effective backstop in this circumstance.[20] The Missouri PSC explains that it has no authority to review and approve an LDC's gas supply decisions or gas transportation contracts with affiliates prior to construction, meaning that it can evaluate the prudence of Spire Missouri's decisions only after the new pipeline is in service. That review is no substitute for the Commission's examination, before the pipeline is constructed, of whether it is in the public interest to proceed with the pipeline in the first place. The risks associated with the Spire Project's affiliate agreement extend beyond its impact on the retail customer base. For example, despite allegations of possible improper self-dealing among the Spire affiliates, the Commission concludes that Spire did not engage in anticompetitive behavior since it held a binding open season following the negotiation of the affiliate precedent agreement,[21] and Spire's tariff "ensures that any future shipper will not be unduly discriminated against."[22] This approach, in which the Commission abdicates its responsibility by relying on a state review that even the state reviewer itself claims cannot be effective, permits Spire and Spire Missouri to escape meaningful regulatory review. That is not what Congress had in mind when it gave the Commission siting responsibilities under section 7 of the NGA.

None of the Commission's citations to precedent directly support today's order. The Commission points to *Ruby Pipeline, LLC* as an example of where it approved a proposed pipeline whose capacity was subscribed by entities that were shifting their business from another pipeline.[23] In *Ruby*, however, the Commission concluded that any adverse impacts on existing pipelines and their captive customers were the result of "fair

---

[20] Certificate Order, 164 FERC ¶ 61,085 at PP 61-65.

[21] *Id.* P 77.

[22] *Id.*

[23] *Id.* PP 114-115 (citing *Ruby Pipeline, LLC*, 128 FERC ¶ 61,224 (2009) (*Ruby*)).

competition"[24]—a result that, as explained above, we cannot reach here without looking behind the single precedent agreement underpinning the Spire Project. In addition, the record in *Ruby* indicated that the gas supplies transported by the existing pipeline were declining and that, by bringing new gas supplies to the relevant market, the proposed pipeline could create new business opportunities for the existing pipelines. Here, however, there is no evidence that MRT is facing declining gas supplies or that the Spire Project will create new business opportunities for MRT. Indeed, the absence of any growth in natural gas demand suggests that the opposite is true.

In addition, the Commission suggests that its decision in *Eastern Shore Natural Gas Co.* supports issuing a certificate to the Spire Project because that proceeding also involved only affiliated precedent agreements, no evidence of increasing market demand, and evidence that the proposed pipeline would reduce receipts of natural gas at one delivery point on an existing pipeline.[25] But, as Commissioner LaFleur explains,[26] *Eastern Shore* relied on the Commission's findings that the proposed pipeline would not affect the existing pipeline's market for firm transportation, that there would be no adverse effects on other pipelines or their captive customers, and the fact that the incumbent pipeline did not oppose the proposed project.[27] However, as described above and in Commissioner LaFleur's dissent, the Commission cannot make equivalent findings here given the record evidence indicating that developing the Spire Project will impair MRT's market for firm transportation, significantly increase rates for its captive customers, and has been vigorously opposed by MRT.

Finally, the Commission must also consider the adverse impacts on landowners and communities. As we all agree, these impacts are important and cannot be an afterthought in the Commission's assessment of a pipeline's adverse impacts.[28] Here, the disruption to landowners and communities, unnecessary rights-of-way, and potential eminent domain action further tip the scale against finding the Spire Project to be in the public interest. For example, Spire must still negotiate easements with most of the landowners whose property lies in its proposed path[29]— potentially resulting in harm, but

---

[24] *Ruby*, 128 FERC ¶ 61,224 at P 37.

[25] Certificate Order, 164 FERC ¶ 61,085 at P 79 (citing *Eastern Shore Natural Gas Co.*, 132 FERC ¶ 61,204 (2010) (*Eastern Shore*)).

[26] *Id.* at 6 (2018) (LaFleur, Comm'r, dissenting).

[27] *Eastern Shore*, 132 FERC ¶ 61,024 at P 23.

[28] *E.g., PennEast Pipeline Company, LLC*, 162 FERC ¶ 61,053, at 1 (2018) (Chatterjee, Comm'r, concurring).

[29] Certificate Order, 164 FERC ¶ 61,085 at P 119 ("[W]e are mindful that Spire still

a harm that receives only passing consideration in the Commission's analysis. Collectively, these harms outweigh the Spire Project's limited benefits and, especially in light of the absence of a demonstrated need for the project, should have resulted in a denial of Spire's application.

