**ORAL ARGUMENT NOT YET SCHEDULED**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| JULI STECK, | ) | |
|        Petitioner, | ) | |
| | ) | |
|        v. | ) | No. 20-1017, consolidated with |
| | ) | 20-1016 (lead case) |
| FEDERAL ENERGY REGULATORY | ) | |
| COMMISSION, | ) | |
|        Respondent; | ) | |
| | ) | |
| Spire STL Pipeline LLC *et al.,* | ) | |
|        Intervenors | ) | |

_____

On Petition for Review of Orders of the Federal Energy Regulatory
Commission, 164 FERC ¶ 61,085 (August 3, 2018) and 169 FERC ¶ 61,134
(November 21, 2019)
_____

**OPENING BRIEF OF PETITIONER JULI STECK**

Henry B. Robertson
Great Rivers Environmental Law Center
319 N. Fourth St., Suite 800
St. Louis, Missouri 63102
Tel. (314) 231-4181
Fax (314) 231-4184
hrobertson@greatriverslaw.org

Attorney for Petitioner Juli Steck

# CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

## Parties

*Petitioners*

Juli Viel, now Juli Steck,[1] in Case No. 20-1017

Environmental Defense Fund in consolidated, lead Case No. 20-1016

*Respondent:* Federal Energy Regulatory Commission

*Intervenors*

Spire STL Pipeline LLC

Spire Missouri Inc.

*Amici curiae:* There are no amici at this time.

## Rulings Under Review

Petitioners seek review of the following orders:

**1.**    *Spire STL Pipeline LLC,* Order Issuing Certificates, Docket CP17-40-000 and 001, 164 FERC ¶ 61,085 (August 3, 2018)(JA ___-___) and

**2.**    *Spire STL Pipeline LLC,* Order on Rehearing, Docket No. CP17-40-002, 169 FERC ¶ 61,134 (November 21, 2019)( JA ___-___).

---

[1] Her legal name is now Steck. *See* Notice of Name Change filed in this case on June 22, 2020. She will be called Steck in the rest of this brief except when citing a document in the record that uses her former name.

## Related Cases

This case has not previously been before this or any other court and is not now before any other court. There are no other cases of which counsel is aware involving substantially the same parties and issues. Circuit Rule 28(a)(1)(C).

## TABLE OF CONTENTS

Table of Authorities ..................................................................................iv

Glossary.............................................................................................. vii

Jurisdictional Statement ...........................................................................1

Statutes and Regulations ...........................................................................1

Statement of Issues...................................................................................2

Statement of the Case ...............................................................................3

Summary of Argument .............................................................................8

Standing..................................................................................................9

Argument ..............................................................................................11

I.     Standard of Review............................................................................11

II.    FERC improperly adopted the applicant's statement of purpose and need and thus inevitably rejected the no-action alternative.........................................11

    A.   FERC violated NEPA by substituting Spire's need for its own purpose and need................................................................................12

B.    FERC improperly rejected the no-action alternative by making it impossible for any alternative to replace Spire's project. ........................14

III.  FERC failed to consider the indirect effects, both "upstream" and "downstream," of its approval of the Spire STL pipeline. ...........................17

A.    FERC denied its own causative role in creating the indirect effects........18

B.    FERC arbitrarily and capriciously denied that the production and combustion of the gas flowing through the pipeline even were indirect effects..........................................................................................20

IV.   FERC arbitrarily and capriciously failed to acknowledge, much less discuss, the cumulative effects of the pipeline..............................................23

Conclusion ..........................................................................................28

Certificates of Compliance and Service................................................29

## TABLE OF AUTHORITIES

**Cases**

*American Rivers v. FERC,* 895 F.3d 32 (D.C. Cir. 2018) .................................26, 28

*Birckhead v. FERC,* 925 F.3d 510 (D.C. Cir. 2019)........................................19–21

*\*Center for Biological Diversity v. NHTSA,* 538 F.3d 1172 (9th Cir. 2008) ....27, 28

*\*Citizens Against Burlington v. Busey,* 938 F.2d 190 (D.C. Cir. 1991)............12–15

*Citizens for a Healthy Comm'ity v. BLM,* 377 F.Supp.3d 1223 (D. Colo. 2019)....22

*City of Alexandria v. Slater,* 198 F.3d 862 (D.C. Cir. 1999).................................12

*City of Boston Delegation v. FERC,* 897 F.3d 241 (D.C. Cir. 2018) ......................10

*City of Grapevine v. Dep't of Transportation,* 17 F.3d 1502 (D.C. Cir. 1994).......14

*\*Delaware Riverkeeper Network v. FERC,* 753 F.3d 1304 (D.C. Cir. 2014) .........25

*Dep't of Transportation v. Public Citizen,* 541 U.S. 752, 124 S.Ct. 2204, 159 L.Ed.2d 60 (2004) ........................................................................................20

*EarthReports Inc. v. FERC,* 828 F.3d 949 (D.C. Cir. 2016) ...................................19

*EDF v. Massey,* 986 F.2d 528 (D.C. Cir. 1993) ......................................................27

*\*Friends of Yosemite Valley v. Kempthorne,* 520 F.3d 1024 (9th Cir. 2008) ....15, 17

*\*Grand Canyon Trust v. FAA,* 290 F.3d 339 (D.C. Cir. 2002) ...............................26

*Massachusetts v. EPA,* 549 U.S. 497, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007) 27–8

*Montana Environmental Information Center v. Office of Surface Mining,* 274 F.Supp.3d 1074 (D. Mont. 2017)....................................................................27

*\*Moreau v. FERC,* 982 F.2d 556 (D.C. Cir. 1993) .................................................11

*Myersville Citizens for a Rural Community v. FERC,* 783 F.3d 1301 (D.C. Cir. 2015) ......................................................................................................11

*National Parks & Conservation Ass'n v. BLM,* 606 F.3d 1058 (9th Cir. 2010) ......17

*\*North Carolina Wildlife Federation v. N.C. Dep't of Transportation,* 677 F. 3d 596 (4th Cir. 2012)............................................................................................15

*Sierra Club v. Dep't of Energy,* 867 F.3d 189 (D.C. Cir. 2017) ........................... 26

*Sierra Club v. FERC,* 827 F.3d 36 (D.C. Cir. 2016) .........................................10, 19

*Sierra Club v. FERC,* 827 F.3d 59 (D.C. Cir 2016) .........................................10, 19

*Sierra Club v. FERC,* 867 F.3d 1357 (D.C. Cir. 2017) ........................19, 21–2, 27

*South Fork Band Council of Western Shoshone v. Dep't of Interior,* 588 F.3d 718,

    (9th Cir. 2009)...........................................................................................22–3

*Theodore Roosevelt Conservation Partnership v. Salazar,* 661 F.3d 66 (D.C. Cir.

