IN THE
# United States Court of Appeals
# for the District of Columbia Circuit

———————

ENVIRONMENTAL DEFENSE FUND,
Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION,
Respondent.

———————

On Petitions for Review of Orders
of the Federal Energy Regulatory Commission

———————

## MOTION OF INTERVENOR-RESPONDENTS
## SPIRE STL PIPELINE LLC AND SPIRE MISSOURI INC.
## FOR STAY OF THE MANDATE

———————

DANIEL ARCHULETA
TROUTMAN PEPPER HAMILTON
  SANDERS LLP
401 9th Street NW, Suite 1000
Washington, DC 20004
(202) 274-2926

SEAN P. JAMIESON
SPIRE STL PIPELINE LLC
3773 Richmond Avenue,
  Suite 300
Houston, TX 77046
(346) 308-7555

THEODORE B. OLSON
EUGENE SCALIA
AMIR C. TAYRANI
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue NW
Washington, DC 20036
(202) 955-8500

JONATHAN S. FRANKLIN
DAVID T. KEARNS
NORTON ROSE FULBRIGHT US LLP
799 9th Street NW, Suite 1000
Washington, DC 20001-4501
(202) 662-0466

*Counsel for Spire STL Pipeline LLC*

September 13, 2021

[Additional Counsel Listed On Inside Cover]

CHRISTOPHER J. BARR
POST & SCHELL, PC
601 14th Street NW, Suite 600
Washington, DC 20005
(202) 662-0466

MATTHEW J. APLINGTON
SPIRE MISSOURI INC.
700 Market Street, 6th Floor
St. Louis, MO 63101
(314) 342-0785

*Counsel for Spire Missouri Inc.*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................... iii

GLOSSARY ......................................................................................... v

INTRODUCTION AND BACKGROUND .............................................1

ARGUMENT ........................................................................................4

    I.   GOOD CAUSE EXISTS TO STAY THE MANDATE. ...........................4

          A.   A Stay Is Warranted Because FERC May Promptly Authorize The Continued Operation Of The Project By Granting Temporary Operating Authority Or A New Certificate Order. .......................................................6

          B.   A Stay Is Warranted Because Intervenors Will Be Filing A Petition For A Writ Of Certiorari Raising A Substantial Question For Supreme Court Review. .....................9

          C.   Immediate Vacatur Could Cause Significant Service Disruptions, With Devastating Consequences For The St. Louis Area. ................................................................13

               1.   The Project's Capacity Cannot Be Replaced..................15

               2.   Spire Missouri's Propane-Peaking Facilities Have Been Decommissioned. .................................................19

               3.   As Last Winter Showed, The Project Protects Against Disruptions In Other Producing Areas..............20

    II.  AT MINIMUM, THE COURT SHOULD WITHHOLD ISSUANCE OF THE MANDATE UNTIL TWENTY-ONE DAYS AFTER ENTRY OF ANY ORDER DENYING THIS MOTION. .........22

CONCLUSION ...................................................................................23

STATEMENT OF CONSENT ..............................................................25

CERTIFICATE OF COMPLIANCE.....................................................26

CERTIFICATE OF SERVICE .............................................................27

**EXHIBITS**

Exhibit 1:  FERC Notice of Application and Establishing Intervention Deadline

Exhibit 2:  Declaration of Scott Smith, President of Spire STL Pipeline LLC

Exhibit 3:  Various Letters of Support for Spire STL Pipeline LLC's Application for a Temporary Emergency Certificate or Limited-Term Certificate

Exhibit 4:  Response of the Missouri Public Service Commission to Spire STL Pipeline LLC's Application for a Temporary Emergency Certificate or Limited-Term Certificate

Exhibit 5:  Second Declaration of Scott Carter, President of Spire Missouri Inc.

# TABLE OF AUTHORITIES

Page(s)

CASES

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*,
781 F.3d 1271 (11th Cir. 2015) ..................................................11, 12

*Cement Kiln Recycling Coal. v. EPA*,
255 F.3d 855 (D.C. Cir. 2001) ..................................................5

*Cent. & South West Servs., Inc. v. EPA*,
220 F.3d 683 (5th Cir. 2000) ..................................................11

*Cent. Me. Power Co. v. FERC*,
252 F.3d 34 (1st Cir. 2001)..................................................11

*Columbia Falls Aluminum Co. v. EPA*,
139 F.3d 914 (D.C. Cir. 1998)..................................................5

*Envtl. Def. Fund v. FERC*,
2 F.4th 953 (D.C. Cir. 2021)......................................3, 7, 9, 10, 12, 22

*Idaho Farm Bureau Fed'n v. Babbitt*,
58 F.3d 1392 (9th Cir. 1995) ..................................................12

*Indep. U.S. Tanker Owners Comm. v. Dole*,
809 F.2d 847 (D.C. Cir. 1987)..................................................15

*Md. People's Counsel v. FERC*,
768 F.2d 1354 (D.C. Cir. 1985) ..................................................5

*NRDC v. EPA*,
808 F.3d 556 (2d Cir. 2015) ..................................................11

*Prometheus Radio Project v. FCC*,
824 F.3d 33 (3d Cir. 2016) ..................................................10

*Sierra Club v. FERC*,
867 F.3d 1357 (D.C. Cir. 2017)..................................................2, 5, 8

*Tex. Ass'n of Mfrs. v. CPSC*,
989 F.3d 368 (5th Cir. 2021) ..................................................10

*Town of Weymouth v. Mass. Dep't of Envtl. Prot.*,
    973 F.3d 143 (1st Cir. 2020) ................................................................. 12

## STATUTES

15 U.S.C. § 717f ............................................................................... 2, 6

## RULES

D.C. Cir. R. 41 ............................................................... 1, 4, 5, 9, 23

Fed. R. App. P. 41 ............................................................................. 5, 9

## OTHER AUTHORITIES

Cayla Harris, *Gov. Greg Abbott Mandates Natural Gas Producers Keep Supply in
    Texas Until Sunday*, Houston Chronicle (Feb. 17, 2021) ................................... 20

Travis Meier et al., *Kansas, Missouri Officials Urge Energy Conservation
    Following Round of Rolling Blackouts*, Fox 4 Kansas City (Feb. 15, 2021) ..... 21

*Order Regarding Further Investigation*, No. GO-2022-0022 (Mo. Pub. Serv.
    Comm'n Sept. 1, 2021) ................................................................. 14

*Staff's Investigation of Spire STL's Pipeline's Application at FERC for a
    Temporary Certificate to Operate*, No. GO-2022-0022 (Mo. Pub. Serv.
    Comm'n Aug. 16, 2021) ....................................................... 13, 14, 18

# GLOSSARY

| | |
|---|---|
| Certificate Order | Federal Energy Regulatory Commission's August 3, 2018 Order Issuing Certificates, 164 FERC ¶ 61,085 (2018), JA932 |
| Dth | Dekatherm |
| EDF | Environmental Defense Fund |
| FERC | Federal Energy Regulatory Commission |
| Intervenors | Spire Missouri Inc. and Spire STL Pipeline LLC |
| MoPSC | Missouri Public Service Commission |
| MRT | Enable Mississippi River Transmission LLC |
| Petitioners | Environmental Defense Fund and Juli Steck |
| Project | Spire STL Pipeline |
| Spire Missouri | Spire Missouri Inc. |
| Spire STL | Spire STL Pipeline LLC |

## INTRODUCTION AND BACKGROUND

Pursuant to Federal Rule of Appellate Procedure 41 and D.C. Circuit Rule 41(a)(2), Intervenor-Respondents Spire STL Pipeline LLC ("Spire STL") and Spire Missouri Inc. ("Spire Missouri," collectively "Intervenors") respectfully move this Court to stay issuance of its mandate until December 13, 2021, which is ninety days after the date on which the mandate would otherwise issue. *See* D.C. Cir. R. 41(b), (d)(2). If the mandate were to issue without a stay, it would result in the shutdown of a vital natural gas pipeline that could leave as many as 400,000 homes and businesses in the St. Louis area without gas service this winter. There is good cause for this Court to issue a stay because it would provide time for completion of ongoing administrative and judicial proceedings that can avert those potentially fatal consequences. Indeed, Petitioner Environmental Defense Fund ("EDF") identified a 90-day stay as an appropriate alternative to remand without vacatur when opposing Intervenors' petition for rehearing. *See* EDF Opp. to Rehearing at 14 n.5.

There are multiple reasons for this Court to issue a stay of the mandate. First, a stay is warranted so that FERC may complete its consideration of Spire STL's pending application for temporary operating authority before the issuance of this Court's mandate vacates the Certificate Order authorizing the operation of the Spire STL Pipeline (the "Project"). After this Court issued its opinion, Spire STL

promptly applied for temporary operating authority from FERC under 15 U.S.C. § 717f(c)(1)(B).  FERC is actively moving forward with that request and has set a deadline of October 5 for reply comments regarding the application.  *See* Ex. 1. Immediate vacatur would deprive FERC of the opportunity to complete its review of Spire STL's application *before* the Project is shut down and hundreds of thousands of St. Louis-area gas customers are subjected to the possibility of lengthy natural gas outages this winter.  As EDF has acknowledged, FERC is "the body with technical expertise concerning the natural gas system," and it "should be allowed to make decisions regarding that system in the first instance."  EDF Opp. to Rehearing at 16.

In a prior case, the Court granted a stay in similar circumstances after vacating FERC's approval of an operational pipeline, in order to provide FERC with sufficient time to complete ongoing agency proceedings that had the possibility of averting a shutdown.  *See* Order, *Sierra Club v. FERC*, No. 16-1329 (D.C. Cir. Mar. 7, 2018) (per curiam) ("*Sierra Club* Stay Order").  If the Court declined to grant similar relief here, Intervenors understand that this would become the first case in history where an order of this Court resulted in the shutdown of an operational natural gas pipeline.  Those unprecedented circumstances would raise a host of difficult legal questions because there are no regulations governing the

actions a pipeline operator must take when a pipeline is ordered to be shut down but may subsequently be re-authorized by FERC. In addition, substantial practical difficulties would result because shutting down and decommissioning the Project would necessitate steps that would make it impossible for Spire STL to resume operations for 10-12 weeks after receiving re-authorization. As a result, if FERC grants Spire STL's application after this Court's mandate has issued, the Project may still be unavailable for some, or all, of the upcoming winter. *See* Ex. 2, ¶ 6.

Moreover, although the Court vacated FERC's Certificate Order, it did not conclude that the record was insufficient to support FERC's ultimate conclusion that the Project was warranted by public convenience and necessity. *See Envtl. Def. Fund v. FERC*, 2 F.4th 953, 975 (D.C. Cir. 2021). Instead, the Court determined only that FERC failed adequately to "engage" with certain record evidence and "nonfrivolous arguments" made by Petitioners. *Id.* at 960. Thus, FERC remains free on remand to consider that evidence and argument, and to issue a new certificate order. Unlike an open-ended remand without vacatur, however, a time-limited 90-day stay of the mandate would provide FERC with a finite period in which to determine whether to reissue a certificate order before the mandate issues and the Project is shut down.

In addition, a stay of the mandate is warranted because Intervenors will be filing a petition for a writ of certiorari. That petition will ask the Supreme Court to decide whether remand without vacatur is the appropriate remedy where an agency decision could be corrected on remand and vacatur of the decision could have serious disruptive effects, which is a substantial question that has divided the circuits.

Accordingly, Intervenors respectfully request a 90-day stay of the mandate so that FERC has sufficient time to act on the application for temporary operating authority and/or conduct its remand proceedings, and so that Intervenors may seek review in the Supreme Court before the Certificate Order is vacated. In the absence of a stay, those administrative and judicial proceedings will be too late to avert the shutdown of the Project and the potentially catastrophic consequences of prolonged natural gas service disruptions in the St. Louis area this winter.

## ARGUMENT

## I.    GOOD CAUSE EXISTS TO STAY THE MANDATE.

A stay of the mandate will issue if there is "good cause for the relief sought." D.C. Cir. R. 41(a)(2). One type of good cause that the Court has repeatedly identified is avoiding the disruptive consequences of vacating an agency decision. Indeed, the Court has expressly invited parties to seek a temporary stay of the mandate to prevent the disruption that vacatur would cause. *See, e.g.,*

*Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 872 (D.C. Cir. 2001) (per curiam); *Columbia Falls Aluminum Co. v. EPA*, 139 F.3d 914, 924 (D.C. Cir. 1998).

In line with those statements, the Court has often issued stays to postpone the impact of a decision vacating agency action. *See, e.g.*, *Sierra Club* Stay Order; Order, *Waterkeeper All. v. EPA*, No. 09-1017 (D.C. Cir. Aug. 16, 2017) (per curiam); *Md. People's Counsel v. FERC*, 768 F.2d 1354, 1354 (D.C. Cir. 1985) (per curiam) (staying mandate to provide FERC time to address the Court's instructions on remand).

A stay of the mandate is materially different from, and narrower than, remand without vacatur. Whereas remand without vacatur leaves a challenged order in place until the agency acts again on remand, a stay of the mandate is limited to 90 days—or until resolution of a timely filed petition for a writ of certiorari—unless the period is extended for good cause. *See* D.C. Cir. R. 41(a)(2); Fed. R. App. P. 41(d)(2). Staying the mandate thus allows the agency to comply with the Court's decision before a disruptive vacatur takes effect, while simultaneously providing a time-limited incentive to act promptly.

A stay of the mandate is particularly appropriate here, where Intervenors have filed an application for temporary operating authority that FERC will likely

resolve promptly, this Court's decision did not foreclose FERC from issuing a new certificate order on remand, and Intervenors intend to file a petition for a writ of certiorari raising a substantial question for Supreme Court review. A time-limited stay will afford an opportunity for resolving those administrative and judicial proceedings before hundreds of thousands of St. Louis-area homes and businesses face the potentially dire consequences of a shutdown.

**A.  A Stay Is Warranted Because FERC May Promptly Authorize The Continued Operation Of The Project By Granting Temporary Operating Authority Or A New Certificate Order.**

Good cause exists for a stay because it would afford FERC the opportunity to review and rule upon Spire STL's pending application for temporary operating authority before this Court's mandate issues and the Project is shut down.

After this Court issued its opinion, Spire STL promptly sought temporary operating authority from FERC under 15 U.S.C. § 717f(c)(1)(B). FERC is actively considering that application. For example, less than two weeks after the application was filed, FERC issued detailed data requests to Spire STL, which responded on September 7. And, FERC has set a deadline of October 5 for interested parties to submit reply comments regarding the application. *See* Ex. 1. Spire STL's application has already garnered substantial support from a diverse array of interested parties, including the Governor, Lieutenant Governor, and Attorney General of Missouri; Missouri's Director of Economic Development;

several Missouri federal and state legislators; the mayors of St. Louis, Kansas City, and more than 40 other Missouri municipalities; and the United Steelworkers of America, District 11, among many others. *See* Ex. 3. Even the Missouri Public Service Commission ("MoPSC"), one of the protestors in the original FERC certificate proceeding, has filed comments *in support of* Spire STL's application for temporary operating authority. *See* Ex. 4. It is therefore quite possible that FERC will grant Spire STL's application for temporary operating authority at some point after the FERC reply comment deadline of October 5.

In addition, FERC will consider whether to issue a new certificate order granting Spire STL permanent operating authority. Given the evidence of need for the Project that is already in the record, *see* Intervenors' Br. 15-23—as well as the recent winter events confirming that the Project is needed to ensure a reliable, diversified source of natural gas to St. Louis-area homes and businesses, *see infra* 20-21—it is possible, if not probable, that FERC could remedy the deficiencies the Court identified and reissue a permanent certificate during the period of a stay. Indeed, although the Court found gaps in FERC's reasoning, it did *not* conclude that the record evidence was insufficient to support FERC's ultimate decision. *See Envtl. Def. Fund*, 2 F.4th at 975.

The Court has granted a stay in similar circumstances. In *Sierra Club v. FERC*, 867 F.3d 1357 (D.C. Cir. 2017), the Court vacated a certificate order for an operational pipeline and denied petitions for rehearing requesting that the Court amend its opinion to provide for remand without vacatur. Orders, *Sierra Club v. FERC*, No. 16-1329 (D.C. Cir. Jan. 31, 2018) (per curiam). The Court nevertheless agreed to stay its mandate—and to prevent an immediate shutdown of the pipeline—in order to provide FERC the necessary time to correct the errors identified by the Court and thereby authorize the pipeline's continued operation. *See Sierra Club* Stay Order.

As it did in *Sierra Club*, the Court should grant a stay here to afford FERC—the agency with acknowledged "technical expertise concerning the natural gas system," EDF Opp. to Rehearing at 16—an opportunity to grant temporary operating authority or a new certificate order *before* the shutdown of the Project creates a serious risk of significant service disruptions this winter.