## III. The Commission Does Not Adequately Consider the No-Action Alternative

The Commission also has failed to meet its obligation under the National Environmental Policy Act (NEPA) to consider the no-action alternative to the proposed project, which is required as part of the environmental review's alternatives analysis. The Commission's criteria to evaluate alternatives include the ability to meet a project's stated objective, technical and economic feasibility, and significant environmental advantage over the proposed action.[30]  In this case, the Environmental Assessment (EA) rejects the no-action alternative, concluding that it "would not satisfy the stated Project objectives."[31]

That conclusion is directly at odds with the EA's definition of the Spire Project's objective, which is to "provide about 400,000 Dth per day of year-round transportation service of natural gas to markets in the St. Louis metropolitan area, eastern Missouri, and southwest Illinois; and to enhance reliability."[32]  The no-action alternative of continued shipment on MRT's existing pipeline system currently provides Spire Missouri transportation capacity of 437,240 Dth per day into the target market areas, achieving the stated objective.[33]  Furthermore, the no-action alternative is technically and economically feasible and offers a "significant environmental advantage over the proposed action."[34]

---

must finalize easement agreements with affected landowners for most of the land required for the project.").

[30] Environmental Assessment at 146 (EA).  It also is worth noting that the Commission does not include downstream greenhouse gas (GHG) emissions as indirect effects of the Spire Project by finding that "Spire STL Pipeline Project is not intended to meet an incremental demand for natural gas above existing levels" ultimately agreeing with the protesters' concerns that the Spire Project is not needed to meet market demand. *See* Certificate Order, 164 FERC ¶ 61,085 at P 253.

[31] EA at 148.

[32] *Id.* at 146.

[33] *See supra* note 17.

[34] EA at 147 (The EA concludes that "[i]f the Commission were to deny Spire's application, the Project would not be built and the environmental impacts identified in this EA would not occur.").

In this case, where there is no demonstrated need for the project, where the adverse effects have not been seriously considered, and the no-action alternative has been prematurely dismissed, approving the Spire Project is flatly inconsistent with the Certificate Policy Statement's goal of "avoid[ing] *unnecessary* environmental and community impacts while serving *increasing* demands for natural gas."[35]

\*      \*      \*

Spire has not demonstrated that the Spire Project is needed or that the benefits of the Project outweigh its harms.  Either failure should have been enough for the Commission to reject Spire's application for a section 7 certificate.  At the very least, the Commission should have further examined the numerous issues of material fact raised by the parties to the proceeding rather than brushing them blithely aside in its rush to issue today's decision.  Under section 7 of the NGA, the pipeline bears the burden of proof to show that the proposed project is in the public interest.[36]  The Commission's unwillingness to take the parties' protests seriously has the effect of flipping that burden on its head.  I do not believe that is what Congress had in mind when it vested the Commission with sitting authority over interstate natural gas pipelines.

For all of these reasons, I respectfully dissent.

_____
Richard Glick
Commissioner

---

[35] Certificate Policy Statement, 88 FERC at 61,743 (emphases added).

[36] *Atl. Ref. Co. v. FPC*, 316 F.2d 677, 678 (D.C. Cir. 1963) ("The burden of proving the public convenience and necessity is, of course, on the natural gas company."); *see Williams Gas Processing—Gulf Coast Co., L.P. v. FERC*, 331 F.3d 1011, 1021 (D.C. Cir. 2003) ("In a public interest analysis, the burden of proof is on the applicant for abandonment to show . . . the public convenience and necessity." (internal quotation marks omitted)).

Document Content(s)

CP17-40-000.DOCX.................................................1-133

# CERTIFICATE OF SERVICE

Pursuant to Rules 15(c) and 25 of the Federal Rules of Appellate Procedure and Rules 15(a) and 25 of the Circuit Rules for the United States Court of Appeals for the District of Columbia Circuit, I hereby certify that I have this 21st day of January 2020, served by electronic means or first class mail, postage prepaid, a true and correct copy of the foregoing document upon all parties to the Federal Energy Regulatory Commission proceeding, Docket CP17-40, as listed herein, and upon the Respondent, Federal Energy Regulatory Commission.