    2011) ..............................................................................................................15

*WildEarth Guardians v. BLM,* 870 F.3d 1222 (10th Cir. 2017).........................17, 21

*WildEarth Guardians v. Jewell,* 738 F.3d 298 (D.C. Cir. 2013)....................10–11

*Wilderness Workshop v. BLM,* 342 F.Supp.3d 1145 (D. Colo. 2018)..............22, 27

**Statutes**

5 U.S.C. §§ 551 *et seq.*................................................................................................11

15 U.S.C. §717f(c) ...............................................................................................1, 12

15 U.S.C. § 717r(a) ....................................................................................................1

15 U.S.C. § 717r(b) ....................................................................................................1

42 U.S.C. § 4332(2)(E) ............................................................................................12

**Code of Federal Regulations**

18 CFR § 380.10(a)(1) ...............................................................................................4

18 CFR § 385.214(c)(1) .............................................................................................4

40 CFR § 1502.13 ....................................................................................................11

40 CFR § 1502.14 ...............................................................................................11, 12

40 CFR § 1508.7 ...............................................................................23, 26

40 CFR § 1508.8 ...........................................................................12, 18, 22

40 CFR § 1508.9(b) ................................................................................12

40 CFR § 1508.27 .....................................................................................23

# GLOSSARY

| | |
|---|---|
| BLM | Bureau of Land Management |
| CBD | Center for Biological Diversity |
| Certificate Order | Order Issuing Certificates, 164 FERC ¶ 61,085 |
| CPCN | Certificate of Public Convenience and Necessity |
| EA | Environmental Assessment |
| EDF | Environmental Defense Fund |
| EIS | Environmental Impact Statement |
| FERC | Federal Energy Regulatory Commission |
| GHG | Greenhouse gas(es) |
| LNG | Liquefied natural gas |
| MRT | Enable Mississippi River Transmission, LLC |
| NEPA | National Environmental Policy Act |
| NGA | Natural Gas Act |
| NHTSA | National Highway Traffic Safety Administration |
| P | denotes a numbered paragraph in a FERC order. |

*Sabal Trail*                    *Sierra Club v. FERC, 867 F.3d 1357 (D.C. Cir. 2017)*

## JURISDICTIONAL STATEMENT

The Federal Energy Regulatory Commission (FERC) by a 3–2 vote granted a certificate of public convenience and necessity (CPCN) authorizing construction and operation of the Spire STL Pipeline under the Natural Gas Act, 15 U.S.C. §717f(c), on August 3, 2018. *Spire STL Pipeline LLC,* Order Issuing Certificates, Docket CP17-40-000 and 001, 164 FERC ¶ 61,085 (August 3, 2018)(JA ___--___)("Certificate Order").

Petitioner Steck timely filed a request for rehearing within 30 days, on August 31, 2018 (JA ____). 15 U.S.C. § 717r(a). FERC issued a "tolling order" on October 1, 2018, purporting to grant all rehearing requests "to afford additional time for consideration" (JA ____). On November 21, 2019, FERC denied all still-pending requests for rehearing. *Spire STL Pipeline LLC,* Order on Rehearing, Docket No. CP17-40-002, 169 FERC ¶ 61,134 (JA ___). This was a final order disposing of all parties' outstanding claims.

On the Monday after the sixtieth day later, January 21, within the time allotted, Ms. Steck filed her Petition for Review in this Court (JA _____). The Court has original jurisdiction on review under 15 U.S.C. § 717r(b).

## STATUTES AND REGULATIONS

Pertinent statutes and regulations appear in Addendum 2 to this brief.

1

## STATEMENT OF ISSUES

Whether FERC acted arbitrarily and capriciously and in violation of the procedural requirements of the National Environmental Policy Act (NEPA) by ratifying the Environmental Assessment (EA) in the following respects.

1.(a) Did FERC define the purpose and need for the project on Spire's terms so that the project itself was the only viable alternative?

(b) Did FERC thereby improperly eliminate the "no action" alternative from consideration?

2. Did FERC violate NEPA's requirement to consider the indirect effects of the pipeline on the climate

(a) by denying that its approval of the pipeline was a cause of greenhouse gas emissions?

(b) by failing to take into account greenhouse gases released by the production and combustion of the gas transported by the pipeline?

3. Did FERC violate NEPA by failing to consider as cumulative impacts of the pipeline the effects on climate of any drilling for gas, of other pipelines or of consumption of gas beyond the immediate area of the Spire STL pipeline?

2

## STATEMENT OF THE CASE

Spire STL Pipeline LLC applied to FERC on Jan. 26, 2017 for permission to build a 24-inch diameter pipeline through three western Illinois counties, crossing the Mississippi River into St. Charles County, Missouri, then crossing the Missouri River to its terminus in St. Louis County, Missouri. (Certificate Order, PP 1, 6; JA ____). Spire amended its application on April 21, 2017. The original Application proposed to use an existing 20-inch pipeline in St. Louis County called Line 888. Spire now sought approval for a new 24-inch line to be called the North County Extension, which would shorten the entire project from 66 miles to 65. Amended Application, pp. 1–2, 8 (JA ___–____, ___).

Spire held an open season that resulted in only one subscriber for capacity on the pipeline — Spire's St. Louis affiliate utility Spire Missouri (Certificate Order P 10, JA ____), formerly Laclede Gas (Application 13; JA ___; Certificate Order 1, fn. 4, JA ____). Enable Mississippi River Transmission ("MRT"), which protested the project, had 87% of Spire's upstream transportation capacity under contract for its own pipeline. (Certificate Order 1, P 1; p. 2, P 4; p. 6, P 17; JA ____, ____, ____). Spire conceded there was no new demand to be served (Certificate Order 48, P 107; JA ____).

The northern terminus of the line in Illinois connects to the Rockies Express Pipeline (REX), giving Spire access to supply basins farther to the west

and east (Application p. 5; JA ___) including the Marcellus and Utica basins (Certificate Order 21, P 50; JA ____).

The southern terminus of the line is the Chain of Rocks meter and regulation station which also serves as the interconnection point for the MRT and Laclede systems and a bidirectional delivery point for MRT (Amended Application 5–6, JA ___–___). The station sits on the same road where Ms. Steck lives one-half mile away (Standing Declaration, Addendum 1). At Chain of Rocks, Spire will receive "new gas supplies" and supplies from MRT that formerly went directly to Spire Missouri, and it will be able to deliver gas to MRT. (Certificate Order 4, P 8; JA ____). FERC overruled MRT's protest of the Chain of Rocks station (Certificate Order pp. 49–51; JA ____–____).

On Sept. 29, 2017, FERC Staff issued its Environmental Assessment (EA) for the project, setting a deadline of Oct. 30 for comments (JA ___). On Oct. 30 petitioner Juli Steck filed comments on the EA (JA ___) and a Motion to Intervene limited to the environmental issues, 18 CFR § 380.10(a)(1), (JA ___), which was granted by operation of rule, 18 CFR § 385.214(c)(1). Certificate Order p. 6, P 15 (JA ____).

The Purpose and Need of the project, as defined by Spire, was to transport gas to the St. Louis metropolitan region, linking it to "a new supply of gas." The pipeline would add diversity and reliability of supply to the St. Louis area, where

4

87% of the supply then came from the existing Enable MRT system. (EA 2, 146; JA ___, ___). The EA states that FERC "does not direct the development of the gas industry's infrastructure regionally or on a project-by-project basis, or redefine an applicant's stated purpose." EA 3 (JA ___).

The first criterion in formulating alternatives to the project is given by the EA as "ability to meet the Project's stated objective." The EA defines the objectives as providing transportation service, enhancing reliability, diversifying supply and avoiding the New Madrid Seismic Zone in southeastern Missouri (EA 146; JA ____). The other criteria were "technical and economic feasibility and practicality" and "significant environmental advantage over the proposed action." *Id*.