Failing to grant a stay would create an unprecedented situation in which an operational pipeline is ordered to be shut down while FERC is deciding whether to grant temporary or permanent operating authority. If FERC grants re-authorization after this Court's mandate has issued, that order may come too late to avert serious natural gas shortages in the St. Louis area this winter because it would take Spire

STL 10-12 weeks to implement the necessary operational steps to allow the Project to resume shipping natural gas after it has been shut down and decommissioned. *See* Ex. 2, ¶ 8.

### B. A Stay Is Warranted Because Intervenors Will Be Filing A Petition For A Writ Of Certiorari Raising A Substantial Question For Supreme Court Review.

A stay of the mandate is also warranted to enable Intervenors to file a petition for a writ of certiorari with the Supreme Court, and for the Court to rule on that petition, before the issuance of this Court's mandate shuts down the Project. Intervenors' petition will "present a substantial question" as to whether remand without vacatur is the appropriate remedy where an agency could correct its errors on remand and vacatur of the agency's decision could cause serious disruption. Fed. R. App. P. 41(d)(1); *see also* D.C. Cir. R. 41(a)(2). The circuits are divided on that question, and this case provides an excellent opportunity for the Supreme Court—which has never considered the appropriate standard for remand without vacatur of agency action—to provide authoritative guidance on that issue.

According to the Court's opinion in this case, vacatur is required where it is "not at all clear" and "far from certain" that an agency could rehabilitate its reasoning even where vacatur would concededly result in at least "some disruption." *Envtl. Def. Fund*, 2 F.4th at 976. In the Court's view, the disruptive consequences of shutting down an operational pipeline had no bearing on the

appropriate remedy because the Court "identified serious deficiencies in the Certificate Order." *Id*.

The rule adopted by this Court thus effectively compels vacatur without full consideration of vacatur's disruptive effects even where an agency decision could be readily sustained on remand. Under the Court's "clear" or "certain" test, even the presence of record evidence that could remedy identified gaps in an agency's reasoning, and acknowledged disruption as a direct result of vacatur, will not warrant remand without vacatur. Indeed, the Court reasoned that remanding without vacatur was inappropriate because it would incentivize FERC to allow "build[ing] first and conduct[ing] comprehensive reviews later." *Envtl. Def. Fund*, 2 F.4th at 976 (citation omitted). That reasoning would *always* justify vacatur of completed projects whenever the Court finds an agency's review was inadequate, regardless of the prospects for error correction by the agency and vacatur's disruptive impact.

The Court's extraordinarily restrictive approach to granting remand without vacatur squarely conflicts with the decisions of other circuits. The Fifth Circuit, for example, has held that "[r]emand, not vacatur, is generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so." *Tex. Ass'n of Mfrs. v. CPSC*, 989 F.3d

368, 389 (5th Cir. 2021) (citing *Cent. & S.W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000)).  Thus, in the Fifth Circuit, "'[o]nly in 'rare circumstances' is remand for agency reconsideration *not* the appropriate solution.'"  *Id.* (emphasis added; citation omitted).

Similarly, the Third Circuit will not vacate where it is "conceivable" the agency "can, if given the opportunity, create a supportable rule" and vacatur risks "disruptive consequences." *Prometheus Radio Project v. FCC*, 824 F.3d 33, 52 (3d Cir. 2016).  Under the First Circuit's standard, vacatur is inappropriate if the agency "can probably" remedy its errors.  *Cent. Me. Power Co. v. FERC*, 252 F.3d 34, 48 (1st Cir. 2001).  And the Eleventh Circuit uses the same "not at all clear" language the Court used in this case, but in support of the *opposite* presumption: "where it is not at all clear that the agency's error incurably tainted the agency's decisionmaking process, the remedy of remand without vacatur is surely appropriate." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015).

Other circuits apply a more amorphous approach that it is still far more permissive that this Court's "certain" or "clear" test.  In particular, both the Second and Ninth Circuits apply an open-ended test in which they decline to vacate "'when equity demands'" that result.  *NRDC v. EPA*, 808 F.3d 556, 584 (2d Cir.

2015) (remanding without vacatur) (quoting *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995) (remanding without vacatur)).[1]

Under any of the standards discussed above—other than this Court's application of its "clear" or "certain" test—remand without vacatur would be the appropriate remedy because it is "conceivable," "possible," and, in fact, even "probable" that FERC could correct its errors in reasoning on remand and because vacatur could have profoundly disruptive consequences for hundreds of thousands of homes and businesses in the St. Louis area, an outcome that is far from equitable for those innocent nonparties. Yet this Court required vacatur in this case— *without* fully considering the massively disruptive consequences of vacatur— because it was not "clear" or "certain" to the Court that FERC could correct its reasoning on remand and because it believed FERC should be incentivized not to err in the future. *Envtl. Def. Fund*, 2 F.4th at 976.

---

[1] Some circuits treat this equitable balancing as a third factor to be considered in addition to the two *Allied-Signal* factors. *See Town of Weymouth v. Mass. Dep't of Envtl. Prot.*, 973 F.3d 143, 145-46 (1st Cir. 2020) (per curiam) (concluding that the "balance of equities and public interest considerations" favored remand without vacatur because vacatur would have meant a pipeline project would "be out of operation for most of the New England and Canadian winter heating season, when demand for natural gas in the region is at its peak and shortages most likely"); *Black Warrior Riverkeeper*, 781 F.3d at 1290.

It is therefore clear that the circuits are deeply divided over the appropriate standard for determining when agency action should be remanded with, or without, vacatur. This case is an ideal opportunity for the Supreme Court to resolve that important, recurring issue—which is arguably the most significant question of administrative law that has gone unaddressed by the Court in the 75 years since the enactment of the Administrative Procedure Act—because it squarely presents the issue for review and the choice among the circuits' competing standards for remand without vacatur would have an outcome-determinative effect in this case. A petition would thus present, at a minimum, a substantial question for the Supreme Court's review.

### C. Immediate Vacatur Could Cause Significant Service Disruptions, With Devastating Consequences For The St. Louis Area.

The far-reaching—and potentially life-threatening—real-world implications of immediate vacatur underscore that good cause exists for issuing a stay. As the attached declaration of Scott Carter demonstrates, if the Project is shut down before FERC has had an adequate opportunity to respond to Spire STL's temporary application or the Court's decision, and before the Supreme Court has had an opportunity to consider Intervenors' petition for a writ of certiorari, Spire Missouri will be unable to replace the lost gas supply, particularly during peak periods, potentially leading to serious service disruptions this winter. *See* Ex. 5.

After Intervenors filed their rehearing petition, a MoPSC staff investigation independently reached many of these same conclusions.[2] On August 16, 2021, the MoPSC staff, at the MoPSC's direction, issued a report confirming that (1) "Spire Missouri cannot reasonably reconfigure its system to replace or restore former capacity, or replace reliance on Spire STL for transportation before or during the Winter of 2021-2022"; (2) "Spire STL transportation services would be necessary if the planned peak demand occurs"; (3) "peak day service interruptions could be expected without access to Spire STL capacity"; (4) such days are "expect[ed]" in a "typical winter"; and (5) if "loss of service to a large number of customers occurs, it is not a trivial matter to restore service." Staff Report at 3, 7. The Staff Report also confirms that the Project provided "overall savings" during Winter Storm Uri, although lower than those calculated by Spire Missouri. *Id.* at 7-8. On September 1, the MoPSC accepted the staff's recommendation that Spire Missouri file monthly reports on, among other things, its ability to provide adequate gas supply and pressure to all customers for the next three winters.[3]

---

[2] *See Staff's Investigation of Spire STL's Pipeline's Application at FERC for a Temporary Certificate to Operate*, No. GO-2022-0022 (Mo. Pub. Serv. Comm'n Aug. 16, 2021), *available at* https://tinyurl.com/5rjr84ew ("Staff Report").

[3] *See Order Regarding Further Investigation*, No. GO-2022-0022 (Mo. Pub. Serv. Comm'n Sept. 1, 2021), *available at* https://tinyurl.com/2xerjcuk.

The massively disruptive consequences of immediate vacatur—which the MoPSC staff investigation confirms and EDF has never disputed in this proceeding, including in opposing rehearing—counsel strongly in favor of a stay.[4]

### 1. The Project's Capacity Cannot Be Replaced.

Since the Project began operation in 2019, the St. Louis-area natural gas market has undergone a dramatic reconfiguration as Spire Missouri and other market participants have restructured their contractual arrangements in light of the new supply the Project provides. If the Project is shut down immediately, its capacity and connectivity cannot be replaced before this winter, if at all.

Spire Missouri subscribed to the Project for additional capacity and to increase supply reliability for its customers. JA295-300. Nearly half that capacity was intended to replace operationally problematic propane-peaking facilities, which enabled Spire Missouri to satisfy periods of peak demand. JA295-96. The remainder provided an alternative to St. Louis's then-existing gas source, natural gas produced in the Midcontinent and surrounding regions and delivered through Enable Mississippi River Transmission LLC ("MRT").

---

[4] The disruptive consequences detailed below are reason enough for the Court to stay the mandate because even where, unlike here, an agency action cannot be sustained on remand, a stay of the mandate can provide critical time to manage and implement necessary changes in an orderly fashion. *See, e.g.*, *Indep. U.S. Tanker Owners Comm. v. Dole*, 809 F.2d 847, 854-55 (D.C. Cir. 1987).

Intervenors predicted to FERC that as Spire Missouri tapped into new natural gas supplies through the Project, MRT would likely remarket Spire Missouri's capacity to other shippers. JA829; JA834; JA593-94; JA976. These predictions were realized. When the Project began operating, Spire Missouri turned back about 180,000 Dekatherm ("Dth")/day of "firm" (contractually locked-in) MRT capacity and cancelled 170,000 Dth/day in upstream contracts that fed that capacity. *See* JA971-77; Ex. 5, ¶ 9. MRT, in turn, remarketed its firm Main Line capacity to other shippers. MRT's Main Line has virtually no firm capacity available for Spire Missouri to replace what it now receives through the Project, *see* JA593-94; JA976; Ex. 5, ¶ 38, and capacity available elsewhere also cannot replace what Spire Missouri previously received from MRT, Ex. 5, ¶¶ 39-41. Nor can Spire Missouri replace the additional 160,000 Dth/day needed for peak-day requirements, previously provided through the now-retired propane-peaking facilities. Ex. 5, ¶ 42.

The only significant capacity available to St. Louis is on MRT's East Line. But even if the supply available on that line were sufficient—and it is not, *id.* ¶ 41—that supply can now only be delivered through the Project to serve this area of Spire Missouri's system. As contemplated in the FERC proceeding, MRT abandoned and removed its Chain of Rocks interconnection, and now MRT's East

Line physically connects to Spire Missouri through the Project at the new Chain of Rocks interconnection. *See* JA933-35 & n.9; Ex. 5, ¶ 40. Thus, even if the East Line could replace the Project's capacity, Spire Missouri would not be able to access it without the Project to serve this area of its system. And Spire Missouri no longer has firm contracts for transportation upstream of the East Line and may be unable to re-secure that firm capacity. Ex. 5, ¶ 37. Issuing the mandate immediately, and thus shuttering the Project, therefore would put Spire Missouri and its customers in a far worse position than before.

The Project also produced other changes that were not fully appreciated until after it became operational. The Project's interconnection with a pipeline operated by an unaffiliated company has allowed Spire Missouri to supply high-pressure gas to suburban areas west of St. Louis experiencing increasing natural gas demand. Ex. 5, ¶ 12. Shutting down the Project would severely impair the reliability of natural gas service in those areas. To provide the pressure needed to supply those western areas without the Project, Spire Missouri would need, at a minimum, to make extraordinarily expensive improvements over many years. *Id.*

Spire Missouri also maintains storage capacity at its "Lange" storage facility that is a necessary resource to meet winter peak demand. *Id.* ¶ 11. But operations at Lange were modified to utilize the Project's high-pressure line, and replenishing

Lange through lower-pressure systems would be less efficient even if the capacity to do so were available, which it would not be without the Project. *See* JA934-35 & n.9; Ex. 5, ¶ 11. Thus, without the Project, Lange may not be reliably replenished during the winter season to provide gas when needed, potentially eliminating an additional 357,000 Dth/day of planned peak-day winter supply. Ex. 5, ¶ 11.

Accordingly, if the Project is shut down, Spire Missouri projects that it could not secure anywhere near the 350,000 Dth/day the Project currently provides to meet extreme cold weather demand. *Id.* ¶ 39. This means that approximately 175,000-400,000 homes and businesses served by Spire Missouri (from approximately 27% to 62% of all eastern Missouri customers) could lose gas service this winter. *Id.* ¶¶ 16, 18-19. Spire Missouri estimates it needs about 1,300,000 Dth/day to meet peak gas demand during extreme cold weather. *Id.* ¶ 17. Without the Project, and if Lange capacity is largely unavailable, Spire Missouri could meet less than half that demand. *Id.* Table 1. Even with Lange operating with adequate replenishment capability, Spire Missouri could not meet demand at average daily temperatures of 9° F, which St. Louis has experienced during four of the past five winters. *Id.* ¶ 20. If Lange storage is depleted, Spire Missouri could not even meet demand at temperatures as high as 38° F. *Id.* ¶ 21

And there is no question that Spire Missouri could not meet demand at the -10.6° F "peak" demand temperature it presently uses for planning purposes. *Id.* Despite best efforts, such weather would likely produce severe service losses, which could cause fatalities as customers—including elderly homeowners, nursing homes, and hospitals—lose heat. *Id.* ¶¶ 15, 28.

Moreover, as the MoPSC Staff Report confirms, disrupted gas service cannot simply be switched back on, but instead necessitates time-consuming, complicated restoration work. Staff Report at 7; Ex. 5, ¶¶ 23-26. Restoring service carries potentially fatal explosion risks and requires laborious site-by-site inspections and re-lighting procedures by trained technicians. Ex. 5 ¶¶ 23-24. Thus, homes and businesses could remain without heat, hot water, and cooking ability for a prolonged time as technicians work to restore service safely. *Id.* ¶ 26.

### 2. Spire Missouri's Propane-Peaking Facilities Have Been Decommissioned.

As mentioned, Spire Missouri's need for the Project stemmed in part from its business decision to decommission its propane-peaking facilities, which once supplied 160,000 Dth/day for peak-day requirements. JA89; JA134; JA295-96. Spire Missouri had multiple reasons for decommissioning those obsolete facilities, including environmental and operational concerns. JA110; JA830-32. Before FERC, it was undisputed that no existing pipeline, including MRT's, could replace

the propane facilities' capacity, thus requiring new infrastructure.  JA769-72; JA1019.

Accordingly, following Project approval, Spire Missouri decommissioned its propane facilities and repurposed their primary vaporization systems.  Ex. 5, ¶ 42. Those facilities can no longer supply peak capacity to Spire Missouri.  Bringing them back online would require rebuilding the primary vaporization systems, which cannot be done by this winter with any certainty.  *Id.*

### 3. As Last Winter Showed, The Project Protects Against Disruptions In Other Producing Areas.

Before FERC, Intervenors identified problems with then-existing supply pipelines, which overwhelmingly came from the Midcontinent and surrounding areas.  Those included reliability concerns from "regional events such as supply freeze offs … or extreme cold … weather [that could] create significant regional price spikes," which the Project's alternative supply would avoid.  JA833.

Those exact events occurred last winter, confirming the wisdom of Spire Missouri's decision to diversify its gas supplies.  Freezing weather in Texas disrupted gas supplies and hugely increased their cost; in response, Texas banned the out-of-state shipment of gas that could be used for Texas power generation. *See* Cayla Harris, *Gov. Greg Abbott Mandates Natural Gas Producers Keep Supply in Texas Until Sunday*, Houston Chronicle (Feb. 17, 2021),

https://tinyurl.com/3brwnanr.  As a result, Kansas City, only 200 miles away from St. Louis but without access to the Project and the diversified gas sources it supplied, experienced skyrocketing prices.  *See* Travis Meier et al., *Kansas, Missouri Officials Urge Energy Conservation Following Round of Rolling Blackouts*, Fox 4 Kansas City (Feb. 15, 2021), https://tinyurl.com/8zxsnr76.

St. Louis customers experienced no such scarcity, due to the Project's sourcing of natural gas from other regions.  Spire Missouri estimates that, without the Project, up to 133,000 homes and businesses would have lost service in February 2021, or, alternatively, total gas costs for St. Louis-area customers would have increased by up to $300 million (assuming Spire Missouri would even have been able to serve all of its customers).  Ex. 5, ¶ 30.

Experience therefore shows that the Project served the exact need that Spire Missouri originally identified:  it provided alternative gas supplies allowing St. Louis to avoid disruptions from southern sources and largely justified its construction costs in February 2021 alone.  JA91.  But if the Project is shut down, St. Louis would be vulnerable again to those same disruptions.

*        *        *

In sum, there are compelling reasons for this Court to stay its mandate so that FERC has an opportunity to decide whether to grant temporary operating

authority or a new certificate order, and the Supreme Court has an opportunity to consider Intervenors' petition for a writ of certiorari, before the Project is shut down and hundreds of thousands of St. Louis-area homes and businesses are exposed to the risk of prolonged natural gas service disruptions this winter.