> Kimberly D. Bose, Secretary
> Office of the Secretary
> Federal Energy Regulatory Commission
> 888 First Street, NE
> Washington, DC 20426

> Robert H. Solomon, Solicitor
> Office of the Solicitor (Room 9A-01)
> Federal Energy Regulatory Commission
> 888 First Street, NE
> Washington, DC 20426

> */s/ Jason Gray*
> Jason T. Gray
> Duncan & Allen
> 1730 Rhode Island Avenue, NW
> Suite 700
> Washington, DC 20036

*Counsel for Environmental Defense Fund*

| Party | Primary Person or Counsel of Record to be Served | Email |
|---|---|---|
| Henry Robertson | Henry Robertson<br>Great Rivers Environmental Law Center<br>319 N. Fourth St., Suite 800<br>St Louis, MO 63102 | hrobertson@greatriverslaw.org |
| Ameren Services Company, Inc. | Kenneth Dothage<br>PO Box 66149<br>Saint Louis, MO 06149 | kdothage@ameren.com |
| Ameren Services Company, Inc. | Jim Massmann<br>1901 Chouteau Avenue<br>St. Louis, MO 63166-6149 | jmassman@ameren.com |
| Ameren Services Company, Inc. | David Hennen<br>1901 Chouteau<br>MC 1310<br>St. Louis, MO 63103 | dhennen@ameren.com |
| Ameren Services Company, Inc. | Karol Lyn Newman<br>Davis Wright Tremaine LLP<br>1919 Pennsylvania Avenue, NW, Suite 800<br>Washington, DC 20006-3401 | klnewman@dwt.com |
| Central Land Consulting, LLC | Nate Laps<br>2929 Olympia Dr<br>Canton, OH 44708 | nlaps@centrallandconsulting.com |
| Central Land Consulting, LLC | DJ Marlatt<br>PO Box 36134<br>Canton, OH 44735 | dmarlatt@centrallandconsulting.com |
| Enable Mississippi River Transmission, LLC | Mark Sundback<br>Andrews Kurth LLP<br>1350 I St NW Ste 1100<br>Washington, DC 20005 | klwiseman49@gmail.com |
| Enable Mississippi River Transmission, LLC | Kenneth L. Wiseman<br>Andrews Kurth LLP<br>5021 Grove Street<br>Chevy Chase, MD 20815 | klwiseman49@gmail.com |

| Party | Primary Person or Counsel of Record to be Served | Email |
|---|---|---|
| Enable Mississippi River Transmission, LLC | Lisa Yoho<br>1111 Louisiana<br>Houston, TX 77002 | lisa.yoho@enablemidstream.com |
| Enable Mississippi River Transmission, LLC | Jonathan F Christian<br>1111 Louisiana St.<br>Ste. 1004<br>Houston, TX 77002 | jonathan.christian@enablemidstream.com |
| Enable Mississippi River Transmission, LLC | Mark C. Schroeder<br>1111 Louisiana Street<br>Suite 1140<br>Houston, TX 77002 | mark.schroeder@enablemidstream.com |
| Environmental Defense Fund | Natalie Karas<br>1875 Connecticut Ave NW<br>Suite 800<br>Washington, DC 20009 | nkaras@edf.org |
| EQT Energy, LLC | Matthew Eggerding<br>2200 Energy Drive<br>Canonsburg, PA 15317 | meggerding@equitransmidstream.com |
| EQT Energy, LLC | Paul Diehl<br>625 Liberty Avenue, Suite 1700<br>Pittsburgh, PA 15222 | pdiehl@eqt.com |
| EQT Energy, LLC | Douglas F. John, ESQ<br>John & Hengerer LLP<br>1730 Rhode Island Avenue, N.W.<br>Suite 600<br>Washington, DC 20036-3116 | djohn@jhenergy.com |
| LACLEDE GAS COMPANY | David Abernathy<br>700 Market Street, 6th Floor<br>Saint Louis, MO 63101 | david.abernathy@spireenergy.com |
| LACLEDE GAS COMPANY | Scott Weitzel<br>700 Market Street<br>St. Louis, MO 63101 | scott.weitzel@spireenergy.com |
| LACLEDE GAS COMPANY | Lew Keathley<br>700 Market St.<br>St. Louis, MO 63101 | lew.keathley@spireenergy.com |