NEPA requires an environmental document to consider a "no-action alternative." The EA began its discussion of this alternative by saying, "If the Commission were to deny Spire's application, the Project would not be built and the environmental impacts identified in this EA would not occur." It added that "The concerns expressed by commenters about the Project purpose are beyond the scope of this environmental document." It concluded:

> Under the no-action alternative, other natural gas transmission
> companies could propose to construct other facilities with the
> intent to increase reliability of service in the St. Louis market

area. Such actions could result in impacts similar to or greater than the proposed Project, and would not meet the Project's objectives within the proposed time frames. Therefore, we have concluded that the no-action alternative would not satisfy the stated Project objectives, and we do not recommend it.

(EA 147–8; JA ____–__).

The EA devised a set of alternatives consisting of three "system alternatives" using existing pipeline systems (EA 148; JA ____); two "major route alternatives" to the east and west of Spire's route (EA 151; JA ____); and two minor "route variations" for the Mississippi River crossing (EA 154–6; JA ____–__). The EA concluded, however, that the three existing pipelines would require capacity increases or other upgrades that could have greater environmental impacts (EA 150–1; JA ____–__), as would the major route alternatives (EA 151–4; JA ____–__), while the Mississippi River Route Variation "does not provide an environmental advantage to the proposed route" (EA 155; JA ____).

The EA's discussion of climate change is located in the Cumulative Impacts section, B.10.9. It does not discuss the impact of the project itself, however, but only the potential for climate impacts in the project "area." This part of the EA consisted of a set of bullet points summarizing observations of effects in the Midwest drawn from the U.S. Global Change Research Program (EA 143–4, 180;

JA ____–__, ____). But there was no discussion of cumulative impacts. Instead, the EA pivoted away from them by saying, "Our analysis presents the direct and indirect GHG emissions associated with construction and operation of the projects" (EA 143–4; JA ____-_). It concluded that the majority of the gas supplied by the Spire STL would replace existing supplies and therefore "we do not anticipate that the end-use would represent new GHG emissions" (EA 144–5; JA ____–__).

Greenhouse gas (GHG) emissions are relegated to the air quality section B.8.1, which notes that while U.S. EPA classifies GHG as pollutants there is no federal regulation for them, but they would anyway only be emitted "during operation of construction equipment" (EA 110–11; JA ____–__). These emissions are estimated at 15,195.83 tons per year of carbon-dioxide equivalent[2] (EA 113; JA ____). On this basis the EA reckoned that it had assessed the "direct and indirect GHG emissions associated with construction and operation." To this it added an estimate of 7.7 million tons of CO2 per year for the "downstream," end-use combustion of all the gas to be delivered by the pipeline, but then negated this finding on the ground that the project was supposed to replace existing supply rather than add new gas so that there was no downstream impact (EA 144–5 (JA ____–__).

---

[2] CO2e, *i.e.* the global warming potential of CO2 and the equivalent potential of the other greenhouse gases methane (CH4) and nitrous oxide (N2O) expressed as multiples of the CO2 potential, which is defined as 1 (EA 111; JA ____).

Petitioner Steck filed comments on the EA which took issue with its treatment of purpose and need for the project, rejection of the no-action alternative, the indirect effects of downstream combustion of the transported gas and upstream inducement of new gas production, and the cumulative effects of "fracking" and methane leaks (Comments pp. 1–8; JA ___–__). The Commission in its Certificate Order (pp. 84–9, 97–104) ratified the EA on these points (JA ____–__, ____–__) and authorized the pipeline by a 3–2 vote. Ms. Steck timely filed a Request for Rehearing (JA ____) which FERC denied for the same reasons it gave in the Certificate Order (Order on Rehearing pp. 25–36; JA ____–__).

## SUMMARY OF ARGUMENT

FERC's treatment of the environmental effects of this project was arbitrary and capricious under NEPA and the Administrative Procedure Act in the following respects.

FERC impermissibly defined the purpose and need for the project as Spire's desire, thus making the selection of the project inevitable even though, given Spire's admission that it did not need new pipeline capacity, the "no action" alternative could otherwise have been selected.

FERC denied that its role in granting certificates of public convenience and necessity (CPCNs) to pipelines was a causal factor in the greenhouse gas effects,

8

although the effects of natural gas production and consumption at every level from local to national would not occur without FERC's authorization of pipelines.

FERC erroneously found that the only GHG effects were from construction of the pipeline and denied that the "upstream" effects of gas production and the "downstream" effects of combustion of the gas transported by the pipeline were indirect effects of the project despite the pipeline being an essential link in the supply chain.

The Commission arbitrarily and capriciously excluded greenhouse gases from cumulative impacts by giving an extremely narrow geographic scope to the project and finding as a result that there were no related projects or cumulative emissions.

## STANDING

Ms. Steck lives one-half mile from the Chain of Rocks meter and regulation station at the southern end of the pipeline (Declaration of Standing, Addendum 1). The station is a large industrial installation on her street, in an area that is otherwise residential or wooded, and is an eyesore and a traffic safety hazard.

Construction of the pipeline and station interfered with Ms. Steck's use and enjoyment of her property and with her aesthetic and recreational use of Spanish Lake Park, where she hikes and kayaks.

9

Aesthetic and recreational harm bestows standing on Ms. Steck. *Sierra Club v. FERC,* 827 F.3d 59, 66 (D.C. Cir. 2016). So do the impacts from construction, *Sierra Club v. FERC,* 827 F.3d 36, 44 (D.C. Cir. 2016), and the ongoing safety risk. *City of Boston Delegation v. FERC,* 897 F.3d 241, 250 (D.C. Cir. 2018). This holds true even though her objections to the EA were directed primarily at the greenhouse gas analysis. *WildEarth Guardians v. Jewell,* 738 F.3d 298, 306–7 (D.C. Cir. 2013).

A NEPA violation is a procedural injury. Causation for standing purposes requires a link between the deficient EA and a substantive government decision, and a further link between that decision and the petitioner's harm. Both links are present because NEPA analysis was a necessary condition to FERC's issuance of the CPCN, which in turn led to Ms. Steck's injury. 738 F.3d at 308; 827 F.3d at 44.

Vacating FERC's Certificate Order would specifically redress the inadequacy of the EA. *Jewell,* 738 F.3d at 307–8; *Sierra Club,* 827 F.3d at 44. Ms. Steck has shown the essential elements of (1) injury in fact (2) traceable to the agency action (3) that is likely to be redressed by a favorable decision. *Sierra Club,* 827 F.3d 59, 65.

Standing must exist throughout the litigation. The pipeline has been built and placed in service. FERC cannot moot Ms. Steck's standing by its own action in confining her request for rehearing and her motion for stay under a tolling order;

10

furthermore, the existence of the pipeline is immaterial to her procedural injury under NEPA. *Moreau v. FERC,* 982 F.2d 556, 565–6 (D.C. Cir. 1993).

## ARGUMENT

### I.     Standard of Review

The Court overturns an agency decision under NEPA only if it is arbitrary and capricious, an abuse of discretion, or if the agency has failed to satisfy the procedural requirements of the statute. The Court does not substitute its judgment for FERC's but must be assured that FERC's decision is reasoned, principled and based on the record and the relevant factors, and not on a clear error in judgment. *Myersville Citizens for a Rural Community v. FERC,* 783 F.3d 1301, 1308 (D.C. Cir. 2015). Review is under the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.* NEPA requires the agency to take a "hard look" at the environmental effects of its proposed action. *WildEarth Guardians v. Jewell,* 738 F.3d at 308.