Although the Court's vacatur was motivated in part by its concern that leaving the Certificate Order in place would incentivize FERC to allow "build[ing] first and conduct[ing] comprehensive reviews later," *Envtl. Def. Fund*, 2 F.4th at 976 (citation omitted), that concern does not warrant immediate issuance of the mandate, with all the disruption that would result. If the Court temporarily stays its mandate for a period of 90 days—a time period that EDF itself has identified as appropriate under the circumstances, *see* EDF Opp. to Rehearing at 14 n.5—FERC will be under an automatic and effectively self-enforcing external deadline to decide whether to provide either temporary or permanent authorization for the Project to remain in operation. Any concerns about delay that might have weighed against remand without vacatur are therefore inapplicable to a time-limited stay of the mandate.

## II. AT MINIMUM, THE COURT SHOULD WITHHOLD ISSUANCE OF THE MANDATE UNTIL TWENTY-ONE DAYS AFTER ENTRY OF ANY ORDER DENYING THIS MOTION.

If the Court denies this motion, Intervenors respectfully request that the Court withhold issuance of its mandate until 21 days after entry of an order

denying this motion, which would allow the Supreme Court sufficient time to act in an orderly manner on an emergency stay application and permit FERC to determine the procedures that would govern the termination of service on the Project. Under this Court's rules, its mandate would ordinarily issue seven days after a denial of this motion. *See* D.C. Cir. R. 41(a)(1). If the motion is denied, Intervenors intend to renew it expeditiously before the Supreme Court. Given the exigencies of the case and what Intervenors believe will be the serious consequences of vacatur, Intervenors submit that it would be appropriate for the Court to stay its mandate for an additional two weeks to allow for a more orderly process before the Supreme Court.

## CONCLUSION

The Court should stay issuance of the mandate until December 13, 2021, with the stay continuing until final resolution of a timely filed petition for a writ of certiorari. In the alternative, if this motion is denied, the Court should withhold issuance of its mandate until 21 days after such denial, to give the Supreme Court a full opportunity to consider and rule on an application for an emergency stay.

Respectfully submitted,

/s/ Christopher J. Barr

CHRISTOPHER J. BARR
POST & SCHELL, PC
601 14th Street NW, Suite 600
Washington, DC 20005
(202) 662-0466

MATTHEW J. APLINGTON
SPIRE MISSOURI INC.
700 Market Street, 6th Floor
St. Louis, MO 63101
(314) 342-0785

*Counsel for Spire Missouri Inc.*

/s/ Theodore B. Olson

THEODORE B. OLSON
EUGENE SCALIA
AMIR C. TAYRANI
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue NW
Washington, DC 20036
(202) 955-8500
tolson@gibsondunn.com

JONATHAN S. FRANKLIN
DAVID T. KEARNS
NORTON ROSE FULBRIGHT US LLP
799 9th Street NW, Suite 1000
Washington, DC 20001-4501
(202) 662-0466

DANIEL ARCHULETA
TROUTMAN PEPPER HAMILTON SANDERS LLP
401 9th Street NW, Suite 1000
Washington, DC 20004
(202) 274-2926

SEAN P. JAMIESON
SPIRE STL PIPELINE LLC
3773 Richmond Avenue, Suite 300
Houston, TX 77046
(346) 308-7555

September 13, 2021

*Counsel for Spire STL Pipeline LLC*

## STATEMENT OF CONSENT

Pursuant to D.C. Circuit Rule 32(a)(2), I certify that Christopher J. Barr, counsel for Spire Missouri Inc., has consented to my filing this brief on behalf of his client.

/s/ Theodore B. Olson
Theodore B. Olson

September 13, 2021                    Counsel for Spire STL Pipeline LLC

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limitations of Fed. R. App. P. 27(d)(2) because it contains 5,197 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This document complies with the typeface requirements of Fed. R. App. P. 32(f) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman typeface.

/s/ Theodore B. Olson
Theodore B. Olson

September 13, 2021                    Counsel for Spire STL Pipeline LLC

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing document with the

Clerk of Court for the United States Court of Appeals for the District of Columbia

Circuit by using the appellate CM/ECF system on September 13, 2021.  Service

upon participants in the case who are registered CM/ECF users will be

accomplished by the appellate CM/ECF system.

/s/ Theodore B. Olson
Theodore B. Olson

September 13, 2021                          Counsel for Spire STL Pipeline LLC

**Exhibit 1**

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Spire STL Pipeline LLC                                    Docket No. CP17-40-007

NOTICE OF APPLICATION AND ESTABLISHING INTERVENTION DEADLINE

(August 6, 2021)

Take notice that on July 26, 2021, Spire STL Pipeline, LLC (Spire), 700 Market Street, St. Louis, Missouri 63101, filed an application under section 7(c)(1)(B) of the Natural Gas Act (NGA),[1] and Part 157 of the Commission's regulations[2] requesting that the Commission issue a temporary certificate of public convenience and necessity for the Spire STL Pipeline Project (STL Pipeline)[3] to assure maintenance of service to Spire's customers while the Commission addresses the issues on remand from the U.S. Court of Appeals for the District of Columbia Circuit's June 22, 2021 decision in *Environmental Defense Fund v. FERC*.[4]  In the alternative, Spire requests that the Commission issue a limited-term certificate, extending through the remand proceedings.

In addition to publishing the full text of this document in the Federal Register, the Commission provides all interested persons an opportunity to view and/or print the contents of this document via the internet through the Commission's Home Page (http://ferc.gov) using the "eLibrary" link.  Enter the docket number excluding the last three digits in the docket number field to access the document.  At this time, the Commission has suspended access to the Commission's Public Reference Room, due to the proclamation declaring a National Emergency concerning the Novel Coronavirus Disease (COVID-19), issued by the President on March 13, 2020.  For assistance, contact the Federal Energy Regulatory Commission at FERCOnlineSupport@ferc.gov or call toll-free, (886) 208-3676 or TYY, (202) 502-8659.

---

[1] 15 U.S.C. § 717f(c)(1)(B) (2018).

[2] 18 C.F.R § 157.17 (2020).

[3] *Spire STL Pipeline LLC*, 164 FERC ¶ 61,085 (2018) (Certificate Order), *order amending certificate*, 169 FERC ¶ 61,074, *order on reh'g*, 169 FERC ¶ 61,134 (2019) (Rehearing Order).

[4] *Environmental Defense Fund v. FERC*, 2 F.4th 953 (D.C. Cir. 2021).

Any questions regarding the proposed project should be directed to Sean P. Jamieson, General Counsel, Spire STL Pipeline LLC, 3773 Richmond Ave., Suite 300, Houston, Texas 77046 or by phone at (346) 308-7555 or email at Sean.Jamieson@SpireEnergy.com.

## PUBLIC PARTICIPATION

There are two ways to become involved in the Commission's review of this application:  you can file comments on Spire's application, and you can file a motion to intervene in the proceeding.  There is no fee or cost for filing comments or intervening. The deadline for filing a motion to intervene is 5:00 p.m. Eastern Time on **September 7, 2021**.

### Comments

Any person wishing to comment on Spire's application may do so.  Comments may include statements of support or objections to the application.  You are also encouraged to review the data request issued by the Commission in this proceeding on August 6, 2020, and include  in your filing any comments responding to the questions raised in the data request.[5]  The deadline for submitting initial comments is **September 7, 2021, with reply comments due by October 5, 2021.**

There are three methods you can use to submit your comments to the Commission. In all instances, please reference the project docket number (CP17-40-007) in your submission.

(1)     You may file your comments electronically by using the eComment feature, which is located on the Commission's website at www.ferc.gov under the link to Documents and Filings.  Using eComment is an easy method for interested persons to submit brief, text-only comments on a project;

(2)     You may file your comments electronically by using the eFiling feature, which is located on the Commission's website (www.ferc.gov) under the link to Documents and Filings.  With eFiling, you can provide comments in

---

[5] This document is available on eLibrary under the following accession number: 20210806-3036.  To view this document visit: https://elibrary.ferc.gov/eLibrary/filedownload?fileid=15841891

a variety of formats by attaching them as a file with your submission. New eFiling users must first create an account by clicking on "eRegister." You will be asked to select the type of filing you are making; first select "General" and then select "Comment on a Filing"; or

(3)     You can file a paper copy of your comments by mailing them to the following address below. Your written comments must reference the Project docket number (CP17-40-007).

> To mail via USPS, use the following address:
> Kimberly D. Bose, Secretary
> Federal Energy Regulatory Commission
> 888 First Street NE
> Washington, DC 20426
>
> To mail via any other courier, use the following address:
> Kimberly D. Bose, Secretary
> Federal Energy Regulatory Commission
> 12225 Wilkins Avenue
> Rockville, MD 20852

The Commission encourages electronic filing of comments (options 1 and 2 above) and has eFiling staff available to assist you at (202) 502-8258 or FercOnlineSupport@ferc.gov.

The Commission considers all comments received about the project in determining the appropriate action to be taken. **However, the filing of a comment alone will not serve to make the filer a party to the proceeding.** To become a party, you must intervene in the proceeding. For instructions on how to intervene, see below.

### **Interventions**

Any person, which includes individuals, organizations, businesses, municipalities, and other entities,[6] has the option to file a motion to intervene in this proceeding. Only intervenors have the right to request rehearing of Commission orders issued in this proceeding and to subsequently challenge the Commission's orders in the U.S. Circuit Courts of Appeal.

---

[6] 18 C.F.R. § 385.102(d).

To intervene, you must submit a motion to intervene to the Commission in accordance with Rule 214 of the Commission's Rules of Practice and Procedure[7] and the regulations under the NGA[8] by the intervention deadline for the project, which is **September 7, 2021**.  As described further in Rule 214, your motion to intervene must state, to the extent known, your position regarding the proceeding, as well as your interest in the proceeding.  For an individual, this could include your status as a landowner, ratepayer, resident of an impacted community, or recreationist.  You do not need to have property directly impacted by the project in order to intervene.  For more information about motions to intervene, refer to the FERC website at https://www.ferc.gov/resources/guides/how-to/intervene.asp.

There are two ways to submit your motion to intervene.  In both instances, please reference the project docket number (CP17-40-007) in your submission.

(1)    You may file your motion to intervene by using the Commission's eFiling feature, which is located on the Commission's website (www.ferc.gov) under the link to Documents and Filings.  New eFiling users must first create an account by clicking on "eRegister."  You will be asked to select the type of filing you are making; first select "General" and then select "Intervention."  The eFiling feature includes a document-less intervention option; for more information, visit https://www.ferc.gov/docs-filing/efiling/document-less-intervention.pdf.; or

(2)    You can file a paper copy of your motion to intervene, along with three copies, by mailing the documents to the address below.  Your motion to intervene must reference the project docket number (CP17-40-007).

> To mail via USPS, use the following address:
> Kimberly D. Bose, Secretary
> Federal Energy Regulatory Commission
> 888 First Street NE
> Washington, DC 20426
>
> To mail via any other courier, use the following address:
> Kimberly D. Bose, Secretary
> Federal Energy Regulatory Commission
> 12225 Wilkins Avenue
> Rockville, MD 20852

---

[7] 18 C.F.R. § 385.214.

[8] 18 C.F.R. § 157.10.

The Commission encourages electronic filing of motions to intervene (option 1 above) and has eFiling staff available to assist you at (202) 502-8258 or FercOnlineSupport@ferc.gov.

Motions to intervene must be served on the applicant either by mail or email at: 3773 Richmond Ave., Suite 300, Houston, Texas 77046 or at Sean.Jamieson@SpireEnergy.com.

Any subsequent submissions by an intervenor must be served on the applicant and all other parties to the proceeding. Contact information for parties can be downloaded from the service list at the eService link on FERC Online. Service can be via email with a link to the document.

All timely, unopposed[9] motions to intervene are automatically granted by operation of Rule 214(c)(1).[10] Motions to intervene that are filed after the intervention deadline are untimely, and may be denied. Any late-filed motion to intervene must show good cause for being late and must explain why the time limitation should be waived and provide justification by reference to factors set forth in Rule 214(d) of the Commission's Rules and Regulations.[11] A person obtaining party status will be placed on the service list maintained by the Secretary of the Commission and will receive copies (paper or electronic) of all documents filed by the applicant and by all other parties.

## TRACKING THE PROCEEDING

Throughout the proceeding, additional information about the project will be available from the Commission's Office of External Affairs, at **(866) 208-FERC**, or on the FERC website at www.ferc.gov using the "eLibrary" link as described above. The eLibrary link also provides access to the texts of all formal documents issued by the Commission, such as orders, notices, and rulemakings.

In addition, the Commission offers a free service called eSubscription which allows you to keep track of all formal issuances and submittals in specific dockets. This can reduce the amount of time you spend researching proceedings by automatically providing you with notification of these filings, document summaries, and direct links to

---

[9] The applicant has 15 days from the submittal of a motion to intervene to file a written objection to the intervention.

[10] 18 C.F.R. § 385.214(c)(1).

[11] 18 C.F.R. § 385.214(b)(3),(d).

the documents.  For more information and to register, go to www.ferc.gov/docs-filing/esubscription.asp.

**Intervention Deadline: 5:00 pm Eastern Time on September 7, 2021.**

Debbie-Anne A. Reese,
Deputy Secretary.

**Exhibit 2**

# IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| Environmental Defense Fund, et al. | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Nos. 20-1016 and 20-1017 |
| | ) | (consolidated) |
| Federal Energy Regulatory | ) | |
| Commission, | ) | |
| | ) | |
| Respondent. | ) | |

## DECLARATION OF SCOTT SMITH

1.    My name is Scott Smith, and I am President of Spire STL Pipeline LLC ("Spire STL").  Spire STL is a natural-gas company, as defined by the Natural Gas Act, 15 U.S.C. § 717a(6), which operates a 65-mile-long interstate natural gas pipeline system ("STL Pipeline") that extends from an interconnection with Rockies Express Pipeline LLC ("REX") in Scott County, Illinois, to interconnections with MoGas Pipeline, LLC ("MoGas") in St. Charles County, Missouri, and Spire Missouri Inc. ("Spire Missouri") and Enable Mississippi River Transmission, LLC ("MRT") in St. Louis County, Missouri.  My business address is 3773 Richmond Ave, Suite 300, Houston, Texas 77046.  I have over thirty years of energy industry experience that includes asset operations, business development, marketing and trading, market analysis, energy asset valuation and optimization, business strategy development, and gas processing operations, at Spire STL and

1

other companies throughout the United States. I earned a B.S. in Chemical Engineering from the University of Texas at Austin and an M.B.A. from Southern Methodist University. I oversee the construction and operation of the STL Pipeline and I am very familiar with Spire STL's system and its operations.

2. Spire STL is regulated by the Federal Energy Regulatory Commission ("FERC"), which provided Spire STL with authority to construct, operate, and maintain the STL Pipeline, pursuant to a certificate of public convenience and necessity. The FERC certificate includes the authority for Spire STL to access right-of-way along the pipeline route as needed to construct, operate, and maintain the STL Pipeline.

3. If the Court issues a mandate that vacates the FERC certificate, Spire STL will have no authority to operate and maintain the STL Pipeline. Spire STL is seeking a temporary certificate from FERC, which would allow Spire STL to continue operating the STL Pipeline and to maintain the right-of-way, including for safety and integrity purposes, in the event its current FERC certificate is vacated. Spire STL's application for a temporary certificate is currently pending before FERC in Docket No. CP17-40-007.

**Purpose of Declaration and Summary of Conclusions**

4. The purpose of this Declaration is to inform the U.S. Court of Appeals for the District of Columbia Circuit of the potential disruption and safety impacts

in the event the STL Pipeline were to cease operations even temporarily due to a loss of certificate authority, and the steps required to restart operations and maintenance if Spire STL reacquires FERC authorization to operate the STL Pipeline.

5.    I am aware of no precedent for shutting down an operational natural gas pipeline due to a vacated certificate where there remains a possibility that FERC may issue either a temporary or permanent certificate soon thereafter. It therefore is not clear exactly what steps would need to occur upon issuance of the D.C. Circuit's mandate. Neither FERC's regulations nor those of the Pipeline and Hazardous Materials Safety Administration ("PHMSA") contemplate shutting down a pipeline that may be deemed necessary in the public interest in the near future. As a result, Spire STL may need to work with FERC and PHMSA to respond to the issuance of the D.C. Circuit's mandate in a way that balances concerns regarding safety, impacts to the environment, and impacts to ratepayers.

6.    That said, if the D.C. Circuit does not stay its mandate and FERC has not issued a temporary or permanent certificate before the mandate issues, Spire STL would likely have to take the following steps to ensure the safety of the pipeline, which could preclude recommissioning and restarting the pipeline before the 2021-22 winter heating season.