| Party | Primary Person or Counsel of Record to be Served | Email |
|---|---|---|
| Laclede Gas Company | Christopher Barr<br>Post & Schell, P.C.<br>607 14th St., N.W.<br>Suite 600<br>Washington, DC 20005-2006 | cbarr@postschell.com |
| Laclede Gas Company | Jessica Rogers<br>Post & Schell, P.C.<br>17 N. Second Street<br>Harrisburg, PA 17101 | jrogers@postschell.com |
| Missouri Public Service Commission | Rodney Massman<br>200 Madison St.<br>Jefferson City, MO 65101 | Rodney.Massman@psc.mo.gov |
| Missouri Public Service Commission | Curtis R Stokes<br>200 Madison Street<br>Jefferson City, MO 65102 | curtis.stokes@psc.mo.gov |
| Missouri Public Service Commission | Shelley S Brueggemann<br>PO Box 360<br>Jefferson City, MO 65102 | shelley.brueggemann@psc.mo.gov |
| Missouri Public Service Commission | Janis Elaine Fischer<br>200 Madison St.<br>Jefferson City, MO 65101 | janis.fischer@psc.mo.gov |
| Missouri Public Service Commission | John D. Borgmeyer<br>PO Box 360<br>Jefferson City, MO 65109 | john.borgmeyer@psc.mo.gov |
| Missouri Public Service Commission | Stephen Pearson<br>Spiegel & McDiarmid LLP<br>1875 Eye St, NW<br>Suite 700<br>Washington, DC 20006 | steve.pearson@spiegelmcd.com |
| MoGas Pipeline LLC | Paul Korman<br>Van Ness Feldman, LLP<br>Suite 700<br>1050 Thomas Jefferson Street<br>Washington, DC 20007 | pik@vnf.com |
| MoGas Pipeline LLC | Cy Zebot<br>President MOGAS Pipeline LLC<br>MOGAS PIPELINE LLC<br>110 Algana<br>St. Peters, MO 63376 | czebot@mogaspipe.com |

| Party | Primary Person or Counsel of Record to be Served | Email |
|-------|--------------------------------------------------|-------|
| MVP Gas Services, LLC | Matthew Rick<br>John & Hengerer LLP<br>1730 Rhode Island Avenue, N.W.<br>Suite 600<br>Washington, DC 20036-3116 | mrick@jhenergy.com |
| Panhandle Eastern Pipe Line Company, LP | Kevin Erwin<br>1300 Main St.<br>Houston, TX 77002 | kevin.erwin@energytransfer.com |
| Panhandle Eastern Pipe Line Company, LP | Michael T. Langston<br>1300 Main Street<br>Suite 17.084<br>Houston, TX 77002 | michael.langston@energytransfer.com |
| Panhandle Eastern Pipe Line Company, LP | Stephen Veatch<br>1300 Main Street<br>Houston, TX 77002 | stephen.veatch@energytransfer.com |
| Panhandle Eastern Pipe Line Company, LP | Thomas Edward Knight<br>Attorney<br>Locke Lord LLP<br>701 Eighth Street, N.W.<br>Suite 700<br>Washington, DC 20001 | tknight@lockelord.com |
| Plumbers' and Pipefitters' Welfare Educational Fund | Sam Gladney<br>4399 Laclede Avenue<br>St. Louis, MO 63108 | sgladney@hghllc.net |
| Rockies Express Pipeline LLC | Adam A. Schiche<br>Tallgrass Energy Partners<br>370 Van Gordon Street<br>Lakewood, CO 80228 | adam.schiche@tallgrassenergylp.com |
| Rockies Express Pipeline LLC | Shannon P. Coleman<br>Tallgrass Energy Partners<br>370 Van Gordon St.<br>Lakewood, CO 80228 | shannon.coleman@tallgrassenergylp.com |

| Party | Primary Person or Counsel of Record to be Served | Email |
|-------|---------------------------------------------------|-------|
| Southern Star Central Gas Pipeline, Inc. | Douglas Field<br>4700 Highway 56<br>Owensboro, KT 42301 | w.doug.field@southernstar.com |
| Southern Star Central Gas Pipeline, Inc. | Philip Rullman<br>4700 Hwy 56<br>Owensboro, KT 42301 | Philip.Rullman@sscgp.com |
| Spire STL Pipeline LLC | Scott Jaskowiak<br>700 Market Street<br>Saint Louis, MO 63101 | Scott.Jaskowiak@spireenergy.com |
| Spire STL Pipeline LLC | David A Yonce<br>700 Market Street<br>Saint Louis, MO 63101 | david.yonce@spireenergy.com |
| Spire STL Pipeline LLC | Lisanne Crowley<br>Troutman Sanders LLP<br>401 Ninth Street, N.W.<br>Suite 1000<br>Washington, DC 20004 | lisanne.crowley@troutman.com |