### II.     FERC improperly adopted the applicant's statement of purpose and need and thus inevitably rejected the no-action alternative.

NEPA requires a statement of purpose and need for a project. 40 CFR § 1502.13. From this the agency performing the NEPA review derives a set of reasonable alternatives against which to compare the project. 40 CFR § 1502.14. An Environmental Assessment "Shall include brief discussions of the need for the

proposal [and] of alternatives as required by section 102(2)(E),"[3] 40 CFR §
1508.9(b). A mandatory alternative to consider is "no action" — the status quo. §
1502.14(d).

Ms. Steck raised these requirements as a single issue (Comments, JA ____–
__) because they are intertwined. Reasonable alternatives must be defined against a
baseline, but to accept the applicant's desire as that baseline "would seem to bias
the process." Instead the purpose and need are determined by "the objectives of the
federal action;" they are the agency's objectives, not the applicant's. *City of
Alexandria v. Slater,* 198 F.3d 862, 867 (D.C. Cir. 1999). The agency should take
into account the needs and goals of the applicant but must define its own goals,
which may be found in the statement of purpose and need. *Citizens Against
Burlington v. Busey,* 938 F.2d 190, 196 (D.C. Cir. 1991).

### A.    FERC violated NEPA by substituting Spire's need for its own purpose and need.

Spire applied for a certificate of public convenience and necessity (CPCN)
under the Natural Gas Act, 15 U.S.C. § 717f(c), for which it defined its own need
for the pipeline. FERC's Certificate Order summarized it:

Spire states that its proposed pipeline is intended to connect the

St. Louis area to competitively priced and productive natural

---

[3] 42U.S.C. § 4332(2)(E).

gas supply areas in the eastern and western United States…
which, in turn, will increase the reliability of Spire Missouri's
system and the security of its supply, as well as result in access
to lower-priced gas supplies. (JA ____)

FERC's objectives are admittedly different; as it summarizes its Certificate Policy

Statement in the Certificate Order, P 26 (JA ____):

The Commission's goal is to give appropriate consideration to
the enhancement of competitive transportation alternatives, the
possibility of overbuilding, subsidization by existing customers,
the applicant's responsibility for unsubscribed capacity, the
avoidance of unnecessary disruptions of the environment, and
the unneeded exercise of eminent domain in evaluating new
pipeline construction.

Environmental protection is missing from Spire's statement of need.

The EA is deficient because FERC staff unabashedly adopted Spire's

purpose, saying that FERC does not "redefine an applicant's stated purpose." (EA

2–3; JA ___–_). The Commission's Certificate Order says, "Courts have upheld

federal agencies' use of applicants' identified project purpose and need as the basis

for evaluating alternatives," but the cases it cites do not go that far (JA ____, P

209). In particular, this Court's *Busey* decision says, "the proposed alternative is

13

reasonable only if it will bring about the ends of the **federal** action," *i.e.* the agency's purpose, not the applicant's. 938 F.2d at 195 (emphasis added). The other case cited by FERC merely quotes *Busey* to the effect that the agency "may accord substantial weight to the preferences of the applicant." *City of Grapevine v. Dep't of Transportation,* 17 F.3d 1502, 1506 (D.C. Cir. 1994). It does not sanction FERC's abdication of its own standards and discretion.

FERC's Order on Rehearing says, "The EA adopted Spire STL's stated project purpose," and "the EA's statement of the purpose and need was defined appropriately to allow for the evaluation of reasonable alternatives" (JA ____, P 52). The Commission thus made its Staff's error its own.

**B.    FERC improperly rejected the no-action alternative by making it impossible for any alternative to replace Spire's project.**

The consequence of adopting the applicant's stated purpose is that no alternative will be acceptable. Ms. Steck focused her comments (p. 2) on the no-action alternative because, in light of Spire's claim that the pipeline was not needed to meet any new demand for gas, the status quo seemed "eminently viable" (JA ____).  The EA adopted Spire's purpose and rejected the no-action alternative because it would not meet Spire's objectives (EA 147–8; JA ____–__).

In both the Certificate Order (p. 89) and the Opinion on Rehearing (p. 29), FERC rejected the no-action alternative because, while it would avoid any adverse

environmental effects, it would not meet the project's needs (JA ____, ____). This is exactly what NEPA forbids. In the judgment of the two dissenting commissioners, LaFleur and Glick, there was no demonstrated need for the pipeline and consequently the majority had not adequately considered the no-action alternative (JA 124/7, 132–3/8–9)

This Court said in *Busey,* 938 F.2d at 196, "Yet an agency may not define the objectives of its action in terms so unreasonably narrow that only one alternative from among the environmentally benign ones in the agency's power would accomplish the goals of the agency's action, and the EIS would become a foreordained formality." Deferring to the applicant's purpose is the ultimate in an unreasonably narrow alternative "that compels the selection of a particular alternative." *Theodore Roosevelt Conservation Partnership v. Salazar,* 661 F.3d 66, 73 (D.C. Cir. 2011). The no-action alternative may not assume the existence of the very project being proposed. *Friends of Yosemite Valley v. Kempthorne,* 520 F.3d 1024, 1037–8 (9th Cir. 2008); *North Carolina Wildlife Federation v. N.C. Dep't of Transportation,* 677 F. 3d 596, 599–600, 603 (4th Cir. 2012).

In the Certificate Order and the Order on Rehearing, FERC accused Ms. Steck and other commenters, including the Environmental Defense Fund (EDF), of confusing purpose and need under NEPA with public need under the Natural Gas Act (JA P210, P 53). It was FERC that was confused. Ms. Steck highlighted

15

Spire's proclaimed absence of demand for more gas in the St. Louis region as a reason to adopt the no-action alternative under NEPA, not as failing to show "public need" for a certificate of public convenience and necessity under the NGA.[4] The statement in the EA that, "The concerns expressed by commenters about the Project purpose are beyond the scope of this environmental document," is therefore wrong (EA 148; JA____).

The EA correctly gave the purpose of the no-action alternative: "If the Commission were to deny Spire's application, the Project would not be built and the environmental impacts identified in this EA would not occur." The no-action alternative is the world as it is, without the environmental harms of the proposed action.

But on the following page the EA assimilated the no-action alternative to Spire's version of need: "Under the no-action alternative, other natural gas transmission companies could propose to construct other facilities with the intent to increase reliability of service in the St. Louis market area. Such actions could result in impacts similar to or greater than the proposed Project, and would not meet the Project's objectives within the proposed time frames." (EA 147–8; JA

---

[4] To be clear, EDF, the petitioner for review in the consolidated case No. 20-1016, has consistently taken a different approach than Ms. Steck by raising the issue that Spire failed to show public need under the NGA because Spire's demonstration of need for a CPCN was based solely on an affiliate agreement. Ms. Steck has raised only NEPA issues.

\_\_\_\_–\_.) If the result of the no-action alternative is the same as the result of the

project, then there has been no consideration of no action.