7.     If Spire STL loses its certificate authority, and FERC has not yet issued a temporary certificate or limited-term certificate, Spire STL will lose the right to enter the pipeline right-of-way along portions of the pipeline. Without access to these areas of the right-of-way, Spire STL would lose the ability to monitor the integrity of the pipeline, which is necessary to ensure safety and compliance with pipeline safety regulations issued by PHMSA. Of particular importance, Spire STL would be unable to ensure the pipeline is not damaged, vandalized, or sabotaged. Therefore, in order to ensure the safety of people, property, and the environment, Spire STL would need to undertake decommissioning activities including purging the pipeline of natural gas. As I describe in more detail below, ceasing operations and decommissioning the pipeline would take an estimated 6-12 weeks to plan and execute.

8.     If FERC issues a temporary certificate or reissues a certificate of public convenience and necessity authorizing operation of the STL Pipeline after the pipeline has been decommissioned, it would take Spire STL an estimated 10-12 weeks to recommission and restart operation of the pipeline. If Spire STL is required to partially or fully decommission and then recommission the STL Pipeline, the STL Pipeline may not be operational during all or parts of the 2021-2022 winter heating season that begins November 1, 2021.

9.     Therefore, it is essential that Spire STL be permitted to maintain service on the STL Pipeline while FERC considers Spire STL's request for a temporary emergency certificate and the Court's order on remand.

**Spire STL Will Be Forced to Halt Safety and Restoration Activities**

10.     If Spire STL loses its certificate authority, Spire STL would lose the right to enter certain portions of the right-of-way along the pipeline route. Spire STL would, therefore, lose the ability to perform certain tasks on the pipeline that are necessary to ensure safety and compliance with the pipeline safety regulations issued by PHMSA.

11.     Specifically, Spire STL would lose the ability to perform leakage surveys, test its cathodic protection test stations, perform line location services in response to planned excavation activities, and monitor the pipeline for potential vandalism or sabotage. *See* 49 C.F.R. §§ 192.706, 192.465, 192.614. Furthermore, Spire STL would not be able to complete any repair work, if needed, on the pipeline at a location where Spire STL would not be able to enter the right-of-way.

12.     In addition, Spire STL is in the process of restoring land following pipeline construction. Without certificate authority, landowners may seek to prevent Spire STL from performing that work, which would cause a greater impact to the environment.

13.     As a result, if Spire STL loses its certificate authority, in order to ensure the safety of people, property, and the environment, Spire STL would need to decommission and purge the pipeline of natural gas, as described below.

**Steps Required to Cease Operations and Shut Down the STL Pipeline**

14.     If the Court issues its mandate before FERC issues a temporary certificate or acts on remand and reissues a certificate of public convenience and necessity for the STL Pipeline, Spire STL would be forced to take steps to shut down the STL Pipeline and ensure the safety of the right-of-way.[1]  If that happens, Spire STL may be required to take the following actions:

15.     If Spire STL does not have a certificate, it cannot transport natural gas.  Spire STL would need to develop and execute a depressurization and flare procedure to remove gas from the pipeline.  This will ensure that any vandalism or sabotage done to the pipeline while Spire STL lacks access to monitor the right-of-

---

[1]     While it is my understanding that PHMSA's pipeline safety regulations do not specify the steps a pipeline must take upon losing certificate authority, they do require operators to prepare and follow customized procedures to provide safety during operations and maintenance of the pipeline.  49 C.F.R. § 192.605(b).  The unique circumstance of losing certificate authority would require Spire STL to develop and follow specific procedures for ceasing operations, purging the pipeline of hazardous fluids, and shutting down the pipeline in order to ensure the continued safety of people, property, and the environment.  The steps outlined in this section summarize the procedures and activities that would likely be needed.

way does not result in an inadvertent release of natural gas. Flaring off the gas would require contracting with a third-party service provider, and further consultation with state and local permitting agencies concerning air emissions.

16.    Spire STL would need to physically isolate the pipeline from any sources of natural gas. This involves cutting or otherwise removing large diameter piping at each of the interconnects with REX, MoGas, MRT, and two with Spire Missouri (the primary gas utility serving eastern Missouri). Isolating the pipeline would require contracting with third-party mechanical contractors and procurement of isolation materials such as blind flanges and weld caps.

17.    Spire STL would also be required to develop and execute a plan to fill the pipeline with nitrogen. Filling the pipeline with nitrogen creates an inert environment in the pipeline and prevents the development of internal corrosion. Executing the nitrogen task would involve contracting with a third-party engineer, mechanical contractor, and nitrogen supplier.

18.    Spire STL may also be required to obtain federal, state, and local permits for some of these actions. While some of these steps may be accomplished concurrently, I estimate that the entire process of ceasing operations and shutting down the pipeline would take 6-12 weeks.

**Steps Required to Recommission and Restart Operations of the STL Pipeline**

19.     In the event the STL Pipeline is decommissioned, and then FERC subsequently issues a temporary certificate or reissues a permanent certificate on remand for the STL Pipeline, Spire STL would need to undertake the following steps to recommission the pipeline and restart transportation service.  Some of these steps may require federal, state, or local permits.

20.     Spire STL would likely need to reverify the integrity of the pipeline, prior to restarting operations to ensure no damage or vandalism occurred after Spire STL lost its right to enter the permanent right-of-way and physically inspect the pipeline facilities.  Specifically, Spire STL may need to design and implement a hydrostatic pressure test of the entire 65 miles of pipeline.[2]  Hydrostatically testing the pipeline will ensure that the pipeline is fit to operate at its certificated operating pressures.  Hydrostatically testing the pipeline would involve contracting with third-party mechanical and testing contractors, procuring large volumes of water and land to store the water, and acquiring state-mandated hydrostatic discharge permits.

---

[2]     Simply put, a hydrostatic test is the process of filling a pipeline with water and pressurizing the medium to test the system's integrity.  Depending on the design, a hydrostatic test of the STL Pipeline may require as much as 7.6 million gallons of water.

21. Spire STL would then design and execute a geometry tool or similar inline inspection tool run to ensure the pipeline was not dented or otherwise damaged while Spire STL did not have access to certain parts of the right-of-way. Performing an inline inspection would involve contracting with a third-party inline inspection tool vendor and mechanical contractor.

22. Spire STL would also need to remove the physical isolation measures previously installed at the metering and regulating stations to restore connectivity at the interconnection points. Restoring connectivity at the interconnects would involve procuring and testing materials and contracting with a third-party mechanical contractor. Spire STL would then refill and pack the pipeline with natural gas in order to be ready for receipt of customer gas for transportation in interstate commerce.

23. Spire STL would need to recommission the five STL Pipeline metering and regulating stations, which would include purging air and nitrogen out of all equipment, performing functional acceptance tests of all equipment, and performing point-to-point verification of all equipment communications with the STL Pipeline gas control room.

24. Spire STL may also be required to obtain federal, state, and local permits for some of these actions. While some of these steps may be accomplished concurrently, the whole process of recommissioning and restarting service on the

pipeline would take an estimated 10-12 weeks, assuming Spire STL is able to quickly negotiate with landowners for use of temporary, additional workspace for staging areas and to situate equipment used for hydrostatic testing processes. This estimate can vary greatly and is subject to weather delays, material and contractor availability, and permitting authorities.

## Summary

25.     As explained above, if there is a lapse in certificate authority for the STL Pipeline, Spire STL will lose the right to enter the pipeline right-of-way along portions of the pipeline. Without access to these areas of the right-of-way, Spire STL would lose the ability to monitor the integrity of the pipeline, which is necessary to ensure safety and compliance with PHMSA's pipeline safety regulations. Spire STL would also be ill-equipped to prevent damage, vandalization, or sabotage to the pipeline while it is denied access to the permanent right-of-way during any lapse in authorization. Therefore, to ensure the safety of people, property, and the environment, Spire STL would need to undertake decommissioning activities including the purging of natural gas from the pipeline.

26.     As detailed above, if a lapse in authorization occurs, then Spire STL would likely need to undertake decommissioning activities for the pipeline facilities, which would take an estimated 6-12 weeks. If FERC issues a temporary certificate or reissues a certificate of public convenience and necessity authorizing

10

operation of the STL Pipeline after the pipeline has been decommissioned, it could take Spire STL an estimated 10-12 weeks to recommission and restart operations of the pipeline. If Spire STL is required to partially or fully decommission and then recommission the STL Pipeline, the STL Pipeline may not be operational during all or parts of the 2021-2022 winter heating season that begins November 1, 2021 even if, after the conclusion of the pending temporary certificate proceeding at the FERC, the FERC determines that STL Pipeline is necessary to avert an emergency of gas service projected outages this coming winter in the Greater St. Louis region.

27.     For all of the foregoing reasons, it is critically important that STL Pipeline continue its current operations for the upcoming 2021-22 winter heating season.

28.     I declare under penalty of perjury that the foregoing is true and correct. Executed on September 13, 2021.


Scott R. Smith

**Exhibit 3**



State Capitol
201 W. Capitol Avenue, Room 216
Jefferson City, Missouri 65101

(573) 751-3222
WWW.GOVERNOR.MO.GOV

*Michael L. Parson*

GOVERNOR
STATE OF MISSOURI

July 30, 2021

Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C. 20426

The Honorable Richard Glick, Chairman
The Honorable Neil Chatterjee, Commissioner
The Honorable James Danly, Commissioner
The Honorable Allison Clements, Commissioner
The Honorable Mark C. Christie, Commissioner

Re:   Spire STL Pipeline LLC Temporary Certificate Application in Emergency
      Docket No. CP17-40-000

Dear Chairman Glick and Commissioners,

Thank you for your continued leadership in furthering the development of safe and reliable U.S. energy infrastructure. I write in support of a temporary certificate of operation for the Spire STL Pipeline, LLC (STL Pipeline).

It is critical that the STL Pipeline be able to continue operations until a long-term, regional solution is established for the citizens and businesses in the St. Louis region. This is particularly important in avoiding gas shortages in the months ahead and throughout this upcoming winter season within the St. Louis area. We look forward to the FERC's prompt consideration and response on issuing a temporary certificate for this regionally significant and currently relied-upon energy infrastructure.

Sincerely,

Michael L. Parson
Governor

cc. Honorable Chairman Ryan Silvey, Missouri Public Service Commission
    Honorable Commissioners Scott Rupp, Maida Coleman, Jason Holsman, Glenn Kolkmeyer of
    the Missouri Public Service Commission

STATE CAPITOL
201 W. CAPITOL AVENUE, ROOM 224
JEFFERSON CITY, MISSOURI 65101



PHONE: (573) 751-4727
FAX: (573) 751-9442
MIKE.KEHOE@LTGOV.MO.GOV

# ORIGINAL

## MIKE KEHOE

July 27, 2021

LIEUTENANT GOVERNOR
STATE OF MISSOURI

Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C. 20426

The Honorable Richard Glick, Chairman
The Honorable Neil Chatterjee, Commissioner
The Honorable James Danly, Commissioner
The Honorable Allison Clements, Commissioner
The Honorable Mark C. Christie, Commissioner

Re:    Spire STL Pipeline LLC Temporary Certificate Application in Emergency
       Docket No. CP17-40-000

Dear Chairman Glick and Commissioners,

Thank you for your continued leadership in furthering the development of safe and reliable U.S. energy
infrastructure.  I write in support of Spire STL Pipeline, LLC's (STL Pipeline) July 26, 2021 temporary certificate
application at the Federal Energy Regulatory Commission (FERC).

Until recently, more than 650,000 residents and businesses in the St. Louis region lacked direct access to reliable,
affordable, and abundant natural gas supplies from diverse domestic sources.  The STL Pipeline changed this by
tapping into gas supply from the Rockies and Appalachian Basins, providing resilience and supply diversity year-
round and when St. Louis needs are most critical.

Since being placed into service, the STL Pipeline has already demonstrated its substantial value in keeping
vulnerable populations in the St. Louis area warm and providing the regional economy significant benefits as it
emerges from the pandemic.  While others across central United States struggled with gas supply constraints and
high costs during Storm Uri in February 2021, STL Pipeline ensured the region had access to affordable energy,
saving ratepayers up to $300 million in the process.

As Missouri's official advocate for seniors, I am particularly sensitive to their financial well-being and quality of
life and believe the STL Pipeline to be vitally important for both.  I support STL Pipeline's application so that the
St. Louis region can avoid potentially dire and life-threatening gas shortages in the months ahead and throughout
the winter.  I look forward to the FERC's prompt consideration and response to the temporary certificate
application for this crucial energy infrastructure.  Please do not hesitate to reach out if I can be of further assistance.

Sincerely,

Mike Kehoe

cc: Honorable Ryan Silvey, Chair MO Public Service Commission
    Honorables Scott Rupp, Maida Coleman, Jason Holsman, Glenn Kolkmeyer---MO PSC

Attorney General Eric S. Schmitt, Jefferson City, MO.
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C.  20426

The Honorable Richard Glick, Chairman
The Honorable Neil Chatterjee, Commissioner
The Honorable James Danly, Commissioner
The Honorable Allison Clements, Commissioner
The Honorable Mark C. Christie, Commissioner

Re: Spire STL Pipeline LLC Temporary Certificate Application in Emergency
Docket No. CP17-40-000

Dear Chairman Glick and Commissioners,

A reliable and affordable energy supply is among the most foundational
elements of a stable, vibrant economy.  With this in mind, I write in support
of the Spire STL Pipeline, LLC's (STL Pipeline) July 26, 2021 temporary
certification application pending before the Federal Energy Regulatory
Commission (FERC).

The St. Louis region is home to a significant percentage of Missouri's
population and generates a substantial portion of our state's economic
activity.  Over hundreds of thousands of residents in the St. Louis area and
the businesses that employ them greatly benefit from having sufficient access
to a reliable supply of natural gas.  Natural gas is an abundant resource in
North America and one that can be safely transported from a variety of
origination points including the Rocky Mountain and Appalachian Basins as
long as the requisite infrastructure is in place.  To this end, the STL
Pipeline was built to provide reliable access to this abundant domestic
resource and to ensure that the St. Louis region is not forced into undue
reliance on any single energy source to fuel its economy.

The STL Pipeline has already proved its value in providing a safe and
abundant supply of energy to the region.  This point cannot be overstated,
particularly in light of what was seen this past February, when the STL
Pipeline ensured the region had access to affordable natural gas and saved
ratepayers up to $300 million.  Some regions of our nation have increasingly
been forced to deal with power shortages and even power outages.  Such
disruptions add an element of uncertainty to both the state and national
economies at the very time they seek to recover from the far-reaching effects
of a global pandemic.

With these important facts in mind, I am supportive of greater energy
diversity and resiliency in the State of Missouri generally, and
specifically, I want to go on record in support of the STL Pipeline.  The
financial and security costs of foreign energy dependence and domestic energy
uncertainty are simply too high and create unacceptable levels of risk to our
economy.  Developing our infrastructure to make full use of our nation's
domestic natural gas resource is a prudent step to help reduce these risks.

As Missouri's summer beings to fade and winter approaches, we are reminded
of the unpredictability of weather in the central part of our nation.  I
encourage the FERC to consider each of the factors outlined above and to give
due consideration to the temporary certificate application on file for the
STL Pipeline.  If I may answer any additional question on this matter, please
do not hesitate to contact me.

Yours Truly,

ERIC S. SCHMITT
Missouri Attorney General



**Michael L. Parson**
Governor

**Robert B. Dixon**
Director

August 3, 2021


Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C. 20426

The Honorable Richard Glick, Chairman
The Honorable Neil Chatterjee, Commissioner
The Honorable James Danly, Commissioner
The Honorable Allison Clements, Commissioner
The Honorable Mark C. Christie, Commissioner

Re: Spire STL Pipeline LLC Temporary Certificate Application in Emergency Docket No. CP 17-40-000

Dear Dr. Chairman Glick and Federal Energy Regulatory Commissioners:

Thank you for the opportunity to provide input on the Spire STL Pipeline temporary certificate application. We ask for your support of this application, which is currently before the Federal Energy Regulatory Commission (FERC), as this expansion of critical infrastructure is essential to our state and our citizens.

As the state of Missouri's Director of Economic Development, I am keenly interested in the long term growth of our economy and the well-being of our citizens. Infrastructure development is one of the most fundamental ways to enhance our state and the nation's economy, and it augments affordability, quality of life, and national security benefits, among others. The STL Pipeline has already demonstrated results in all of these facets.

Thank you for the opportunity to write on this issue, and we ask for your support and favorable consideration of STL Pipeline's temporary certificate application. If I can provide further information or otherwise be of assistance, please do not hesitate to let me know.