In *WildEarth Guardians v. BLM,* 870 F.3d 1222, 1234–38 (10th Cir. 2017),

the court found a NEPA violation where the BLM made a "perfect substitution

assumption" that if it did not lease the lands in question, the same amount of coal

would be mined elsewhere in the region; "the blanket assertion that coal would be

substituted from other sources, unsupported by hard data, does not provide

'information sufficient to permit a reasoned choice' between the preferred

alternative and no action alternative." *Id.* at 1235. FERC made the same mistake

here. The EA speculated on what would happen in the absence of the Spire STL

instead of comparing it to the no-action alternative.

Once FERC adopted Spire's purpose as its own, it was a foregone

conclusion that it would approve the pipeline. This is a plain violation of NEPA.

*National Parks & Conservation Ass'n v. BLM,* 606 F.3d 1058, 1072 (9th Cir.

2010); *Friends of Yosemite Valley v. Kempthorne,* 520 F.3d 1024, 1037–8.

## III.   FERC failed to consider the indirect effects, both "upstream" and "downstream," of its approval of the Spire STL pipeline.

A pipeline is not entire in itself. Metaphorically it is part of a stream that

commences with gas supply (upstream) and terminates with the end-use

combustion of that gas (downstream). The pipeline is a mere conduit. Ms. Steck

17

faulted the EA for failing to consider the real effects of the pipeline (Comments pp. 3, 5–6; JA ____, ____–_).

NEPA defines the indirect effects of an action as those that "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 CFR 1508.8(b).

The EA denied that these effects even existed, saying that greenhouse gases would be emitted only during construction (EA 110–11; JA ____–__). It did go on to estimate downstream emissions but nullified that datum by finding that the Spire STL "would be replacing, not adding to, other fuel sources" (EA 144–5; JA ____–_). FERC said that there would be no new emissions or that they would be too "nebulous" to be foreseeable (Cert. Order 103; JA ____).

## A.    FERC denied its own causative role in creating the indirect effects.

FERC went farther than the EA and denied that its approval of the pipeline was even a cause of GHG emissions. "To be clear, the Commission only has jurisdiction over the pipeline applicant, whose sole function is to transport gas from and to the contracted for delivery and receipt points" (Certificate Order 101–2; JA ____–_). "A causal relationship sufficient to warrant Commission analysis of the non-pipeline activity as an indirect impact would only exist if the proposed pipeline would transport new production from a specified production area and that

production would not occur in the absence of the proposed pipeline (i.e., there will be no other way to move the gas)" (Certificate Order 100, P 251; JA ____).

FERC does not even say who the causative actor is unless it is Spire itself — an untenable grant of self-permitting. The Commission says that neither Spire nor the states could know exactly where the gas was coming from (Certificate Order 101, 102 fn. 399: JA ____–__). Apparently no one is responsible; emissions just happen. In response to Ms. Steck's Request for Rehearing (p. 4; JA ____), FERC referred to its "limited statutory authority over the relevant actions" as an excuse to duck the issue (Order on Rehearing 30 P 59; JA ____).

FERC drew on liquefied natural gas export cases where the Court found that FERC was not the cause of the effects because the Department of Energy has the sole authority to license LNG export facilities. *EarthReports Inc. v. FERC,* 828 F.3d 949, 955 (D.C. Cir. 2016); and two *Sierra Club v. FERC* cases, 827 F.3d 59, 68; and 827 F.3d 36, 49 (D.C. Cir 2016)(Certificate Order p. 99, fn. 386; JA ____).

The Court distinguished both those cases in *Sierra Club v. FERC,* 867 F.3d 1357, 1373 (D.C. Cir. 2017), the *Sabal Trail* pipeline case, holding that, "Because FERC could deny a pipeline certificate on the ground that the pipeline would be too harmful to the environment, the agency is a 'legally relevant cause' of the direct and indirect environmental effects of pipelines it approves." In agreement with *Sabal Trail* is *Birckhead v. FERC,* 925 F.3d 510, 519 (D.C. Cir. 2019). FERC

also relied on *Dep't of Transportation v. Public Citizen,* 541 U.S. 752, 770, 124 S.Ct. 2204, 159 L.Ed.2d 60 (2004), which holds that an agency is not a legally relevant cause when it has "limited statutory authority over the relevant actions." That is not an apt description of FERC's authority over pipeline construction.

**B.     FERC arbitrarily and capriciously denied that the production and combustion of the gas flowing through the pipeline were indirect effects.**

The EA betrayed a misunderstanding of the scope of NEPA when it said that the only GHG releases from the project would occur during construction. The Commission in its Certificate Order went to greater lengths to rebut Ms. Steck's comments and reached the sweeping conclusion: "Accordingly, the potential increase of GHG emissions associated with the production, processing, distribution, or consumption of gas are not indirect impacts of the Spire STL Pipeline Project" (p. 104; JA ____).

In the context of an EA, an agency must examine the relevant data and articulate a satisfactory explanation for its action, one that rationally connects the facts found to the choice made. *Birckhead v. FERC,* 925 F.3d at 515.

Like the EA, the Certificate Order, P 253, concluded, "we do not find that approval of the Spire STL Pipeline Project will spur additional identifiable gas consumption" (JA ____). But the fact that the pipeline's gas may displace another

20

supply does not excuse the Commission from estimating downstream emissions. *Birckhead,* 925 F.3d at 518–9; *Sabal Trail,* 867 F.3d at 1374–5. The insistence that the Spire STL is not intended to meet new incremental demand obscures the fact that it is intended to displace the existing supplier, Enable MRT (Cert. Order 4, JA ____). MRT will have to find new buyers. The Spire STL will also expand Spire's capacity by replacing the 20-inch Line 888 pipeline with 24-inch pipe (Cert. Order 2–3 and fn. 9; JA ____–__). It will also deliver gas to MRT (Certificate Order 4, P 8; JA ____).

The EA gave an estimate of downstream GHG emissions (7.7 million tons of $CO_2$ per year, JA p144) which the Commission ignored. The Certificate Order concluded there would be no new emissions or that they were too "nebulous" to be foreseeable (Cert. Order 103; JA ____). These conclusions, in the face of a GHG emissions estimate and FERC's own finding that the Spire STL will access new gas supplies (Cert. Order 4 P 11; JA ____), do not resolve contradictions in the record but are arbitrary and capricious. *WildEarth Guardians v. BLM,* 870 F.3d 1222, 1235 (10th Cir. 2017).

No more than one of the following statements from the EA and the Certificate Order can be true: there will be no indirect emissions, there will be downstream emissions of 7.7 million metric tons per year of carbon-dioxide, or the emissions are too nebulous to estimate.

21

An agency cannot, for example, rely on a production estimate while claiming that the estimate is too speculative. *Citizens for a Healthy Community v. BLM,* 377 F.Supp.3d 1223, 1237 (D. Colo. 2019); *Wilderness Workshop v. BLM,* 342 F.Supp.3d 1145, 1155–6 (D. Colo. 2018). FERC must resolve contradictions in the record, not exploit them by reaching inconsistent conclusions in the hope that one of them will stick.

Combustion of gas from a pipeline is an indirect effect, indeed the entire purpose of the pipeline. *Sabal Trail,* 867 F.3d at 1372. Upstream production is a "growth inducing effect" included in the definition of an indirect effect. 40 CFR § 1508.8(d). "The Spire STL will directly induce new production because existing wells will not feed the pipeline for its lifetime, which may be 50 years." (Viel Comments p. 5; JA ___). Furthermore, the "no effect" conclusion of the EA and Certificate Order "is unsupported by any evidence that any portion of the existing supply or pipeline network will go out of service as a result of the Spire STL Pipeline" (Viel Request for Rehearing 5; JA ____).