Sincerely,

Robert B. Dixon
Director
Missouri Department of Economic Development

cc:     Honorable Ryan Silvey, Chair - MO Public Service Commission
        Honorables Scott Rupp, Maida Coleman, Jason Holsman, Glenn Kolkmeyer – MO Public Service
        Commission

  

**BLAINE LUETKEMEYER**
MEMBER OF CONGRESS
3RD DISTRICT, MISSOURI

www.luetkemeyer.house.gov/
www.facebook.com/BlaineLuetkemeyer
www.twitter.com/RepBlainePress
www.instagram.com/RepBlaine

COMMITTEE ON
FINANCIAL SERVICES
CONSUMER PROTECTION
AND FINANCIAL
INSTITUTIONS
RANKING MEMBER
HOUSING AND INSURANCE

COMMITTEE ON
SMALL BUSINESS
RANKING MEMBER

# Congress of the United States
## House of Representatives
### Washington, DC 20515

August 24, 2021

The Honorable Richard Glick
Chairman
Federal Energy Regulatory Commission
888 First Street, NE
Washington, D.C. 20426

**RECEIVED**

By The Federal Regulatory Commission Office of External Affairs at 1:03 pm, Aug 31, 2021

RE: Spire STL Pipeline LLC Temporary Certificate Application in Emergency Docket No. CP17-40-000

Dear Chairman Glick,

We urge the Federal Energy Regulatory Commission to give full, fair, and transparent consideration of Spire's application for a Temporary Emergency Certificate or a Limited-Term Certificate. The Spire STL Pipeline Project ("STL Pipeline") offers critical access to affordable and reliable clean natural gas produced from critical domestic sources.

Shutting down the Spire STL Pipeline would have a devastating effect on the local communities in and surrounding St. Louis area during the cold winter months. In February of 2021, severe winter storms led to massive natural gas supply disruptions, historic spikes in the cost of natural gas, and widespread service outages throughout the United States. These winter storms proved how critical it is to have a robust and diverse natural gas supply to uphold citizen safety and keep Missourians warm.

If the STL Pipeline was not operational during this time, up to 133,000 households and small businesses in Missouri may have lost gas service, being forced to brave the winter cold without heat. Having the STL Pipeline in service saved Missouri lives, and an estimated $300 million by providing access to natural gas from the Appalachian Basins and the Rocky Mountains.

A scenario in which the STL Pipeline is mandated to shut down would immediately increase the odds of severe and catastrophic impacts to vulnerable populations in the St. Louis area, while still battling the effects of the coronavirus pandemic. The STL Pipeline provides benefits to homes, businesses, and the economy by ensuring diversity and reliability of natural gas. The Federal Energy Regulatory Commission should do everything within its power to ensure Missourians remain safe during the winter months.

Again, we encourage the Commission to give full, fair, and transparent consideration to Spire's application as expeditiously as possible. We look forward to working alongside our federal partners to ensure Missourians are well served. Please do not hesitate to contact our offices should you have concerns or questions.

Sincerely,

Blaine Luetkemeyer (MO-03)
Member of Congress

Ann Wagner (MO-02)
Member of Congress

2230 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515
PHONE: (202) 225-2956
FAX: (202) 225-5712

113 EAST PEARCE BOULEVARD
WENTZVILLE, MO 63385
PHONE: (636) 327-7055

516 JEFFERSON STREET
WASHINGTON, MO 63090
PHONE: (636) 239-2276

2117 MISSOURI BOULEVARD
JEFFERSON CITY, MO 65109
PHONE: (573) 635-7232
FAX: (573) 635-8347

www.luetkemeyer.house.gov



*Nothing is politically right that is morally wrong.*

*Free and fair discussion is the firmest friend of truth.*

# MISSOURI SENATE
## JEFFERSON CITY

August 2, 2021

Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C. 20426

The Honorable Richard Glick, Chairman
The Honorable Neil Chatterjee, Commissioner
The Honorable James Danly, Commissioner
The Honorable Allison Clements, Commissioner
The Honorable Mark C. Christie, Commissioner

Re:     Spire STL Pipeline LLC Temporary Certificate Application in Emergency
        Docket No. CP17-40-000

Dear Chairman Glick and Commissioners,

Thank you for your continued leadership in furthering the development of safe and reliable U.S. energy infrastructure. I write in support of Spire STL Pipeline, LLC's (STL Pipeline) July 26, 2021 temporary certificate application at the Federal Energy Regulatory Commission (FERC).

Until recently, more than 650,000 residents and businesses in the St. Louis region lacked direct access to reliable, affordable, and abundant natural gas supplies from diverse domestic sources. The STL Pipeline changed this by tapping into gas supply from the Rockies and Appalachian Basins, providing resilience and supply diversity both year-round and when St. Louis needs are most critical.

Since being placed into service, the STL Pipeline has already demonstrated its critical role in keeping vulnerable populations in the St. Louis area warm and providing the regional economy significant benefits as it emerges from the pandemic. While others across central United States struggled with gas supply constraints and high costs during Storm Uri in February 2021, STL Pipeline ensured the region had access to affordable energy during this difficult time, saving ratepayers up to $300 million in the process.

I support STL Pipeline's application so that the St. Louis region can avoid potentially dire and life-threatening gas shortages in the months ahead and throughout the winter. I look forward to the

FERC's prompt consideration and response on the temporary certificate application for this crucial energy infrastructure.  Please do not hesitate to reach out if I can be of further assistance.

Sincerely,

*Mike Cierpiot*

Sen. Mike Cierpiot

8th Senatorial District

*Karla R May*

Sen. Karla May

4th Senatorial District

cc. Honorable Ryan Silvey, Chair MO Public Service Commission

   Honorables Scott Rupp, Maida Coleman, Jason Holsman, Glenn Kolkmeyer--MO PSC

CAPITOL OFFICE
State Capitol
201 West Capitol Avenue
Rm. 101-A
Jefferson City, MO 65101

Phone 573-751-7535

Tracy McCreery
State Representative
District 88



COMMITTEES
-Agriculture Policy, Ranking
Minority Member
-Utilities, Ranking Minority
Member
-Legislative Review, Ranking
Minority Member
--Emerging Issues, Ranking
Minority Member
-Joint Committee on Life
Sciences
-Joint Committee on Tax
Policy
-Ethics

Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C. 20426

The Honorable Richard Glick, Chairman
The Honorable Neil Chatterjee, Commissioner
The Honorable James Danly, Commissioner
The Honorable Allison Clements, Commissioner
The Honorable Mark C. Christie, Commissioner

Re:     Spire STL Pipeline LLC Temporary Certificate Application in Emergency
        Docket No. CP17-40-000

Dear Chairman Glick and Commissioners,

Thank you for your leadership in furthering the development of safe and reliable U.S. energy infrastructure.  I write in support of Spire STL Pipeline, LLC's (STL Pipeline) July 26, 2021 temporary certificate application at the Federal Energy Regulatory Commission (FERC).

I write to you as a residential consumer advocate and state representative. I urge you to not do anything that will impact consumers in this region until we get through the winter of 2022.

Until recently, more than 650,000 residents and businesses in the St. Louis region lacked direct access to reliable, affordable, and abundant natural gas supplies from diverse domestic sources.  The STL Pipeline changed this by tapping into gas supply from the Rockies and Appalachian Basins, providing resilience and supply diversity both year-round and when St. Louis needs are most critical.

While others across central United States struggled with gas supply constraints and high costs during February's Storm Uri, STL Pipeline ensured my region had access to affordable energy during this difficult time, saving ratepayers up to $300 million in the process.

I support STL Pipeline's application so that the St. Louis region can avoid potentially dire and gas shortages in the months ahead and throughout the winter.  I look forward to the FERC's prompt consideration and response on the temporary certificate application for this crucial energy infrastructure.  Please do not hesitate to reach out if I can be of further assistance.

Sincerely,

Tracy McCreery

cc. Honorable Ryan Silvey, Chair MO Public Service Commission

Honorables Scott Rupp, Maida Coleman, Jason Holsman, Glenn Kolkmeyer--MO PSC

**CAPITOL OFFICE**

State Capitol
201 West Capitol Avenue
Room 402
Jefferson City, MO 65101
Tele: (573) 751-3674

Email: Bill.Kidd@house.mo.gov



**COMMITTEES**

**Chairperson:**
Utilities
**Member:**
Special Committee on Homeland Security
Pensions

## MISSOURI HOUSE OF REPRESENTATIVES

# BILL KIDD

State Representative
District 20

July 28, 2021

Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C. 20426

The Honorable Richard Glick, Chairman
The Honorable Neil Chatterjee, Commissioner
The Honorable James Danly, Commissioner
The Honorable Allison Clements, Commissioner
The Honorable Mark C. Christie, Commissioner

Re:    Spire STL Pipeline LLC Temporary Certificate Application in Emergency
       Docket No. CP17-40-000

Dear Chairman Glick and Commissioners,

As Chairman of the Missouri House of Representatives Standing Committee on Utilities, I write in support of Spire STL Pipeline, LLC's (STL Pipeline) July 26, 2021 temporary certificate application at the Federal Energy Regulatory Commission (FERC).

The Missouri House Standing Committee on Utilities oversees the operation of Spire Gas company in the state of Missouri. If I have correctly read the recent ruling against the Certificate of Need for the STL Pipeline, according to the court, FERC failed to perform its due diligence. It was not Spire who was at fault. So my question is, why are Spire and the citizens of Missouri going to be penalized with higher rates when it was FERC that was at fault? Why are more than 650,000 residences and businesses in the St. Louis region suffering for FERC's error? The pipeline is in operation and rates are lower because of its operation. The citizens and businesses of Missouri benefit from this pipeline and can only be injured by some bureaucratic error. This makes no sense and quite frankly smells of other political maneuvering.

If there is a problem with FERC policies then fix them, but please don't penalize the citizens and businesses of Missouri. Times during this pandemic are difficult enough. We don't need more "political" oversight.

I support STL Pipeline's application so that the St. Louis region can avoid potentially dire and life-threatening gas shortages in the months ahead and throughout the winter. I look forward to the FERC's prompt consideration and response on the temporary certificate application for this crucial energy infrastructure. Please do not hesitate to reach out if I can be of further assistance.

Sincerely,

Bill E. Kidd

Bill Kidd
State Representative, District 20
Chairman, Standing Committee on Utilities

cc.  Honorable Ryan Silvey, Chair MO Public Service Commission
     Honorables Scott Rupp, Maida Coleman, Jason Holsman, Glenn Kolkmeyer--MO PSC

<table>
<tr><td>CAPITOL OFFICE<br>State Capitol<br>201 West Capitol Avenue<br>Rm. 101-A<br>Jefferson City, MO 65101<br><br>Phone 573-751-7535</td><td>Tracy McCreery<br>State Representative<br>District 88</td><td>COMMITTEES<br>-Agriculture Policy, Ranking<br>Minority Member<br>-Utilities, Ranking Minority<br>Member<br>-Legislative Review, Ranking<br>Minority Member<br>--Emerging Issues, Ranking<br>Minority Member<br>-Joint Committee on Life<br>Sciences<br>-Joint Committee on Tax<br>Policy<br>-Ethics</td></tr>
</table>



Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C. 20426

The Honorable Richard Glick, Chairman
The Honorable Neil Chatterjee, Commissioner
The Honorable James Danly, Commissioner
The Honorable Allison Clements, Commissioner
The Honorable Mark C. Christie, Commissioner

Re:     Spire STL Pipeline LLC Temporary Certificate Application in Emergency
        Docket No. CP17-40-000

Dear Chairman Glick and Commissioners,

Thank you for your leadership in furthering the development of safe and reliable U.S. energy infrastructure.  I write in support of Spire STL Pipeline, LLC's (STL Pipeline) July 26, 2021 temporary certificate application at the Federal Energy Regulatory Commission (FERC).

I write to you as a residential consumer advocate and state representative. I urge you to not do anything that will impact consumers in this region until we get through the winter of 2022.

Until recently, more than 650,000 residents and businesses in the St. Louis region lacked direct access to reliable, affordable, and abundant natural gas supplies from diverse domestic sources.  The STL Pipeline changed this by tapping into gas supply from the Rockies and Appalachian Basins, providing resilience and supply diversity both year-round and when St. Louis needs are most critical.

While others across central United States struggled with gas supply constraints and high costs during February's Storm Uri, STL Pipeline ensured my region had access to affordable energy during this difficult time, saving ratepayers up to $300 million in the process.

I support STL Pipeline's application so that the St. Louis region can avoid potentially dire and gas shortages in the months ahead and throughout the winter.  I look forward to the FERC's prompt consideration and response on the temporary certificate application for this crucial energy infrastructure.  Please do not hesitate to reach out if I can be of further assistance.

Sincerely,

Tracy McCreery

cc. Honorable Ryan Silvey, Chair MO Public Service Commission

Honorables Scott Rupp, Maida Coleman, Jason Holsman, Glenn Kolkmeyer--MO PSC



**OFFICE OF THE MAYOR**
**CITY OF ST. LOUIS**
**MISSOURI**

**CITY HALL - ROOM 200**
**1200 MARKET STREET**
**SAINT LOUIS, MISSOURI 63103-2877**
**(314) 622-3201**

**TISHAURA O. JONES**
**MAYOR**

Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, DC 20426

The Honorable Richard Glick, Chairman
The Honorable Neil Chatterjee, Commissioner
The Honorable James Danly, Commissioner
The Honorable Allison Clements, Commissioner
The Honorable Mark C. Christie, Commissioner

Dear Mr. Chairman and Commissioners,

As Mayor for the City of St. Louis, I am responsible for protecting nearly 300,000 residents from the shocks of extreme weather.  I am writing regarding Spire STL Pipeline LLC and to urge the Commission to give full and fair consideration of Spire's application for a Temporary Emergency Certificate or in the Alternative a Limited-Term Certificate. The Spire STL Pipeline Project provides important access to abundant, affordable, and reliable supplies of clean natural gas produced from diverse domestic sources.

I am concerned with the detrimental effects an immediate shutdown of the STL Pipeline would have on communities in and around St. Louis during the winter months. We saw the importance of having diverse natural gas supply in February 2021 during Winter Storm Uri, which caused severe natural gas supply disruptions, unprecedented spikes in the cost of natural gas, and widespread service outages across the country. The outages during Winter Storm Uri resulted in a tragic loss of human life and nearly $200 billion in damages, making it one of the deadliest and costliest natural disasters in United States history.

I support maintaining Spire's access to the STL Pipeline to allow for the safe transition to less harmful forms of energy. The STL Pipeline provides numerous benefits to homes and businesses by providing access to some of the most competitively priced supplies of natural gas, and by ensuring diversity and reliability of natural gas.

Again, I encourage the Commission to give full and fair consideration to Spire's application. Please do not hesitate to contact my office should you have any other concerns or questions.

Sincerely,

Tishaura O. Jones
Mayor, City of St. Louis



CITY OF FOUNTAINS
HEART OF THE NATION

KANSAS CITY
MISSOURI

QUINTON D. LUCAS
Mayor

August 11, 2021

Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C. 20426

The Honorable Richard Glick, Chairman
The Honorable Neil Chatterjee, Commissioner
The Honorable James Danly, Commissioner
The Honorable Allison Clements, Commissioner
The Honorable Mark C. Christie, Commissioner

Re:     Spire STL Pipeline LLC Temporary Certificate Application in Emergency
        Docket No. CP17-40-000

Dear Chairman Glick and Commissioners,

Thank you for your continued leadership in furthering the development of safe and reliable U.S. energy infrastructure.  I write in support of Spire STL Pipeline, LLC's (STL Pipeline) July 26, 2021, temporary certificate application at the Federal Energy Regulatory Commission (FERC).

Until recently, more than 650,000 residents and businesses in the St. Louis region lacked direct access to reliable, affordable, and abundant natural gas supplies from diverse domestic sources.  The STL Pipeline changed this by tapping into gas supply from the Rockies and Appalachian Basins, providing resilience and supply diversity both year-round and when St. Louis needs are most critical.

 I support STL Pipeline's application so that the St. Louis region can avoid potentially dire gas shortages in the months ahead and throughout the winter.  I look forward to the FERC's prompt consideration and response on the temporary certificate application for this crucial energy infrastructure.  Please do not hesitate to reach out if I can be of further assistance.

Very truly yours,

Quinton D. Lucas

cc:
Frank Quagraine, Director of Rental Production
Gus Metz, Chief Underwriter

Federal Energy Regulatory Commission 888 First Street, N.E.
Washington, D.C. 20426

The Honorable Richard Glick, Chairman
The Honorable Neil Chatterjee, Commissioner The Honorable James Danly, Commissioner
The Honorable Allison Clements, Commissioner The Honorable Mark C. Christie,
Commissioner

Re: Spire STL Pipeline LLC Temporary Certificate Application in Emergency Docket No.
CP17-40-000

Dear Chairman Glick and Commissioners,

We are writing to you today out of concern for the well-being of our citizens if the STL
Pipeline ceases operation. We strongly ask that you approve Spire's temporary emergency
certificate application so it can continue operating on an interim basis ensuring our citizens don't
lose critical access to the natural gas they need when temperatures start to drop. We understand
the Federal Energy Regulatory Commission (FERC) is considering their original approval of the
STL Pipeline, but we strongly urge FERC to consider the thousands of Missourians that rely on
this pipeline to satisfy their basic needs and approve the temporary emergency certificate
application.