The Spire STL will add, not merely replace, capacity, and as new infrastructure it will prolong the GHG effects of gas production and consumption for many years. FERC therefore failed to take the requisite "hard look." *South Fork Band Council of Western Shoshone v. Dep't of Interior,* 588 F.3d 718, 725–6 (9th Cir. 2009), holding that even without an increase in the rate of ore shipping, mine

expansion would lead to 10 additional years of shipments and associated environmental effects above the no-action scenario.

## IV.    FERC arbitrarily and capriciously failed to acknowledge, much less discuss, the cumulative effects of the pipeline.

"*Cumulative impact* is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 CFR § 1508.7. This definition seems custom-made for climate change, to which even the largest individual contribution seems minor but collectively a myriad of actions takes on crisis proportion.

The intensity or severity of impact is judged in part by "Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts." 40 CFR § 1508.27(b)(7).

The EA considered cumulative impacts to be solely those associated with similar projects in the same area and within the same timespan (EA 132, JA ____).

23

Under the heading of cumulative impacts from climate change in § 10.9, it offered a list of "observations" of GHG-induced changes in the Midwest, mostly those already experienced along with some projections of continuing trends, but instead of discussing them the EA only said, "Our analysis presents the direct and indirect GHG emissions associated with construction and operation of the projects" (EA 143–4; JA ____-_). Discussing other effects is an odd way to discuss cumulative effects.

> The sole effort to address them in FERC's Certificate Order is footnote 401: The requirement that an impact must be "reasonably foreseeable" to be considered in a NEPA analysis applies to both indirect and cumulative impacts. To the extent that Ms. Viel argues that the upstream effects are cumulative impacts, we disagree. There is nothing in the record that demonstrates such upstream effects are reasonably foreseeable or within the geographic scope of the proposed action. (JA 103 )

Ms. Viel's comments addressed both upstream and downstream GHG emissions and in particular the more greenhouse gas-intensive production method of hydraulic fracturing ("fracking") based on Spire's demonstrated interest in the Marcellus and Utica shale formations in the Appalachian basin (Comments 1, 7–8; JA ____, ____–_). Her request for rehearing took issue with the Commission's

24

narrow view of climate effects: "The global nature of global warming does not release the agency from the duty of assessing the cumulative impacts of its actions" (JA pp.5–6).

The Order on Rehearing made a belated attempt to put some meat on FERC's barebones response in the Certificate Order. It drew an extremely narrow geographic scope for the project (*e.g.* a 0.25 mile radius for air impacts, no specified range for climate impacts) and concluded (JA OR34–5):

> We note that Ms. Viel identifies no specific locations within the Spire Project's geographic scope where additional production will occur as a result of the Spire Project, and believe that her failure to do so only highlights the speculative nature of the inquiry she advocates. Accordingly, we continue to believe that broadly analyzing effects related to upstream production using generalized assumptions will not assist us in making a reasoned decision regarding the siting of proposed natural gas pipelines.

Simple conclusory statements of "no impact" in an EA, without signs of reasoned decisionmaking, are arbitrary and capricious. *Delaware Riverkeeper Network v. FERC,* 753 F.3d 1304, 1313, 1319–20 (D.C. Cir. 2014). The EA in this case did not even rise to that level; it offered only a list of Midwestern climate impacts with no finding or discussion at all. At least that list pointed in the

direction of wider, regionwide effects, but FERC refused to take the hint and instead assigned an extremely narrow geographic scope to the project.

An agency may not isolate a project and view it in a vacuum but must consider reasonably foreseeable effects outside the planning area, including interregional effects. *Grand Canyon Trust v. FAA,* 290 F.3d 339, 342 (D.C. Cir. 2002). An EA must consider the enduring and ongoing cumulative effects of past actions. *American Rivers v. FERC,* 895 F.3d 32, 55 (D.C. Cir. 2018).

It may be important to know the source of gas in the context of liquefied natural gas exports, which depend on international price-competitiveness. *Sierra Club v. Dep't of Energy,* 867 F.3d 189, 210 (D.C. Cir. 2017). But in the domestic market with its "interconnected pipeline system covering these [lower 48] states," *id.* at 211, squinting at maps to determine the exact source of future gas supplies amounts to refusal to see the forest for the trees.

The entire national natural gas pipeline network cumulatively contributes to the climate crisis. The definition in 40 CFR § 1508.7 extends to "other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."

In this case FERC did not discuss, indeed it ruled out of bounds, any analysis of the cumulative effects of all these incremental additions to the greenhouse gas burden. "The impact of greenhouse gas emissions on climate

change is precisely the kind of cumulative impacts analysis that NEPA requires

agencies to conduct;" the increments are individually minor but collectively

significant. *Center for Biological Diversity v. NHTSA,* 538 F.3d 1172, 1216–7 (9th

Cir. 2008).

      FERC could have (in fact the EA did) estimated the incremental effect of the

pipeline by assuming end-use combustion of the amount of gas delivered by the

pipeline, as the Court said in *Sabal Trail,* 867 F.3d at 1374.

      The cumulative sources and effects of GHG are regional, national and

global. *Wilderness Workshop v. BLM,* 342 F.Supp.3d 1145, 1157 (D. Colo. 2018).

(The agency got a pass in that case, *id.* at 1158, because the regional management

plan in issue was much more preliminary than a pipeline CPCN, the impacts of

which are more foreseeable.) There are sources available for assessing global

effects such as the Assessment Reports of the Intergovernmental Panel on Climate

Change. *Montana Environmental Information Center v. Office of Surface Mining,*

274 F.Supp.3d 1074, 1095 (D. Mont. 2017). Evaluating the global consequences of

action within the U.S. is not a forbidden extraterritorial application of NEPA. *EDF*

*v. Massey,* 986 F.2d 528, 533 (D.C. Cir. 1993).

      "The harms associated with climate change are serious and well

recognized." *Massachusetts v. EPA,* 549 U.S. 497, 521, 127 S.Ct. 1438, 167

L.Ed.2d 248 (2007). "Agencies, like legislatures, do not generally resolve massive

problems in one fell regulatory swoop." *Id.* at 524. The cumulative effect of GHG

emissions associated with natural gas is not negligible. FERC should not be

allowed to keep its eyes closed to the gravest environmental result of its actions.

## CONCLUSION

Ms. Steck asks the Court to remand the case to the Commission for the

preparation of a revised EA or, as necessary, a full EIS, *CBD v. NHTSA,* 538 F.3d

at 1227; and to vacate the CPCN as being "fatally infected" by the NEPA

deficiencies. *American Rivers v. FERC,* 895 F.3d 32, 55 (D.C. Cir. 2018).

Respectfully submitted,

/s/ Henry B. Robertson
Henry B. Robertson
Great Rivers Environmental Law Center
319 N. Fourth St., Suite 800
St. Louis, Missouri 63102
Tel. (314) 231-4181
Fax (314) 231-4184
hrobertson@greatriverslaw.org

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation in this Court's Briefing Schedule because this brief contains 6,340 words, excluding the parts of the brief exempted by FRAP 32(a)(7)(B) and D.C. Cir. Rule 32(e)(1). Microsoft Office 2016 computed the word count.