As the elected leaders of our towns, it is our duty to ensure our citizens have the highest
quality of life attainable. A key component to that goal is ensuring that our communities have
reliable and affordable access to clean energy sources. The STL Pipeline has ensured this goal is
accomplished by establishing more supply options for the St. Louis region, which in turn has
kept our natural gas prices affordable, even throughout the harshest winters.

Severe weather comes in all forms and leaves a different path of destruction every time.
One of the main constants that occurs when severe weather hits is the reliance and trust we put
into our utility companies to make sure service to our communities is minimally disrupted. The
cost of disaster recovery can be exponentially raised without proper utility services due to the
heightened emergency services we must deploy to ensure the safety of our citizens. We are all
thankful that we didn't have to live through the same experiences our counterpart mayors in
southern states had during Winter Storm Uri with virtually no access to natural gas to heat homes
or cook foods. The only reason our cities didn't see this fate was because of the STL Pipeline
which solidified natural gas supplies for the St. Louis region. The constantly supply made sure
that our residents were able to heat their homes and continue feeding their families during the
coldest parts of the year without seeing an exorbitant rise
in costs. It is estimated that the pipeline alone saved ratepayers over $300 million during the
storm, and that an estimated 400,000 residents will lose power in a similar storm if Spire is
forced to cease operations of the STL Pipeline.

We support the STL Pipeline's temporary emergency certificate application to ensure the
STL Pipeline can keep serving its critical natural gas to our residents. We rely on the pipeline to

deliver natural gas to our communities in a reliable and affordable way. We look forward to FERC's consideration and the response on the application for this critical energy infrastructure.

Sincerely,

Hon. Terry Briggs
Mayor, City of Bridgeton



Hon. James A. Paunovich
Mayor, City of Calverton Park, MO



Hon. Grant J. Mabie
Mayor, City of Crestwood, MO



Hon. Bob Hoffman
Mayor, City of Creve Coeur



Hon. Bob Nation
Mayor, City of Chesterfield



Hon. Mike Wilcox
Mayor, City of Glendale



Hon. Russ Fortune
Mayor, Village of Twin Oaks



Hon. Sharon Pace
Mayor, City of Northwoods



Hon. Jack Shrewsbury
Mayor, City of Breckenridge Hills



Hon. Ernest Shields
Mayor, City of Pagedale



Hon. Norman C. McCourt
Mayor, City of Black Jack



Hon. Tim Griffin
Mayor, City of Kirkwood



Hon. Mike Clement
Mayor, City of Manchester

 

Hon. Sean M. Flower
Mayor, City of Eureka



Hon. Bender McKinney Jr.
Mayor, City of Country Club Hills



Hon. Michele DeShay
Mayor, City of Moline Acres



Hon. Kevin Kelso
Chairman of the Board of Trustees, Town of
Grantwood Village



Hon. Tommie Pierson,
Mayor, City of Bellefontaine Neighbors



Hon. Neal Vohsen
Chairman of the Board of Trustees, Village of
Wilbur Park



Hon. Christina McDonald
Chairwomen of the Board of Trustees, Village
of Uplands Park



Hon. Gerry Welch
Mayor, City of Webster Groves



Hon. James W. McGee
Mayor, City of Vinita Park



Hon. Nancy Hartman
Mayor, City of Bellerive Acres



Hon. Mark J. Becker, Esq
Mayor, City of Des Peres



Hon. Jim Thomson
Mayor, City of Richmond Heights



Hon. Mike Travaglini
Mayor, City of Shrewsbury



Hon. Tom Halaska
Mayor, City of St. John



Hon. Michael T. Schneider
Mayor, City of Overland



Hon. Timothy J. Lowery
Mayor, City of Florissant



Hon. Mike Moeller
Mayor, City of Maryland Heights



Hon. Victoria Valle
Chairman, Board of Trustees, Village of Glen Echo
Park



Hon. Scott Douglass
Mayor, City of Clarkson Valley



Hon. Charles Rehm
Mayor, Town and County



Hon. Edward Mahan,
Mayor, City of Rock Hill



Hon. Cynthia Pender McCarthy
Mayor, City of Pasadena Hills



Hon. Andrew M. Stewart
Mayor, City of Oakland



Hon. William D. Hook
Mayor, City of Bel-Nor



Hon. Jeffery Walton
Chairman of the Board of Trustees Village of
Hanley Hills



Hon. Sidney Clark
Mayor, City of Olivette



Hon. Reggie Jones
Mayor, City of Dellwood



Hon. Babatunde Deinbo
Mayor, City of Berkley



**Exhibit 4**

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

|  |  |  |
|---|---|---|
| | ) | |
| **Spire STL Pipeline LLC** | ) | **Docket No. CP17-40** |
| | ) | |

**RESPONSE OF THE PUBLIC SERVICE COMMISSION**
**OF THE STATE OF MISSOURI**
**TO THE APPLICATION OF SPIRE STL PIPELINE LLC**
**FOR A TEMPORARY EMERGENCY CERTIFICATE,**
**OR, IN THE ALTERNATIVE, LIMITED-TERM CERTIFICATE**

The Public Service Commission of the State of Missouri (MoPSC) hereby submits

these comments in response to the *Application Of Spire STL Pipeline LLC For A*

*Temporary Emergency Certificate, Or, In The Alternative, Limited-Term Certificate*

(*Application*) filed in this docket on July 26, 2021. As discussed below, the MoPSC

requests the Commission take expedited action by granting a temporary emergency

certificate, or, in the alternative, a limited-term certificate to Spire STL Pipeline LLC

(Spire STL) for the STL Pipeline. Such action will allow Spire Missouri Inc. (Spire

Missouri) to continue providing safe and adequate natural gas service to its retail

customers as required by Missouri law, as the Commission proceeds with the matter of

Spire STL's certificate on remand.

**Introduction**

The MoPSC is a government agency created under the laws of the State of

Missouri, Section 386.040, RSMo (2016), with jurisdiction to regulate rates, charges and

1

quality of service for the sale of natural gas to consumers in Missouri.[1] The MoPSC is a

"State Commission" within the meaning of Section 1.101(k) of the Commission's general

regulations.

Spire Missouri is a "gas corporation" and a "public utility" subject to the

jurisdiction of the MoPSC pursuant to Section 386.020(18) and (43), RSMo (2016). Spire

Missouri is a subsidiary of Spire Inc. and an affiliate of Spire STL. Spire Missouri

provides natural gas service to approximately 650,000 residential, commercial and

industrial customers in eastern Missouri.[2] Spire Missouri relies on natural gas it receives

from its affiliate Spire STL through a 20-year firm gas supply agreement in order to serve

those customers.[3] Additionally, in December 2020, an interconnection between MoGas

Pipeline LLC and the STL Pipeline went into service.[4]

## Background

In August 2018, the Commission issued a Certificate Order granting Spire STL the

authority to build and operate the pipeline.[5] In October 2018, the Commission issued a

tolling order affording the Commission additional time to consider matters raised by

parties requesting rehearing of the Certificate Order.[6] The Commission issued a

---

[1] Section 386.250, RSMo (2016).
[2] *Application* pg. 2.
[3] *Id.* pg. 7.
[4] CP17-40, *Motion To Intervene Out-Of-Time Of MoGas Pipeline LLC and Comments In Support* (July 28, 2021).
[5] CP17-40, *Order Issuing Certificates re Spire STL Pipeline LLC* (Certificate Order) (August 3, 2018).
[6] CP17-40-002, *Order Granting Rehearings For Further Consideration* (October 1, 2018).

2

Rehearing Order in November 2019 denying the requests for rehearing on their merits.[7]

During the time between the Certificate Order and the Rehearing Order, Spire STL

completed virtually all construction of the pipeline.[8] After the pipeline was placed in

service in November 2019, Spire Missouri allowed some of its gas supply contracts to

expire, and Spire Missouri retired its propane facilities that allowed the utility to

supplement its gas supply during periods of peak demand.[9]

After the Commission issued its Rehearing Order, the Environmental Defense

Fund (EDF) sought judicial review of the Commission's decision to approve the pipeline.

On June 22, 2021, the United States Court of Appeals for the District of Columbia Circuit

issued an opinion concluding that the Commission erred in its approval by failing to

scrutinize Spire STL's evidence of need for the pipeline and failing to consider evidence

of self-dealing among the various Spire-related entities.[10] The Court vacated the

Commission's orders.[11] Spire STL filed its *Application* because, as Spire STL stated,

"[u]pon issuance of the mandate from the D.C. Circuit, the STL Pipeline will have to shut

down."[12]

---

[7] CP17-40-002, *Order On Rehearing* (November 21, 2019).
[8] CP-40, *Letter Order Granting Spire STL Pipeline LLC's 11/12/2019 Request To Commence Service To Facilities In St. Louis And St. Charles Counties etc. Part Of The Spire STL Pipeline Project Under CP17-40 et al.* (November 14, 2019).
[9] *Application* Ex. Z-1, Affidavit of Scott Carter, pg. 4.
[10] *Environmental Defense Fund v. F.E.R.C.*, 2021 WL 2546672 (U.S. Ct. App. D.C. 2021).
[11] *Id.*
[12] *Application* pg. 2.

**Comments**

The MoPSC is concerned by claims in the *Application* of potentially widespread loss of natural gas service to Missouri customers if Spire STL takes the STL Pipeline out of service. The MoPSC respectfully requests the Commission take expedited action on Spire STL's *Application* that will allow the public utility affiliate, Spire Missouri, to continue providing safe and adequate natural gas service to their customers in the St. Louis metropolitan area, while the Commission proceeds with the case on remand or until Spire Missouri can implement a contingency plan to serve its customers without the STL Pipeline. Spire Missouri's customers include individuals and businesses that depend on continuous natural gas service for heat, cooking, and commercial activity. Caught in a situation not of their own making, these captive retail customers may have no viable alternative to the natural gas provided by Spire Missouri. As the winter season approaches, the unique circumstances set forth in the *Application* constitute an emergency for Spire Missouri customers that supports the Commission's issuance of a temporary certificate.

To protect essential service to captive customers, Missouri law requires that "[e]very gas corporation… shall furnish and provide such service instrumentalities and facilities as shall be safe and adequate and in all respects just and reasonable."[13] A public utility such as Spire Missouri "must serve on reasonable terms all those who desire the

---

[13] Section 393.130.1, RSMo (2016).

4

company's service without unreasonable discrimination."[14] Missouri courts hold the

general rule is that once a utility undertakes to supply a utility service, they owe a duty to

supply continuous service.[15] As the Commission noted in its Certificate Order, under

Missouri law and practice the MoPSC does not pre-approve Spire Missouri's agreements

with suppliers such as its affiliate Spire STL.[16] The MoPSC will review the

reasonableness and prudence of Spire Missouri's actions with respect to the STL Pipeline

in upcoming cases.[17]

   In an affidavit attached to Spire STL's *Application*, Spire Missouri president Scott

Carter explains that Spire Missouri's operations may be compromised if the STL Pipeline

is taken out of service.[18] The MoPSC is concerned by the extent of the potential

disruptions asserted by Spire Missouri. Spire Missouri states that loss of supply from the

STL Pipeline could create an overall deficit of over half the utility's planned supply on a

cold day when demand for natural gas in the St. Louis region would hit its peak.[19] If the

STL Pipeline is not in service during the upcoming winter heating season, Spire Missouri

estimates that between 175,000 and 400,000 of the utility's 650,000 Missouri customers

---

[14] *State ex rel. Fed. Res. Bank of Kansas City v. Pub. Serv. Comm'n*, 191 S.W.2d 307, 313 (Mo. Ct. App. W.D. 1945).
[15] *National Food Stores, Inc. v. Union Elec. Co.*, 494 S.W.2d 379, 383 (Mo. Ct. App. E.D. 1973).
[16] Certificate Order P 64.
[17] *Id.*
[18] *Application* Ex. Z-1, Affidavit of Scott Carter, pg. 4.
[19] *Id*. at pgs. 5-7. Spire Missouri's planning estimates show the utility would need nearly 1,300,000 Dth of capacity for a planned peak day.

may be without gas service for some period of time in an extreme cold weather
scenario.[20]

The STL Pipeline provides Spire Missouri with 350,000 dekatherms (Dth) per day
of pipeline capacity that would be lost if the pipeline ceases operation.[21] In addition,
Spire Missouri states that it relies on the STL Pipeline's high-pressure supply to fill the
large Lange underground storage field, which Spire Missouri draws upon during the
winter.[22] The Lange storage field can deliver up to 357,000 Dth per day.[23] Once the gas
stored in Lange would be depleted, Spire Missouri states that it may be unable to operate
the field without the high-pressure supply from the STL Pipeline, jeopardizing the
availability of the asset to serve its customers at temperatures as high as approximately 38
degrees Fahrenheit.[24]

Spire Missouri attests that service disruptions could extend beyond mandatory
curtailments.[25] The company says that loss of service from the STL Pipeline would lead
to low pressure on the distribution system during cold periods, which would "cause
uncontrolled loss of service to households and other high priority consumers, such as
hospitals, nursing homes and schools."[26] Spire Missouri estimates that its customers

---

[20] *Id*. at pg. 8.
[21] *Id.* at pg. 4.
[22] *Id*. at 4-5. After the STL Pipeline commenced service, Spire Missouri says it retired and removed three compressors that the company used to inject gas into the Lange storage field prior to the STL Pipeline.
[23] *Id.* at pg. 5.
[24] *Id*.
[25] *Id*.
[26] *Id*. at pg. 8.

could begin to lose service due to uncontrolled pressure loss at an average daily

temperature of approximately 9 degrees Fahrenheit, which is not atypical for St. Louis.

The loss of natural gas during cold periods would create the potential for loss of life and

severely impact essential services relied on by many people and businesses served by this

public utility.[27]

The Commission should take expedited action on Spire STL's *Application For A*

*Temporary Emergency Certificate*. The Court decided to vacate the Commission's

Certificate Order and Rehearing Order, and remand the matter to the Commission for

further proceedings.[28] As explained in the *Application*, the Court's mandate is scheduled

to issue on August 13, 2021. Once the Court issues its mandate, the Certificate Order and

Rehearing Order are "officially gone… [t]hey have no legal effect whatever… [t]hey are

void"[29] and Spire STL will not possess the federal certification required under the Natural

Gas Act to construct and operate the pipeline.[30] The Commission should act in this

situation before the court issues its mandate.

If the STL Pipeline is shut down, Spire Missouri attests that its ability to provide

safe and adequate natural gas service to Missouri customers will be impaired going into

the winter 2021-22 heating season. This presents an emergency for Spire Missouri's

customers that rely on the utility for an essential service. Under these circumstances,

expedited action is warranted in order to preserve safe and adequate service to Missouri

---

[27] *Id*. 2.
[28] 2021 WL 2546672 at p. 16.
[29] *United States v. Sigma Int'l, Inc*., 300 F.3d 1278, 1280 (11th Cir. 2002).
[30] 15 USC § 717f(c)(1)(A) (2020).

customers while the Commission proceeds with the certificate case on remand or while

Spire Missouri develops a contingency plan in order to meet its legal obligations to its

customers.

### Conclusion

The MoPSC respectfully submits this response to the July 26, 2021, *Application*

*Of Spire STL Pipeline LLC For A Temporary Emergency Certificate, Or, In The*

*Alternative, Limited-Term Certificate* in this matter.

Respectfully submitted,

*/s/ John D. Borgmeyer*
John Borgmeyer, Mo. Bar No. 61992
Shelley Brueggemann, Mo. Bar No.
52173
Public Service Commission of the State
of Missouri
P.O. Box 360
Jefferson City, Missouri 65201
Ph: 573-751-7504
john.borgmeyer@psc.mo.gov
shelley.brueggemann@psc.mo.gov

Attorneys for the Public Service
Commission of the State of Missouri

### CERTIFICATE OF SERVICE

I hereby certify that I have this day e-served a copy of this document upon all
parties listed on the official service list compiled by the Secretary in the above-captioned
proceeding, in accordance with the requirements of Rule 2010 of the Commission's
Rules of Practice and Procedure (18 C.F.R. § 385.2010).

Dated this 29th day of July 2021 in Jefferson City Missouri.

*/s/ John D. Borgmeyer*

**Exhibit 5**

## IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| Environmental Defense Fund, et al. | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Nos. 20-1016 and 20-1017 |
| | ) | (consolidated) |
| Federal Energy Regulatory | ) | |
| Commission, | ) | |
| | ) | |
| Respondent. | ) | |

## SECOND DECLARATION OF SCOTT CARTER

1.      My name is Scott Carter, and I am President of Spire Missouri Inc. ("Spire Missouri").  Spire Missouri is the natural gas utility serving the St. Louis, Missouri metropolitan area and is a local distribution company ("LDC") regulated by the Missouri Public Service Commission.  My business address is 700 Market St., Saint Louis, MO 63101.  I have decades of experience in the natural gas utility industry, both at Spire Missouri and other utilities throughout the United States.  I am very familiar with Spire Missouri's natural gas supply portfolio, distribution system and natural gas supply requirements.