This brief complies with the typeface requirements of FRAP 32(a)(5) and the type style requirements of FRAP 32(a)(6) because this brief has been prepared in a proportionally spaced typeface (Microsoft Word 2010 Times New Roman) in 14-point font.

/s/ Henry B. Robertson
Henry B. Robertson


**CERTIFICATE OF SERVICE**

I hereby certify that on June 26, 2020, I electronically filed the foregoing Petitioner's Opening Brief with the Clerk of the Court by using the appellate CM/ECF System and served copies of the foregoing via the Court's EM/ECF system on all ECF-registered counsel.

/s/ Henry B. Robertson
Henry B. Robertson

29

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

JULI VIEL,                                          )
            Petitioner,                             )
                                                    )
            v.                                      )    No. 20-1017, consolidated with
                                                    )    20-1016 (lead case)
FEDERAL ENERGY REGULATORY            )
COMMISSION,                                         )
            Respondent;                             )

### DECLARATION OF JULI STECK

My name is Juli Steck, formerly Juli Viel. I am over the age of 18,
competent to testify, and have personal knowledge of the facts set forth in this
declaration. Under penalty of perjury I declare the following.

1. I live at 885 Prigge Road in Spanish Lake, an unincorporated community
in northeastern St. Louis County, Missouri, near the confluence of the Missouri
and Mississippi Rivers.

2. I first became aware of the Spire STL pipeline in late 2016, when I
learned that it would run past my house, where I was living then and have lived
ever since. I now know that there was a 20-inch Laclede Gas pipeline called line
888 across the street that Spire was going to expand to 24 inches. Laclede Gas is
now part of Spire.

3. At that time I wrote a letter to the Secretary of FERC to express my opposition to the pipeline due to the urgent crisis of climate change, and how continued burning of natural gas and other fossil fuels would raise global temperatures to a level that endangered human well-being. I also expressed concern about the damage that would be done by a leak or explosion of the pipeline. This was entered as a scoping comment in the Spire STL case.

4. As it turned out, Spire changed the route so the pipeline does not run in front of my house. However, I am only half a mile from the southern end of the pipeline at the Chain of Rocks station, which is on Prigge Road. I took the following picture with my cell phone on June 8, 2020.



5. It is not easy to get a frontal view from the road because the station sits between two 90-degree bends in Prigge Road. These are blind curves with the

station blocking the view, and in my opinion a potential safety hazard. The station and its grounds occupy all of the short distance between the two bends. Across the street is a tangle of vegetation, so I took the picture from my car.

6. The immediate area is residential but there is no street grid, just Prigge Road itself and a couple of cul de sacs off it. Otherwise it is largely a wooded area, as you may be able to tell better from this picture that I also took on June 8, 2020.



7. They cut trees to build the station. Spire has five acres at the site; about half an acre is fenced. There's a slope on the east side towards the river with a high retaining wall. This piece of infrastructure is not in keeping with the character of my neighborhood. It is a looming eyesore and a traffic hazard. I have to pass the

3

station every time I go east. The only north-south through street between me and

the Mississippi River is Riverview Drive, which I can only reach by Prigge Road. I

use this route about three times a week. I took this picture showing the view from

the southeast:



8. I experienced the noise, dust, diesel fumes and traffic stops from

construction both at home and in Spanish Lake Park.

9. The pipeline was built through Spanish Lake Park. I hike on the trails in

the park about once a week and sometimes kayak on Sunfish Lake. Spire drilled

under the lake to lay the pipe. This interfered with my use and enjoyment of the

park. They parked construction vehicles on the parking lot, excavated under the

lake, and put plates and boards on the neighboring roads.

10. I realize the pipeline is finished. This is because FERC sat on my

rehearing request and motion for stay until construction was done. I feel that FERC

4

did not properly consider the environmental issues. They showed no concern for

the environmental damage and the harm it will cause to us in the future. They seem

to think their job is to approve pipelines, so they gave it a rubber stamp. If the court

sends the case back to FERC so that they will have to reconsider and confront their

environmental obligations, this would still give me some redress even if Spire

didn't have to dig up the pipeline.

11. Since my decree of divorce became final, my legal name is Juli Steck,

but I am the same person formerly known as Juli Viel.

I declare, under penalty of perjury, that the foregoing declaration is true and

accurate to the best of my knowledge.

Executed at: *St. Louis, Missouri*

Dated: *6/19/2020*      *Juli Steck*

Juli Steck

5

# ADDENDUM 2

# STATUTES AND REGULATIONS

## TABLE OF CONTENTS

**Statutes**

15 U.S.C. §717f(c) ........................................................................................1

15 U.S.C. § 717r ...........................................................................................2

42U.S.C. § 4331 ............................................................................................5

42U.S.C. § 4332 ............................................................................................6

**Code of Federal Regulations**

18 CFR § 380.10 ...........................................................................................8

18 CFR § 385.214(c) .....................................................................................9

40 CFR § 1502.13 .........................................................................................9

40 CFR § 1502.14 .........................................................................................9

40 CFR § 1508.7 .........................................................................................10

40 CFR § 1508.8 .........................................................................................10

40 CFR § 1508.9(b) .....................................................................................10

40 CFR § 1508.27 .......................................................................................11

# Natural Gas Act

## 15 U.S.C.A. § 717f. Construction, extension, or abandonment of facilities

* * *

(c) Certificate of public convenience and necessity

(1)(A) No natural-gas company or person which will be a natural-gas company upon completion of any proposed construction or extension shall engage in the transportation or sale of natural gas, subject to the jurisdiction of the Commission, or undertake the construction or extension of any facilities therefor, or acquire or operate any such facilities or extensions thereof, unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations: Provided, however, That if any such natural-gas company or predecessor in interest was bona fide engaged in transportation or sale of natural gas, subject to the jurisdiction of the Commission, on February 7, 1942, over the route or routes or within the area for which application is made and has so operated since that time, the Commission shall issue such certificate without requiring further proof that public convenience and necessity will be served by such operation, and without further proceedings, if application for such certificate is made to the Commission within ninety days after February 7, 1942. Pending the determination of any such application, the continuance of such operation shall be lawful.

(B) In all other cases the Commission shall set the matter for hearing and shall give such reasonable notice of the hearing thereon to all interested persons as in its judgment may be necessary under rules and regulations to be prescribed by the Commission; and the application shall be decided in accordance with the procedure provided in subsection (e) of this section and such certificate shall be issued or denied accordingly: Provided, however, That the Commission may issue a temporary certificate in cases of emergency, to assure maintenance of adequate service or to serve particular customers, without notice or hearing, pending the determination of an application for a certificate, and may by regulation exempt from the requirements of this section temporary acts or operations for which the issuance of a certificate will not be required in the public interest.

(2) The Commission may issue a certificate of public convenience and necessity to a natural-gas company for the transportation in interstate commerce of natural gas used by any person for one or more high-priority uses, as defined, by rule, by the Commission, in the case of--

(A) natural gas sold by the producer to such person; and

(B) natural gas produced by such person.

(d) Application for certificate of public convenience and necessity

Application for certificates shall be made in writing to the Commission, be verified under oath, and shall be in such form, contain such information, and notice thereof shall be served upon such interested parties and in such manner as the Commission shall, by regulation, require.

(e) Granting of certificate of public convenience and necessity

Except in the cases governed by the provisos contained in subsection (c)(1) of this section, a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operation, sale, service, construction, extension, or acquisition covered by the application, if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of this chapter and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, sale, operation, construction, extension, or acquisition, to the extent authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied. The Commission shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require.