### Purpose of Declaration and Summary of Conclusions

2.      The purpose of this Second Declaration is to inform the U.S. Court of Appeals for the District of Columbia Circuit of the potential disruptive impacts on the retail customers and communities served by Spire Missouri in the event Spire

1

STL Pipeline LLC ("STL Pipeline") were to cease operations due to a loss of

certificate authority, in support of the accompanying Motion for Stay of Mandate.[1]

3.       As I will explain in detail below, loss of service from STL Pipeline

would severely jeopardize Spire Missouri's ability to provide needed energy to a

large portion of the 650,000 households and businesses that Spire Missouri serves

in eastern Missouri,[2] in addition to other potentially severe disruptive

consequences.  This energy is needed to fuel the economy, and to enable residents

to heat their homes and cook food.

4.       Spire Missouri cannot replace its current "firm" (contractually locked-

in) supply from STL Pipeline with sufficient other alternatives to ensure adequate

reliable gas service to the St. Louis region for at least this upcoming winter season.

Without supply from STL Pipeline, Spire Missouri would very likely be forced to

intentionally curtail natural gas service to many of its customers during the

upcoming 2021-2022 winter heating season.  In addition, Spire Missouri faces the

---

[1]       As Spire Missouri continues to evaluate its supply options, there have been certain factual developments and Spire Missouri has developed a fuller understanding of the potential impacts relating to a cessation in service from STL Pipeline; consequently this Second Declaration reflects minor changes from my prior declaration.

[2]       References to Spire Missouri's customers throughout refer only to Spire Missouri's customers in eastern Missouri.

very real threat that despite such mandated curtailments, its reduced gas supply would lead to low pressure on its distribution system during cold periods, causing uncontrolled loss of service to households and other high priority consumers, such as hospitals, nursing homes, and schools. Loss of natural gas service during cold periods would create the potential for loss of life and severe disruptive impacts to essential services relied on by many individuals and communities served by Spire Missouri.

5.      Therefore, it is essential that STL Pipeline be permitted to maintain service to all of its customers, including Spire Missouri, during the upcoming winter season and beyond.

**Pertinent Background**

6.      In order to provide the context for these projections, I will first address the background that led to the current supply situation and constraints.

7.      Spire Missouri serves approximately 650,000 households and businesses in eastern Missouri. Historically, Spire Missouri was heavily dependent on a single interstate natural gas pipeline—the Enable Mississippi River Transmission ("MRT") system—to supply eastern Missouri. However, in the normal course of the utility's prudent system planning efforts, the MRT system was identified as presenting a heightened reliability risk for Spire Missouri customers because (1) MRT derived its supplies from the traditional Midcontinent

and Gulf Coast natural gas basins, whereas, by the mid-2010s, alternative supplies from the developing Appalachian Basins were providing better access to more diverse, reliable, and abundant natural gas, and (2) MRT's system runs through the seismically unstable New Madrid fault zone. Additionally, during these planning efforts, operational problems were identified with Spire Missouri's liquid propane "peaking" facilities, as outlined in this declaration. (Peaking facilities are facilities that are called into service to meet periods of peak demand.)

8. Consequently, to mitigate the identified risks from prudent system planning analyses, Spire Missouri initiated discussions with pipeline developers to improve critical infrastructure for gas supply into the St. Louis region that could optimize opportunities to access new prolific supplies from the Appalachian Basins and allow Spire Missouri to remove its liquid propane peaking facilities from its supply stack. But those discussions did not lead to any definitive agreements to construct new capacity. Accordingly, STL Pipeline developed and proposed a project that satisfied all of Spire Missouri's critical infrastructure needs. STL Pipeline proposed to build and operate a new 65-mile long pipeline to bring gas from the Rockies Express Pipeline ("REX"), which would provide Spire Missouri with improved access to natural gas supplies from the Rockies and Appalachian Basins, bringing new supply diversity, reliability and cost competitiveness to the region.

**Changes to Spire Missouri's Facilities and Operations Post-STL Pipeline**

9.      Once STL Pipeline was placed into service in 2019, it provided Spire Missouri with 350,000 dekatherms per day ("Dth/day") of new firm pipeline capacity.  Because of this new firm capacity, and to preserve affordability to its customers consistent with its obligations, Spire Missouri undertook several steps to diversify and optimize its natural gas supply portfolio, which resulted in replacing preexisting sources.  Specifically, Spire Missouri took the following steps: (1) allowed approximately 180,000 Dth/day of firm capacity contracts on MRT, as well as 170,000 Dth/day of firm capacity on upstream pipelines that fed into MRT's East Line, to expire; and (2) retired its obsolete propane peaking facilities, which previously had the design capacity to supply 160,000 Dth/day of peak demand.  Had Spire Missouri held onto this capacity from MRT or maintained the propane facilities, the associated costs would have posed an additional and unwarranted financial burden on its customers, especially because the old capacity portfolio would not have resolved the previously identified operational risks.

10.     Spire Missouri was later able to take advantage of the high-pressure deliveries available from the STL Pipeline system in other ways, providing additional benefits, including some major benefits beyond those presented by Spire Missouri in the STL Pipeline certificate proceeding before FERC.

11.     First, Spire Missouri was able to use the higher pressure STL Pipeline supply to improve the injections of natural gas into Spire Missouri's on-system underground Lange storage facility.  The high-pressure supply available from STL Pipeline allows for direct injection into the facility without having to rely on compressor facilities to do so.  That is a more efficient and reliable process.  Given the ability to direct-inject into the Lange storage facility from STL Pipeline, Spire Missouri retired and removed three of the six compressors that had been used for injection into the Lange storage facility prior to STL Pipeline.  These compressors were approximately 70 years old, and were at or beyond their useful life.  The changes to the operations at Spire Missouri's Lange storage facility resulted in more than an 80% reduction in greenhouse gas emissions (GHG) from the Lange storage facility.  However, it is important to recognize that even aside from the reduced pressure without STL Pipeline and the problems this would cause, there is insufficient supply available to replenish the Lange storage facility without STL Pipeline.  The Lange storage facility has a high yield deliverability of up to 357,000 Dth/day, and Spire Missouri typically replenishes the Lange storage facility throughout the winter heating season to maintain Spire Missouri's inventory level for late season cold weather events.  Spire Missouri relies heavily on the Lange storage facility to meet its customers' needs, and now relies on the high-pressure supply of STL Pipeline to replenish that storage inventory.  Without

the high-pressure supply from STL Pipeline, Spire Missouri risks being unable to operate the Lange storage facility once it is depleted.  In this scenario, Spire Missouri could face a lack of inventory availability, as it will not be able to replenish inventory from time to time as needed throughout the winter months. (While this risk cannot be quantified precisely, it exceeds the risk that Spire Missouri would take when planning for the necessary winter natural gas supply, as illustrated by the February 2021 experience described later in this paragraph.) Accordingly, if the Lange storage facility is depleted, there is a potential for significant disruptions to service and the potential loss of up to an additional 357,000 Dth/d of deliverability into our distribution system.  This deliverability shortfall, combined with the loss of 350,000 Dth/d from STL Pipeline, would create an overall deficit of over half of our planned peak day supply, as illustrated below in Table 1.  Without the high pressure supply available from STL Pipeline, using Spire Missouri's current primary contract rights and currently available supplies, it would likely not be able to maintain ongoing replenishment of the Lange storage facility over the winter, thus jeopardizing the availability of that facility to serve Spire Missouri's customers at temperatures as high as approximately 38 degrees Fahrenheit.  As an example, this past February following

Winter Storm Uri,[3] Spire Missouri reinjected natural gas into its Lange storage facility for nine days, February 20-28, 2021, in order to replenish inventory in the event of another late cold spell during that winter season. If the high pressure supply from STL Pipeline had not been available for this purpose, Spire Missouri would not have been able to replenish that level of inventory and would have been at risk for customer outages throughout the rest of the winter season if there had been another cold snap. The high-pressure supply from STL Pipeline is absolutely critical to the operation of Spire Missouri's on-system underground storage.

12. Second, and not contemplated during the certificate application process, MoGas Pipeline ("MoGas"), a 263-mile interstate natural gas pipeline system in and around St. Louis that extends into Central Missouri, interconnected with STL Pipeline. STL Pipeline's high-pressure deliveries into MoGas increased MoGas's operating pressure,[4] allowed MoGas to increase its transportation capacity without having to undertake a major expansion of its system.[5] That

---

[3] References to Winter Storm Uri refer to the major winter and ice storm from February 13-17, 2021 that impacted the United States (in particular, Texas), Northern Mexico, and parts of Canada.

[4] *See* MoGas Pipeline LLC's Motion to Intervene Out-Of-Time and Comments in Support, at 9, *Spire STL Pipeline LLC*, Dkt. No. CP17-40-007 (FERC July 28, 2021).

[5] *See id.*

additional capacity allowed Spire Missouri to contract for more capacity on MoGas, and allowed Spire Missouri to forego making certain costly expansions to its own distribution system, which would have been absorbed by customers. The additional capacity now held by Spire Missouri on MoGas is more than double what Spire Missouri previously held before STL Pipeline was placed into operations, and is used to benefit the west and southwest portions of our distribution system that are served by MoGas. These areas are seeing increased demand for natural gas, but the new capacity held by Spire Missouri on MoGas is at risk of being unavailable without STL Pipeline.[6] This permitted Spire Missouri to avoid making certain costly reinforcements of its facilities to ensure adequate supply into these areas of its distribution system. Without the additional deliveries from MoGas, reinforcements would have been required and would have involved building additional high-pressure pipelines in very populated areas. Without Spire STL, MoGas deliveries would be substantially reduced and Spire Missouri would face the prospect of curtailing customers. These deliveries cannot adequately be replaced this winter. Based on our engineering estimates, it would take years to install such reinforcements, putting the company at risk of not being able to serve its customers during the construction period.

---

[6]     *See id.* at 10.

13.     The net result of all of Spire Missouri's actions to improve reliability and reduce costs to customers is an enormous change to its distribution operations and supply situation.  Consequently, if STL Pipeline were to cease functioning, Spire Missouri would no longer have the firm capacity that it needs to meet winter season demand for household, industrial, commercial, and other uses.  The following chart shows the current primary contract rights and supply capabilities of Spire Missouri, both with and without STL Pipeline.

**Table 1**

| Pipeline | Current Portfolio w/ STL Pipeline (Dth/day) | Winter 21/22 w/out STL Pipeline (Dth/day) | Winter 21/22 w/out STL Pipeline and Lange (Dth/day) |
|---|---|---|---|
| Enable MRT | 550,779 | 472,979[1] | 472,979[1] |
| Mogas Pipeline | 145,600 | 62,800[2] | 62,800[2] |
| Southern Star Central | 30,300 | 30,300 | 30,300 |
| Spire STL Pipeline | 189,400[3] | 0 | 0 |
| Spire MO Underground Storage | 357,000 | 357,000[4] | 0[4] |
| **Total** | **1,273,079** | **923,079** | **566,079** |

[1] *Assumes the following (reflecting current Spire Missouri primary contract rights): (1) 7,800 Dth/day of the 550,779 Dth/day now becomes upstream capacity utilized to feed MoGas and (2) 70,000 Dth/d of capacity from STL Pipeline is no longer available to feed a southbound contract on MRT in the market area.*

[2] *Assumes the historical contract capacity Spire Missouri held pre-STL Pipeline given the STL Pipeline interconnect will no longer be available.*

[3] *Spire Missouri's total contract with Spire STL Pipeline is 350,000 Dth/d, of which 189,400 is delivered into Spire Missouri's system directly, 90,600 Dth/d of which is delivered into MoGas, and 70,000 of which is delivered into MRT, and MoGas and MRT then deliver those volumes into Spire Missouri's system.*

[4] *Spire Missouri's on-system underground storage is a finite resource. As Spire Missouri's underground storage is depleted, our ability to withdraw at max rates—357,000 Dth/d—and support peak loads will also decline. STL is currently the sole source of supply for winter re-injections and annual summer storage refill. Without access to STL Pipeline, the Company may not be able to sustain the max withdrawal rate long term, eliminating the city gate capacity represented by underground storage.*

14.     Table 1 shows a shortfall of 350,000 Dth/day in the absence of STL Pipeline's deliveries, and a shortfall of up to 707,000 Dth/day once Spire Missouri's Lange storage facility is depleted.

**Loss of STL Pipeline Would Cause Severe Harm, and Potentially Loss of Life**

15.     Without STL Pipeline's firm, high-pressure deliveries into its distribution system, Spire Missouri would face significant shortfalls of the natural gas needed to serve its customers during the winter season. Winter weather increases demand, and it does so during a period when natural gas is critically needed by households, businesses, hospitals, nursing homes, schools, and other consumers to provide space and water heat.

16.     If STL Pipeline is not in service during the upcoming winter heating season, depending on availability of natural gas from the Lange storage facility, and using Spire Missouri's current primary contract rights and currently available supplies, approximately 175,000-400,000 homes and businesses may be without gas service for periods of time, based on Spire Missouri's extreme cold weather planning scenarios.

17.     Spire Missouri undertakes a planning process, consistent with industry standards and audited by the Missouri Public Service Commission, to estimate its planned peak day (*i.e.*, peak customer demand) during the winter heating season, so it may determine how that demand will be met. For these planning purposes,

Spire Missouri uses hydraulic modeling software to simulate its natural gas distribution system; this software is widely used in the industry, and this modeling process is used by Spire Missouri in the regular course of business to model customer demand and thereby determine the natural gas supply necessary to serve its customers. Spire Missouri has used this same software and modeling process to arrive at the projections set forth in this section and preceding sections of this Declaration. Based on its planning estimates, Spire Missouri would require nearly 1,300,000 Dth/day of capacity for a planned peak day.

18. Without STL Pipeline's 350,000 Dth/day of supply, using Spire Missouri's current primary contract rights and currently available supplies, it estimates that as many as 175,000 households and businesses, or 27% of Spire Missouri's customers, could be without gas service on a planned peak day assuming natural gas in the Lange storage faciltity is still available.

19. A large portion of Spire Missouri's peak day is served by natural gas in the Lange storage facility, which as discussed above Spire Missouri must replenish following withdrawals during the winter months (*i.e*., Spire Missouri may withdraw large volumes to meet winter cold spells, but must refill the storage field to maintain sufficient inventory). Without supply from STL Pipeline, the Lange storage facility could be depleted much earlier in the winter than normal, and therefore the inability to replenish the Lange storage facility during the winter

months will be even more impactful.  Once the inventory in the Lange storage

facility is fully depleted, and without the ability to replenish it through the STL

Pipeline, as many as 400,000 households and businesses, or close to 62% of Spire

Missouri's customers, could be without gas service on a planned peak day using

Spire Missouri's current primary contract rights and currently available supplies.

20.     After Spire Missouri maximizes its available supplies and issues

curtailment orders to minimize use of natural gas by non-essential end users, our

modeling indicates that, based on current primary contract rights and currently

available supplies, customers could begin to lose service due to uncontrolled

pressure loss at an average daily temperature of approximately 9 degrees

Fahrenheit without natural gas supply from STL Pipeline, as explained further

below.  These temperatures are not atypical for St. Louis.  Spire Missouri has

experienced days with average daily temperatures at or below 9 degrees Fahrenheit

during four of the last five winters, according to data from National Oceanic

Atmospheric Administration's (NOAA) National Climatic Data Center converted

to a "gas day average" (9 a.m. to 9 a.m.).

21.     This temperature threshold for potential loss of service to customers

increases to approximately 38 degrees Fahrenheit once the natural gas in the Lange

storage facility is depleted.  Finally, it is important to note that these temperatures

are well above the temperature of -10.6 degrees Fahrenheit, which is the "peak day

temperature" Spire Missouri currently uses for planning purposes consistent with industry standards and the oversight exercised by the Missouri Public Service Commission.[7]

22.    The geographical impact of such gas supply outages is illustrated broadly in the map attached as Appendix A, which is entitled "Missouri East Projected Outages" ("Outage Map").  The Outage Map is based on two scenarios.

Scenario 1:

Estimated outages on a peak day without STL Pipeline, using Spire Missouri's current primary contract rights and currently available supplies (yellow polygon region).  This is the area that Spire Missouri expects to have insufficient pressure to provide natural gas service should the following occur (the total expected outages in this scenario is as many as 175,000 homes and businesses):

a.    STL Pipeline is no longer in service.