## § 717r. Rehearing and review

(a) Application for rehearing; time

Any person, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any person unless such person shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

(b) Review of Commission order

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the court of appeals of the United States for any circuit wherein the natural-gas company to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of Title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings, which is supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of Title 28.

(c) Stay of Commission order

The filing of an application for rehearing under subsection (a) shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

(d) Judicial review

(1) In general

The United States Court of Appeals for the circuit in which a facility subject to section 717b of this title or section 717f of this title is proposed to be constructed, expanded, or operated shall have original and exclusive jurisdiction over any civil action for the review of an order or action of a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit, license, concurrence, or approval (hereinafter collectively referred to as "permit") required under Federal law, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.).

(2) Agency delay

The United States Court of Appeals for the District of Columbia shall have original and exclusive jurisdiction over any civil action for the review of an alleged failure to act by a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit required under Federal law, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.), for a facility subject to section 717b of this title or section 717f of this title. The failure of an agency to take action on a permit required under Federal law, other than the Coastal Zone Management Act of 1972, in accordance with the Commission schedule established pursuant to section 717n(c) of this title shall be considered inconsistent with Federal law for the purposes of paragraph (3).

(3) Court action

If the Court finds that such order or action is inconsistent with the Federal law governing such permit and would prevent the construction, expansion, or operation of the facility subject to section 717b of this title or section 717f of this title, the Court shall remand the proceeding to the agency to take appropriate action consistent with the order of the Court. If the Court remands the order or action to the Federal or State agency, the Court shall set a reasonable schedule and deadline for the agency to act on remand.

(4) Commission action

For any action described in this subsection, the Commission shall file with the Court the consolidated record of such order or action to which the appeal hereunder relates.

(5) Expedited review

The Court shall set any action brought under this subsection for expedited consideration.

## National Environmental Policy Act (NEPA; excerpts)

### 42 U.S.C.A § 4331. Congressional declaration of national environmental policy

(a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

(b) In order to carry out the policy set forth in this chapter, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may--

(1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

(2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;

(3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

(4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;

(5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

(6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

(c) The Congress recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment.

**42 U.S.C.A. § 4332. Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts**

The Congress authorizes and directs that, to the fullest extent possible:
 (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and
(2) all agencies of the Federal Government shall—
(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;
(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;
(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on--
(i) the environmental impact of the proposed action,
(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
(iii) alternatives to the proposed action,
(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;
(D) Any detailed statement required under subparagraph (C) after January 1, 1970, for any major Federal action funded under a program of grants to States shall not

be deemed to be legally insufficient solely by reason of having been prepared by a State agency or official, if:

(i) the State agency or official has statewide jurisdiction and has the responsibility for such action,

(ii) the responsible Federal official furnishes guidance and participates in such preparation,

(iii) the responsible Federal official independently evaluates such statement prior to its approval and adoption, and

(iv) after January 1, 1976, the responsible Federal official provides early notification to, and solicits the views of, any other State or any Federal land management entity of any action or any alternative thereto which may have significant impacts upon such State or affected Federal land management entity and, if there is any disagreement on such impacts, prepares a written assessment of such impacts and views for incorporation into such detailed statement.

The procedures in this subparagraph shall not relieve the Federal official of his responsibilities for the scope, objectivity, and content of the entire statement or of any other responsibility under this chapter; and further, this subparagraph does not affect the legal sufficiency of statements prepared by State agencies with less than statewide jurisdiction.1

(E) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

(F) recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

(G) make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

(H) initiate and utilize ecological information in the planning and development of resource-oriented projects; and

(I) assist the Council on Environmental Quality established by subchapter II of this chapter.

## Code of Federal Regulations, Federal Energy Regulatory Commission

**18 CFR § 380.10, Participation in Commission proceedings**

(a) Intervention proceedings involving a party or parties—

(1) Motion to intervene.

(i) In addition to submitting comments on the NEPA process and NEPA related documents, any person may file a motion to intervene in a Commission proceeding dealing with environmental issues under the terms of § 385.214 of this chapter. Any person who files a motion to intervene on the basis of a draft environmental impact statement will be deemed to have filed a timely motion, in accordance with § 385.214, as long as the motion is filed within the comment period for the draft environmental impact statement.

(ii) Any person that is granted intervention after petitioning becomes a party to the proceeding and accepts the record as developed by the parties as of the time that intervention is granted.

(2)(i) Issues not set for trial-type hearing. An intervenor who takes a position on any environmental issue that has not yet been set for hearing must file a timely motion with the Secretary containing an analysis of its position on such issue and specifying any differences with the position of Commission staff or an applicant upon which the intervenor wishes to be heard at a hearing.

(ii) Issues set for trial-type hearing.

(A) Any intervenor that takes a position on an environmental issue set for hearing may offer evidence for the record in support of such position and otherwise participate in accordance with the Commission's Rules of Practice and Procedure. Any intervenor must specify any differences from the staff's and the applicant's positions.

(B) To be considered, any facts or opinions on an environmental issue set for hearing must be admitted into evidence and made part of the record of the proceeding.

(iii) Commission pre-filing activities commenced under §§ 157.21 and 50.5 of this chapter, respectively, are not considered proceedings under part 385 of this chapter and are not open to motions to intervene. Once an application is filed under part 157 subpart A or part 50 of this chapter, any person may file a motion to intervene in accordance with §§ 157.10 or 50.10 of this chapter or in accordance with this section.

(b) Rulemaking proceedings. Any person may file comments on any environmental issue in a rulemaking proceeding.

8

**18 CFR § 385.214, Intervention**
* * *
(c) Grant of party status.
(1) If no answer in opposition to a timely motion to intervene is filed within 15 days after the motion to intervene is filed, the movant becomes a party at the end of the 15 day period.
(2) If an answer in opposition to a timely motion to intervene is filed not later than 15 days after the motion to intervene is filed or, if the motion is not timely, the movant becomes a party only when the motion is expressly granted.

## Code of Federal Regulations, Council on Environmental Quality

**40 CFR § 1502.13, Purpose and Need**
The statement shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action.

**40 CFR § 1502.14, Alternatives including the proposed action**

This section is the heart of the environmental impact statement. Based on the information and analysis presented in the sections on the Affected Environment (§ 1502.15) and the Environmental Consequences (§ 1502.16), it should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public. In this section agencies shall:
(a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.
(b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.
(c) Include reasonable alternatives not within the jurisdiction of the lead agency.
(d) Include the alternative of no action.
(e) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.
(f) Include appropriate mitigation measures not already included in the proposed action or alternatives.

## 40 CFR § 1508.7, Cumulative Impact

Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

## 40 CFR § 1508.8, Effects

Effects include:
(a) Direct effects, which are caused by the action and occur at the same time and place.
(b) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.
Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

## 40 CFR § 1508.9, Environmental Assessment

Environmental assessment:
(a) Means a concise public document for which a Federal agency is responsible that serves to:
(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.
(2) Aid an agency's compliance with the Act when no environmental impact statement is necessary.
(3) Facilitate preparation of a statement when one is necessary.
(b) Shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

## 40 CFR § 1508.27, Significantly

Significantly as used in NEPA requires considerations of both context and intensity:

(a) Context. This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant.

(b) Intensity. This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.