---

[7]    The -10.6 degrees Fahrenheit peak day average temperature is based on the coldest historical gas day average temperature experienced in the St. Louis area in recent decades, which was December 24th, 1983.  A gas day is measured between 9 a.m. and 9 a.m. the next calendar day.  This figure differs from the prior peak day temperature that Spire Missouri previously referenced in the FERC certificate proceeding of -8 degrees Fahrenheit because the prior -8 degrees Fahrenheit level resulted from the use of a coldest past average calendar day temperature (12:00 a.m. to midnight).

     b.     St. Louis experiences its peak planning scenario, with an average daily gas day temperature of -10.6 degrees Fahrenheit.

Scenario 2:

Estimated outages on a peak day without STL Pipeline, using Spire Missouri's current primary contract rights and currently available supplies, and also without inventory from the Lange storage facility (yellow and red polygon regions). This is the area that Spire Missouri expects to have insufficient pressure to provide natural gas service should the following occur (the total expected outages in this scenario is as many as 400,000 homes and businesses):

     a.     STL Pipeline is no longer in service.

     b.     Spire Missouri depletes its Lange storage facility.

     c.     St. Louis experiences its peak planning scenario, with an average daily gas day temperature of -10.6 degrees Fahrenheit.

These projections have both been generated using the modeling system that is used by Spire's system planning department in the regular course of business, as described above, and both scenarios assume peak conditions. It is important to note, however, that customer outages can occur at temperatures well above our peak planning temperature of -10.6 degrees Fahrenheit, as I referenced earlier in this Declaration.

23.     The practical disruptive impacts of a loss of natural gas service would be dire.  In the event of a mass outage, customers will remain without heat, hot water, and the ability to cook for a prolonged period of time due to the time and complexity required to reestablish service.  Loss of heat during extreme cold weather sometimes results in death.

24.     Loss of natural gas service is considerably more difficult to restore, and is more hazardous, than the more familiar loss of electric service.  Missouri state pipeline safety regulations,[8] company operating standards, and sound safety practices require that, to restore natural gas service, a utility technician must visit each impacted home or business to physically shut-off the meter prior to re-establishment of gas into the system.  When gas flow is re-established to the company's facilities, a utility technician must then return later to physically turn-on the meter for the customer, purge the customer's fuel lines of any air, complete a shut-in pressure test, and re-light all gas appliances.

25.     Moreover, natural gas outages caused by uncontrolled pressure loss present an even more dangerous scenario.  When pressure is lost to a customer's premise, the lack of flowing gas can extinguish gas appliance pilot lights.  If pressure is restored prior to the customer's meter being physically shut-off, there is

---

[8]     *See* Mo. Code Regs. tit. 20 § 4240-40.030(12)(S)1.A.

a risk of explosion created by uncontrolled gas escaping into customer homes through the unlit gas appliance pilot orifice.

26.     Even under a controlled curtailment scenario, mass restoration of natural gas service is a formidable challenge.  Depending on the size of the outage and the resources available to restore service, Spire Missouri's customers could be subjected to prolonged service disruptions.  It is important to note that gas flow typically cannot be re-established until after the cold weather subsides and overall demand on the system decreases, potentially leaving customers without service for an even longer period of time during extreme and sustained cold weather.

27.     As discussed in more detail below, the widespread impact of a mass outage during the winter could therefore result in loss of life and property similar to, or even worse than, that seen in Texas during Winter Storm Uri in February 2021.

28.     In addition to loss of service to households, in the above scenarios, gas service could be lost to more than 320 schools and nearly 20 hospitals, as well as nursing homes, churches and government facilities.  The brunt of the loss of service will be felt by the communities who can least afford it.

**Winter Storm Uri, in January 2021, Demonstrates Both the Need for STL Pipeline and the Potential Disruptive Impacts of Losing Its Supplies**

29.     Confirmation of STL Pipeline's value in meeting St. Louis's energy needs is provided by the experience of Spire Missouri during Winter Storm Uri in February 2021.  Without STL Pipeline, Spire Missouri's customers would have likely experienced gas service outages and far higher costs.

30.     Spire Missouri estimates that without STL Pipeline, up to 133,000 homes and business would have been without gas service as a result of Winter Storm Uri.  (This estimate is derived by comparing the demand actually experienced during that period with the supply that would have been available using current primary contract rights without STL Pipeline.)  Alternatively, Spire Missouri estimates that its customers overall could have experienced a combined increased gas cost of up to $300 million (assuming Spire Missouri would have been able to serve all of its customers), as discussed further below.

31.     Spire Missouri's ability to avoid that disastrous outcome was a direct result of STL Pipeline's access to alternative supplies other than Spire Missouri's traditional supply basins.  During Winter Storm Uri, natural gas production in the U.S. declined by roughly 25%,[9] mostly driven by declines in Oklahoma, Texas,

---

[9]     *Natural Gas Weekly Update*, U.S. Energy Info. Admin. (Feb. 18, 2021), https://www.eia.gov/naturalgas/weekly/archivenew_ngwu/2021/02_18/ ("In the wake of record-low temperatures affecting most of the country, dry natural gas production in the United States fell by 21.0 billion cubic feet per day (Bcf/d),

and Louisiana.  In contrast, STL Pipeline derives its supply from production in the Rockies and Appalachian Basins, which saw little to no impact during same period.  As a result, Spire Missouri was able to provide reliable service to its customers during this weather event.

32.     Without STL Pipeline, and based on current primary contract rights and supplies available during that period, Spire Missouri expects that customers would have lost gas service on eight of the nine days from February 11, 2021 to February 19, 2021, with a peak of roughly 133,000 homes and businesses without service on February 15, 2021.  The average daily temperature on this day was 2 degrees Fahrenheit, which is approximately 13 degrees Fahrenheit warmer than Spire Missouri's planned peak day of -10.6 degrees Fahrenheit.

33.     Spire Missouri customers could have realized up to an estimated $300 million in gas cost savings over the course of nine days during Winter Storm Uri because STL Pipeline delivered gas supply sourced from the Rockies and Appalachian Basins, instead of gas from the significantly higher-priced Midcontinent producing basins, around Texas and Oklahoma, that suffered from major operational impediments due to the Winter Storm Uri extreme weather. These price differentials are illustrated in Appendix B, which reflects daily

---

declining from 90.7 Bcf/d on February 8 to about 69.7 Bcf/d on February 17, according to data from IHS Markit.").

published index prices from Platts Gas Daily during the period of February 16-18, 2021.  The map shows the extremely high prices that were experienced in the Midcontinent region around Texas and Oklahoma (red circle) relative to those experienced from trading points that had access to the Appalachian Basins (green circle).

34.     Winter Storm Uri provides concrete historical evidence of the supply security and cost benefits that STL Pipeline provides by allowing Spire Missouri to maintain a portfolio consisting of diverse supplies of natural gas.  Those benefits would be lost if STL Pipeline were forced to cease operations.

**Spire Missouri Cannot Re-Establish the Supply Sources that STL Pipeline Replaced This Winter**

35.     As discussed above, Spire Missouri faces a high risk of significant loss of natural gas service to large areas of its service territory if STL Pipeline ceases operation, because of changes to its supply portfolio, system, and operations leading up to, and since, STL Pipeline commenced service.  Specifically, those changes were: (1) allowing contracts on MRT and upstream pipelines to expire; (2) retiring the obsolete propane peaking facilities; (3) relying on high pressure supply from STL Pipeline at the Lange storage facility ; and (4) foregoing system reinforcements for service to the western and southwestern areas because of the new supplies by STL Pipeline.

36.     None of those steps can be reversed, and none of these sources of gas can be accessed before the upcoming winter season or beyond, as is explained in more detail below.

37.     **MRT is not available to replace the STL Pipeline supply.**  As noted above, Spire Missouri allowed 180,000 Dth/day of firm transportation contract rights on MRT to expire, as well as the nearly 170,000 Dth/day of firm upstream contracts that fed its MRT East Line capacity via NGPL and Trunkline.  These quantities of firm entitlements may no longer be available, for several reasons.

38.     Other shippers have subsequently contracted for the pipeline capacity that Spire Missouri allowed to expire on those pipelines.  For example, MRT has capacity available on two distinct segments, its Main Line and its East Line, but neither can adequately replace STL Pipeline for the 2021-2022 heating season, as explained in the next two paragraphs.

39.     MRT has told Spire Missouri that it now only has 568 Dth/day of capacity available on MRT's Main Line, a negligible quantity compared to the 350,000 Dth/day contracted on STL Pipeline.

40.     According to MRT's electronic bulletin board (the generic name for MRT's FERC-mandated posting of pipeline and electric transmission information), MRT has 135,548 Dth/d available on the MRT East Line for this winter (MRT personnel have indicated via email that there is up to 181,402 Dth/d available on

the East Line).  But MRT's delivery point facilities at Chain of Rocks have been removed by MRT, and replaced with STL Pipeline facilities as contemplated in the FERC certificate proceeding, so this capacity is not a viable option for Spire Missouri to use in place of STL Pipeline.  In addition to the delivery point being out of service, due to the changing flow dynamics associated with the Appalachian Basins gas flowing south to the Gulf Coast area, upstream flows have not been reliable into the MRT East Line at the pressures MRT would need to deliver gas to the Spire Missouri service territory.

41.     At present, any MRT East Line deliveries must be made through STL Pipeline to get into this area of Spire Missouri's distribution system.[10]  The facilities that would be needed to reconnect MRT directly with Spire Missouri's distribution system cannot be constructed in time for the upcoming 2021-2022 winter season, and would lack the higher pressures that STL Pipeline provides, which would be crippling for Spire Missouri's operations.  Moreover, even if the MRT East Line were to be re-connected to Spire Missouri's system at some point in the future, upstream pipeline deliveries into the MRT East Line have had

---

[10]     Assuming certain contractual changes were to be made, approximately 80,000 Dth/d could be sourced on the MRT East Line and delivered to Spire Missouri delivery points south of Chain of Rocks; however, these deliveries would be made to different areas of the Spire Missouri distribution system.

significant pressure reliability problems for years, making them an unreliable and consequently unacceptable supply source to serve customers when they need it the most, as noted in marketer filings in the temporary emergency FERC docket.[11] Spire Missouri knows that firm shippers experienced interruptions of service on their MRT East Line volumes during Winter Storm Uri. While MRT was able to deliver quantities actually received from upstream pipelines on its MRT East Line, interruptions occurred due to the inability of MRT to receive all scheduled gas from the upstream pipelines, thus leaving shippers with deliveries less than their nominated quantities. Spire Missouri is exploring availability on upstream pipelines, NGPL and Trunkline, to feed into the MRT East Line. However, both of these pipelines have refused Spire Missouri's requests for guarantees that they can deliver gas at adequate pressure levels. Trunkline announced on September 3, 2021 that it is developing a project to address these pressure issues, but nonetheless, continues to refuse to provide firm delivery pressure commitments. As such, even assuming the Trunkline project were to be placed in service by this winter, Spire Missouri remains concerned, given the past performance issues, relying on deliveries on the MRT East Line. Finally, even if—contrary to fact— Spire Missouri could access the MRT East Line capacity at Chain of Rocks, and

---

[11] Motion to Intervene and Comments in Support of Symmetry Energy Solutions, LLC, filed August 23, 2021, at pp. 4-5, FERC Docket No. CP17-40-007.

contract for the 181,402 Dth/d this winter, it would be far from adequate to meet the overall shortfall that Spire Missouri faces this winter since Spire STL can deliver up to 350,000 this winter.

42. **The propane peaking facilities are no longer available.** Spire Missouri's previously operated propane injection facilities also currently cannot be used to meet planned peak day demand this winter season. The propane injection facilities were designed, at two locations, to deliver 160,000 Dth/d of supply (80,000 Dth/d per location) on a planned peak day, but were decommissioned as planned after the STL Pipeline went into service. The injection facilities have been disconnected from the propane supply pipeline or the vaporizers have been repurposed. Physically reassembling these facilities at both locations cannot be done before the 2021-2022 winter season.[12] Additionally, Spire Missouri made a strategic decision to no longer rely on propane in the future to meet customer demand. There are many reasons for this, but in particular, vaporizing propane is more complicated and introduces more risk than flowing natural gas supply; it introduces higher Btu content to the system, requiring Spire Missouri to notify large industrial customers prior to propane injection as higher percentages of

---

[12] Spire Missouri is exploring options to determine if there is any way work can be performed at one of the locations to allow it to operate this winter, but it still remains uncertain whether this is possible.

propane can damage equipment; and to the best of Spire Missouri's knowledge, the Spire Missouri system was the only system of its kind in the U.S., and therefore the specialized knowledge and expertise needed to maintain and operate the facility presented a long-term risk. Finally, Spire Missouri may no longer retain assured access to propane supply even if, contrary to fact, Spire Missouri could rebuild and reconnect its facilities, because it terminated its propane contract following the commencement of STL Pipeline service.

43. **The high-pressure supply from STL Pipeline cannot be replaced for injection into the Lange storage facility.** As noted above, the operations of the Lange storage facility changed with the advent of STL Pipeline, to capture the benefits of receiving direct injections from the STL Pipeline's higher-pressure supply. Any resumption of service from MRT (which is purely hypothetical because there is no longer an MRT delivery location other than STL Pipeline at Chain of Rocks) would still leave Spire Missouri without a high pressure supply for direct injection into the field.

44. **Reinforcements to the Spire Missouri distribution system cannot be completed in time to allow continued adequate service to the western and southwestern service areas that have relied on the new supplies from STL Pipeline**. As noted above, STL Pipeline's service allowed Spire Missouri to forego certain reinforcements on its own system in order to serve demand in the

west and southwest areas of its eastern Missouri service territory. Instead, the greatly improved pressure on MoGas due to its interconnection with STL Pipeline[13] has rendered these reinforcements currently unnecessary. As I mentioned before, to construct these reinforcements would take years, making that option unavailable for the 2021-2022 heating season, and beyond.

45. In sum, even if Spire Missouri were to attempt to replace STL Pipeline with the pre-existing alternatives, which would involve numerous risks and costs even if completed, it cannot do so in time for the upcoming 2021-2022 heating season.

### Conclusion: Continued Operation of STL Pipeline Remains Essential to Continued Service by Spire Missouri to its Customers

46. Spire Missouri is attempting to make contingency plans to ensure customers have continued access to reliable gas supply in the event STL Pipeline is taken out of service, including discussions with Enable MRT (and related upstream pipelines), MoGas and Southern Star Central regarding available capacity. But there currently is no viable alternative to replace the energy supply delivered by STL Pipeline to ensure reliable service to customers, and no such alternative is

---

13      *See supra* n.4.

expected to be available by the 2021-2022 winter, making it imperative to avoid a shutdown.

47.     For the reasons discussed above in detail, if STL Pipeline ceases service, Spire Missouri does not have sufficient natural gas supply to meet the anticipated demands of the St. Louis region during the upcoming winter season, and faces the prospect of major losses in natural gas service during cold weather events, with attendant hardships to the residents of eastern Missouri including a significant potential for loss of life.

48.     For all of the foregoing reasons, it is critically important that STL Pipeline continue its current operations for the upcoming 2021-22 winter heating season.

49.     I declare under penalty of perjury that the foregoing is true and correct.  Executed on September 13, 2021.

_____
Scott Carter



# Spire Missouri East Projected Outages

## Appendix A

STL to MoGas

MRT to MoGas

UGS

STL Lange

STL Chain of Rocks

Wentzville

Algana

Southpoint

Ivory

**Scenario 1:**

Estimated outages on a peak day without STL Pipeline (yellow polygon region): This is the area that Spire Missouri expects to have insufficient pressure to provide natural gas service should the following occur: (the total expected outages in this scenario is as many as 175,000 customers)

   a.   STL Pipeline is no longer in service.
   b.   St. Louis experiences its peak planning scenario, with an average daily gas day temperature of -10.6º F.

**Scenario 2:**

Estimated outages on a peak day without Lange underground storage and STL Pipeline (red and yellow polygon regions): This is the area that Spire Missouri expects to have insufficient pressure to provide natural gas service should the following occur: (the total expected outages in this scenario is as many as 400,000 customers)

   a.   Spire Missouri depletes its Lange underground storage facility.
   b.   STL Pipeline is no longer in service.
   c.   St. Louis experiences its peak planning scenario, with an average daily gas day temperature of -10.6º F.

Both scenarios were run in an industry-leading hydraulic model maintained by Spire's system planning department, and both scenarios assume peak conditions. It is important to note, however, that customer outages can occur at temperatures well above our peak planning temperature of -10.6º F.

### Legend

▲ *UGS*

◎ *Interconnect*

◎ *City Gates*

━━ *Supply Feeder*

━ *Distribution*

⬛ *Outages on Peak Day*

⬛ *Outages on Peak Day w/o UGS*

*Interstate Pipelines*
*Company*

━━ *Enable MRT*

━━ *MoGas Pipeline*

━━ *Southern Star Central*

━━ *Spire STL Pipeline*



REX - Z3:
$65.60

TETCO:
$14.57

SSC:
$622.79

PEPL - OK:
$224.56

OGT-OK:
$1,193.15

EGT-East:
$428.64

Appendix B

Prices shown in $/MMBtu

300 km
200 mi
N